

**One Tower Square**
**Hartford, CT 06183**

## Toll-Free ERISA HelpLine

As part of the services provided through Risk Management PLUS+ Online®, Travelers Bond & Specialty Insurance is pleased to provide its Fiduciary Liability policyholders with access to the ERISA HelpLine, a toll-free hotline designed for quick, practical guidance on day-to-day workplace issues.

To utilize the HelpLine, call **1-888-401KLAW (1-888-401-5529).**

Through the ERISA HelpLine, policyholders are eligible to receive up to one hour of consultation with an ERISA attorney from the law firm of Morgan Lewis at no charge. Morgan Lewis is a global law firm with a national ERISA practice and more than 1,400 lawyers in 22 offices throughout the world.

The ERISA HelpLine is designed to provide general guidance on issues relating to employee benefits and ERISA law. From reviewing issues related to contingent workers to questions about HIPAA, attorneys from Morgan Lewis are there to help you. The ERISA HelpLine is available toll-free from anywhere in the United States.

We encourage policyholders to take advantage of this no-cost hotline. For more information about the hotline, go to  www.rmplusonline.com/ERISAHelpLine.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law. Availability of coverage referenced in this document can depend on underwriting qualifications and state regulations.

Travelers Casualty and Surety Company of America,and its property casualty affiliates, 1 Tower Square, Hartford, CT 06183

BlueRidge-00001



**September 25, 2018**

**VIRGINIA COMMUNITY BANKSHARES, INC.**
**114 INDUSTRIAL DRIVE, PO BOX 888**
**LOUISA, VA 23093**

Re: Important Information about **Claims Information Line**

Dear   **VIRGINIA COMMUNITY BANKSHARES, INC.**

Travelers Bond & Specialty Insurance is pleased to announce its **1-800-842-8496** Claims Information Line.  This line is designed to provide insureds with an additional resource on how to report claims or those circumstances or events which may become claims.

Policyholders will be able to obtain assistance on the following topics from the Claims Information Line:

·The information that needs to be included with the claim notice

·The address, electronic mail address and/or facsimile number to which the policyholder can send claims related information

· Get questions on the claim process answered

The Declarations Page of your policy sets forth where you should report claims and claims related information.  You should also review the policy's reporting requirements to be aware of how much time you have to report a claim to Travelers.  The sooner Travelers is notified, the sooner we can become involved in the process and offer assistance to our policyholder.  A delay in reporting may result in all or part of a matter to fall outside of the coverage provided.

The Claims Information Line should streamline the claim reporting process and allow policyholders to ask questions on what information is needed as well as other questions which will assist them in working with Travelers.  While the Claims Information Line provides policyholders a valuable resource by answering questions and providing information, the line does not replace the reporting requirements contained in the Policy.

We hope this improvement to customer service is something our policyholders will find helps them understand the claim process and provides them a resource for reporting.


Best regards,
**Gregory P Jabs**

LTR-4035 Ed. 06-09  Printed in U.S.A.                                                      Page 1 of 1
©2009 The Travelers Companies, Inc. All Rights Reserved

BlueRidge-00002



**One Tower Square**
**Hartford, CT 06183**

## Employment Practices Liability Hotline

As part of the services provided through Risk Management PLUS+ Online ®, Travelers Bond & Specialty Insurance is pleased to provide its Employment Practices Liability policyholders with unlimited access to a toll-free hotline designed to provide quick, practical guidance on day-to-day workplace issues.

To utilize the hotline, call **1-866-EPL-TRAV (1-866-375-8728)**.

Through this hotline, policyholders are eligible to receive free general guidance from the national employment law firm of Jackson Lewis, LLP. The hotline is available toll-free from anywhere in the United States.

We have developed this program in conjunction with Jackson Lewis LLP, one of the largest law firms in the country, exclusively dedicated to representing management on workplace issues. With more than 650 attorneys, in 46 offices countrywide, the firm has both a recognized expertise in workplace-related issues and a sensitivity to regional business environments.

From reviewing the proper steps for a sexual harassment investigation to discussing general factors to consider before you make day-to-day employment decisions, the firm's attorneys are available to assist policyholders in managing their workplace risk and minimizing employment related claims. As part of this program, policyholders are also eligible to receive a 10 percent discount on Jackson Lewis' regular fees for matters beyond the scope of the hotline, such as those dealing with specific employees or areas not within the scope of their policy. Similarly, the hotline cannot be used to report a claim regardless of any disclosure made to Jackson Lewis.

We encourage policyholders to take advantage of this no-cost hotline.  For more information about the hotline, go to www.rmplusonline.com/EPLhotline.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy and bond provisions, and any applicable law. Availability of coverage referenced in this document can depend on underwriting qualifications and state regulations.

Travelers Casualty and Surety Company of America, One Tower Square, Hartford, CT 06183





# CyberRisk Policyholder Benefits

Thank you for choosing Travelers for your cyber insurance needs. As our insured, Travelers provides you with innovative value-added pre and post breach risk management services at **no additional cost** to help you protect your business. These current benefits include:

**Travelers *eRisk Hub*®:**

Access to a private web-based portal containing information and technical resources that can assist you in the prevention of network, cyber and privacy events and support you in a timely response if an incident occurs. Travelers *eRisk Hub* portal powered by *NetDiligence*® features news, content and services from leading practitioners in risk management, computer forensics, forensic accounting, crisis communications, legal counsel, and other highly-specialized segments of cyber risk.

**To register for Travelers *eRisk Hub*:**

1. **Go to www.eriskhub.com/travelerscyber**
2. **Complete the registration form. Your Access Code is 13881-197**
3. **Once registered, you can access the portal immediately.**

**Please note the following:**

· Travelers *eRisk Hub* is a private site provided to certain cyber insureds of Travelers. Please do not share portal access instructions with anyone outside your organization. You are responsible for maintaining the confidentiality of the Access Code provided.

· Travelers *eRisk Hub* contains a directory of experienced providers of cyber risk management and breach recovery services. Travelers does not endorse these companies or their respective services. Before you engage any of these companies, we urge you to conduct your own due diligence to ensure the companies and their services meet your needs Unless otherwise indicated or approved, payment for services provided by these companies is your responsibility.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that  coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law.

© 2017 The Travelers Indemnity Company. All rights reserved. LTR-19027 Rev. 04-17

# CyberRisk Policyholder Benefits

**Travelers Cyber Coaches –**

Three cybersecurity coach services are available to help your organization extend your team with expert guidance at no additional cost, as follows:

- **Breach Coach® –**
  Should you experience a data breach event, you may choose to call the Breach Coach listed in the Travelers *eRisk Hub* portal for immediate triage assistance. Your initial consultation of up to one half-hour is at no additional charge. Please be aware that the Breach Coach service is provided by a third-party law firm. Therefore,contacting the Breach Coach does NOT satisfy the claim or first-party notification requirements of your policy.

- **HIPAA Coach –**
  To help your organization identify the cyber related issues HIPAA raises and help minimize potential exposures, you are entitled to consult with a HIPAA Coach listed in the Travelers *eRisk Hub* portal for up to one hour.

- **Security Coach –**
  Talk with a Symantec™ security professional about general cybersecurity questions for up to one hour to help strengthen your organizations security posture with actionable advice and insights listed in the Travelers *eRisk Hub* portal.

**Pre-Breach Services provided by Symantec™ :**

Preparation is key in helping to mitigate a potential cyber related event. To assist policyholders achieve a higher level of cybersecurity for their organizations Travelers offers the following pre-breach services from Symantec, a global leader in cybersecurity solutions accessible through the Travelers *eRisk Hub*:

- **Symantec™ Cyber Resilience Readiness Assessment and Cyber Security Professional Consultation –**
  An online assessment designed for an organization to quickly understand their current cybersecurity posture while receiving an official report and up to 1 hour consultation with a Symantec security professional to help in improving areas of weakness or vulnerability.

- **Symantec™ Cyber Security Awareness Training Videos –**
  Gain access to security awareness training videos as a method of defense against cybersecurity threats by promoting proactive employee behavior. These courses can be used to complement your employee training requirements.

- **Symantec™ Service Discounts –**
  Obtain meaningful discounts on Symantec products and services including Managed Security Services, Norton for Small Business Software, DeepSight™ Intelligence, Endpoint Encryption, Phishing Readiness and more.

- **Risk Management Whitepapers –**
  Topical insights and expertise on current cyber related trends, risks and threats that face organizations in today's business environment. Available quarterly, these resource guides will help with your organization's preparedness when it comes to cyber related events.

Certain services are being provided to you by Symantec and in using them you must agree to Symantec's terms of use & privacy policy. Travelers Casualty and Surety Company of America and its property casualty affiliates ("Travelers") makes no warranty, guarantee, or representation as to the accuracy or sufficiency of any such services. The use of the services and the implementation of any product or practices suggested by Symantec or NetDiligence is at your sole discretion. Travelers disclaims all warranties, express or implied. In no event will Travelers be liable in contract or in tort for any loss arising out of the use of the services or Symantec's or any other vendor's products. eRisk Hub and Breach Coach are registered trademarks of NetDiligence.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that  coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law.



**One Tower Square**
**Hartford, CT 06183**

09/25/2018
VIRGINIA COMMUNITY BANKSHARES, INC.

114 INDUSTRIAL DRIVE, PO BOX 888
LOUISA, VA 23093

**RE: Risk Management PLUS+ Online ® from Travelers Bond & Specialty Insurance** (www.rmplusonline.com)

As a Travelers Bond & Specialty Insured you receive risk management services, at no cost, to help protect you and your business.

Risk Management PLUS+ Online, is a robust website to assist you in the mitigation of risk relative to employment practices, directors and officers, fiduciary liability, cyber, crime, kidnap & ransom, and identity fraud exposures.

Highlights of Risk Management PLUS+ Online include:
 · Thousands of articles on a variety of risk management topics
 · Topical webinars and podcasts on current issues
 · Checklists to assist in managing risk
 · Web based training
 · Model Employee Handbook, including policies and forms for downloading or printing that reduce risks in the workplace.

The following Risk Management PLUS+ Online Registration Instructions contain easy, step-by-step instructions to register for this valuable tool. For more information, call 1-888-712-7667 and ask for your Risk Management PLUS+ Online representative. It's that simple.

Thank you for choosing Travelers Bond & Specialty Insurance for your insurance needs. Travelers is a market leader in providing management liability and crime coverages that are specifically customized for your organization.

Instructions for Registration & Orientation to Risk Management PLUS+ Online®

*Registration for Site Administrators:*
The Site Administrator is the person in your organization who will oversee Risk Management PLUS+ Online for the organization. The Site Administrator is typically a person who leads human resources and/or financial functions or is responsible for legal matters pertaining to personnel. The Site Administrator may add other Site Administrators later to assist with their responsibilities. To register:

1. Go to www.rmplusonline.com.
2. In the Sign-In box, click **Register**.
3. Enter the password/passcode: <TRVP300100 for Insurance Companies> <TRVP300400 for Banks and Diversified> <TRVP300300 for Asset Management>
4. Fill in the Registration Information and click **Submit**.
5. Your organization is registered, and you are registered as Site Administrator.

*Learning to Navigate the Site:*
1. Go to www.rmplusonline.com. On each page, you will see a box outlined in blue that contains the instructions for use of that page.
2. If you have any questions, just click on **Contact Us** on the front page. Enter your question in the form provided, and the System Administrator will get back to you quickly with the answer.
3. You can also schedule a live walk-through of the site by sending a request for a walk-through via the contact link on the front page.

LTR-4107 Rev. 06-18
© 2018 The Travelers Indemnity Company. All rights reserved.

## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND
## BROKER COMPENSATION

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html

If you prefer, you can call the following toll-free number: 1-866-904-8348. Or you can write to us at Travelers, Agency Compensation, One Tower Square, Hartford, CT 06183.

NTC-19036 Ed. 08-15                                                        Page 1 of 1
© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00007

This notice provides no coverage, nor does it change any policy terms. To determine the scope of coverage and the insured's rights and duties under the policy, read the entire policy carefully. For more information about the content of this notice, the insured should contact their agent or broker. If there is any conflict between the policy and this notice, the terms of the policy prevail.

**Privacy Policy Notice**

Thank you for selecting Travelers Casualty and Surety Company of America as your Identity Fraud Expense Reimbursement insurer. At Travelers Casualty and Surety Company of America, a subsidiary of Travelers, we recognize that privacy is important to you. That is why we are committed to protecting your privacy through adoption of the following privacy principles:

**Collection Of Information.**

We collect, retain, and use information about you, or about participants, beneficiaries or claimants under your Identify Fraud Expense Reimbursement coverage, only where we believe that it will help or is necessary to provide you products and services or otherwise conduct our business. We collect nonpublic personal financial information about you, or about participants, beneficiaries or claimants under your Identify Fraud Expense Reimbursement coverage, from the following sources:

1. information we receive from you or through your agent or broker on applications or other forms;
2. information we receive from or about you in the process of adjusting claims;
3. information about your other transactions, including risk control and other consulting services, with us, our affiliates, or other third parties;
4. information about your coverages and loss activity with other carriers; and
5. information we receive from a consumer reporting agency.

Such information includes identifying information such as policyholder, participant, beneficiary, or claimant name, address, and social security number; financial information such as income, payment history, or credit history; and, under certain circumstances, health information such as information about an illness, disability, or injury. It could also include information on claims with other insurance companies and us and the condition and maintenance of your property.

**Disclosure Of Information.**

We usually do not disclose nonpublic personal information about you, or about participants, beneficiaries or claimants under your Identify Fraud Expense Reimbursement coverage, without your consent. However, in some circumstances we may disclose information to others without your prior authorization. The most common disclosures are to the following persons:

1. our affiliated property and casualty insurance companies;
2. state insurance departments, for their regulation of our business;
3. other government authorities;
4. our agents and brokers as necessary to conduct our business;
5. organizations that perform underwriting and claims investigations;
6. another insurance company to which you have applied for a policy or submitted a claim;
7. insurance support agencies, law enforcement agencies, and our reinsurers; and
8. any other third party, as permitted or required by law.

**Confidentiality And Security.**

We restrict access to nonpublic personal information about you, or about participants, beneficiaries or claimants under your Identify Fraud Expense Reimbursement coverage, to those who need it to serve your insurance needs and to maintain and improve customer service. We maintain physical, electronic, and procedural safeguards that comply with federal and state laws and regulations to guard your nonpublic personal information.

**Disclosure And Protection Of Former Customers' Information.**

We may disclose all the personal information we have collected, as described above. However, even if you no longer have a customer relationship with us, we will continue to follow our privacy policies and practices to protect your information.

**Most importantly, Travelers Casualty and Surety Company of America does not and will not disclose or sell nonpublic personal information** about you, or about participants, beneficiaries or claimants under your Identify Fraud Expense Reimbursement coverage, **to anyone for marketing purposes**.

© 2018 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00008

**Changes In Privacy Policy.**

We may choose to modify our policy regarding the treatment of personal information at any time. Before we do so, we will notify you and provide an updated privacy notice.

© 2018 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00009

## VIRGINIA POLICYHOLDERS NOTICE - IMPORTANT CONTACT INFORMATION

Should you need to contact anyone about this insurance for any reason, please contact your agent. If you have additional questions you may contact Travelers at:

WASHINGTON, D.C. OFFICE
14048 Parkeast Circle
Chantilly, Virginia 20151
(800) 328-2189

Travelers.com

If you have been unable to contact or obtain satisfaction from Travelers or your agent, you may contact the Virginia State Corporate Commission's Bureau of Insurance at:

Property and Casualty Consumer Outreach
PO Box 1157
Richmond, VA 23218
Toll free:  1-877-310-6560
Richmond, VA area:  804-371-9092

Email:  PCOutreach@scc.virginia.gov

Written correspondence is preferable so that a record of your inquiry is maintained.  When contacting your agent, company or the Bureau of Insurance, have your policy number available.

# VIRGINIA IMPORTANT NOTICE
# ATTENTION VIRGINIA INSUREDS

## EXTENDED REPORTING PERIOD OPTIONS

You have purchased a claims-made liability insurance policy. Please read this policy carefully to understand your coverage. There are certain circumstances in which you must be provided the opportunity to purchase an Extended Reporting Period for reporting claims. These are explained in your policy. If you have any questions regarding the cost of an Extended Reporting Period or the available options under the Extended Reporting Period, please contact your insurance company or your insurance agent.

Standard Extended Reporting Period lengths are three (3), six (6), and twelve (12) months. State laws and regulations regarding minimum Extended Reporting Periods must be followed.

Virginia insureds have additional optional Extended Reporting Period choices: 1) The Virginia insured has the option to purchase any available optional Extended Reporting Period with or without a reinstated limit of liability. 2) One of the available optional Extended Reporting Periods is a two (2) year Extended Reporting Period with or without a reinstated limit of liability.

If you have any questions regarding the cost of an extended reporting period or the available options under the extended reporting period, please contact your insurance agent.

This notice is for information only and does not become a part or condition of the attached document.

BlueRidge-00011



# Identity Fraud Expense Reimbursement Coverage and Identity Fraud Resolution Services

This document is a summary only and is intended to provide important information about the protection available to an Insured Person under the Identity Fraud Expense Reimbursement Policy (the "Policy"). Keep this coverage description for your records. This summary is not an insurance policy and does not amend, extend or alter the coverage afforded by the Policy described herein.

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you, your spouse, qualified domestic partner, children under 18 and parents* with this valuable coverage.

Your Policy Number is:  106420159

Your Coverage Limit is: $25,000

Your Deductible is:       $0

If you are a victim of Identity Fraud, please call Travelers to report your claim: 800.842.8496 or email bfpclaims@travelers.com

The coverage reimburses identity fraud victims for the following:

- ☒ Lost wages as a result of time taken off from work to meet with, or talk to, law enforcement agencies, credit agencies and/or legal counsel, to complete fraud affidavits, or due to wrongful incarceration arising solely from someone having committed a crime in the insured person's name, up to $1,000 per week for five weeks up to the policy limit.

- ☒ Notary and certified mail charges for completing and delivering fraud affidavits.

- ☒ Fees to re-apply for loans that were denied because of erroneous credit information due to the identity fraud.

- ☒ Long distance telephone charges for calling merchants, law enforcement agencies or credit grantors to discuss an actual identity fraud.

- ☒ Attorney fees incurred, with Travelers' prior consent, for:

  - – Defending suits brought incorrectly by merchants or their collection agencies

  - – Removing criminal or civil judgments wrongly entered against the victim

  - – Challenging information in a credit report

  - – Release of medical records in cases of medical identity fraud

  - – Contesting wrongfully incurred tax liability

  - – Contesting the wrongful transfer of ownership of an insured person's tangible property

- ☒ Costs for daycare and eldercare coverage, if that coverage is necessary for an insured person to attend meetings or otherwise have the ability to restore financial health and credit history as a result of identity fraud.

- ☒ Travel and accommodations expense up to $1,000 per week up to five weeks which are incurred in the process of resolving fraud.

- ☒ Expenses and fees for new government issued identification such as passports, drivers license and social security cards.

- ☒ Expense and fees for copies of health records for purpose of investigating medical identity fraud.

*Unless modified by endorsement. Children and Parents must reside in your household in order to qualify for coverage.

## Identity Fraud Resolution Services

Becoming a victim of identity fraud is a frightening, frustrating experience. It can happen to anyone at any time. Our identity fraud specialists can help victims during this difficult time. Not only will we pay for expenses associated with clearing up your credit, but we will also provide you with detailed information on how to fix your credit and resolve other identity fraud issues. Travelers partners with Identity Theft 911 (idt911.com/AboutUs.aspx), whose experienced fraud team works closely with victims to learn about the incident, document the case, advise on case resolution, and support victims by providing written correspondence that will help expedite resolution of their situation. Identity Theft 911 performs the following activities for Travelers Identity Fraud Insureds:

- ⊠ **Proactive Assistance.** Call any time you have a question or concern, whether or not you are or ever have been a victim of identity fraud. Help is available for identity-related risks throughout life, when you are filing your taxes, sending your child off to college, traveling or moving, from the birth of your first child to your retirement.

- ⊠ **Document Replacement Help** when personal documents such as Social Security cards, birth certificates, passports and driver's licenses are lost, stolen or destroyed.

- ⊠ **Personal Access** to an expert fraud specialist at Identity Theft 911 to help stop fraudulent bills and charges, work with government agencies and creditors and set up fraud alerts to help detect a recurrence.

- ⊠ **Step-by-Step Guidance** through the identity resolution process if you are ever a victim of identity fraud. A fraud specialist will provide a victim of identity fraud with the following services:
  - – Unlimited assistance to restore victims' identity, handling the entire notification and documentation process
  - – 3-in-1 credit report to review with the victim
  - – Enrollment in one year of free credit, cyber and fraud monitoring, plus follow-up

- ⊠ **Exclusive Online Educational Resources** providing tips, information and steps to take to avoid becoming a victim of identity theft. To access content exclusive for Travelers insureds, visit **travelers.com/idfraud** to access daily news alerts, topical articles, monthly newsletters and a wealth of proactive tips.

For your first visit to the site enter the following generic username and password:

| |
|---|
| **USERNAME:** Travelers1 |
| **PASSWORD:** Identity2 |

Please be aware Username and Password are case sensitive. Once logged in using the generic username and password, you will be asked to create your very own personal log-in. You will then be able to access exclusive content at any time and at your convenience.



**travelersbond.com**

Travelers Casualty and Surety Company of America and its property casualty affiliates. One Tower Square, Hartford, CT 06183

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law. Availability of coverage referenced in this document can depend on underwriting qualifications and state regulations.

© 2013 The Travelers Indemnity Company. All rights reserved. Travelers and the Travelers Umbrella logo are registered trademarks of The Travelers Indemnity Company in the U.S. and other countries. 59699 Rev. 4-13.

Travelers is pleased to supply this member benefit card template which you may reproduce and distribute.

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**TRAVELERS**

VIRGINIA COMMUNITY BANKSHARES, INC.
has purchased the Identity Fraud Expense Reimbursement policy from Travelers Casualty and Surety Company of America in order to provide you and certain members of your family with this valuable coverage.

Your Policy Number is: 106420159
Your Coverage Limit is: $25,000
Your Deductible is:          $0

If you are a victim of Identity Fraud, please call Travelers to report your claim and begin the Identity Fraud Resolution Process: 1.800.842.8496 or email bfpclaims@travelers.com

To learn more about identity fraud, visit travelers.com/idfraud
Login: Travelers1  Password: Identity2

**CRISIS RESPONSE**
**EMERGENCY CONTACT INFORMATION**

A 24-hour Crisis Line enables you to reach your crisis response firm any time of the day or night and be assured of rapid response to your emergency. While professionals are stationed in various parts of the world to ensure rapid response, all calls for assistance should come to the crisis response firm headquarters:

**Constellis**
**12018 Sunrise Valley Drive**
**Suite 140**
**Reston, VA 20191, USA**

**USA Telephone: +1 713-918-6401**
**UK Telephone: +44 (0)207 240 3237**
**Constellis Email:** info@constellis.com
**Constellis Website:** www.constellis.com

**REPORTING PROCEDURE**

Whenever you call about a kidnap, extortion, detention, or other crisis, please state:

•        That you are calling about an emergency incident
•        Your name and company
•        The time and date of your call
•        The phone number(s) where you can be reached
•        A concise description of the problem.

© 2018 The Travelers Indemnity Company. All rights reserved.
BlueRidge-00015



*SelectOne*✛®
for Community Banks

*Declarations*

| POLICY NO. | 106420159 |
|---|---|

**Travelers Casualty and Surety Company of America**
**One Tower Square**
**Hartford, Connecticut 06183**
(A Stock Insurance Company, herein called the Company)

**LIABILITY COVERAGES, SEPARATE LIABILITY COVERAGES, AND THIRD PARTY LIABILITY INSURING AGREEMENTS ARE WRITTEN ON A CLAIMS-MADE BASIS AND COVER ONLY CLAIMS MADE AGAINST INSUREDS DURING THE POLICY PERIOD.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.**

---

**ITEM 1**   **NAMED INSURED/INSURANCE REPRESENTATIVE:**

VIRGINIA COMMUNITY BANKSHARES, INC.

D/B/A:

Principal Address:
114 INDUSTRIAL DRIVE, PO BOX 888
LOUISA, VA 23093

---

**ITEM 2**   **POLICY PERIOD:**

Inception Date: September 30, 2018          Expiration Date: September 30, 2019
12:01 A.M. local time both dates at the Principal Address stated in ITEM 1.

---

**ITEM 3**   **ADDRESS INFORMATION FOR NOTICES TO COMPANY:**

Email: BSIclaims@travelers.com
Fax: (888) 460-6622

Mail: Travelers Bond & Specialty Insurance Claim
        385 Washington St. – Mail Code 9275-NB03F
        St Paul, MN  55102

---

**ITEM 4**   **COVERAGES INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**

**Liability Coverages** (subject to LIA-3001 Terms & Conditions)

        Employment Practices Liability

---

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00016

Fiduciary Liability

Financial Institution Professional Liability

**Separate Liability Coverages**

Directors, Officers, and Organization Liability

**Crime Coverages**

Kidnap and Ransom

**Bond Coverage**

Financial Institution Bond with Extended Coverages

**Cyber Coverage**

CyberRisk

**Other Coverage**

Identity Fraud Expense Reimbursement

---

**ITEM 5**

**LIABILITY COVERAGES** (subject to LIA-3001)

| **EMPLOYMENT PRACTICES LIABILITY** |
|---|

**Limit of Liability:** $2,000,000 for all **Claims**

**Third Party Claim Coverage:** ☒ Applicable ☐ Not Applicable

**Additional Defense Coverage:** ☐ Applicable ☒ Not Applicable

**Additional Defense Limit of Liability:** Not Covered for all **Claims**

**Retention:** $25,000 for each **Claim** under Insuring Agreement A.
$25,000 for each **Claim** under Insuring Agreement B., if applicable

**Prior and Pending Proceeding Date:** **Claims** for **Wrongful Employment Practices**: January 01, 2013
**Claims** for **Third Party Wrongful Acts**: January 01, 2013

**Continuity Date:** **Claims** for **Wrongful Employment Practices**: January 01, 2013
**Claims** for **Third Party Wrongful Acts**: January 01, 2013

| **FIDUCIARY LIABILITY** |
|---|

**Limit of Liability:** $2,000,000 for all **Claims**

**Settlement Program Limit of Liability:** $100,000 for each **Settlement Program Notice**, which amount is included within, and not in addition to, any applicable limit of liability

---

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00017

| | | |
|---|---|---|
| **HIPAA Limit of Liability:** | $100,000 | which amount is included within, and not in addition to, any applicable limit of liability |
| **Additional Defense Coverage:** | ☐ Applicable | ☒ Not Applicable |
| **Additional Defense Limit of Liability:** | Not Covered | for all **Claims** |
| **Retention:** | $75,000<br>$0 | for each **Claim** under Insuring Agreement A.<br>for each **Settlement Program Notice** under Insuring Agreement B. |
| **Prior and Pending Proceeding Date:** | January 01, 2013 | |
| **Continuity Date:** | January 01, 2013 | |

---

### FINANCIAL INSTITUTION PROFESSIONAL LIABILITY

| | | |
|---|---|---|
| **Financial Institution Professional Liability Aggregate Limit of Liability:** | $2,000,000 | for all **Claims** |
| **Insuring Agreement A<br>Lender Liability Coverage<br>Limit of Liability:** | $2,000,000 | for all **Claims** |
| **Insuring Agreement B<br>Professional Services Liability Coverage<br>Limit of Liability:** | $2,000,000 | for all **Claims** |
| **Insuring Agreement C<br>Trust Services Liability Coverage<br>Limit of Liability:** | Not Covered | for all **Claims** |

The Financial Institution Professional Liability Aggregate Limit of Liability is applicable to all Insuring Agreements of this **Liability Coverage**. The Limits of Liability for Lender Liability Coverage, Professional Services Liability Coverage and Trust Services Liability Coverage, if applicable, are included within, and are not in addition to, the Financial Institution Professional Liability Aggregate Limit of Liability.

| | | |
|---|---|---|
| **Additional Defense Coverage:** | ☐ Applicable | ☒ Not Applicable |
| **Additional Defense Limit of Liability:** | Not Covered | for all **Claims** |
| **Retention:** | $50,000<br>$50,000 | for each **Claim** under Insuring Agreement A.<br>for each **Claim** under Insuring Agreement B.<br>for each **Claim** under Insuring Agreement C. |
| **Prior and Pending Proceeding Date:** | January 1, 2013<br>January 1, 2013 | for all **Claims** under Insuring Agreement A.<br>for all **Claims** under Insuring Agreement B.<br>for all **Claims** under Insuring Agreement C. |
| **Continuity Date:** | January 1, 2013 | for all **Claims** under Insuring Agreement A. |

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00018

January 1, 2013                    for all **Claims** under Insuring Agreement B.

for all **Claims** under Insuring Agreement C.

## SEPARATE LIABILITY COVERAGES

| DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY |
|---|

**Directors, Officers,
and Organization
Limit of Liability:**         $3,000,000                    for all **Claims**

**Investigation Expense
Limit of Liability:**         $100,000                    for all **Investigation Expense**, which
amount is part of, and not in addition to,
the Directors, Officers, and
Organization Limit of Liability

**Supplemental Independent
Director Limit of Liability:**   $1,000,000                    for all **Independent Director Claims**,
which amount is in addition to, and
excess of, the Directors, Officers, and
Organization Limit of Liability

**Retention:**              Not applicable to non-indemnifiable **Loss** or Insuring Agreement D

$75,000                    for all **Securities Claims**

$75,000                    for all other **Claims**

**Prior or Pending
Proceeding Date:**           January 01, 2013

## CRIME COVERAGES

| KIDNAP AND RANSOM |
|---|

| INSURING AGREEMENT | LIMIT OF INSURANCE | RETENTION |
|---|---|---|
| **A. Kidnap for Ransom** | $1,000,000 for each **Insured Event** | $0 for each **Insured Event** |
| **B. Extortion for Ransom** | $1,000,000 for each **Insured Event** | $0 for each **Insured Event** |
| **C. Loss of Ransom In Transit/Delivery** | $1,000,000 for each **Insured Event** | $0 for each **Insured Event** |
| **D. Covered Expenses for Kidnap or Extortion** | $1,000,000 for each **Insured Event** | $0 for each **Insured Event** |

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00019

| | | |
|---|---|---|
| **E.  Covered Expenses for Detention or Hijack** | $1,000,000 for each **Insured Event** | $0      for each **Insured  Event** |
| **F.  Rest and Rehabilitation Expenses** | $50,000 per   **Insured Person** | $0      for each **Insured  Event** |
| **G.  Personal Accident** | $250,000 per **Insured Person,** subject to the BENEFIT  SCHEDULE found in Section III. DEFINITIONS W.. not to  exceed $1,000,000 in the aggregate for the **Policy  Period** | $0      for each **Insured  Event** |
| **H.  Legal Liability** | $1,000,000 for each **Insured  Event** | $0      for each **Insured  Event** |
| **I.  Crisis Response Firm Fees and Expenses** | Unlimited for each **Insured Event** | |

If "*Not Covered*" is inserted above opposite any specified Insuring Agreement, or if no amount is included in the Limit of Insurance, such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Kidnap and Ransom Policy.**

**Policy Aggregate Limit of Insurance:**  ☐  Applicable          ☒  Not Applicable
If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each **Policy Period** is: Not Applicable. If a Policy Aggregate Limit of Insurance is not included, then this **Kidnap and Ransom Policy** is not subject to a Policy Aggregate Limit of Insurance as set forth in Section V. CONDITIONS, C. LIMIT OF INSURANCE, 1. Policy Aggregate Limit of Insurance.

| | |
|---|---|
| **Crisis Response Firm:** Constellis 12018 Sunrise Valley Drive, Suite 140 Reston, VA 20191, USA UK Telephone: +44 (0)207 240 3237 USA Telephone: +1 713-918-6401 Constellis Email: info@constellis.com Constellis Website: www.constellis.com | **Travelers Bond and Speciality Insurance Claim Contact Numbers:** US Tel: +1 800 842-8496 (available 24/7/365) See ITEM 3 of the Declarations for the Travelers Claim mailing address. |

**Cancellation of Prior Insurance:**
By acceptance of this **Kidnap and Ransom Policy**, the **Named Insured** gives the Company notice canceling prior policies or bonds issued by the Company that are designated by policy or bond numbers Not Applicable, such cancellation to be effective at the time this **Kidnap and Ransom Policy** becomes effective.

**BOND COVERAGE**

| **FINANCIAL INSTITUTION BOND WITH EXTENDED COVERAGES** |
|---|

| INSURING AGREEMENT | SINGLE LOSS LIMIT OF | SINGLE LOSS DEDUCTIBLE |
|---|---|---|

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00020

| | INSURANCE | AMOUNT |
|---|---|---|
| **A. FIDELITY**<br>  Coverage A.1. Employee Dishonesty<br>  Coverage A.2. Trading Loss<br>  Coverage A.3. ERISA<br>  Coverage A.4. Restoration Expenses | <br>$2,500,000<br>$2,500,000<br>$2,500,000<br>$250,000 | <br>$25,000<br>$25,000<br>$0<br>$25,000 |
| **B. ON PREMISES** | $2,500,000 | $25,000 |
| **C. IN TRANSIT** | $2,500,000 | $25,000 |
| **D. FORGERY OR ALTERATION** | $2,500,000 | $25,000 |
| **E. SECURITIES**<br>  Loan Participation Included | $2,500,000 | $25,000 |
| **F. KIDNAP AND RANSOM** | Not Covered | |
| **G. COUNTERFEIT MONEY AND<br>  COUNTERFEIT MONEY ORDERS** | $2,500,000 | $25,000 |
| **H. CLAIM EXPENSE** | $25,000 | $0 |
| **I.  INDEMNITY FOR INJURY OR DEATH OF<br>  DIRECTORS OR EMPLOYEES**<br>  Coverage I.1.  For Injury of<br>         Directors or Employees | <br><br>Maximum weekly payment of $500 to any one Director or Employee not to exceed total payments of $10,000 | <br><br>$0 |
|   Coverage I.2.   For Death of<br>         Directors or Employees | $10,000 | $0 |
| **J. SERVICING CONTRACTORS** | Not Covered | |
| **K. AUTOMATED TELLER MACHINES** | $25,000 | $1,000 |
| **L. TRANSIT CASH LETTERS** | $1,000,000 | $0 |
| **M. SAFE DEPOSIT BOX**<br>  Coverage M.1.  Legal Liability<br>  Coverage M.2.  Loss of Customers' Property<br>         **Excluding** Money | <br>$1,000,000<br>$1,000,000 | <br>$0<br>$0 |
| **N. REAL PROPERTY MORTGAGES – DEFECTIVE<br>  SIGNATURES** | $500,000 | $25,000 |
| **O. STOP PAYMENT ORDERS OR WRONGFUL<br>  DISHONOR OF CHECKS** | $100,000 | $5,000 |
| **P. COMPUTER SYSTEMS**<br>  Coverage P.1.   Computer Fraud<br>  Coverage P.2.   Fraudulent Instructions<br>  Coverage P.3.   Remote Access PBX System Fraud<br>  Coverage P.4.   Restoration Expenses | <br>$2,500,000<br>$2,500,000<br>$1,000,000<br>$250,000 | <br>$25,000<br>$25,000<br>$25,000<br>$25,000 |
| **Q. EXCESS SECURITIES**<br>  Coverage Q.1.   On Premises<br>  Coverage Q.2.   In Transit | <br>Not Covered<br>Not Covered | |

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00021

CYBER COVERAGES

| CYBERRISK |
|---|

### Third Party Liability Insuring Agreements

| | | | |
|---|---|---|---|
| A. | Network and Information Security Limit of Liability: | $2,000,000 | for each **Claim** |
| B. | Communications and Media Limit of Liability: | $2,000,000 | for each **Claim** |
| C. | Regulatory Defense Expenses Limit of Liability: | $2,000,000 | for each **Regulatory Claim** |

| Retention: | $50,000 | for each **Claim** under Insuring Agreement A. |
|---|---|---|
| | $50,000 | for each **Claim** under Insuring Agreement B. |
| | $50,000 | for each **Regulatory Claim** under Insuring Agreement C. |

### First Party Insuring Agreements

| INSURING AGREEMENT | LIMIT OF INSURANCE | RETENTION |
|---|---|---|
| D. Crisis Management Event Expenses | $1,000,000 for each **Single First Party Insured Event** | $25,000 for each **Single First Party Insured Event** |
| E. Security Breach Remediation and Notification Expenses | $1,000,000 for each **Single First Party Insured Event** | $25,000 for each **Single First Party Insured Event** |
| F. Computer Program and Electronic Data Restoration Expenses | $1,000,000 for each **Single First Party Insured Event** | $25,000 for each **Single First Party Insured Event** |
| G. Computer Fraud | Not Covered for each **Single First Party Insured Event** | for each **Single First Party Insured Event** |
| H. Funds Transfer Fraud | Not Covered for each **Single First Party Insured Event** | for each **Single First Party Insured Event** |
| I. E-Commerce Extortion | $1,000,000 for each **Single First Party Insured Event** | $25,000 for each **Single First Party Insured Event** |
| J. Business Interruption and Additional Expenses | $1,000,000 for each **Single First Party Insured Event** | |

**CyberRisk Policy Aggregate Limit:**          $2,000,000

The **CyberRisk Policy Aggregate Limit** for each **Policy Period** is applicable to all Insuring Agreements.

| **Prior and Pending Proceeding Date:** | January 01, 2013 |
|---|---|
| **Retroactive Date:** | January 01, 2013 |

---

ACF-2001 Rev. 07-16                                                                                                    Page 7 of 10
© 2016 The Travelers Indemnity Company.  All rights reserved.

**Continuity Date:**          January 01, 2013

**Waiting Period (Hours):** with respect to Insuring Agreement J: 8

## OTHER COVERAGES

| IDENTITY FRAUD EXPENSE REIMBURSEMENT |
|---|

**Limit of Insurance:**          $25,000          per **Insured Person** for each **Identity Fraud**

**Retention:**          $0          per **Insured Person** for each **Identity Fraud**

---

**ITEM 6**

**PREMIUM FOR THE POLICY PERIOD FOR ALL COVERAGES:**

$60,472.00          Policy Premium for all purchased Coverages

**AGGREGATE LIMIT OF INSURANCE FOR BOND COVERAGE:**

**All Insuring Agreements Except Insuring Agreement Q:**     Not Applicable

**Aggregate Limit of Insurance – Insuring Agreement Q:**     Not Covered

The Aggregate Limit of Insurance for each **Bond Period** is defined in section VI.CONDITIONS, E. AGGREGATE LIMIT OF INSURANCE of this Financial Institution Bond.

---

**ITEM 7**   **TYPE OF CLAIM DEFENSE FOR LIABILITY COVERAGES** (subject to LIA-3001) **AND CYBER COVERAGE:**

☐     Reimbursement

☐     Duty-to-Defend

☒     Varies by Coverage - See Expanded Claim Defense Options Endorsement

Only the type of CLAIM DEFENSE marked "☒" is included in this policy.

**PREVIOUS BONDS OR POLICIES:**

The Insured, by acceptance of this bond, gives notice to the Company canceling or terminating prior bond or policy numbers:

Not Applicable

such cancellation or termination to be effective as of the time this bond becomes effective.

**EXTENDED REPORTING PERIOD FOR SEPARATE LIABILITY COVERAGES:**

**Directors, Officers, and Organization Liability:**

---

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00023

| Additional Premium Percentage: | Additional Months: |
|---|---|
| 90 % | 12 |
| 100 % | 24 |
| 125 % | 36 |

---

**ITEM 8**   **EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001) **AND CYBER COVERAGES:**

Additional Premium Percentage:   75 %
Additional Months:   12

(If exercised in accordance with the applicable EXTENDED REPORTING PERIOD condition)

**DISCOVERY PERIOD FOR BOND COVERAGE:**

Additional Premium Percentage:   100% of the annualized premium
Additional Months:   12 months

(If exercised in accordance with section VI. CONDITION, T. DISCOVERY PERIOD)

---

**ITEM 9**   **RUN-OFF EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001) **AND CYBER COVERAGES:**

Additional Premium Percentage:   Not Applicable
Additional Months:   Not Applicable

(If exercised in accordance with the applicable CHANGE OF CONTROL condition)

---

**ITEM 10**   **ANNUAL REINSTATEMENT OF THE LIABILITY COVERAGE LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

☒   Applicable      ☐   Not Applicable

Only those coverage features marked " ☒ Applicable" are included in this policy.

---

**ITEM 11**   **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE FOR ALL COVERAGES:**

BOND-7005-0112; ACF-7007-0811; AFE-19004-0115; AFE-19008-0115; ACF-7006-0511; PCDO-16002-1217; PCDO-19115-0316; PCDO-19116-0316; PCDO-19120-0316; PCDO-19147-0316; PCDO-10609-0416; PCDO-19173-1016; PCDO-17042-0417; LIA-3001-0109; LIA-7119-0109; LIA-FI-7500-0312; LIA-FI-7505-0112; FRI-19090-0714; LIA-19097-0315; LIA-4029-0517; EPL-3001-0109; EPL-FI-7031-0109; EPL-19007-0712; EPL-19050-0316; EPL-4012-0109; FRI-3001-0109; FRI-7018-0109; FRI-19086-0414; FIPL-3001-0112; FIPL-7011-0112; FIPL-7034-0112; FIPL-7037-0112; FIPL-7004-0813; FIPL-19006-1014; FIPL-19007-1014; FIPL-10074-1015; FIPL-19014-0117; FIPL-17005-0112; KER-16001-0716; KER-19053-0716; KER-19045-0716; KER-19047-0716; KER-19037-0716; KER-19050-0716; KER-19025-0716; KER-17025-0716; CYB-3001-0710; CYB-19017-0315; CYB-19025-0815; CYB-19039-0217; CYB-19049-0217; CYB-19047-0217; CYB-19048-0217; CYB-19006-VA-0217; CYB-19042-0217; CYB-19052-0817; CYB-19053-0817; CYB-19050-0817; CYB-19060-0817; CYB-19065-0817; CYB-19063-0817; CYB-19059-0817; CYB-19058-0817; CYB-19057-0817; CYB-19056-0817; CYB-19055-0817; CYB-19001-0817; CYB-19022-0817; CYB-4033-0311; CYB-7001-0710; IDF-3001-0109; IDF-7019-0110; IDF-7005-0513; IDF-19002-0315; FIB-3001-0116; BOND-7013-0116; BOND-7021-0116; BOND-19109-1117; BOND-7026-1117; BOND-19111-0218; BOND-19074-0315; BOND-19078-0216; BOND-4011-0112; BOND-5044-0112; ACF-18002-0214

---

BlueRidge-00024

**ITEM 12**   **LIABILITY COVERAGE SHARED LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001):

☐   Applicable          ☒   Not Applicable

N/A                              for all **Claims** under the following **Liability Coverages** that are subject to the Terms & Conditions in LIA-3001:

If the **Liability Coverages** selected in ITEM 12 are also **Scheduled Coverages** selected in ITEM 13, then the amount of the **Liability Coverage Shared Limit of Liability** set forth in ITEM 12 is part of, and not in addition to, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages** set forth in ITEM 13.

---

**ITEM 13**   **SHARED LIMIT OF LIABILITY/LIMIT OF INSURANCE FOR SCHEDULED COVERAGES:**

☐   Applicable          ☒   Not Applicable

N/A                              for all **Claims** and limits of insurance under the following **Scheduled Coverages**:

The Company's maximum liability for the **Policy Period** for all **Claims** and limits of insurance under the **Scheduled Coverages** listed in ITEM 13 will not exceed the amount of the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**. Any Additional Defense Limit of Liability, Supplemental Personal Indemnification Limit of Liability, or Identity Fraud Expense Reimbursement Limit of Insurance is in addition to, and not part of, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**.

---

**PRODUCER INFORMATION:**

MASON INS AGCY INC
PO BOX 1070
ORANGE, VA 22960

---

IN WITNESS WHEREOF, the Company has caused this policy/bond to be signed by its authorized officers.

President, Bond & Specialty Insurance                    Corporate Secretary

---

© 2016 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

## NAMED INSURED ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

**It is agreed that:**

The following are added to ITEM 1 of the Declarations as Named Insureds:

**Virginia Community Bank**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned bond, except as expressly stated herein. This endorsement is part of such bond and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Bond Number:  **106420159**

BOND-7005 Ed. 01-12                                                                                    Page 1 of 1
© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00026

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CROSS-COVERAGE NOTICE ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability, Employment Practices Liability, Fiduciary Liability, Financial Institution Professional Liability,Financial Institution Bond with Extended Coverages,Kidnap and Ransom, CyberRisk, Identity Fraud Expense Reimbursement**

**It is agreed that:**

Notice provided to the Company of any:

1.      **Claim**, **Potential Claim**, **Settlement Program Notice**, or circumstances which may give rise to a **Claim** under any Management Coverage or **Liability Coverage**; or

2.      loss or situation that may result in loss, **Insured Event**, or **Identity Fraud** under any Crime Coverage or Other Coverage;

shall be deemed to have been provided under the Policy in its entirety.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106420159**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This endorsement modifies any Coverage Part or coverage Form included in this policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

**It is agreed that:**

The following is added to this policy. This provision can limit coverage for any loss arising out of a **Certified Act Of Terrorism** if such loss is otherwise covered by this policy. This provision does not apply if and to the extent that coverage for the loss is excluded or limited by an exclusion or other coverage limitation for losses arising out of **Certified Acts Of Terrorism** in another endorsement in this policy.

If aggregate insured losses attributable to **Certified Acts Of Terrorism** exceed $100 billion in a calendar year and the Company has met its insurer deductible under **TRIA**, the company will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act Of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of **TRIA**, to be an act of terrorism pursuant to **TRIA**. The criteria contained in **TRIA** for a **Certified Act Of Terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to **TRIA**; and
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**TRIA** means the federal Terrorism Risk Insurance Act of 2002 as amended.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2015 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00028

# FEDERAL TERRORISM RISK INSURANCE ACT
## DISCLOSURE ENDORSEMENT

This endorsement applies to the insurance provided under any Coverage Part or coverage Form included in this policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA"), establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). Act Of Terrorism is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is established by TRIA and is a percentage of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA). Through 2020, that percentage is established by TRIA as follows:

- 85% with respect to such Insured Losses occurring in calendar year 2015.
- 84% with respect to such Insured Losses occurring in calendar year 2016.
- 83% with respect to such Insured Losses occurring in calendar year 2017.
- 82% with respect to such Insured Losses occurring in calendar year 2018.
- 81% with respect to such Insured Losses occurring in calendar year 2019.
- 80% with respect to such Insured Losses occurring in calendar year 2020.

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

For each coverage provided by this policy that applies to such Insured Losses, the charge for such Insured Losses is no more than one percent of your premium, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA. Please note that no separate additional premium charge has been made for the terrorism coverage required by TRIA.  The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium.

© 2015 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00029

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REMOVAL OF SHORT-RATE CANCELLATION ENDORSEMENT

This endorsement changes the following:
**Directors, Officers, and Organization Liability, Employment Practices Liability, Fiduciary Liability, Financial Institution Professional Liability,Financial Institution Bond with Extended Coverages,Kidnap and Ransom, CyberRisk, Identity Fraud Expense Reimbursement**

**It is agreed that:**

In any cancellation, termination or non-renewal provision, any reference to computing a premium on a short rate basis is replaced with a reference to computing such premium on a pro-rata basis.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2011 The Travelers Indemnity Company. All rights reserved.
BlueRidge-00030



**DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY COVERAGE**
**FOR FINANCIAL INSTITUTIONS**

**THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.**
**PLEASE READ THE POLICY CAREFULLY.**

**CONSIDERATION CLAUSE**

IN CONSIDERATION of the payment of the premium, subject to the Declarations, and pursuant to all terms, conditions, exclusions, and limitations of this **Policy**, the Company and the **Insureds** agree as follows:

**I. INSURING AGREEMENTS**

**A. DIRECTORS AND OFFICERS INDIVIDUAL LIABILITY COVERAGE**

The Company will pay, on behalf of an **Insured Person**, **Loss** that is not indemnified by the **Insured Organization** and that such **Insured Person** becomes legally obligated to pay on account of a **Claim** first made  against such **Insured Person** during the **Policy Period** or any applicable **Extended Reporting Period**.

**B. ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE**

The Company will pay, on behalf of an **Insured Organization**, **Loss** of an **Insured Person**  that such **Insured Organization** indemnifies and that such **Insured Person** becomes legally obligated to pay on account of a **Claim** first made against such **Insured Person** during the **Policy Period** or any applicable **Extended Reporting Period**.

**C. ORGANIZATION SECURITIES CLAIM LIABILITY COVERAGE**

The Company will pay, on behalf of an **Insured Organization**, **Loss** that such **Insured Organization** becomes legally obligated to pay on account of a **Securities Claim** first made against such **Insured Organization** during the **Policy Period** or any applicable **Extended Reporting Period**.

**D. SECURITY HOLDER DERIVATIVE DEMAND OR ACTION INVESTIGATION EXPENSE COVERAGE**

The Company will pay, on behalf of an **Insured Organization**, **Investigation Expenses** on account of a **Security Holder Derivative Action** or **Security Holder Derivative Demand** first made during the **Policy Period** or any applicable **Extended Reporting Period**.

**II. ADDITIONAL BENEFITS**

**A. SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE**

If the Directors, Officers, and Organization Limit of Liability set forth in ITEM 5 of the Declarations and any other insurance or indemnification available to an **Independent Director** are completely exhausted, the Company will pay, on behalf of such **Independent Director**, **Loss** covered under Insuring Agreement A.

This **Policy** will not be subject to the terms, conditions, exclusions, or limitations of any other insurance; provided,  if an insurance policy written as specific excess insurance over this **Policy** is more favorable with respect to  section III. DEFINITIONS, **Claim**, **Defense Expenses**, **Loss**, or **Wrongful Act**, or section IV. EXCLUSIONS, then coverage under this section will be amended to follow form to such more favorable corresponding definitions or exclusions.

**B. INTERVIEW REQUEST COVERAGE**

1.  The Company will pay, on behalf of an **Insured Person**, **Interview Expenses** that are not indemnified by the **Insured Organization** incurred by such **Insured Person** in responding to an **Interview Request** first made against such **Insured Person** during the **Policy Period** or any applicable **Extended Reporting Period**.

2.  The Company will pay, on behalf of an **Insured Organization**, **Interview Expenses** of an **Insured Person** that such **Insured Organization** indemnifies and that such **Insured Person** incurred in responding to an **Interview Request** first made against such **Insured Person** during the **Policy Period** or any applicable **Extended Reporting Period**.

**C. RETIREE COVERAGE**

If, after the Inception Date of this **Policy**, or the first primary policy continuously written by the Company of which the coverage provided by this **Policy** is a renewal or replacement, and before the end of the **Policy Period**:

1.  an **Insured Person** retires and no longer serves in his or her capacity as an **Insured Person**;

2.  the Company or **Named Insured** does not renew this **Policy**, or the **Named Insured** terminates this **Policy**; and

3.  this **Policy** is not replaced by any other directors and officers liability coverage,

then coverage granted by this **Policy** under Insuring Agreement A for such **Insured Person** is extended for a six-year period from such **Insured Person's** official retirement date, but only with respect to a **Claim** for a **Wrongful Act** occurring before such **Insured Person's** official retirement date.

No coverage is available under this section if the **Named Insured** is entitled to elect an extension of coverage pursuant to section V. CONDITIONS, M. CHANGE OF CONTROL.

## III. DEFINITIONS

Wherever appearing in this **Policy**, either in the singular or plural, the following words and phrases appearing in bold type have the following meanings:

*Application* means: (i) all applications submitted during the 12 months preceding the **Policy Period**, including any written materials attached thereto, requested therein, or submitted to the Company, for the purpose of underwriting this **Policy**; and (ii) all public documents filed by the **Insured Organization** with the Securities and Exchange Commission (SEC), Federal Deposit Insurance Corporation (FDIC), or any similar domestic or foreign regulatory body during the 12 months preceding the **Policy Period**. All such applications, materials, and public documents are deemed attached to, and incorporated into, this **Policy**.

*Claim* means:

1.  a written demand, other than a **Security Holder Derivative Demand**, against an **Insured**, commenced by such **Insured's** receipt of such demand for monetary damages or non-monetary relief, including arbitration, mediation, or other formal alternative dispute resolution, injunctive relief, or a request to toll or waive any statute of limitations;

2.  a proceeding, other than an administrative or regulatory proceeding or investigation, against an **Insured**, commenced by: (i) service of a civil complaint or similar pleading; or (ii) the filing of charges, or the return of an indictment, information, or similar document, solely with respect to a criminal proceeding;

3.  an administrative or regulatory proceeding, other than an investigation, against an: (i) **Insured Person**; or (ii) **Insured Organization**, provided that such proceeding is initially made and continuously maintained against an **Insured Person** identified by name, commenced by such **Insured's** receipt of a notice of filed charges or similar document;

4.  a formal investigation of an **Insured Person** identified by name, commenced by such **Insured Person's** receipt of a formal order of investigation or similar document, or written notice identifying such **Insured Person** as a target of an investigatory authority, including a Wells Notice from the SEC indicating that it may commence an enforcement action against such **Insured Person**;

5.  a request for **Extradition**, commenced by receipt of such request;

6.  a **Security Holder Derivative Demand**, solely with respect to Insuring Agreement D, commenced by an **Insured's** receipt of such demand; or

7.  a subpoena identifying an **Insured Person** by name, commenced by service upon such **Insured Person** pursuant to an SEC formal investigative order against an **Insured**,

for a **Wrongful Act** occurring before or during the **Policy Period**, including any appeal therefrom; or

8.  an **Interview Request**, solely with respect to section II. ADDITIONAL BENEFITS, B. INTERVIEW REQUEST COVERAGE, provided notice has been given to the Company pursuant to section V. CONDITIONS, E. NOTICE, 1. Notice of Claim, commenced by receipt of such **Interview Request**.

*Defense Expenses* mean:

1.  the reasonable costs, charges, fees, or expenses, including any premium or origination fee for a bond, loan, or similar financial instrument, incurred: (i) defending, investigating, or appealing a **Claim**, other than an **Interview Request**; (ii) lawfully opposing, challenging, or resisting any request for, or any effort to obtain, **Extradition**; or (iii) lawfully seeking release of any arrest or confinement of an **Insured Person** to a specific residence or a secure custodial facility by or on behalf of any law enforcement authority;

2. **Event Study Expenses**; or

3. **Nominal Defendant Expenses**;

provided, **Defense Expenses** do not include any: (i) regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**; (ii) **Interview Expenses**; (iii) **Investigation Expenses**; or (iv) the principal of, collateral or interest on collateral for, or interest on, a bond, loan, or similar financial instrument.

**Enforcement Body** means the U.S. Department of Justice, the SEC, any state attorney general, or the enforcement unit of any securities exchange, or any foreign enforcement body that is the functional equivalent thereof.

**Event Study Expenses** mean the reasonable costs, charges, fees, or expenses of an expert witness consented to by the Company, such consent not to be unreasonably withheld, incurred by the **Insured** to conduct an event study regarding issues of price impact relevant to the court's decision whether to grant class certification in a **Securities Claim**.

**Executive Officer** means any natural person who was, is, or becomes the chief executive officer, chief financial officer, chief compliance officer, or any functional equivalent position, of the **Insured Organization**.

**Extended Reporting Period** means the period of time set forth in ITEM 7 of the Declarations following the effective date of any nonrenewal or termination of the **Policy**.

**Extradition** means a formal process by which an **Insured Person** located in any country is surrendered, or sought to be surrendered, to any other country to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

**Financial Insolvency** means the: (i) court appointment of an examiner, receiver, conservator, liquidator, trustee, or rehabilitator, or any functional equivalent position, to take control of, supervise, manage, or liquidate the **Insured Organization** or **Outside Entity**; or (ii) **Insured Organization** or **Outside Entity** becoming a debtor in possession under the U.S. Bankruptcy Code, Chapter 11, or its foreign equivalent.

**Financial Interest** means the **Named Insured's** insurable interest in an **Insured Organization** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **Named Insured's**:

1. ownership of the majority of the outstanding securities or voting rights of such **Insured Organization** representing the present right to elect, appoint, or exercise a majority control over such **Insured Organization's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

2. indemnification of, or representation that it has an obligation to indemnify, such **Insured Organization** for **Loss** incurred by such **Insured Organization**; or

3. election or obligation to obtain insurance for such **Insured Organization**.

**Independent Director** means an **Insured Person** who is a "Non-Employee Director" of the **Insured Organization** as  such term is defined in Rule 16b-3 promulgated under the Securities Exchange Act of 1934; provided, that the term  "issuer" as referenced in such rule is deemed to refer to the **Insured Organization**.

**Insured** means the **Insured Persons** and the **Insured Organizations**.

**Insured Organization** means any **Named Insured** or **Subsidiary**, including such entity as a debtor in possession under the U.S. Bankruptcy Code, Chapter 11, or its foreign equivalent.

**Insured Person** means any natural person:

1. who was, is, or becomes a duly elected or appointed director, officer, **Manager**, risk manager, or in-house general counsel, or any functional equivalent position, of the **Insured Organization**, or such natural person while serving in  an **Outside Position**;

2. who was, is, or becomes a shadow director of the **Insured Organization** pursuant to the United Kingdom Companies Act of 2006, or equivalent statute; or

3. not described in 1. who was, is, or becomes a full or part-time employee of the **Insured Organization**, with respect to: (i) a **Securities Claim**; or (ii) any other **Claim**, but only if such **Claim** is made and maintained against both such natural person and any natural person described in 1.

**Interview Expenses** mean the reasonable costs, charges, fees, or expenses, incurred by an **Insured Person**, or the **Insured Organization** pursuant to its indemnification of an **Insured Person**, in responding to an **Interview Request**. **Interview Expenses** do not include: (i) the regular or overtime wages, salaries, or fees of any director, officer, **Manager**,  or employee of an **Insured Organization** or **Outside Entity**, or any other compensation of an **Insured Person** associated with an **Interview Request**; or (ii) costs, charges, fees, or expenses incurred in responding to requests for the

production of documents, records, or electronic information that are in the possession, custody, or control of the **Insured Organization**, an **Enforcement Body**, or any party other than the **Insured Person**.

*Interview Request* means a written request for an **Insured Person** to appear for an interview or meeting, or to produce documents or records, concerning matters or circumstances occurring before or during the **Policy Period**, made by:

1.  an **Enforcement Body** in connection with an investigation of: (i) the **Insured Organization**; or (ii) an **Insured Person**, in his or her capacity as such; or

2.  an **Insured Organization** in connection with: (i) an investigation by an **Enforcement Body** against such **Insured Organization**, or (ii) a **Security Holder Derivative Demand**;

provided, **Interview Request** does not include any routine or regularly scheduled examination, inspection, compliance, oversight, interview, or audit conducted pursuant to the **Enforcement Body's** or **Insured Organization's** ordinary review or compliance procedures.

*Investigation Expenses* mean the reasonable costs, charges, fees, or expenses incurred in connection with investigating or evaluating whether it is in the best interests of the **Insured Organization** to prosecute the claims alleged in a **Security Holder Derivative Demand** or **Security Holder Derivative Action** by: (i) the **Insured Organization**; (ii) the board of directors or board of managers, or any functional equivalent board, of the **Insured Organization**; or (iii) any committee of such board; provided, **Investigation Expenses** do not include regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**.

*Joint Venture* means any incorporated joint venture, other than a **Subsidiary**, if the **Insured Organization**: (i) owns or controls at least 33% of the outstanding voting securities representing the present right to vote for the election or appointment of the directors or officers, or any functional equivalent position, of such joint venture; or (ii) has the present right to elect or appoint at least 33% of the directors or officers, or any functional equivalent position, of such joint venture.

*Loss* means: (i) damages, judgments, settlements, prejudgment and postjudgment interest, and **Defense Expenses**; provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by any **Insured**, **Loss** only includes such damages to the extent they are insurable under the law of a jurisdiction that is most favorable to the insurability of such damages, and has a substantial relationship to the **Insured**, **Claim**, Company, or this **Policy**; (ii) **Investigation Expenses**, with respect to Insuring Agreement D only; (iii) **Interview Expenses**, with respect to section II. ADDITIONAL BENEFITS, B. INTERVIEW REQUEST COVERAGE only; and (iv) **Non-Monetary Resolution Fees**. **Loss**, other than **Defense Expenses**, does not include:

1.  any amount that an **Insured** is absolved from paying;

2.  taxes, fines, or penalties; provided, **Loss** includes:

    a.  civil penalties assessed against an **Insured Person** pursuant to the Foreign Corrupt Practices Act of 1977 §§ 15 U.S.C. 78dd-2(g)(2)(B) and 78ff(c)(2)(B) and the United Kingdom Bribery Act of 2010 (Eng.) § 11(1)(a); or

    b.  taxes assessed against an **Insured Person** pursuant to applicable federal, provincial, or territorial statutory law imposing liability upon the **Insured Person** in his or her capacity as such where the **Insured Organization** has failed to deduct, withhold, or remit such amounts as required by law and is financially unable to do so;

3.  any cost of complying with any order for, grant of, or agreement to provide, injunctive or non-monetary relief;

4.  any cost incurred testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or assessing the effects of, any **Pollutant**;

5.  any amount of damages, judgments, or settlements that represents, or is substantially equivalent to, an increase in the price or consideration paid, or proposed to be paid, for: (i) an actual or attempted acquisition of all, or substantially all, of the ownership interest in, or assets of, an entity; or (ii) merger with any entity;

6.  disgorgement or other loss that is uninsurable under the law pursuant to which this **Policy** is construed; provided, the Company will not assert that any amount of a judgment or settlement in a **Securities Claim** for a violation of the **Securities** Act of 1933 §§ 11, 12, or 15 constitutes disgorgement or other uninsurable loss; or

7.  the amount required to be repaid, returned, or refunded pursuant to Dodd-Frank § 954(b)(2), SOX § 304(a), or similar statute or regulation requiring the return of incentive-based compensation.

*Manager* means, with respect to an **Insured Organization** that is a limited liability company, political action committee, or non-profit entity, any natural person who was, is, or becomes a: (i) member of the board of managers, the board of governors, management committee, or advisory committee, or any functional equivalent position, of such **Insured Organization**; or (ii) trustee, other than a bankruptcy trustee, or any functional equivalent position, of any non-profit entity.

*Named Insured* means the entity named in ITEM 1 of the Declarations.

© 2017 The Travelers Indemnity Company. All rights reserved.

***Nominal Defendant Expenses*** mean the reasonable costs, charges, fees, or expenses incurred by an **Insured Organization** in its capacity as a nominal defendant while seeking to dismiss a **Security Holder Derivative Action** for lack of jurisdiction or failure to allege demand futility.

***Non-Monetary Resolution Fees*** mean the reasonable plaintiff's attorney's fees awarded or approved by a court in connection with a judgment in, or settlement of, a **Securities Claim** as defined in subpart (i) of **Securities Claim**, wherein no monetary consideration would be received by such security holders or **Insured Organization**.

***Outside Entity*** means any: (i) non-profit entity, other than a **Subsidiary**, that is exempt from federal income tax as an entity described in section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code; or (ii) **Joint Venture**.

***Outside Position*** means any natural person serving in the position of director, officer, manager, or trustee, or any functional equivalent position, in an **Outside Entity**, but only if service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to such natural person by the **Insured Organization**.

***Policy*** means, collectively, the Declarations, the **Application**, this coverage form, and any endorsement attached thereto.

***Policy Period*** means the period of time set forth in ITEM 2 of the Declarations, subject to prior termination in accordance with section V. CONDITIONS, P. TERMINATION OF POLICY.

***Pollutant*** means: (i) a solid, liquid, gaseous, or thermal irritant or contaminant; (ii) an electric, magnetic, or electromagnetic field; (iii) an odor or noise; (iv) oil or oil products; or (v) the actual or alleged presence, or actual, alleged, or threatened dispersal of, asbestos, asbestos fibers, or products containing asbestos; including materials to be recycled, reconditioned, or reclaimed.

***Related Interview Requests*** means all **Interview Requests** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

***Related Wrongful Acts*** means all **Wrongful Acts** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

***Securities Claim*** means any **Claim**, in whole or in part, that is: (i) brought and maintained by one or more security holders of the **Insured Organization**, in their capacity as such; (ii) based upon or arising out of the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the **Insured Organization**, whether such purchase, sale, or offer involves a transaction with the **Insured Organization** or occurs in the open market, including any such **Claim** brought by the SEC or any other claimant; or (iii) based upon or arising out of the violation of any securities law, rule, or regulation, whether statutory or common law, involving the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the **Insured Organization**; provided that for the purposes of this definition, securities do not include products issued in the course of the **Insured Organization's** business that constitute securities. **Securities Claim** does not include a **Claim** brought by an **Insured Person** based upon or arising out of any compensation to such **Insured Person** in the form of securities of the **Insured Organization**.

***Security Holder Derivative Action*** means a civil proceeding brought and maintained on behalf of, or in the name or right of, an **Insured Organization** by one or more security holders of such **Insured Organization** in their capacity as such.

***Security Holder Derivative Demand*** means a written demand on behalf of an **Insured Organization** made by a security holder of such **Insured Organization** and made upon the board of directors or board of managers, or any functional equivalent board, of such **Insured Organization** to bring a civil proceeding in a court of law against an **Insured Person** for a **Wrongful Act** committed by such **Insured Person**.

***Spouse*** means any natural person who qualifies as a legal spouse, domestic partner, or party to a civil union, under the provisions of any applicable domestic or foreign law or regulation, or under the provisions of any formal program established by the **Insured Organization**.

***Subsidiary*** means any:

1.  entity, other than a general partner, portfolio company, or investment fund, while the **Named Insured**, directly or indirectly, owns more than 50% of the outstanding voting securities or other equity ownership, representing the present right to vote for the election or appointment of directors or officers, **Managers**, or any functional equivalent position; or

2.  corporation, limited liability company, or non-profit entity while the **Named Insured**, directly or indirectly, has the right, pursuant to a written contract or the by-laws, charter, operating agreement, or similar documents of such entity, to elect or appoint a majority of directors or officers, **Managers**, or any functional equivalent position,

on or before the Inception Date set forth in ITEM 2 of the Declarations or subject to section V. CONDITIONS, K. ACQUISITIONS, during the **Policy Period**.

*Wrongful Act* means:

1.  an actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted: (i) by an **Insured Person** in his or her capacity as such; or (ii) by an **Insured Organization**, solely with respect to Insuring Agreement C; or

2.  any matter claimed against an **Insured Person** solely because of his or her serving in such capacity.

Solely with respect to determining whether a **Security Holder Derivative Action** that names the **Insured Organization** as a nominal defendant is a **Securities Claim** against such **Insured Organization** for purposes of Insuring Agreement C,  any **Wrongful Act** as defined in 1.(i) will also be deemed to be a **Wrongful Act** of such **Insured Organization**; provided,  this provision will only be deemed to create coverage for **Non-Monetary Resolution Fees** and **Nominal Defendant Expenses**.

**Wrongful Act** does not include any conduct committed or attempted by any **Insured Person** in his or her capacity as a director, officer, manager, trustee, or employee of any entity other than the **Insured Organization** or **Outside Entity**,  even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties  regularly assigned to such **Insured Person** by the **Insured Organization**.

## IV. EXCLUSIONS

### A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND ADDITIONAL BENEFITS

#### 1. PRIOR NOTICE

The Company will not be liable for **Loss** on account of a **Claim** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** that has been the subject of any written notice given by or on behalf of any   **Insured**  and accepted under any directors and officers liability policy of insurance.

#### 2. PRIOR OR PENDING PROCEEDING

The Company will not be liable for **Loss** on account of a **Claim** based upon or arising out of any: (i) prior or pending written demand, suit, or other proceeding against any **Insured** or **Outside Entity** as of, or prior to,  the applicable Prior or Pending Proceeding Date set forth in ITEM 5 of the Declarations; or (ii) **Wrongful Act**,  or **Related Wrongful Act** underlying or alleged in such written demand, suit, or other proceeding.

#### 3. ENTITY VERSUS INSURED

The Company will not be liable for **Loss** on account of a **Claim** that is brought or maintained by or on behalf  of: (i) an **Insured Organization** against an **Insured**; or (ii) an **Outside Entity**, or an entity that has an  ownership interest in a **Joint Venture**, against an **Insured Person** for a **Wrongful Act** while serving in his or  her capacity in an **Outside Position** with such **Outside Entity**; provided, this exclusion will not apply to a **Claim** brought and maintained:

a.  in the form of a security holder derivative action or **Security Holder Derivative Demand**, without the active participation, solicitation, or assistance of an **Insured Person**, or a natural person who is a director, officer, manager, trustee, or functional equivalent position of such entity identified in 3.(ii), unless such person has not served in such capacity for at least three years preceding the date the **Claim** is first made, or is acting pursuant to any whistleblower statute;

b.  by the **Insured Organization** pursuant to section II. ADDITIONAL BENEFITS, B. INTERVIEW REQUEST COVERAGE;

c.  by a court-appointed examiner, receiver, creditors' committee, conservator, liquidator, trustee, or rehabilitator of such entity, or a similar official serving in the same legal capacity, in a bankruptcy proceeding by or against the entity;

d.  outside of the United States (including any U.S. territory, possession, or protectorate), Canada, the United Kingdom, Australia, or any other jurisdiction governed by a common law legal system, but only if the laws where such **Claim** is brought and maintained require that such **Claim** be brought by or on behalf of such entity;

e.  pursuant to Dodd-Frank § 954; or

f.  by the FDIC acting as a: (i) receiver, conservator, or liquidator of the **Insured Organization**; or (ii) similar official serving in the same legal capacity as such receiver, conservator, or liquidator.

#### 4. ERISA

© 2017 The Travelers Indemnity Company. All rights reserved.

The Company will not be liable for **Loss** on account of a **Claim** for a violation of the responsibilities, obligations, or duties imposed by the Employee Retirement Income Security Act of 1974, or similar provisions of any domestic or foreign law or regulation.

### 5. BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY

The Company will not be liable for **Loss** on account of a **Claim** for: (i) bodily injury, mental anguish, emotional distress, sickness, disease, or death of any person; (ii) damage to, or destruction of, any tangible property, including loss of use of such property; or (iii) libel, slander, discrimination, defamation of character, disparagement, or violation of a person's right of privacy; provided, this exclusion will not apply with respect to: (a) any mental anguish, emotional distress, libel, slander, discrimination, defamation of character, disparagement, or violation of a natural person's right of privacy in any **Claim** brought and maintained by a past, present, or prospective employee of the **Insured Organization** for an employment-related **Wrongful Act**; (b)**Loss** on account of a **Securities Claim**; or (c) **Defense Expenses** for a **Claim** against an **Insured Person** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007, or any similar statute.

## B. EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A AND C, AND TO ADDITIONAL BENEFITS A, B.1., AND C

### CONDUCT

The Company will not be liable for **Loss** on account of that portion of a **Claim** based upon or arising out of:

1. a deliberate fraudulent or deliberate criminal act by an:

   a. **Insured Person**, with respect to Insuring Agreement A and section II. ADDITIONAL BENEFITS, A. SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE, B. INTERVIEW REQUEST COVERAGE, 1., and C. RETIREE COVERAGE; or

   b. **Executive Officer** or **Insured Organization**, with respect to Insuring Agreement C; or

2. an **Insured** gaining any profit, remuneration, or financial advantage to which such Insured was not legally entitled,

if a final, nonappealable adjudication adverse to such **Insured** in the underlying proceeding establishes that such conduct occurred.

Exclusion B.2. will not apply to that portion of: (i) a **Securities Claim** for a violation of the Securities Act of 1933 §§ 11, 12, or 15, to the extent such amount is insurable under the law pursuant to which this **Policy** is construed; or (ii) **Defense Expenses** incurred in connection with a **Claim** made pursuant to Dodd-Frank § 954, SOX § 304(a), or similar statute or regulation requiring the return of incentive-based compensation.

## C. SEVERABILITY OF EXCLUSIONS

No **Wrongful Act** of, or knowledge possessed by, an **Insured** will be imputed to any other **Insured Person** for purposes of applying section IV. EXCLUSIONS. Only **Wrongful Acts** of, or knowledge possessed by, an **Executive Officer** will be imputed to the **Insured Organization** for purposes of applying section IV. EXCLUSIONS.

---

## *V. CONDITIONS*

### A. LIMITS OF LIABILITY

The applicable Limits of Liability set forth in ITEM 5 of the Declarations are the maximum amounts the Company will pay under this **Policy** for all **Loss**, including **Defense Expenses**, regardless of the number of **Claims** or **Insureds**, and regardless of when payment is made by the Company, or when an **Insured's** legal obligation with regard to a **Claim** arises or is established.

The Company's maximum liability for all **Loss** for all **Claims** first made during the same **Policy Period**, whether covered under one or more Insuring Agreements, is the Directors, Officers, and Organization Limit of Liability for the **Policy Period** set forth in ITEM 5 of the Declarations.

The Company's maximum liability under Insuring Agreement D for all **Investigation Expenses** for all **Security Holder Derivative Actions** and **Security Holder Derivative Demands** first made during the same **Policy Period** is the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations. Such Investigation Expense Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

---

The Company's maximum liability under section II. ADDITIONAL BENEFITS, A. SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE for all **Loss** for all **Claims** first made during the same **Policy Period** is the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations.  Such Supplemental Independent Director Limit of Liability is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

All **Claims** arising out of the same **Wrongful Act** and all **Related Wrongful Acts** are deemed one **Claim**, and such **Claim** is deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

All **Related Interview Requests** for which notice has been provided to the Company  are deemed one **Interview Request**, and such **Interview Request** is deemed to be first made on the date  earliest of such **Interview Requests** is first made to any **Insured**, regardless of whether such date is before or  during the **Policy Period**.

Any **Claim** arising out of the same or substantially similar facts or circumstances as an **Interview Request** for which notice has been provided to the Company is deemed to be first made on the date the earliest of such **Interview Requests** is first made to any **Insured**, regardless of whether such date is before or during the **Policy Period**.

The Limits of Liability for any applicable **Extended Reporting Period** are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The purchase of an **Extended Reporting Period** will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations.

The Limits of Liability for any applicable coverage extension under section II. ADDITIONAL BENEFITS, C. RETIREE COVERAGE are part of, and not in addition to, the Limit of Liability for the **Policy Period**. Such  coverage extension will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations.

The Limits of Liability for any applicable coverage extension under section V. CONDITIONS, M. CHANGE OF CONTROL are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The election of such coverage extension will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations.

## B. RETENTION

The Company's liability with respect to **Loss** on account of each **Claim** applies only to that portion of **Loss** that is excess of each applicable Retention set forth in ITEM 5 of the Declarations. If a **Claim** is subject to more than one Retention, the largest applicable Retention is the maximum Retention applicable to all **Loss** for such **Claim**. Such Retentions will be borne by the **Insured Organization** uninsured, at its own risk, and in satisfaction of **Loss**.

Regardless of the number of **Claims**, the largest Retention set forth in ITEM 5 of the Declarations is the maximum sum of such Retentions that must be satisfied.

No Retention applies to that portion of **Loss**: (i) incurred as **Event Study Expenses**; or (ii) covered under  Insuring Agreements A or D or sections II. ADDITIONAL BENEFITS, A. SUPPLEMENTAL INDEPENDENT  DIRECTOR LIABILITY COVERAGE or B. INTERVIEW REQUEST COVERAGE, 1.

## C. INDEMNIFICATION AND ADVANCEMENT OF LOSS WITHIN RETENTION

Regardless of whether **Loss** on account of a **Claim** against an **Insured Person** is actually indemnified, the applicable Retention set forth in ITEM 5 of the Declarations will apply to  **Loss**  that the **Insured Organization** or **Outside Entity**  is legally permitted to indemnify, unless such **Insured Organization** or **Outside Entity** fails to provide indemnification solely because of **Financial Insolvency**.

If the **Insured Organization** or **Outside Entity** fails to indemnify an **Insured Person** for **Loss** within the  applicable Retention, then the Company will advance such amounts on behalf of the **Insured Person** and such **Insured Person**  will not be liable for amounts within the applicable Retention. Such advancement of  **Loss**  is  subject to the following:

1. advancement of **Loss** will reduce, and may exhaust, the Limits of Liability set forth in ITEM 5 of the Declarations;

2. advancement of **Loss** does not relieve the **Insured Organization** or **Outside Entity** of its obligation to  provide indemnification to such **Insured Person**, or the **Insured Organization's** obligation to satisfy the  applicable Retention on behalf of such **Insured Person**; and

3. the Company will be subrogated to the **Insured Person's** rights of recovery against the **Insured Organization** or **Outside Entity** for any amounts it owes to the **Insured Person** and that the Company has advanced under this section.

© 2017 The Travelers Indemnity Company. All rights reserved.

The **Insured Organization** or **Outside Entity's** failure to indemnify an **Insured Person** occurs if the **Insured Organization** or **Outside Entity** fails or refuses to pay **Loss** on behalf of the **Insured Person** within 60 days of the **Insured Person's** written demand to the **Insured Organization** or **Outside Entity** for such indemnification payment.

**D.  EXTENDED REPORTING PERIOD COVERAGE**

If the Company or **Named Insured** does not renew this **Policy**, or if the **Named Insured** terminates this **Policy**, the **Named Insured** has the right, upon payment of the additional premium described below in this section, to elect an extension of coverage granted by this **Policy** for the **Extended Reporting Period**, but only with respect to: (i) a **Claim**, other than an **Interview Request**, for a **Wrongful Act** occurring before or during the **Policy Period**; or (ii) an **Interview Request** based upon or arising out of matters or circumstances that occurred before  or during the **Policy Period**.

The premium due for the **Extended Reporting Period** will equal that percent set forth in ITEM 7 of the Declarations of the original annualized premium, and the fully annualized amount of any additional premium, charged by the Company for or during the **Policy Period**. The entire premium for the **Extended Reporting Period** will be deemed fully earned and non-refundable upon payment.

This right of extension will lapse unless the **Named Insured** provides written notice of such election, together with payment of the additional premium due, to the Company within 60 days following the effective date of such nonrenewal or termination.

The **Named Insured** will not be entitled to elect the **Extended Reporting Period** under this section if an  extension of coverage is elected pursuant to section V. CONDITIONS, M. CHANGE OF CONTROL.

**E.  NOTICE**

1. Notice of Claim

   As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the Company written notice of any **Claim**, other than an **Interview Request**, made against any **Insured** as soon as practicable after the in-house general counsel, risk manager, or any functional equivalent position of the **Named Insured**,  first becomes aware of such **Claim** , but in no event later than:

   a.  180 days after the Expiration Date of the **Policy Period** as set forth in ITEM 2 of the Declarations, if the **Named Insured** elects to renew this **Policy**; or

   b.  60 days after: (i) the Expiration Date of the **Policy Period** as set forth in ITEM 2 of the Declarations; or (ii) the expiration of any applicable **Extended Reporting Period**.

   With respect to any **Claim**, other than an **Interview Request**, the **Insured** must give to the Company such other information and cooperation as the Company may reasonably request.

   If an **Insured** elects to seek coverage for **Interview Expenses**, the  **Insured**  must:

   a.  give the Company written notice of the **Interview Request** as soon as practicable after such **Insured Person** first becomes aware of such **Interview Request**, but in no event later than: (i) 60 days after the Expiration Date of the **Policy Period** as set forth in ITEM 2 of the Declarations; or (ii) the expiration of any applicable **Extended Reporting Period**;

   b.  include with any notice of an **Interview Request**, the name of the **Enforcement Body** making the  request and, to the best of the **Insured's** knowledge, a description of the nature and subject matter  identified by the  **Enforcement Body** in its **Interview Request**; and

   c.  provide to the Company such other information and cooperation as the Company may reasonably  request, including additional information about the subject matter and nature of the **Interview Request** as  it is learned.

2. Notice of Circumstance

   If an **Insured**: (i) becomes aware of any circumstance that could give rise to a **Claim** for a **Wrongful Act** occurring before or during the **Policy Period**; and (ii) gives written notice of such circumstance, including the anticipated **Wrongful Act** and other allegations, the reasons for anticipating such **Claim**, the nature of the alleged or potential damage, and the names of potential claimants and **Insureds** involved, to the Company during the **Policy Period** or any applicable **Extended Reporting Period**, then any **Claim** subsequently  arising from such circumstance will be deemed made during the **Policy Period**.

3. Notice Requirements

All notices under this section must be sent or delivered to the Company, at the address set forth in ITEM 3 of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent. The failure of the **Insured** to give the Company timely notice of any **Claim** will not, for purposes of this **Policy**, result in a forfeiture of coverage under this **Policy**, unless and to the extent that the Company is materially prejudiced by such delay.

## F. DEFENSE AND SETTLEMENT

The Company has no duty under this **Policy** to defend any **Claim**. The **Insureds** have the duty to defend **Claims** made against them.

The **Insureds** agree not to settle or offer to settle any **Claim**, or incur any **Defense Expenses** or **Interview Expenses** in connection with any **Claim**, without the Company's written consent; provided, that if the **Insureds** are able to fully and finally settle or otherwise dispose of any **Claim**, for an amount, including **Defense Expenses** or **Interview Expenses**, not to exceed the applicable Retention, the Company's consent will not be required. The Company is not liable for any settlement, **Defense Expenses**, or **Interview Expenses** to which it has not consented.

The **Insureds** also agree not to assume any contractual obligation, stipulate to any judgment, or admit any liability with respect to any **Claim** without the Company's written consent, and the Company will not be liable for any such assumed obligation, stipulated judgment, or admission without such written consent.

With respect to any **Claim** submitted for coverage under this **Policy**, the Company has the right, and will be given the opportunity, to effectively associate with, and be consulted in advance by, the **Insured** regarding the investigation, defense, and settlement of such **Claim**, including the selection of appropriate defense counsel and any settlement negotiations.

The **Insured** agrees to provide the Company with all information, assistance, and cooperation that the Company reasonably requests. Failure of an **Insured Person** to provide the Company with such information, assistance, or cooperation will not impair the rights of another **Insured Person** under this **Policy**.

In the event of a **Claim**, the **Insureds** will do nothing to prejudice the Company's position or its potential or actual rights of subrogation or recovery. The Company may make any investigation it deems necessary.

The Company will advance, on behalf of the **Insureds**, **Defense Expenses**, **Interview Expenses**, or **Investigation Expenses** that the Company believes to be covered under this **Policy** and are incurred in  connection with a **Claim** first made against them during the **Policy Period**, or any applicable **Extended Reporting Period**; provided, that to the extent it is finally established that any such **Defense Expenses**, **Interview Expenses**, or **Investigation Expenses** are not covered under this **Policy**, the **Insureds**, severally  according to their interests, agree to repay the Company such  **Defense Expenses** , **Interview Expenses**, and **Investigation Expenses**. Such **Defense Expenses**, **Interview Expenses**, or **Investigation Expenses** will be  advanced within 90 days of the date when the Company's Claims department receives: (i) the invoices  documenting that such **Defense Expenses**, **Interview Expenses**, or **Investigation Expenses** have been  incurred; and (ii) any additional information or documentation reasonably requested by the Company related to such **Defense Expenses**, **Interview Expenses**, or **Investigation Expenses**.

The Company may, with the written consent of the **Insured**, settle any **Claim** for a monetary amount that the Company deems reasonable.

The Company and the **Insureds** will not unreasonably withhold any consent referenced in this section.

## G. ALLOCATION

If, in any **Claim**, an **Insured** incurs **Loss** jointly with others (including an **Insured Person** incurring **Loss** jointly with the **Insured Organization** for any **Claim** not covered under Insuring Agreement C) or incurs an amount consisting of both **Loss** covered by this **Policy** and loss not covered by this **Policy** because the **Claim** includes both covered and uncovered matters, then the **Insureds** and the Company will use their best efforts to allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters.

If there can be no agreement on an allocation of **Defense Expenses** or **Interview Expenses**, the Company will advance **Defense Expenses** or **Interview Expenses** that the Company believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated, or judicially determined. The Company will advance **Defense Expenses** or **Interview Expenses** allocated to covered  **Loss**  on a current basis and prior to disposition of the **Claim**. Any negotiated, arbitrated, or judicially determined allocation of **Defenses Expenses** or **Interview Expenses** in connection with a **Claim** will apply retroactively to all **Defense Expenses** or **Interview Expenses** in connection with such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or

advancement of **Defense Expenses** or **Interview Expenses** in connection with a **Claim** will not apply to, or create any presumption with respect to, the allocation of other **Loss** for such **Claim** or any other **Claim**.

## H. OTHER INSURANCE

If **Loss** arising from any **Claim** made against an **Insured** is insured under any other valid and collectible insurance, then this **Policy** covers such **Loss** only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is a personal umbrella liability policy, personal directors and officers liability policy purchased by an **Insured Person**, or is written as specific excess insurance over this **Policy**. Any payment by an **Insured** of a retention or deductible under any such other insurance issued by the Company or any of its affiliated companies will reduce, by the amount of such payment that would otherwise have been covered under this **Policy**, any applicable Retention under this **Policy**. This **Policy** is not subject to the terms, conditions, exclusions, or limitations of any other insurance, except as provided in section II. ADDITIONAL BENEFITS, A. SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE.

This **Policy** covers **Loss** for any **Claim** made against any **Insured Person** serving in an **Outside Position** only to the extent that the amount of such **Loss** exceeds any indemnity and other insurance available from, or provided by, the applicable **Outside Entity**. Payment by the Company, or any of its affiliated companies, under another policy as a result of a **Claim** made against an **Insured Person** in an **Outside Position** reduces the Company's Limits of Liability under this **Policy** with respect to such **Claim**, by the amount of such payment.

## I. ORDER OF PAYMENTS

If **Loss** covered under Insuring Agreement A or section II. ADDITIONAL BENEFITS, B. INTERVIEW REQUEST COVERAGE, 1. and any other **Loss** are concurrently due under this **Policy**, the Company will first pay **Loss** covered under Insuring Agreement A or section II. ADDITIONAL BENEFITS, B. INTERVIEW REQUEST COVERAGE, 1.

Except as provided in this section, the Company may pay **Loss** as it becomes due without regard to the potential for other future payment obligations.

## J. ESTATES, LEGAL REPRESENTATIVES, AND SPOUSAL LIABILITY COVERAGE

Subject to the applicable Insuring Agreement, this **Policy** will afford coverage for **Claims** for **Wrongful Acts** of any **Insured Person** made against: (i) any estate, heir, legal representative, or assignee of the **Insured Person** in the event of death, incapacity, insolvency, or bankruptcy of such **Insured Person**; or (ii) the **Insured Person's Spouse** solely because of such **Spouse's** legal status as a **Spouse**, or because of such **Spouse's** ownership interest in property that the claimant seeks to recovery for alleged **Wrongful Acts** of the **Insured Person**.

All loss that such estate, heir, legal representative, assignee, or **Spouse** of such **Insured Person** becomes legally obligated to pay for such **Claim** will be treated as **Loss** that the **Insured Person** is legally obligated to pay for such **Claim**. The coverage afforded by this section will not apply to the extent the **Claim** alleges any wrongful act or omission by the estate, heir, legal representative, assignee, or **Spouse** of the **Insured Person**.

## K. ACQUISITIONS

If, during the **Policy Period**, an **Insured Organization** acquires or creates a **Subsidiary**, or acquires an entity by such entity's merger into, or consolidation with, an **Insured Organization**, and the **Insured Organization** is the surviving entity, then such **Subsidiary** or acquired entity and its **Insured Persons** will be covered under this **Policy** as follows:

a.   If the total assets of any such **Subsidiary** or acquired entity are less than 30% of the total assets of all **Insured Organizations**, as reflected in the **Insured Organizations'** most recent financial statements as of the inception of the **Policy Period**, then it and its **Insured Persons** will be covered automatically under this **Policy**, but only with respect to **Claims** for **Wrongful Acts**, or **Interview Requests** based upon or arising out of matters or circumstances, occurring after such acquisition or creation, unless the Company agrees after presentation of a complete **Application** and all appropriate information to provide coverage by endorsement for **Wrongful Acts** or matters or circumstances occurring prior to such acquisition or creation.

b.   With respect to all acquisitions or creations other than as described in K.a., such **Subsidiary** or acquired entity and its **Insured Persons** will be covered automatically under this **Policy**, but only for the lesser of the remainder of the **Policy Period** or 90 days, following the effective date of such acquisition or creation (Automatic Coverage Period), and only with respect to **Wrongful Acts**, or **Interview Requests** based upon or arising out of matters or circumstances, occurring after such acquisition or creation. As a condition precedent to further coverage with respect to such **Subsidiary** or acquired entity and its **Insured Persons** after such Automatic Coverage Period, the **Named Insured** must give written notice of such acquisition or creation to

the Company as soon as practicable, but in no event later than 90 days following the effective date of such acquisition or creation, and must promptly provide the Company such information as the Company may reasonably request. Upon receipt of such notice and other information, the Company will provide the **Named Insured** a quotation for such coverage under this **Policy** for the remainder of the **Policy Period**. If the **Named Insured** fails to comply with such condition precedent, or if within 90 days following receipt of such  quotation the **Named Insured** fails to pay any additional premium or fails to agree to any additional coverage  terms, conditions, exclusions, or limitations set forth in such quotation, coverage otherwise afforded by this  section for such **Subsidiary** or acquired entity and its **Insured Persons** will terminate upon expiration of such  Automatic Coverage Period.

This section V. CONDITIONS, K. ACQUISITIONS, does not apply to investment funds or portfolio companies.

## L.  CESSATION OF SUBSIDIARIES

If, before or during the **Policy Period**, an entity ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insured Persons** will continue until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts**, or **Interview Requests** based upon or arising out of matters or circumstances, occurring  during the time that such entity was a **Subsidiary**.

## M.  CHANGE OF CONTROL

If, during the **Policy Period**:

1.  the **Named Insured** merges into, or consolidates with, another entity such that the **Named Insured** is not the surviving entity; or

2.  another entity, person, or affiliated group of entities or persons acting in concert, acquires more than 50% of the outstanding securities or voting rights representing the present right to vote for the election or appointment of directors, officers, **Managers**, or functional equivalent positions, of the **Named Insured**,

then coverage under this **Policy** will continue until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts**, or **Interview Requests** based upon or arising out of matters or circumstances, occurring before such event. As of the effective date of such event, all premiums paid or due at any time under this **Policy** are deemed fully earned and non-refundable.

Upon the occurrence of such merger, consolidation, or acquisition, at the **Named Insured's** request, the Company will provide the **Named Insured** with a quotation for a six-year, or shorter period as may be negotiated,  extension of coverage from such merger, consolidation, or acquisition. Such quotation will be conditioned upon  the **Named Insured** providing any information the Company may request.

Any coverage extension will be conditioned upon the **Named Insured** completing the following within 60 days  after receipt of such quotation: (i) providing written notice to the Company of the election of such coverage  extension; (ii) paying any additional premium required by the Company, which is deemed fully earned upon  inception of such coverage extension; and (iii) accepting any additional terms, conditions, exclusions, and  limitations required by the Company. If the **Named Insured** elects such coverage extension, then it is not entitled  to elect coverage under section V. CONDITIONS, D. EXTENDED REPORTING PERIOD COVERAGE.

## N.  REPRESENTATIONS AND SEVERABILITY

In consideration of issuing this **Policy**, the Company has relied upon the statements and representations in the **Application**. The **Insureds** represent and agree that all such statements and representations are true and accurate and are the basis of the **Policy**. This **Policy** is issued in reliance upon the truth of all such statements  and representations.

The **Application** will be construed as a separate **Application** for each **Insured** and, with respect to all  statements and representations contained in the **Application**, no knowledge possessed by any one **Insured Person** will be imputed to any other **Insured Person**.

The Company will not, under any circumstance, rescind this **Policy** with respect to any **Insured**. However, the **Insureds** agree that in the event any such statements or representations in the **Application** are: (i) untrue or inaccurate, and (ii) are either made with the intent to deceive or materially affect either the acceptance of the risk  or the hazard assumed by the Company, then no coverage will be afforded under this **Policy** with respect to the following **Insureds** for any **Claim** based upon or arising out of the information that was not truthfully or accurately disclosed in the **Application** with respect to any of the following **Insureds**:

1.  any **Insured Person**, under Insuring Agreements A, who knew the information that was not truthfully or accurately disclosed in the **Application**;

2. the **Insured Organization**, under Insuring Agreement B, to the extent it indemnifies any **Insured Person** referenced in N.1.; and

3. the **Insured Organization**, under Insuring Agreements C or D, if any **Executive Officer** knew the information that was not truthfully or accurately disclosed in the **Application**,

whether or not such **Insured** or **Executive Officer** knew the **Application** contained such untruthful or inaccurate information.

## O. TERRITORY AND VALUATION

1. This **Policy** applies anywhere in the world; provided, this **Policy** does not apply to **Loss** incurred by an **Insured** residing or domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

2. In the event that an **Insured Person** residing in a country or jurisdiction in which the Company is not licensed incurs **Loss** referenced in O.1. under Insuring Agreement A, such **Loss** will be paid in a country or jurisdiction mutually acceptable to such **Insured Person** and the Company, to the extent that doing so would not violate any applicable laws or regulations.

3. In the event an **Insured Organization** incurs **Loss** referenced in O.1. to which this insurance would have applied, the Company will reimburse the **Named Insured** for its **Loss**, on account of its **Financial Interest** in such **Insured Organization**. As a condition precedent to such reimbursement, or any rights under this **Policy**, the **Named Insured** will cause the **Insured Organization** or its **Insured Persons** to comply with the conditions of this **Policy**.

4. All premiums, Limits of Liability, Retention, **Loss**, and other amounts under this **Policy** are expressed and payable in U.S. dollars. If a judgment is rendered, settlement is denominated, or another element of **Loss** under this **Policy** is stated in a currency other than U.S. dollars, payment under this **Policy** will be made in U.S. dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon, or any other element of **Loss** is due, respectively.

## P. TERMINATION OF POLICY

This **Policy** terminates at the earliest of the following times:

1. the effective date of termination specified in a prior written notice by the **Named Insured** to the Company; provided, this **Policy** may not be terminated after the effective date of any merger, consolidation, or acquisition of the **Named Insured** as described in section V. CONDITIONS, M. CHANGE OF CONTROL;

2. upon expiration of the **Policy Period** set forth in ITEM 2 of the Declarations;

3. 20 days after receipt by the **Named Insured** of a written notice of termination from the Company for failure to pay a premium when due, unless the premium is paid within such 20 day period; or

4. at such other time as may be agreed upon by the Company and the **Named Insured**.

The Company may not terminate this **Policy** prior to expiration of the **Policy Period**, except as provided above for non-payment of premium. In the event this **Policy** is terminated prior to the expiration of the **Policy Period** set forth in ITEM 2 of the Declarations, the Company will refund any unearned premium computed on a pro rata basis. Payment or tender of any unearned premium by the Company is not a condition precedent to the effectiveness of such termination, but such payment must be made as soon as practicable.

## Q. SUBROGATION

In the event of payment under this **Policy**, the Company will be subrogated to all of the **Insureds'** rights of recovery against any person or entity, including the **Insured Persons'** rights to indemnification or advancement from any entity, to the extent of such payment.

The Company will not exercise any available rights of subrogation against an **Insured Person** unless section IV. EXCLUSIONS, B. EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A, C AND TO ADDITIONAL BENEFITS A AND B.1., CONDUCT applies to such **Insured Person**.

The **Insured** must execute and deliver instruments and papers, and do all that is necessary to secure such rights, and must do nothing to prejudice such rights.

**R.  APPLICATION OF RECOVERY OF AMOUNTS PAID**

In the event the Company recovers amounts it paid under this **Policy**, such amounts will be used to reimburse the Company for amounts paid under this **Policy**; provided, the Company will reinstate the applicable Limits of  Liability of this **Policy** to the extent of such recovery, less any recovery costs incurred by the Company.  Recoveries do not include any recovery from insurance, suretyship, reinsurance, security, or indemnity taken for  the Company's benefit. The Company assumes no duty to seek a recovery of any amounts paid under this **Policy**.

**S. BANKRUPTCY**

Bankruptcy or insolvency of an **Insured**, or an **Insured's** estate, will not relieve the Company of its obligations,  nor deprive the Company of its rights or defenses, under this **Policy**.

In the event a liquidation or reorganization proceeding is commenced by or against an **Insured Organization** pursuant to the U.S. Bankruptcy Code, or any similar domestic or foreign law, and there is **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **Policy**, the **Insureds** must: (i) make a  request to waive and release any automatic stay or injunction that may apply to this **Policy** or its proceeds in such proceeding, to the extent permitted under the applicable law; and (ii) agree not to oppose, or object to, any efforts by the Company or any  **Insured**  to obtain relief from any such stay or injunction.

**T.  ACTION AGAINST THE COMPANY**

No action will lie against the Company unless, as a condition precedent, there has been full compliance with all  the provisions of this **Policy**. No person or entity will have any right under this **Policy** to join the Company as a  party to any action against any **Insured** to determine such **Insured's** liability, nor may the Company be impleaded  by any **Insured** or their legal representative.

**U. AUTHORIZATION**

By acceptance of this **Policy**, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the  giving and receiving of notice of a **Claim** or termination, nonrenewal, change of coverage, or the payment of  premiums and the receiving of any return premiums that may become due under this **Policy**, and each **Insured** agrees that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**;  provided, that nothing in this section relieves any **Insured** from giving any notice to the Company required under this **Policy**.

**V. ALTERATION AND ASSIGNMENT**

No change in, modification of, or assignment of interest under this **Policy** will be effective except when made by the Company by written endorsement to this **Policy**.

**W. SANCTIONS**

This **Policy** will provide coverage, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States or any other applicable trade or economic sanction, prohibition, or restriction.

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BANK SERVICES OR PRODUCTS EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

The following is added to section  **IV. EXCLUSIONS**,  **A. EXCLUSIONS APPLICABLE TO ALL INSURING  AGREEMENTS AND ADDITIONAL BENEFITS**:

**SERVICES**

The Company will not be liable for **Loss** on account of a **Claim**  based upon or arising out of providing or failing to provide any services or products to any customer or client; provided, this exclusion will not apply to a **Securities Claim**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or  limitations of  the  above-mentioned  policy,  except  as  expressly  stated  herein.    This  endorsement  is  part  of  such  policy  and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00045

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BANK ACQUISITIONS AND CHANGE OF CONTROL SECTIONS AMENDMENTS ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1. The following is added to section  **V. CONDITIONS**, **K. ACQUISITIONS**:

   If, during the **Policy Period**, an **Insured Organization** purchases assets or assumes liabilities of another entity, without acquiring such entity, then such assets or liabilities will be covered under this **Policy** as follows:

   a. If the total purchased assets or assumed liabilities are less than 30% of the total assets of all **Insured Organizations**, as reflected in the **Insured Organization's** most recent financial statements as of the inception of the **Policy Period**, then **Claims** in connection with or related to such assets or liabilities will be covered automatically under this **Policy**, but only with respect to **Claims** for **Wrongful Acts**, or **Interview Requests** based upon or arising out of matters or circumstances, occurring after such purchase or assumption, unless the Company agrees after presentation of a complete **Application** and all appropriate information to provide  coverage by endorsement for **Wrongful Acts** or matters or circumstances occurring prior to such purchase or  assumption.

   b. With respect to all purchased assets or assumed liabilities other than as described in subpart a. of this endorsement, **Claims** in connection with or related to such assets or liabilities will be covered automatically under this **Policy**, but only for the lesser of the remainder of the **Policy Period** or 90 days following the effective date of such purchase or assumption (Automatic Coverage Period), and only with respect to **Claims** for **Wrongful Acts**,  or **Interview Requests** based upon or arising out of matters or circumstances, occurring after such purchase or assumption. As a condition precedent to further coverage with respect to such purchased assets or assumed liabilities after such Automatic Coverage Period, the **Named Insured** must give written notice of such purchase or assumption to the Company as soon as practicable, but in no event later than 90 days following the effective date of such purchase or assumption, and must promptly provide the Company such information as the Company may reasonably request. Upon receipt of such notice and other information, the Company will provide the **Named Insured** a quotation for such coverage under this **Policy** for the remainder of the **Policy Period**. If the **Named Insured** fails to comply with such condition precedent, or if within 90 days following receipt of such quotation the **Named Insured** fails to pay any additional premium or fails to agree to any additional coverage terms, conditions, exclusions, or limitations set forth in such quotation, coverage otherwise afforded by this section for such purchased assets or assumed liabilities will terminate upon expiration of such Automatic Coverage Period.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

2.      The following is added to section  **V. CONDITIONS**, **M. CHANGE OF CONTROL**:

If, during the **Policy Period** any governmental agency or regulator is appointed as receiver, conservator, or legal custodian of:

a.  the **Named Insured**; or

b.  one or more **Insured Organizations**, if the total assets of the **Insured Organizations** under receivership, conservatorship, or custodianship equal or exceed 30% of the total assets of all **Insured Organizations** as reflected in the **Insured Organizations'** most recent fiscal year-end financial statements prior to the Inception Date of the **Policy Period**,

then the terms, conditions, and limitations set forth in this section V. CONDITIONS, M. CHANGE OF CONTROL will apply.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

PCDO-19116 Ed. 03-16
© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00047

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CRUCIAL EVENT MANAGEMENT ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

   **Crucial Event Management**
   **Limit of Liability:**            $50,000 for all **Crucial Event Management Loss**, which amount is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability

2. The following is added to section **II. ADDITIONAL BENEFITS**:

   **CRUCIAL EVENT MANAGEMENT COVERAGE**

   The Company will pay, on behalf of the **Insured Organization**, **Crucial Event Management Loss** on account of a **Crucial Event Management Matter** first occurring during the **Policy Period**.

3. The following are added to section **III. DEFINITIONS**:

   *Crucial Event Management Firm* means any crucial event or crisis management firm, law firm, or public relations firm hired by the **Insured Organization** with the Company's written consent, which will not be unreasonably withheld, to perform services for the **Insured Organization** or its directors, officers, or employees to minimize potential harm to the **Insured Organization** arising from a **Crucial Event Management Matter**, including actions designed to maintain and restore investor confidence in the **Insured Organization**.

   *Crucial Event Management Loss* means the: reasonable costs, charges, fees, or expenses incurred by the **Crucial Event Management Firm** or the **Insured Organization** in connection with the **Crucial Event Management Matter**, incurred during or within 90 days prior to and in anticipation of, a **Crucial Event Management Matter**, regardless of whether a **Claim** is made against an **Insured** arising from the **Crucial Event Management Matter** and, in the event a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**.

   *Crucial Event Management Matter* means:

   1. a public announcement of the **Insured Organization's** past or future earnings or sales, which is substantially less favorable than: (i) the **Insured Organization's** prior year's earnings or sales for the same period; (ii) the **Insured Organization's** prior public statements or projections regarding earnings or sales for such period; or (iii) an outside securities analyst's published estimate of the **Insured Organization's** earnings or sales;

   2. a public announcement by the **Insured Organization** that it intends to write off a material amount of its assets;

   3. a public announcement by the **Insured Organization** that it has been libeled on an Internet message site or "chat room";

   4. a public announcement by the **Insured Organization** that it will restate its previously filed financial statements;

   5. a public announcement by the **Insured Organization** that it will eliminate or suspend a regularly scheduled dividend previously paid to common or preferred shareholders of the **Insured Organization**;

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00048

6.  a public announcement of an unforeseen loss of: (i) the **Insured Organization's** intellectual property rights for a patent, trade mark or copyright, other than by expiration; (ii) a major customer or client of the **Insured Organization**; or (iii) a major contract with the **Insured Organization**;

7.  a public announcement of the recall of a major product of the **Insured Organization** or the unforeseen delay in the production of a major product of the **Insured Organization**;

8.  the public announcement or accusation that the **Insured Organization** has caused the bodily injury, sickness, disease, death, or emotional distress of a group of persons, or damage to, or destruction of, any tangible group of properties, including the loss of use thereof;

9.  a public announcement of employee layoffs, or the death or resignation any **Executive Officer** of the **Insured Organization**;

10. a public announcement that the **Insured Organization** has defaulted or intends to default on its debt, or intends to enter into a debt restructuring agreement;

11. a public announcement that the **Insured Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Insured Organization**; or the imminence of bankruptcy proceedings, whether voluntary or involuntary;

12. a public announcement that governmental or regulatory proceedings are beginning or may begin against the **Insured Organization**; or

13. an unsolicited written offer or bid attempt by a person or entity other than an **Insured** or **Insured** affiliate, whether publicly announced or privately made to a director of the **Insured Organization** or **Executive Officer** to acquire controlling voting interest in the **Insured Organization**,

which, in the good faith opinion of the chief financial officer of the **Insured Organization**, caused or reasonably would be likely to cause the price per share of the **Insured Organization's** common stock to decrease by the greater of $5 per share or 10% net of the change in the Standard & Poor's Composite Index, within a period of 24 hours.

A **Crucial Event Management Matter** will first begin when the **Insured Organization** or any of its directors or executive officers become aware of the matter, and will conclude when the **Crucial Event Management Entity** advises the **Insured Organization** that such matter no longer exists or when the Crucial Event Management Limit of Liability set forth in ITEM 5 of the Declarations is exhausted.

4.  The following is added to section **V. CONDITIONS**, **A. LIMITS OF LIABILITY**:

The Company's maximum liability for all **Crucial Event Management Loss** first made during the **Policy Period** is the Crucial Event Management Limit of Liability set forth in ITEM 5 of the Declarations. Such Crucial Event Management Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

5.  The following is added to section **V. CONDITIONS**, **B. RETENTION**:

No Retention applies to **Crucial Event Management Loss**.

6.  The following is added to section **V. CONDITIONS**, **E. NOTICE**:

If an **Insured** elects to seek coverage for **Crucial Event Management Loss**, the **Insured** must give the Company written notice of any **Crucial Event Management Matter** or circumstances that could give rise to a **Crucial Event Management Matter** as soon as practicable after the **Insured Organization** first incurs any **Crucial Event Management Loss**, but in no event later than: (i) 60 days after the Expiration Date of the **Policy Period** as set forth in ITEM 2 of the Declarations; or (ii) the expiration of any applicable **Extended Reporting Period**.

If an **Insured** elects to seek coverage for **Crucial Event Management Loss**, the **Insured** must:

1.  include within any notice of **Crucial Event Management Matter** a description of the **Crucial Event Management Matter**, the nature of the **Crucial Event Management Matter**, the nature of the alleged or potential damage, the

names of actual or potential claimants and **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Crucial Event Management Matter**; and

2.   give to the Company such other information and cooperation as the Company may reasonably request.

All notices under this NOTICE section must be sent or delivered to the Company, at the address set forth in ITEM 3 of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ACQUISITION, MERGER, OR CONSOLIDATION RETENTION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1.  The following replaces the Retention section in ITEM 5 of the Declarations:

    **Retention:** Not applicable to non-indemnifiable **Loss** or Insuring Agreement D

    | | |
    |---|---|
    | $75,000 | for all **Securities Claims,** other than **Securities Claims** based upon or arising out of any actual, proposed, or attempted **Merger and Acquisition Event** |
    | $150,000 | for all **Claims** or **Securities Claims** based upon or arising out of any actual, proposed, or attempted **Merger and Acquisition Event** |
    | $75,000 | for all other **Claims** |

2.  The following is added to **III. DEFINITIONS**:

    *Merger and Acquisition Event* means:

    1.  an **Insured Organization** merging into, or consolidating with, another entity such that the **Insured Organization** is not the surviving entity;

    2.  another entity, person, group of entities, or group of persons acting in concert, acquiring securities or voting rights that result in ownership or voting control by the other entity, persons, or group of more than 50% of the outstanding securities representing the present right to vote for the election or appointment of directors, officers, or **Managers** of an **Insured Organization**, or any functional equivalent position; or

    3.  any actual, attempted, or proposed merger, acquisition, or divesture involving the **Insured Organization**, including any actual, attempted, proposed, or alleged negotiations, investigation, evaluation, consideration, recommendation, or decision relating to such merger, acquisition, or divesture.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00051

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ENHANCED ORGANIZATION LIABILITY COVERAGE ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1. The following replaces section **I. INSURING AGREEMENTS**, **C.**:

   **C.   ORGANIZATION LIABILITY COVERAGE**

   The Company will pay, on behalf of the **Insured Organization**, **Loss** that such **Insured Organization** becomes legally obligated to pay on account of a **Claim** first made against such **Insured Organization** during the **Policy Period** or any applicable **Extended Reporting Period**.

2. The following is added to section **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND ADDITIONAL BENEFITS**:

   **PUBLICLY TRADED SECURITIES**

   The Company will not be liable for **Loss** on account of a **Claim** based upon or arising out of any purchase or sale of, or offer to purchase or sell, on the NASDAQ Stock Market, the American Stock Exchange, or the New York Stock Exchange (NYSE), any securities issued by the **Insured Organization**, including any actual or alleged violation of any of the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, any similar federal, state, provincial or local statutory law, common law or civil law anywhere in the world, or any amendment thereto, relating to any such purchase, sale or offer.

   Provided that, if at least 30 days prior to an offering of securities issued by the **Insured Organization**, the Company receives written notice of the proposed transaction and any additional information requested by the Company, the **Insured Organization** may request a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

3. The following is added to section **IV. EXCLUSIONS**:

   **EXCLUSIONS APPLICABLE TO INSURING AGREEMENT C**

   **ANTI-TRUST**

   The Company will not be liable for **Loss** on account of any **Claim** for any liability of the **Insured Organization** based upon or arising out of any actual or alleged violation of the Interstate Commerce Act of 1867, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1938, the Cellar-Kefauver Act of 1950, the Competition Act, the Federal Trade Commission Act of 1914, amendments thereto, or other federal, state, provincial or local statutory law, common law or civil law anywhere in the world designed to prevent monopolies, preclude price discrimination, price fixing or unfair trade practices, or to otherwise protect competition.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

**CONTRACTUAL LIABILITY**

The Company will not be liable for **Loss** on account of any **Claim** for any liability of the **Insured Organization** under any contract or agreement, whether oral or written, provided that this exclusion will not apply to the extent that the **Insured Organization** would have been liable for such Loss in the absence of the contract or agreement.

**EMPLOYMENT-RELATED STATUTES AND REGULATIONS**

The Company will not be liable for **Loss** on account of any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation or for any violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

**EMPLOYMENT-RELATED WRONGFUL ACTS**

The Company will not be liable for **Loss** on account of any **Claim** based upon or arising out of any employment-related **Wrongful Act**.

**INTELLECTUAL PROPERTY**

The Company will not be liable for **Loss** on account of any **Claim** for any misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret, or any other intellectual property rights.

**MECHANICAL OR ELECTRONIC FAILURE**

The Company will not be liable for **Loss** on account of any **Claim** based upon or arising out of the mechanical or electronic failure, breakdown or malfunction of any machine or system of machines.

**PLAGIARISM**

The Company will not be liable for **Loss** on account of any **Claim** for any plagiarism.

**POLLUTION, ASBESTOS, AND OTHER HAZARDS**

The Company will not be liable for **Loss** on account of any **Claim**:

a. based upon or arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of;

b. based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of; or

c. brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of,

any **Pollutant**, any oil or oil products, any electric, magnetic, or electromagnetic field, any odor or noise, or the actual or alleged presence or actual, alleged, or threatened dispersal of any asbestos, asbestos fibers, or products containing asbestos, including any **Securities Claim** or any other **Claim** brought or maintained by or on behalf of the **Insured Organization** or **Outside Entity**, its securities holders, or creditors based upon or arising out of the matters described in this exclusion.

© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00053

4.   The following is added to section **V. CONDITIONS**:

**TERMINATION OF ENHANCED ORGANIZATION LIABILITY COVERAGE FOR INSURED ORGANIZATION**

If during the **Policy Period** any debt or equity securities issued by the **Insured Organization** become listed on the NASDAQ Stock Market, the American Stock Exchange or the New York Stock Exchange (NYSE), then any additional coverage provided to the **Insured Organization** pursuant to this endorsement will apply, but only with respect to **Claims** for **Wrongful Acts** occurring prior to the issuance, offering or listing of such securities. Such additional coverage will not apply with respect to **Claims** for **Wrongful Acts** occurring after the issuance, offering or listing of such securities.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2016 The Travelers Indemnity Company. All rights reserved.
BlueRidge-00054

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND REPRESENTATIONS AND SEVERABILITY ENDORSEMENT – SIDE A NON-RESCINDABILITY

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

The following replaces the third paragraph of section **V. CONDITIONS**, **N. REPRESENTATIONS AND SEVERABILITY**:

The Company will not, under any circumstance, rescind this **Policy** with respect to any **Insured Person** under Insuring Agreement A. However, the **Insureds** agree that in the event any such statements or representations in the **Application** are: (i) untrue or inaccurate, and (ii) are either made with the intent to deceive or materially affect either the acceptance of the risk or the hazard assumed by the Company, then this **Policy** is void and of no effect whatsoever, but only with respect to:

1. the **Insured Organization**, under Insuring Agreement B, to the extent it indemnifies any **Insured Person** who knew the information that was not truthfully or accurately disclosed in the **Application**; and

2. the **Insured Organization**, under Insuring Agreements C or D, if any **Executive Officer** knew the information that was not truthfully or accurately disclosed in the **Application**,

whether or not such **Insured** or **Executive Officer** knew the **Application** contained such untruthful or inaccurate information.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00055

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## VIRGINIA CHANGES ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1. The following replaces section **III. DEFINITIONS**, **Extended Reporting Period**:

   **Extended Reporting Period** means the period of time set forth in ITEM 7 of the Declarations, which will include a period of 24 months, following the effective date of the **Termination of Coverage**, subject to the provisions of section V. CONDITIONS, D. EXTENDED REPORTING PERIOD COVERAGE.

2. The following replaces part (i) of the first paragraph of section **III. DEFINITIONS**, **Loss**:

   (i) damages, judgments, settlements, prejudgment interest, and **Defense Expenses**; provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by any **Insured**, **Loss** only includes such damages to the extent they are insurable under the law of a jurisdiction that is most favorable to the insurability of such damages, and has a substantial relationship to the **Insured**, **Claim**, Company, or this **Policy**;

3. The following is added to section **III. DEFINITIONS**:

   **Termination of Coverage** means, whether by the Company or the **Named Insured**:

   1. cancelation, termination, or nonrenewal of this **Policy**;

   2. renewal of this **Policy** on a basis other than claims-made;

   3. renewal with an exclusionary endorsement that restricts or excludes a coverage provided by this **Policy** issued immediately prior to such renewal; or

   4. where an exclusionary or restrictive change is made by endorsement during the **Policy Period**, except for changes effective on the Inception Date set forth in the Declarations.

4. The following replaces the eighth paragraph of section **V. CONDITIONS, A. LIMITS OF LIABILITY**:

   The Limits of Liability for any applicable Standard **Extended Reporting Period**, where elected by the **Named Insured** under section V. CONDITIONS, D. EXTENDED REPORTING PERIOD COVERAGE of this **Policy**, are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The purchase of a Standard **Extended Reporting Period** will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations, which are the maximum Limits of Liability of the Company for all **Loss** for all **Claims** first made during the **Policy Period** and Standard **Extended Reporting Period**, combined.

   The Limits of Liability for any applicable Enhanced **Extended Reporting Period**, where elected by the **Named Insured** under section V. CONDITIONS, D. EXTENDED REPORTING PERIOD COVERAGE of this **Policy**, are equal to the Limits of Liability for the **Policy Period**. The purchase of an Enhanced **Extended Reporting Period** will reinstate the Limits of Liability set forth in ITEM 5 of the Declarations, which are the maximum Limits of Liability of the Company for all **Loss** for all **Claims** first made during the Enhanced **Extended Reporting Period**.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number:   **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00056

5.  The following replaces section **V. CONDITIONS**, **D. EXTENDED REPORTING PERIOD**:

At any time prior to or within 60 days after the effective date of a **Termination of Coverage**, the **Named Insured** has the right, upon payment of the additional premium described below in this section, to elect an extension of coverage granted by this **Policy** for the **Extended Reporting Period**, but only with respect to: (i) a **Claim**, other than an **Interview Request**, for a **Wrongful Act** occurring before or during the **Policy Period**, or (ii) an **Interview Request** based upon or arising out of matters or circumstances that occurred before or during the **Policy Period**.

The **Named Insured** may elect to purchase one of the following options for such **Extended Reporting Period**:

1.  an **Extended Reporting Period** for which the Company's maximum Limits of Liability for all **Claims** made during such **Extended Reporting Period** will be only the remaining portion of the applicable Limits of Liability set forth in the Declarations as of the effective date of the **Termination of Coverage**, without any new, additional, or renewed Limits of Liability ("Standard **Extended Reporting Period**"); or

2.  an **Extended Reporting Period** for which the Company's maximum Limits of Liability for all **Claims** made during such **Extended Reporting Period** will be equal to the applicable Limits of Liability set forth in the Declarations ("Enhanced **Extended Reporting Period**").

The Company's maximum Limit of Liability for all **Claims** made during the Standard **Extended Reporting Period** will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the **Termination of Coverage**. The Company's maximum Limit of Liability for all **Claims** made during the Enhanced **Extended Reporting Period** will be equal to the applicable Limit of Liability set forth in the Declarations as of the effective date of the **Termination of Coverage**.

The premium due for the **Extended Reporting Period** will equal that percent set forth in ITEM 7 of the Declarations of the original annualized premium, and the fully annualized amount of any additional premium, charged by the Company for or during the **Policy Period**. The entire premium for the **Extended Reporting Period** will be deemed fully earned and non-refundable upon payment.

The right of extension will lapse unless the **Named Insured** provides written notice of such election, together with payment of the additional premium due, to the Company within 60 days following the effective date of such **Termination of Coverage**. Any **Claim** made during the **Extended Reporting Period** will be deemed made during the **Policy Period**.

It is further agreed that such **Extended Reporting Period** will not be available to any **Named Insured** where the **Policy** is nonrenewed or canceled for any of the following reasons:

a.  nonpayment of premium;

b.  failure by any **Insured** to comply with the Terms or Conditions of the **Policy**; or

c.  fraud committed by any **Insured**.

6.  The second and third paragraph of section **V. CONDITIONS**, **M. CHANGE OF CONTROL** are deleted.

7.  The following replaces section **V. CONDITIONS**, **P. TERMINATION OF POLICY**:

**P.  TERMINATION OF POLICY**

This **Policy** terminates at the earliest of the following times:

1.  the effective date of termination specified in a prior written notice by the **Named Insured** to the Company;

2.  upon expiration of the **Policy Period** set forth in ITEM 2 of the Declarations; or

3.  20 days after receipt by the **Named Insured** of a written notice of termination from the Company for failure to pay a premium when due, unless the premium is paid within such 20 day period.

The Company may not terminate this **Policy** prior to expiration of the **Policy Period**, except as provided above for non-payment of premium. In the event this **Policy** is terminated prior to the expiration of the **Policy Period** set forth in ITEM 2 of the Declarations, the Company will refund any unearned premium computed on a pro rata basis. Payment or tender of any unearned premium by the Company is not a condition precedent to the effectiveness of such termination, but such payment must be made as soon as practicable.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00057

Nonrenewal

The Company will not be required to renew this **Policy** upon its expiration. If the Company elects not to renew, it will provide to the **Named Insured** written notice to that effect at least 45 days before the Expiration Date set forth in ITEM 2 of the Declarations.

Any notice of termination or nonrenewal from the Company under this **Termination of Policy** section will be sent by first class registered mail.

8.  The following is added to section **V. CONDITIONS**, **T. ACTION AGAINST THE COMPANY**:

To the extent required by applicable law, and subject to the terms, conditions, exclusions, or limitations of this **Policy**, in the event any person or entity or the legal representative thereof has secured a final judgment against an **Insured** which constitutes covered **Loss** under this **Policy**, and such judgment remains unsatisfied after the expiration of 30 days from the service of notice of entry of the final judgment upon the attorney for the **Insured** and upon the Company, then an action may, except during a stay or limited stay of execution against the **Insured** on such judgment, be maintained against the Company, under the terms of this **Policy** for the amount of such judgment to the extent of the insurance provided by this **Policy** and not exceeding the Limits of Liability for each **Policy Period** set forth in ITEM 5 of the Declarations which will be the Company's maximum liability for all **Loss** on account of all **Claims** first made during the same **Policy Period**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00058



### LIABILITY COVERAGE TERMS AND CONDITIONS

**THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE COVERAGE LIMITS. PLEASE READ THE POLICY CAREFULLY.**

#### CONSIDERATION CLAUSE

IN CONSIDERATION of the payment of the premium, in reliance on the statements in the **Application,** subject to the Declarations, and pursuant to all the terms, conditions, exclusions and limitations of this **Policy**, the Company and the Insureds agree as follows:

### I.    GENERAL

These **Liability Coverage** Terms and Conditions apply to all **Liability Coverages**.  Unless otherwise stated to the contrary, the terms and conditions of each **Liability Coverage** apply only to that particular **Liability Coverage**.  If any provision in these Liability Coverage Terms and Conditions is inconsistent or in conflict with the terms and conditions of any particular **Liability Coverage**, such **Liability Coverage's** terms, conditions, and limitations will control for purposes of that **Liability Coverage**.

### II.    DEFINITIONS

Wherever appearing in this **Liability Policy**, the following words and phrases appearing in bold type will have the meanings set forth in this Section II. DEFINITIONS:

**A.** *Additional Defense Limit of Liability* means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**. If "*Not Applicable*" is shown as the amount of any **Liability Coverage's Additional Defense Limit of Liability**, then any reference to the **Additional Defense Limit of Liability** will be deemed to be deleted from such **Liability Coverage**.

**B.** *Annual Reinstatement of the Liability Coverage Limit of Liability* means, if included in ITEM 10 of the Declarations, the reinstatement of each applicable **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for each applicable **Liability Coverage** for each **Policy Year** during the **Policy Period**.

**C.** *Application* means the application deemed to be attached to and forming a part of this **Liability Policy**, including any materials submitted and statements made in connection with that application. If the **Application** uses terms or phrases that differ from the terms defined in this **Liability Policy**, no inconsistency between any term or phrase used in the **Application** and any term defined in this **Liability Policy** will waive or change any of the terms, conditions and limitations of this **Liability Policy**.

**D.** *Change of Control* means:
1.  the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or
2.  the obtaining by any person, entity or affiliated group of persons or entities the right to elect, appoint or designate more than fifty percent (50%) of the board of directors, board of trustees, board of managers, or functional equivalent thereof or to exercise a majority control of the board of directors, board of trustees, board of managers, or a functional equivalent thereof of the **Named Insured**.

**E.** *Claim* has the meaning set forth in the applicable **Liability Coverage**.

F.   **Defense Expenses** means reasonable and necessary legal fees and expenses incurred by the Company or the **Insured**, with the Company's consent, in the investigation, defense, settlement and appeal of a **Claim**, including but not limited to, cost of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such **Claim**; provided, that **Defense Expenses** will not include the salaries, wages, benefits or overhead of, or paid to, any **Insured** or any employee of such **Insured**.

G.   **Executive Officer** has the meaning set forth in the applicable **Liability Coverage**.

H.   **Financial Insolvency** means, with respect to the **Insured Organization** or any **Outside Entity**, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the **Insured Organization** or **Outside Entity** financially to indemnify the **Insured Persons**.

I.   **Foreign Parent Corporation** means any entity incorporated outside the United States, which owns more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint the **Named Insured's** board of directors, board of trustees or board of managers, or to exercise a majority control of the board of directors, board of trustees or board of managers of the **Named Insured**.

J.   **Insured**  has the meaning set forth in the applicable **Liability Coverage**.

K.   **Insured Organization** has the meaning set forth in the applicable **Liability Coverage**.

L.   **Insured Person** has the meaning set forth in the applicable **Liability Coverage**.

M.   **Liability Coverage** means, individually or collectively, the **Liability Coverages** that have been purchased, as indicated in ITEM 4 of the Declarations.

N.   **Liability Coverage Limit of Liability** means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**.

O.   **Liability Coverage Shared Limit of Liability** means the amount set forth in ITEM 12 of the Declarations. If "*Not Applicable*"  is shown in ITEM 12 of the Declarations or ITEM 4 of the Declarations indicates that only one **Liability Coverage** is included in this **Liability Policy**, any reference to either the **Liability Coverage Shared Limit of Liability** or ITEM 12 of the Declarations will be deemed to be deleted from this **Liability Policy**.

P.   **Liability Policy** means, collectively, the Declarations, the **Application**, the Liability Coverage Terms and Conditions, each purchased **Liability Coverage**, and any endorsements attached thereto.

Q.   **LLC Manager** means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of an **Insured Organization** that is a limited liability company.

R.   **Loss** has the meaning set forth in the applicable **Liability Coverage**.

S.   **Named Insured** means any entity named in ITEM 1 of the Declarations.

T.   **Policy Period** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations.  In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Liability Policy**.

U.   **Policy Year** means:
   1.   the period of one year following the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof;
   2.   the time between the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof and the effective date of cancellation or termination of this **Liability Policy** if such time period is less than one year;

---

3. with respect to a **Liability Coverage** added to this **Liability Policy** after the Inception Date set forth in ITEM 2, the time between the inception date of  such **Liability Coverage** and any anniversary of this **Liability Policy** if the time between the inception date of such **Liability Coverage** and any anniversary of this **Liability Policy** is less than one year; and

4. with respect to a **Liability Coverage** added to this **Liability Policy** after the Inception Date set forth in ITEM 2, the time between the inception date of such **Liability Coverage** and the effective date or cancellation or termination of this **Liability Policy**, if such time is less than one year.

**V.**   *Pollutant* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**W.**   *Potential Claim* means any **Wrongful Act** that may subsequently give rise to a **Claim**.

**X.**   *Related Wrongful Act* means all **Wrongful Acts** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event or decision.

**Y.**   *Subsidiary* has the meaning set forth in the applicable **Liability Coverage**.

**Z.**   *Wage and Hour Law* means any federal, state, or local law or regulation governing or related to the payment of wages including the payment of overtime, on-call time, minimum wages, meals, rest breaks or the classification of employees for the purpose of determining employees' eligibility for compensation under such law(s).

**AA.**   *Wrongful Act* has the meaning set forth in the applicable **Liability Coverage**.

---

**III.**   *CONDITIONS*

---

**A.**   **TERRITORY**

This **Liability Policy** applies to **Claims** made or **Wrongful Acts** occurring anywhere in the world.

**B.**   **RETENTION**

The **Insured** shall bear uninsured at its own risk the amount of any applicable Retention, which amount must be paid in satisfaction of  **Loss.**

If any **Claim** gives rise to coverage under a single **Liability Coverage**, the Company has no obligation to pay **Loss**, including **Defense Expenses**, until the applicable Retention amount set forth in ITEM 5 of the Declarations has been paid by the **Insured**.

If any **Claim** is subject to different Retentions under a single **Liability Coverage**, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions will not exceed the largest applicable Retention under such **Liability Coverage**.

If any **Claim** gives rise to coverage under two or more **Liability Coverages**, the Company shall have no obligation to pay  **Loss**, including **Defense Expenses**, until the largest Retention that is applicable to such **Claim** under such **Liability Coverages** has been paid by the **Insured**.

No Retention will apply to an **Insured Person** if indemnification by the **Insured Organization** is not permitted by law or if the **Insured Organization** is unable to make such indemnification solely by reason of its **Financial Insolvency**. The **Insured Organization** will be conclusively deemed to have indemnified all  **Insured Persons**  to the extent that the **Insured Organization** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Insured Organization**.

The Company, at its sole discretion, may pay all or part of the Retention amount on behalf of any **Insured**, and in such event, the **Insureds** agree to repay the Company any amounts so paid.

---

**C.     LIMITS OF LIABILITY**

1.     Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, and further subject to any applicable **Liability Coverage Shared Limit of Liability** or **Annual Reinstatement of the Liability Coverage Limit of Liability**:

a.     the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all applicable **Liability Coverage** under each applicable **Liability Coverage** will not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the **Declarations** for each applicable **Liability Coverage**; and

b.     in the event that a **Claim** triggers more than one **Liability Coverage**, the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for any such **Claim** will not exceed the sum of the remaining **Liability Coverage Limits of Liability** of the applicable **Liability Coverages**.

2.     Liability Coverage Shared Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established; and further subject to any applicable **Annual Reinstatement of the Liability Coverage Limit of Liability**, if ITEM 4 of the Declarations indicates that more than one **Liability Coverage** has been purchased and a **Liability Coverage Shared Limit of Liability** is shown in ITEM 12 of the Declarations:

a.     the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will not exceed the remaining **Liability Coverage Shared Limit of Liability**; and

b.     if the **Liability Coverage Shared Limit of Liability** is exhausted by the payment of amounts covered under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, the premium for all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will be fully earned, all obligations of the Company under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations.

3.     Annual Reinstatement of the Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 10 of the Declarations includes an **Annual Reinstatement of the Liability Coverage Limit of Liability**:

a.     the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** made during each **Policy Year** will not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the Declarations for each applicable **Liability Coverage** or, if applicable, the remaining **Liability Coverage Shared Limit of Liability**; and

b.     with regard to the Extended Reporting Period or the Run-Off Extended Reporting Period, if applicable, the Company's maximum limit of liability for all **Claims** made during the Extended Reporting Period or the Run-Off Extended Reporting Period will not exceed the remaining **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for the last **Policy Year** in effect at the time of the termination or cancellation of the **Liability Coverage** or the **Change of Control**.

4.      Other Provisions

Payment of **Defense Expenses** will reduce and may exhaust all applicable limits of liability. In the event the amount of **Loss** exceeds the portion of the applicable limit of liability remaining after prior payments of **Loss**, the Company's liability will not exceed the remaining amount of the applicable limit of liability. In no event will the Company be obligated to make any payment for **Loss** , including **Defense Expenses**, with regard to a **Claim** after the applicable limit of liability has been exhausted by payment or tender of payment of **Loss**.

If a **Liability Coverage Limit of Liability** is exhausted by the payment of amounts covered under such **Liability Coverage**, the premium for such **Liability Coverage** will be fully earned, all obligations of the Company under such **Liability Coverage** will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under such **Liability Coverage**.

## D.      ADDITIONAL DEFENSE COVERAGE

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 5 of the Declarations indicates that any **Liability Coverage** includes Additional Defense Coverage, **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of any **Claim** made during the **Policy Period** under any such **Liability Coverage** will apply first to and reduce the **Additional Defense Limit of Liability**. The **Additional Defense Limit of Liability** will be in addition to, and not part of, such **Liability Coverage's** applicable **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable. The **Additional Defense Limit of Liability** is applicable to **Defense Expenses** only. If the **Annual Reinstatement of the Liability Coverage Limit of Liability** is applicable, the **Additional Defense Limit of Liability** will be reinstated for each **Policy Year**.

Upon exhaustion of the Additional Defense Limit of Liability:

1.      **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of a **Claim** are part of and not in addition to any applicable limit of liability; and

2.      payment by the Company or the **Insured** , with the Company's consent, of **Defense Expenses** reduces any applicable limit of liability.

## E.      CLAIM  DEFENSE

1.      If Duty-to-Defend coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend any **Claim** covered by a **Liability Coverage**, even if the allegations are groundless, false or fraudulent, including the right to select defense counsel with respect to such **Claim**; provided, that the Company will not be obligated to defend or to continue to defend any **Claim** after the applicable limit of liability has been exhausted by payment of **Loss**.

2.      If Reimbursement coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations:

a.      the Company will have no duty to defend any **Claim** covered by a **Liability Coverage**. It will be the duty of the **Insured** to defend such **Claims**; and the Company will have the right to participate with the **Insured** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by such **Liability Coverage** and the selection of appropriate defense counsel; and

b.      upon written request, the Company will advance **Defense Expenses** with respect to such **Claim**.  Such advanced payments by the Company will be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses** under such **Liability Coverage**. As a condition of any payment of **Defense Expenses** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of any **Claim** is not covered under such **Liability Coverage**.

3.   The **Insured** agrees to cooperate with the Company and, upon the Company's request, assist in making settlements and in the defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insured** because of an act or omission insured under such **Liability Coverage**, will attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

## F.   INSURED'S DUTIES IN THE EVENT OF A CLAIM

The **Insured's** duty to report a **Claim** commences on the earliest date a written notice thereof is received by an **Executive Officer**.  If an **Executive Officer** becomes aware that a **Claim** has been made against any **Insured**, the **Insured**, as a condition precedent to any rights under this **Liability Policy,** must give to the Company written notice of the particulars of such **Claim**, including all facts related to any alleged **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable.  The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt.  The **Insured** agrees not to voluntarily settle any **Claim**, make any settlement offer, assume or admit any liability or, except at the **Insured's** own cost, voluntarily make any payment, pay or incur any **Defense Expenses**, or assume any obligation or incur any other expense, without the Company's prior written consent, such consent not to be unreasonably withheld.  The Company is not liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

## G.   NOTICE OF POTENTIAL CLAIMS

If an **Insured** becomes aware of a **Potential Claim** and gives the Company written notice of the particulars of such **Potential Claim,** including all facts related to the **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act** , the dates of the alleged events, and the reasons for anticipating a **Claim** , as soon as practicable during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, any **Claim** subsequently made against any **Insured** arising out of such **Wrongful Act** will be deemed to have been made during the **Policy Period**.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt.

## H.   RELATED  CLAIMS

All **Claims** or **Potential Claims** for **Related Wrongful Acts** will be considered as a single **Claim** or **Potential Claim**, whichever is applicable, for purposes of this **Liability Policy**. All **Claims** or **Potential Claims** for **Related Wrongful Acts** will be deemed to have been made at the time the first of such **Claims** or **Potential Claims** for **Related Wrongful Acts** was made whether prior to or during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

## I.   SUBROGATION

In the event of payment under this **Liability Policy**, the Company is subrogated to all of the **Insured's** rights of recovery against any person or organization to the extent of such payment and the **Insured** agrees to execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** will do nothing to prejudice such rights.

## J.   RECOVERIES

All recoveries from third parties for payments made under this **Liability Policy** will be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

1.   first, to the Company to reimburse the Company for any Retention amount it has paid on behalf of any **Insured**;

2.   second, to the **Insured** to reimburse the **Insured** for the amount it has paid which would have been paid hereunder but for the fact that it is in excess of the applicable limits of liability hereunder;

3.    third, to the Company to reimburse the Company for the amount paid hereunder; and

4.    fourth, to the **Insured** in satisfaction of any applicable Retention;

provided, recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit.

## K.    CHANGE OF CONTROL

If, during the **Policy Period**, a **Change of Control** occurs, coverage will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed after such event.  No coverage will be available hereunder for **Loss**, including **Defense Expenses**, for any **Claim** based upon, alleging, arising out of, or in any way relating to, directly or indirectly any **Wrongful Act** committed or allegedly committed after such event.  After any such event, the **Liability Policy** may not be canceled by the **Named Insured** and the entire premium for the **Liability Policy** will be deemed fully earned.

Upon the occurrence of any **Change of Control**, the **Named Insured** will have the right to give the Company notice that it desires to purchase a Run-Off Extended Reporting Period for any **Liability Coverage** for the period set forth in ITEM 9 of the Declarations following the effective date of such **Change of Control**, regarding **Claims** made during such Run-Off Extended Reporting Period against persons or entities who at the effective date of the **Change of Control** are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to such **Change of Control** and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.    such Run-Off Extended Reporting Period will not provide new, additional or renewed limits of liability; and

2.    the Company's total liability for all **Claims** made during such Run-Off Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the **Change of Control**.

The premium due for the Run-Off Extended Reporting Period will equal the percentage set forth in ITEM 9 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Period** prior to the **Change of Control**. The entire premium for the Run-Off Extended Reporting Period will be deemed fully earned at the commencement of such Run-Off Extended Reporting Period.

The right to elect the Run-Off Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the **Change of Control**. In the event the Run-Off Extended Reporting Period is purchased, the option to purchase the Extended Reporting Period in Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions will terminate. In the event the Run-Off Extended Reporting Period is not purchased, the **Named Insured** will have the right to purchase the Extended Reporting Period under the terms of Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions.

If, at any time during the **Policy Period**, the **Insured Organization** eliminates or reduces its ownership interest in, or control over a **Subsidiary**, such that it no longer meets the definition of a **Subsidiary**, coverage will continue for such entity but only with regard to **Claims** for **Wrongful Acts** which occurred wholly during the time that the entity was a **Subsidiary**.

## L.    ACQUISITIONS

If, during the **Policy Period**, the **Insured Organization** acquires or forms a **Subsidiary**, this **Liability Policy** will provide coverage for such **Subsidiary** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Policy**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for such **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired or formed **Subsidiary** do not exceed 30% of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement; or (2) the acquisition or formation occurs less than 90 days prior to the end of the **Policy Period**.

**M.**     **SPOUSAL AND DOMESTIC PARTNER LIABILITY COVERAGE**

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse or a person qualifying as a domestic partner under the provisions of any applicable federal, state or local law (a "Domestic Partner") of an **Insured Person**, but only if and so long as:

1.     the **Claim** against such spouse or Domestic Partner results from a **Wrongful Act** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, or who is joined with the Domestic Partner; and

2.     such **Insured Person** and his or her spouse or Domestic Partner are represented by the same counsel in connection with such **Claim**.

No spouse or Domestic Partner of an **Insured Person** will, by reason of this subsection have any greater right to coverage under this **Liability Policy** than the **Insured Person** to whom such spouse is married, or to whom such Domestic Partner is joined.

The Company has no obligation to make any payment for **Loss** in connection with any **Claim** against a spouse or Domestic Partner of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse or Domestic Partner.

**N.**     **FOREIGN PARENT CORPORATION COVERAGE**

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply coverage for **Defense Expenses** resulting from any **Claim** made against a **Foreign Parent Corporation**, but only if and so long as:

1.     such **Claim** results from a **Wrongful Act** actually or allegedly committed solely by any **Insured**;

2.     such **Insured** and the **Foreign Parent Corporation** are represented by the same counsel in connection with such **Claim**; and

3.     such **Insured** is included as a co-defendant.

No **Foreign Parent Corporation** will, by reason of this subsection, have any greater right to coverage under this **Liability Policy** than any **Insured**.

The Company has no obligation to make any payment for **Loss** in connection with any **Claim** against a **Foreign Parent Corporation** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such **Foreign Parent Corporation** or any member of the board of directors, officer, employee, or functional equivalent thereof.

**O.**     **EXTENDED REPORTING PERIOD**

At any time prior to or within 60 days after the effective date of termination or cancellation of any Liability Coverage for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the Declarations following the effective date of such termination or cancellation, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.     such Extended Reporting Period will not provide a new, additional or renewed limit(s) of liability; and

2.     the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancellation;

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such termination or cancellation. The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 60 days of the effective date of the termination or cancellation.

**P.   ALLOCATION**

1.   If Duty-to-Defend coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then such covered  **Loss**  and uncovered loss will be allocated as follows:

   a.   one hundred percent (100%) of **Defense Expenses** incurred by the **Insureds** who are afforded coverage for such **Claim** will be allocated to covered **Loss**; and

   b.   all loss other than **Defense Expense** will be allocated between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under such **Liability Coverage**. In making such a determination, the **Insured Organization**, the **Insured Persons** and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts. In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

2.   If Reimbursement coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, the **Insureds**  and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts. In making such a determination, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under the applicable **Liability Coverage**. In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

**Q.   CANCELLATION**

The Company may cancel this **Liability Policy** for failure to pay a premium when due, in which case twenty (20) days written notice will be given to the **Named Insured**, unless, payment in full is received within twenty (20) days of the **Named Insured's** receipt of such notice of cancellation. The Company has the right to the premium amount for the portion of the **Policy Period** during which this **Liability Policy** was in effect.

Subject to the provisions set forth in Section III. CONDITIONS K. CHANGE OF CONTROL, the **Named Insured** may cancel any **Liability Coverage** by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Named Insured** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this **Liability Policy** upon its expiration.  If the Company elects not to renew, it will provide to the **Named Insured** written notice to that effect at least thirty (30) days before the Expiration Date set forth in ITEM 2 of the Declarations.

**R.**  **ACTION AGAINST THE COMPANY**

No action will lie against the Company unless there has been full compliance with all of the terms of this **Liability Policy**.

No person or organization has any right under this **Liability Policy** to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor may the Company be impleaded by an **Insured**  or said **Insured's** legal representative.  Bankruptcy or insolvency of any **Insured** or an **Insured's**  estate does not relieve the Company of any of its obligations hereunder.

**S.**  **CHANGES**

Only the **Named Insured** is authorized to make changes in the terms of this **Liability Policy** and solely with the Company's prior written consent.  This **Liability Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **Liability Policy**.  Notice to any representative of the  **Insured**  or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **Liability Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Liability Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Liability Policy** issued by the Company.

**T.**  **ASSIGNMENT**

This **Liability Policy** may not be assigned or transferred, and any such attempted assignment or transfer is void and without effect unless the Company has provided its prior written consent to such assignment or transfer.

**U.**  **REPRESENTATIONS**

By acceptance of the terms set forth in this **Liability Policy**, each **Insured** represents and agrees that the statements contained in the **Application**, which is deemed to be attached hereto, incorporated herein, and forming a part hereof, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this  **Liability Policy**  is issued in reliance upon the truth of such representations, and embodies all agreements existing between said  **Insured**  and the Company or any of its agents.

If any statement or representation in the **Application** is untrue with respect to any **Liability Coverage**, such **Liability Coverage** is void and of no effect whatsoever, but only with respect to:
1.   any **Insured Person** who knew, as of the Inception Date set forth in ITEM 2 of the Declarations, that the statement or representation was untrue;
2.   any **Insured Organization**, with respect to its indemnification coverage, to the extent it indemnifies any **Insured Person** referenced in 1. above; and
3.   any **Insured Organization**, if the person who signed the **Application** knew that the statement or representation was untrue.

Whether an **Insured Person** had such knowledge will be determined without regard to whether the **Insured Person** actually knew the **Application**, or any other application completed for this **Liability Policy**, contained any such untrue statement or representation.

**V.**  **LIBERALIZATION**

If, during the **Policy Period**, the Company is required, by law or by insurance supervisory authorities of the state in which this **Liability Policy** was issued, to make any changes in the form of this **Liability Policy**, by which the insurance afforded by this **Liability Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance will inure to the benefit of the **Insured** as of the date the revision or change is approved for general use by the applicable department of insurance.

**W.  AUTHORIZATION**

By acceptance of the terms herein, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due hereunder, and the receiving of notices of cancellation, nonrenewal, or change of coverage, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**; provided, that nothing herein will relieve the **Insureds** from giving any notice to the Company that is required under this **Liability Policy**.

**X.  ENTIRE AGREEMENT**

The Declarations, the **Application**, the Liability Coverage Terms and Conditions, each **Liability Coverage**, and any endorsements attached thereto, constitute the entire agreement between the Company and the **Insured**.

**Y.  HEADINGS**

The titles of the various paragraphs of this **Liability Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## COMBINED AGGREGATE LIMIT OF LIABILITY FOR ALL LOSS FOR ALL EMPLOYER SECURITIES CLAIMS ENDORSEMENT

This endorsement modifies the following:

**Fiduciary Liability**

---

**It is agreed that**:

1. The following is added to Item 5. of the Declarations:

   **Employer Securities Claim Limit of Liability  $3,000,000**

2. The following is added to section **II. DEFINITIONS** of the **Liability Coverage Terms and Conditions**:

   ***Employer Securities Claim*** means a **Claim** based upon or arising out of any securities issued by the **Insured Organization**

.
3. The following is added to section **III. CONDITIONS, C. LIMITS OF LIABILITY** 1. of the **Liability Coverage Terms and Conditions:**

   However, the Company's maximum limit of liability for **Loss** for **Claims** based upon or arising out of any **Employer Securities Claim** is further limited by the following:

   The Company's maximum limit of liability for all **Loss,** including  **Defense Expenses**, covered under one or  more Scheduled Policies or **Liability Coverages** set forth below for all **Employer Securities Claims** first made against the **Insured** during the **Policy Period**, including the Extended Reporting  Period or Run-Off  Extended  Reporting Period  if  exercised, will  be  the  **Employer Securities Claim Limit of Liability** set forth in Item 5. of the Declarations. Such **Employer Securities  Claim  Limit  of Liability** amount is included within, and not in addition to, any other applicable limit of liability.

   If  **Loss**  arising  from  any  **Employer  Securities Claim** is covered under  more t han one Scheduled Policy or **Liability Coverage**, the applicable limits of liability  under such  Scheduled Policies or  **Liability Coverages** will apply separately to each part of such **Loss** subject to the **Employer Securities Claim Limit of Liability**.

   The  **Employer Securities Claim Limit of Liability** will be  reduced, and may be exhausted, by payment of **Loss** for  any  **Employer Securities  Claim**  under  any  of  the  Scheduled  Policies  or  **Liability Coverages**. **Defense Expenses** are part of, and not in addition to,  the **Employer Securities Claim Limit of Liability** and the payment of **Defense Expenses** will reduce, and may exhaust, such **Employer Securities Claim Limit of Liability**.

   The Company's  obligations  under  each Scheduled Policy  or  **Liability Coverage**  for any **Employer Securities Claim** shall cease once the:

   (1) applicable limits of liability under such Scheduled Policy or **Liability Coverage**, or

   (2) **Employer Securities Claim Limit of Liability**,

has first been exhausted by payment of **Loss**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

---

©2009 The Travelers Companies, Inc. All Rights Reserved

BlueRidge-00070

The limits of liability for the Extended Reporting Period or Run-Off Extended Reporting Period, if exercised, are part of, and not in addition to, the applicable Scheduled Policy or **Liability Coverage's** limit of liability and the **Employer Securities Claim Limit of Liability** for the **Policy Period.** The purchase of an Extended Reporting Period or Run-Off Extended Reporting Period will not increase or reinstate the applicable Scheduled Policy or **Liability Coverage's** limit of liability or the **Employer Securities Claim Limit of Liability** for the **Policy Period.**

**Scheduled Policies or Liability Coverages and Corresponding Policy Periods:**

| Policy or Liability Coverage Part | Corresponding Policy Period |
|---|---|
| **D&O** | **1/1/2018-2019** |

4.  The following is added to section **III. CONDITIONS, D. ADDITIONAL DEFENSE COVERAGE** of the Liability Coverage Terms and Conditions:

The Company's maximum liability for all **Defense Expenses** for all **Employer Securities Claims** paid pursuant to the **Additional Defense Limit of Liability** will not exceed the **Employer Securities Claim Limit of Liability** set forth in Item 5. of the Declarations. Such **Defense Expenses** will be part of, and not in addition to, such **Employer Securities Claim Limit of Liability** and such **Employer Securities Claim Limit of Liability** will be reduced,and may be exhausted, by payment of such **Defense Expenses** under the **Additional Defense Limit of Liability**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

---

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

---

### SELECTONE FOR FINANCIAL INSTITUTIONS COVERAGE ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability, Fiduciary Liability, Financial Institution Professional Liability**

---

**It is agreed that:**

1.  The following replaces section *II. DEFINITIONS*, **D.** of the Liability Coverage Terms and Conditions:

     **D.** *Change of Control* means:

     1.  the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity;

     2.  the obtaining by any person, entity or affiliated group of persons or entities the right to elect, appoint or designate more than 50% of the board of directors, board of trustees, board of managers, or functional equivalent thereof or to exercise a majority control of the board of directors, board of trustees, board of managers, or a functional equivalent thereof of the **Named Insured**; or

     3.  the appointment of any governmental agency or regulator as receiver, conservator or legal custodian of:

          a.  the **Named Insured**; or

          b.  one or more **Insured Organizations**, if the total assets of the **Insured Organizations** under receivership, conservatorship or custodianship equal or exceed 30% of the total assets of all **Insured Organizations** as reflected in the **Insured Organizations'** most recent fiscal year-end financial statements prior to the Inception Date of the **Policy Period.**

2.  The following replaces the first paragraph of section *III. CONDITIONS*, **F.** of the Liability Coverage Terms and Conditions:

     **F.**  **INSURED'S DUTIES IN THE EVENT OF A CLAIM**

     The **Insured's** duty to report a **Claim** commences on the earliest date a written notice thereof is received by an **Executive Officer.** The **Insured**, as a condition precedent to any rights under this **Liability Policy**, must give to the Company written notice of the particulars of such **Claim**, including all facts related to any alleged **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable, but in no event later than 90 days from the expiration of the **Policy Period** or the expiration of the Extended Reporting Period or Run-Off Extended Reporting Period, if purchased. The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

---

© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00072

3.   The following replaces section *III. CONDITIONS*, **L. ACQUISITIONS** of the Liability Coverage Terms and Conditions:

**L.   ACQUISITIONS OR CREATIONS OF SUBSIDIARIES; PURCHASE OF ASSETS OR ASSUMPTION OF LIABILITIES**

If, during the **Policy Period**, the **Insured Organization**:

1.   acquires or forms a **Subsidiary**;

2.   acquires any entity by such entity's merger into, or consolidation with, the **Insured Organization** such that the **Insured Organization** is the surviving entity;

3.   purchases assets of another entity, without acquiring such entity; or

4.   assumes liabilities of another entity, without acquiring such entity,

then this **Liability Policy** will provide coverage for such acquired or formed entity and its **Insured Persons**, or for such purchased assets or assumed liabilities, subject to all other terms and conditions of this **Liability Policy**, provided that written notice of such acquisition, formation, purchase or assumption has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such acquisition, formation, purchase or assumption. Such coverage will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

However, the 90-day notice requirement and the 90-day limitation of coverage will not apply to:

1.   any **Subsidiary** acquired or formed by the **Insured Organization** if:

a.   the assets of the **Subsidiary** do not exceed 30% of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement prior to the Inception Date of the **Policy Period**; or

b.   the acquisition or formation of the **Subsidiary** occurs less than 90 days prior to the end of the **Policy Period**; or

2.   assets purchased or liabilities assumed by the **Insured Organization** if:

a.   the purchased assets or assumed liabilities do not exceed 30% of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement prior to the Inception Date of the **Policy Period**; or

b.   the purchase of assets or assumption of liabilities occurs less than 90 days prior to the end of the **Policy Period**.

Any coverage afforded under this section will only extend to **Wrongful Acts** relating to, or in connection with, such acquisition, formation, purchased assets, or assumed liabilities committed after such acquisition, formation, purchase of assets, or assumption of liabilities, unless the Company agrees, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for **Wrongful Acts** committed before such acquisition, creation, purchase of assets, or assumption of liabilities.

© 2012 The Travelers Indemnity Company.  All rights reserved.

4.      In the Private Company Directors and Officers Liability, Employment Practices Liability, and Fiduciary Liability Coverages, the following replaces the last two sentences in the definition of **Claim**:

A **Claim** will be deemed to have been made when such **Claim** is first commenced as set forth in this definition or, in the case of a written demand, when such written demand is first received by an **Insured**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00074

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXPANDED CLAIM DEFENSE OPTIONS ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability, Fiduciary Liability, Financial Institution Professional Liability, CyberRisk**

**It is agreed that:**

1.     The following replaces ITEM 7 of the Declarations:

| ITEM 7 | TYPE OF CLAIM DEFENSE: | |
|---|---|---|
| | **Employment Practices Liability** | **Duty to Defend** |
| | **Fiduciary Liability** | **Duty to Defend** |
| | **Financial Institution Professional Liability** | **Reimbursement** |
| | **CyberRisk** | **Duty to Defend** |

2.     The following replaces section *III. CONDITIONS*, **E. CLAIM DEFENSE** of the Liability Coverage Terms and Conditions:

**E.     CLAIM DEFENSE**

   1.     If Duty-to-Defend coverage is provided with respect to any **Liability Coverage(s)** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend any **Claim** covered by such **Liability Coverage**, even if the allegations are groundless, false or fraudulent, including the right to select defense counsel with respect to such **Claim**; provided, that the Company will not be obligated to defend or to continue to defend any **Claim** after the applicable limit of liability has been exhausted by payment of **Loss**.

   2.     If Reimbursement coverage is provided with respect to any **Liability Coverage(s)** as indicated in ITEM 7 of the Declarations:

      a.     the Company will have no duty to defend any **Claim** covered by such **Liability Coverage**. It will be the duty of the **Insured** to defend such **Claims**; and the Company will have the right to participate with the **Insured** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by such **Liability Coverage** and the selection of appropriate defense counsel; and

      b.     upon written request, the Company will advance **Defense Expenses** with respect to such **Claim**. Such advanced payments by the Company will be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses** under such **Liability Coverage**. As a condition of any payment of **Defense Expenses** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of any **Claim** is not covered under such **Liability Coverage**.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00075

3.    The **Insured** agrees to cooperate with the Company and, upon the Company's request, assist in making settlements and in the defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insured** because of an act or omission insured under such **Liability Coverage**, will attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00076

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PPACA, SECTION 502(c), SECTION 507, AND SECTION 4975 CIVIL MONEY PENALTIES ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| | | |
|---|---|---|
| **PPACA Civil Money Penalties Limit of Liability:** | **$100,000** | which amount is included within, and not in addition to, any applicable limit of liability. |
| **Section 502(c) Penalties Limit of Liability:** | **$100,000** | which amount is included within, and not in addition to, any applicable limit of liability. |
| **Section 507 Penalties Limit of Liability:** | **$100,000** | which amount is included within, and not in addition to, any applicable limit of liability. |
| **Section 4975 Penalties Limit of Liability:** | **$100,000** | which amount is included within, and not In addition to, any applicable limit of liability. |
| **Retention:** **$5,000** | | for each **Claim** under Insuring Agreement A that seeks only **Section 502(c) Penalties** |
| **Retention:** **$5,000** | | for each **Claim** under Insuring Agreement A that seeks only **Section 507 Penalties** |
| **Retention:** **$5,000** | | for each **Claim** under Insuring Agreement A that seeks only **Section 4975 Penalties** |

2. The following is added to section **III. CONDITIONS**, **B. RETENTION** of the Liability Coverage Terms and Conditions:

   The Retention under this **Liability Coverage** for each **Claim** under Insuring Agreement A set forth in ITEM 5 of the Declarations will not apply to each **Claim** that seeks only **Section 502(c) Penalties** and, instead, the Retention for each **Claim** that seeks only **Section 502(c) Penalties** will be the amount set forth in ITEM 5 of the Declarations as the Retention for each **Claim** under Insuring Agreement A that seeks only **Section 502(c) Penalties**.

   The Retention under this **Liability Coverage** for each **Claim** under Insuring Agreement A set forth in ITEM 5 of the Declarations will not apply to each **Claim** that seeks only **Section 507 Penalties** and, instead, the Retention for each **Claim** that seeks only **Section 507 Penalties** will be the amount set forth in ITEM 5 of the Declarations as the Retention for each **Claim** under Insuring Agreement A that seeks only **Section 507 Penalties**.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

BlueRidge-00077

The Retention under this **Liability Coverage** for each **Claim** under Insuring Agreement A set forth in ITEM 5 of the Declarations will not apply to each **Claim** that seeks only **Section 4975 Penalties** and, instead, the Retention for each **Claim** that seeks only **Section 4975 Penalties** will be the amount set forth in ITEM 5 of the Declarations as the Retention for each **Claim** under Insuring Agreement A that seeks only **Section 4975 Penalties**.

3.   The following is added to section 1 of **III. CONDITIONS, C. LIMITS OF LIABILITY**, of the Liability Coverage Terms and Conditions:

However, the Company's maximum limit of liability for all:

(1)   **PPACA Civil Money Penalties** will be the PPACA Civil Money Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable limit of liability.

(2)   **Section 502(c) Penalties** will be the Section 502(c) Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable limit of liability;

(3)   **Section 507 Penalties** will be the Section 507 Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable limit of liability; and

(4)   **Section 4975 Penalties** will be the Section 4975 Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable limit of liability.

4.   The following is added to section **II. DEFINITIONS** of the **Liability Coverage**:

*PPACA Civil Money Penalties* means civil money penalties or fines imposed on any **Insured** pursuant to the Patient Protection and Affordable Care Act, as amended, including any rules or regulations promulgated thereunder. **PPACA Civil Money Penalties** does not include any civil money penalties imposed on any **Insured** pursuant to section 4980H of the Internal Revenue Code.

*Section 502(c) Penalties* means civil penalties imposed on any **Insured** pursuant to Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended, including such penalties imposed on any **Insured** pursuant to the Pension Protection Act of 2006, as amended, including **Section 507 Civil Money Penalties**.

*Section 507 Penalties* means civil money penalties imposed on any **Insured** pursuant to Section 507 of Title V of the Pension Protection Act of 2006, as amended.

*Section 4975 Penalties* means the 15% or less tax imposed on any **Insured** as a penalty pursuant to Section 4975 of the Internal Revenue Code, as amended.

5.   The following replaces section 1 of **II. DEFINITIONS**, **M. Loss**, of the **Liability Coverage**:

1.   civil or criminal fines (except **Settlement Fees** pursuant to Insuring Agreement B.; **PPACA Civil Money Penalties**; **Section 502(c) Penalties**; **Section 507 Penalties**; civil penalties under Sections 502(i) and 502(l) of **ERISA** or the privacy provisions of **HIPAA**; or, in the United Kingdom, civil penalties imposed by the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, Pensions Regulator, or any successor body thereto, provided that the funds or assets of the pension scheme will not be used to fund, pay or reimburse the premium for this coverage or any portion thereof); sanctions; liquidated damages; payroll or other taxes (except **Section 4975 Penalties**); or damages or types of relief deemed uninsurable under applicable law; provided that **Defense Expenses** will be provided for items specifically excluded from **Loss** pursuant to section II. DEFINITIONS, M. Loss, 1., subject to the other terms, conditions, and exclusions of this **Liability Policy**;

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GLOBAL COVERAGE COMPLIANCE ENDORSEMENT

This endorsement changes the following:

**Liability Coverage Terms and Conditions**

**It is agreed that:**

1. The following is added to section **II. DEFINITIONS**:

    *Financial Interest* means the **Named Insured's** insurable interest in an **Insured Organization** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **Named Insured's**:

    1. ownership of the majority of the outstanding securities or voting rights of such **Insured Organization** representing the present right to elect, appoint, or exercise a majority control over such **Insured Organization's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

    2. indemnification of, or representation that it has an obligation to indemnify, such **Insured Organization** for **Loss** incurred by such **Insured Organization**; or

    3. election or obligation to obtain insurance for such **Insured Organization**.

2. The following is added to section **III. CONDITIONS**:

    **SANCTIONS**

    This **Liability Policy** will provide coverage, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition, or restriction.

3. The following replaces section **III. CONDITIONS, A. TERRITORY**:

    **A.  TERRITORY AND VALUATION**

    1. This **Liability Policy** applies anywhere in the world; provided, this **Liability Policy** does not apply to **Loss** incurred by an **Insured**, or a **Foreign Parent Corporation**, residing or domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

    2. In the event an **Insured Organization** incurs **Loss** referenced in 1. above to which this insurance would have applied, the Company will reimburse the **Named Insured** for its **Loss**, on account of its **Financial Interest** in such **Insured Organization**. As a condition precedent to such reimbursement, or any rights under this **Liability Policy**, the **Named Insured** will cause the **Insured Organization** or its **Insured Persons** to comply with the conditions of this **Liability Policy**.

    3. All premiums, Limits of Liability, Retention, **Loss**, and other amounts under this **Liability Policy** are expressed and payable in the currency of the United States. If a judgment is rendered, settlement is denominated, or another element of **Loss** under this **Liability Policy** is stated in a currency other than United States dollars, payment under this **Liability Policy** will be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon, or any other element of **Loss** is due, respectively.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

4.   The following is added to section **III. CONDITIONS**, **E. CLAIM DEFENSE**:

In the event of a **Claim** against an **Insured** or **Foreign Parent Corporation** that resides or is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance and if Duty-to-Defend coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend such **Claim** as set forth in this section III. CONDITIONS, E. CLAIM DEFENSE, 1. to the extent that doing so would not violate the laws or regulations of such country or jurisdiction.

If the Company is prohibited from defending such **Claim** or if Reimbursement coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, then this section III. CONDITIONS, E. CLAIM DEFENSE, 2. applies to such **Claim**; provided, any such **Claim** is subject to section III. CONDITIONS, P. ALLOCATION, 2.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## VIRGINIA CHANGES ENDORSEMENT

This endorsement changes the following:

**Liability Coverage Terms and Conditions**

**It is agreed that:**

1.     The following is added to section **II. DEFINITIONS**:

*Termination of Coverage* means, whether by the Company or the **Named Insured** at any time:

1.     cancellation, termination, or nonrenewal of this **Liability Policy**;

2.     renewal of this **Liability Policy** on a basis other than claims-made;

3.     renewal with an exclusionary endorsement that restricts or excludes a coverage provided by this **Liability Policy** issued immediately prior to such renewal;

4.     advancement of the Continuity Date; or

5.     where an exclusionary or restrictive change is made by endorsement during the **Policy Period**, except for changes effective on the Inception Date set forth in the Declarations.

2.     The following replaces section **III. CONDITIONS**, **C. LIMITS OF LIABILITY**, 3. Annual Reinstatement of the Liability Coverage Limit of Liability:

3.     Annual Reinstatement of the Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment of made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 10 of the Declarations includes an **Annual Reinstatement of the Liability Coverage Limit of Liability**:

a.     the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** made during each **Policy Year** will not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the Declarations for each applicable **Liability Coverage** or, if applicable, the remaining **Liability Coverage Shared Limit of Liability**;

b.     with regard to the Extended Reporting Period, if applicable, the Company's maximum limit of liability for all **Claims** made during the Extended Reporting Period:

(1)     will not exceed the remaining **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for the last **Policy Year** in effect at the time of the **Termination of Coverage**, where the **Named Insured** elects the Standard Extended Reporting Period under section **III. CONDITIONS**, **O. EXTENDED REPORTING PERIOD**, of the Liability Coverage Terms and Conditions; or

(2)     will not exceed the **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for the last **Policy Year** in effect at the time of the **Termination of Coverage**, where the **Named Insured** elects the Enhanced Extended Reporting Period under section **III. CONDITIONS**, **O. EXTENDED REPORTING PERIOD**, of the Liability Coverage Terms and Conditions; and

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number:      **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00081

    c.    with regard to the Run-Off Extended Reporting Period, if applicable, the Company's maximum limit of liability for all **Claims** made during the Run-Off Extended Reporting Period will not exceed the remaining **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for the last **Policy Year** in effect at the time of the **Change of Control**.

3.    The following replaces section **III. CONDITIONS**, **C. LIMITS OF LIABILITY**, 4. Other Provisions:

    4.    Other Provisions

Payment of **Defense Expenses** will reduce and may exhaust all applicable limits of liability. In the event the amount of **Loss** exceeds the portion of the applicable limit of liability remaining after prior payments of **Loss**, the Company's liability will not exceed the remaining amount of the applicable limit of liability. In such event, the Company will not be obligated to make any payment for **Loss**, including **Defense Expenses**, or any pending claims, provided, however, that this provision will not limit the right of the **Named Insured** to elect an Extended Reporting Period as set forth herein.

4.    The following is added to section **III. CONDITIONS**, **K. CHANGE OF CONTROL**:

Standard Run-Off Extended Reporting Periods will be three and six years.

5.    The following replaces section **III. CONDITIONS**, **O. EXTENDED REPORTING PERIOD**:

At any time prior to or within 90 days after the effective date of a **Termination of Coverage**, any **Named Insured** to which the applicable limit of liability separately applies may give the Company written notice that it desires to purchase an Extended Reporting Period offered by the Company. Such offering will include a period of 24 months for all liability coverages for which this form applies, following the effective date of such **Termination of Coverage**, regarding **Claims** made during such Extended Reporting Period against persons or entities who at the effective date of **Termination of Coverage** are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of **Termination of Coverage** and which otherwise would be covered by such **Liability Coverage**. The **Named Insured** may elect to purchase one of the following options for such Extended Reporting Period:

    1.    an Extended Reporting Period for which the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the **Termination of Coverage**, without any new, additional, or renewed limit of liability ("Standard Extended Reporting Period"); or

    2.    an Extended Reporting Period for which the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be equal to the applicable limit of liability set forth in the Declarations ("Enhanced Extended Reporting Period").

The Company's maximum limit of liability for all **Claims** made during the Standard Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the **Termination of Coverage**. The Company's maximum limit of liability for all **Claims** made during the Enhanced Extended Reporting Period will be equal to the applicable limit of liability set forth in the Declarations as of the effective date of the **Termination of Coverage**.

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such **Termination of Coverage**. Such percentage will reflect, among other factors, which type of Extended Reporting Period the **Named Insured** elects to purchase. The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00082

Such Extended Reporting Period will be excess over any insurance purchased or obtained by the **Named Insured** or its successors in business, which replaces in whole or in part the insurance afforded by this Policy.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 90 days of the effective date of the termination or cancellation.

It is further agreed that such Extended Reported Period will not be available to any **Named Insured** where the **Liability Policy** is terminated or cancelled for any of the following reasons:

a.   nonpayment of premium;

b.   failure by any **Insured** to comply with the terms or conditions of the **Liability Policy**; or

c.   fraud committed by any **Insured**.

6.   The second paragraph of section **III. CONDITIONS, R. ACTION AGAINST THE COMPANY** is amended by deleting the phrase "Bankruptcy or insolvency of the Insured will not relieve the Company of any of its obligations hereunder." and replacing it with "Bankruptcy or insolvency of the Insured, or insolvency of the Insured's estate, will not relieve the Company of any of its obligations hereunder."

7.   The following is added to section **III. CONDITIONS**, **U. REPRESENTATIONS**:

Policies may only be voided by court order.

8.   The following is added to section **III. CONDITIONS**:

**LOSS INFORMATION**

At the request of the **Named Insured**, the Company will provide loss information to the **Named Insured** within 45 days of a request.

9.   The following is added to the introduction of the Declarations:

Please read this **Liability Policy** carefully to understand the terms and conditions of coverage provided herein. There are certain circumstances in which the **Named Insured** must be provided the opportunity to purchase an Extended Reported Period for reporting **Claims**. These circumstances are explained in section **III. CONDITIONS, O. EXTENDED REPORTING PERIOD**, of the Liability Coverage Terms and Conditions, as amended by this Virginia Changes Endorsement. If you have any questions regarding the cost of an Extended Reporting Period or the available options thereunder, please contact the Company or an authorized agent.

10.   The following is deleted from section **II. DEFINITIONS**, **Loss**, of the **Liability Coverage**:

"prejudgment and postjudgment interest"

and is replaced with: "prejudgment interest".

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00083



*EMPLOYMENT PRACTICES LIABILITY COVERAGE*

***THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ ALL TERMS CAREFULLY.***

## I.    INSURING  AGREEMENT

**A**.    The Company will pay on behalf of the **Insured**, **Loss** for any **Employment Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Employment Practice**.

**B**.    If ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, the Company will pay on behalf of the **Insured**, **Loss** for any **Third Party Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Third Party Wrongful Act**.

## II.    DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in section II. DEFINITIONS:

**A**.    ***Claim*** means an **Employment Claim** or, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, a **Third Party Claim**.  A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim**  will be deemed to have been made on the date such  **Insured Person**  first received written notice of the  **Claim**.

**B**.    ***Claimant*** means:

1.    a past, present or future **Employee** of or applicant for employment with the **Insured Organization**;

2.    a governmental entity or agency, including the Equal Employment Opportunity Commission or similar federal, state or local agency, when acting on behalf of or for the benefit of a past, present or future **Employee** or applicant for employment with the **Insured Organization**; or

3.    any **Independent Contractor**.

**C**.    ***Discrimination*** means any actual or alleged:

1.    violation of any employment discrimination law; or

2.    disparate treatment of, or the failure or refusal to hire a **Claimant** or **Outside Claimant** because he or she is or claims to be a member of a class which is or is alleged to be legally protected.

**D**.    ***Employee*** means a natural person whose labor or service is engaged by and directed by the **Insured Organization** and:

1.    who is on the payroll of the **Insured Organization**, including:

a.    any in-house general counsel of the **Insured Organization**; and

     b.      any other full-time, part-time, and seasonal worker;

    2.      who is a volunteer or temporary worker; or

    3.      whose services have been leased by the **Insured Organization**.

**Independent Contractors** are not **Employees**.  The status of an individual as an **Employee** will be determined as of the date of the alleged **Wrongful Act**.

**E**.     *Employment Agreement* means any express or implied employment agreement regardless of the basis in which such agreement is alleged to exist, other than a collective bargaining agreement.

**F**.     *Employment Claim* means:

    1.      a written demand for monetary damages or non-monetary relief;

    2.      a civil proceeding commenced by service of a complaint or similar pleading;

    3.      a criminal proceeding commenced by filing of charges;

    4.      a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document, including a proceeding before the Equal Employment Opportunity Commission or any similar governmental agency; provided that in the context of an audit conducted by the Office of Federal Contract Compliance Programs,  **Employment Claim** will be limited to a Notice of Violation or Order to Show Cause or written demand for monetary damages or non-monetary relief;

    5.      an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

    6.      a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** by or on behalf of or for the benefit of a **Claimant**, or against an **Insured Person** serving in an **Outside Position** by or on behalf of or for the benefit of an **Outside Claimant**, for a **Wrongful Employment Practice**; provided that **Employment Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

**G**.     *Executive Officer* means an officer, member of the board of directors, natural person partner, principal, risk manager, **LLC Manager**, in-house general counsel, member of the staff of the human resources department of the **Insured Organization** or a functional equivalent thereof.

**H**.     *Independent Contractor* means any natural person who is not an **Employee** but who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement. The status of an individual as an **Independent Contractor** will be determined as of the date of the alleged **Wrongful Act**.

**I**.     *Insured* means the **Insured Persons** and the **Insured Organization**.

**J**.     *Insured Organization* means the **Named Insured**, any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

**K**.     *Insured Person* means any natural person who was, is or becomes an **Employee**, duly elected or appointed member of the board of directors, officer, member of the board of trustees, member of the board of regents, member of the board of governors, natural person partner, **LLC Manager** or a functional equivalent thereof of the **Insured Organization** for **Wrongful Acts** committed in the discharge of his or her duties as such, or while serving in an **Outside Position**.

©2009 The Travelers Companies, Inc. All Rights Reserved

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

L.  *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages; prejudgment and postjudgment interest; and legal fees and expenses of a **Claimant** or **Outside Claimant** awarded pursuant to a court order or judgment. "**Loss**" does not include:

1.  civil or criminal fines; sanctions; liquidated damages other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act; payroll or other taxes; or damages, penalties or types of relief deemed uninsurable under applicable law;

2.  future compensation, including salary or benefits, for a **Claimant** or **Outside Claimant** who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **Claim**; or that part of any judgment or settlement which constitutes front pay, future monetary losses including pension and other benefits, or other future economic relief or the value or equivalent thereof, if the **Insured** has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a **Claim**, to promote, accommodate, reinstate, or hire the **Claimant** or **Outside Claimant** to whom such sums are to be paid, but fails to do so;

3.  medical, pension, disability, life insurance, **Stock Benefit** or other similar employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of:

    a.  medical, pension, disability, life insurance, or other similar employee benefits; or

    b.  **Stock Benefits** of an **Insured Organization** whose equity or debt securities are not publicly traded, including on a stock exchange or another organized securities market,

    as consequential damages for a **Wrongful Act**; or

4.  any amount allocated to non-covered loss pursuant to Section III. CONDITIONS P. ALLOCATION of the Liability Coverage Terms and Conditions.

M.  *Outside Claimant* means:

1.  a past, present or future **Outside Employee** of or applicant for employment with an **Outside Entity**;

2.  a governmental entity or agency, including the Equal Employment Opportunity Commission or similar federal, state or local agency, when acting on behalf of or for the benefit of present or former **Outside Employees** or applicants for employment; or

3.  any natural person independent contractor who performs labor or service for the **Outside Entity** pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Outside Entity**.

N.  *Outside Employee* means a natural person whose labor or service is engaged by and directed by an **Outside Entity** and:

1.  who is on the payroll of an **Outside Entity**, including:

    a.  any in-house general counsel of the **Outside Entity**; and

    b.  any other full-time, part-time, and seasonal worker;

2.      who is a volunteer or temporary worker; or

3.      whose services have been leased by the **Outside Entity**.

The status of an individual as an **Outside Employee** will be determined as of the date of the alleged **Wrongful Employment Practice**.

**O**.     *Outside Entity* means a corporation or organization:

1.      other than the **Insured Organization**, which is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended; or

2.      specifically scheduled as an **Outside Entity** by endorsement to this **Liability Policy**.

**P**.     *Outside Position* means service by an **Insured Person** as a member of the board of directors, officer, member of the board of trustees, member of the board of managers, member of the board of regents, member of the board of governors or a functional equivalent thereof with an **Outside Entity**, but only during such time that such service is with the knowledge, consent, and at the specific request of the **Insured Organization**.

**Q**.     *Retaliation* means any actual or alleged **Wrongful Termination** or other adverse employment action against a **Claimant** or **Outside Claimant** on account of such **Claimant's** or **Outside Claimant's** exercise or attempted exercise of rights protected by law, refusal to violate any law, disclosure or threat to disclose to a superior or to any governmental agency alleged violations of the law, or on account of the **Claimant** or **Outside Claimant** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

**R** .    *Sexual Harassment* means any actual or alleged unwelcome sexual advances, requests for sexual favors or any other conduct of a sexual nature:

1.      which is made a term or condition of a **Claimant's** or **Outside Claimant's** employment or advancement;

2.      which the submission to or rejection of is used as a basis for decisions affecting the **Claimant** or **Outside Claimant**; or

3.      which has the purpose or effect of creating an intimidating, hostile or offensive work environment.

**S**.     *Stock Benefit* means compensation provided to **Employees** in the form of equity or debt securities or rights to purchase equity or debt securities or the value thereof, including any grant of stock, restricted stock, stock options or warrants, phantom stock, stock appreciation rights, or performance shares.

**T**.     *Subsidiary* means:

1.      any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

2.      any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

3.      any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly fifty percent (50%) of the issued and outstanding  voting  stock  and  whose  management and operation the **Insured**

**Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4.  subject to the provisions set forth in Section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

U.  *Third Party Claim* means:

1.  a written demand for monetary damages or non-monetary relief;

2.  a civil proceeding commenced by service of a complaint or similar pleading;

3.  a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons, or similar document;

4.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

5.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** by or on behalf of or for the benefit of any natural person other than a **Claimant** for a **Third Party Wrongful Act**; provided that **Third Party Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement or any type of criminal proceeding.

V.  *Third Party Wrongful Act* means, with respect to any natural person other than a **Claimant**, any actual or alleged:

1.  violation of any federal, state or local law or statute or any common law prohibiting any kind of discrimination; or

2.  unwelcome sexual advances, requests for sexual favors or any other conduct of a sexual nature which violates the civil rights of any such person.

W.  *Workplace Harassment* means any actual or alleged harassment, other than **Sexual Harassment**, which creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive work environment.

X.  *Wrongful Act* means:

1.  a **Wrongful Employment Practice** occurring in the course of or arising out of a **Claimant's** employment, application for employment or performance of services with the **Insured Organization**;

2.  a **Wrongful Employment Practice** by an **Insured Person** in his or her **Outside Position** occurring in the course of or arising out of an **Outside Claimant's** employment, application for employment or performance of services with an **Outside Entity**; or

3.  **a Third Party Wrongful Act**, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage has been purchased.

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

**Y.**   *Wrongful Employment Practice*  means any actual or alleged:

   1.   **Discrimination**;

   2.   **Retaliation**;

   3.   **Sexual Harassment**;

   4.   **Workplace Harassment**;

   5.   **Wrongful Termination**;

   6.   breach  of  **Employment Agreement**;

   7.   violation of the Family Medical Leave Act;

   8.   employment-related  misrepresentation;

   9.   employment-related  defamation, including libel or slander, or invasion of privacy;

   10.   failure or refusal to create or enforce adequate workplace or employment policies and procedures, employ or promote, including wrongful failure to grant bonuses or perquisites, or grant tenure;

   11.   wrongful discipline, wrongful demotion, denial of training, deprivation of career opportunity, denial or deprivation of seniority, or evaluation;

   12.   employment-related wrongful infliction of emotional distress; or

   13.   negligent hiring, supervision of others, training, or retention committed or allegedly committed by any **Insured**, but only if such act is alleged in connection with a **Wrongful Employment Practice** set forth in 1. through 12. above; provided that the **Claim** alleging the negligent hiring, supervision of others, training, or retention is brought by or on behalf of any **Claimant** or **Outside Claimant**.

**Z.**   *Wrongful Termination* means the actual, alleged or constructive termination of an employment relationship between a **Claimant** and the **Insured Organization**, or the actual or constructive termination of an employment relationship between an **Outside Claimant** and an **Outside Entity**, in a manner or for a reason which is contrary to applicable law or public policy, or in violation of an **Employment Agreement**.

## III.   *EXCLUSIONS*

**A.**   **EXCLUSIONS APPLICABLE TO ALL LOSS**

   1.   The Company will not be liable for **Loss** for any **Claim** for any damage to, or destruction of, loss of, or loss of use of, any tangible property including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

   2.   The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, or loss of consortium; provided that this exclusion will not apply to that portion of a **Claim** seeking **Loss** for emotional distress, mental anguish, humiliation, or loss of reputation.

   3.   The  **Company**  will not be liable for **Loss** for any **Claim**:

a. based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

b. based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

c. brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

provided that this exclusion will not apply to **Claims** for **Retaliation**.

4. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding, including audits initiated by the Office of Federal Contract Compliance Programs, against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

5. The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

6. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

7. The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation; or for any actual or alleged violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), National Labor Relations Act (NLRA) or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; provided that this exclusion will not apply to **Claims** for **Retaliation**.

8. The Company will not be liable for **Loss** for any **Claim** for any liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement.

9. The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or **Outside Employee** or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA; provided that this exclusion will not apply to **Claims** for **Retaliation**.

10. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

11. The Company will not be liable for **Loss** for any **Third Party Claim**:

      a.    alleging price discrimination, or other violation of any antitrust or unfair trade practices law; or

      b.    against an **Insured Person** solely due to their service in an **Outside Position**.

12.    The Company will not be liable for **Loss** for any **Claim** for any liability under any agreement governing the terms of the labor or service of an **Independent Contractor**, temporary worker or leased employee with the **Insured Organization** or for liability under any agreement governing the terms of the labor or service of any natural person independent contractor who performs labor or service solely for the **Outside Entity** on a full-time basis pursuant to a written contract or agreement.

13.    The Company will not be liable for **Loss** for any **Claim** for violation of responsibilities, duties or obligations imposed on an **Insured** under any **Wage and Hour Law**; provided that this exclusion will not apply to:

      a.  **Claims** for **Retaliation**; or

      b.  any actual or alleged violation of the Equal Pay Act.

**B.**    **EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**

1.    The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

2.    The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking severance pay, damages or penalties under an express written **Employment Agreement**, or under any policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services.

---

## IV.    *CONDITIONS*

**A.**    **SETTLEMENT**

1.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that:

      a.    the **Insured** and the party bringing a **Claim** hereunder consent to the first settlement offer recommended by the Company (the "Settlement Offer") within thirty (30) days of being made aware of such offer by the Company; and

      b.    the amount of such Settlement Offer:

          i.    is less than the remaining applicable limit of liability available at the time; and

          ii.    combined with **Defense Expenses** incurred with respect to such **Claim**, exceeds the Retention;

      the Retention will be retroactively reduced by ten percent (10%) with respect to such **Claim**.

2.   If the **Insured** does not consent to the Settlement Offer within thirty (30) days of being made aware of such offer by the Company:

a.   the Retention will not be reduced as provided in paragraph 1. above even if consent is given to the same or subsequent Settlement Offer; and

b.   the **Insured** will be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for thirty percent (30%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

**B.   OTHER INSURANCE**

1.   This **Liability Coverage** is primary, except as expressly stated otherwise in this **Liability Coverage**.

2.   Except as stated in paragraph 3. of section IV. CONDITIONS B., this **Liability Coverage** will apply only as excess insurance over, and will not contribute with any insurance that applies to any **Claim**:

a.   against any leased or temporary worker; or

b.   for a **Third Party Wrongful Act**.

3.   With respect to **Claims** against **Insured Persons** for **Wrongful Employment Practices** in their **Outside Positions**, this **Liability Coverage** will apply only as excess insurance over, and will not contribute with:

a.   any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**; or

b.   indemnification to which an **Insured Person** is entitled from any **Outside Entity** other than the **Insured Organization**.

4.   This **Liability Coverage** will not be subject to the terms of any other insurance.

**C.   OUTSIDE POSITIONS - LIMIT OF LIABILITY**

If any **Claim** against an **Insured Person** gives rise to an obligation both under this **Liability Coverage** and under any other coverage or policy of insurance issued by the Company or any of its affiliates to any **Outside Entity**, the Company's maximum aggregate limit of liability under all such policies for any **Loss**, for such **Claim** will not exceed the largest single available limit of liability under such coverage.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## THIRD PARTY SEXUAL HARASSMENT COVERAGE ENDORSEMENT

This endorsement modifies the following:

**Employment Practices Liability**

---

**It is agreed that**:

The following replaces section **II. DEFINITIONS**, **V. Third Party Wrongful Act**:

V.   ***Third Party Wrongful Act*** means, with respect to any natural person other than a **Claimant**, any actual or alleged unwelcome sexual advances, requests for sexual favors or any other conduct of a sexual nature which violates the civil rights of any such person.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

EPL-FI-7031 Ed. 01-09 Printed in U.S.A.                                      Page 1 of 1
©2009 The Travelers Companies, Inc. All Rights Reserved

BlueRidge-00093

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SECTION 510 OF ERISA ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

1.       The following replaces section *III. EXCLUSIONS,* **A. EXCLUSIONS APPLICABLE TO ALL LOSS, A.9.**:

9.       The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or **Outside Employee** or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA; provided that this exclusion will not apply to **Claims** for **Retaliation** or **Claims** for any actual or alleged violation of Section 510 of the Employee Retirement Income Security Act of 1974.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**Issuing Company: Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00094

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## WORKPLACE VIOLENCE EXPENSES ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

---

**It is agreed that:**

1.  The following is added to ITEM 5 of the Declarations:

| | |
|---|---|
| **Workplace Violence Expenses Limit of Liability:** | $250,000 for all **Workplace Violence Expenses**, which amount is in addition to, and not part of, any applicable limit of liability. |

2.  The following is added to section **I. INSURING AGREEMENT** of the **Liability Coverage**:

    The Company will reimburse the **Insured Organization**, **Workplace Violence Expenses** incurred by the **Insured Organization** as a result of any **Workplace Violence Event;**

    1.  first occurring during the **Policy Period**; and,
    2.  reported to the Company as soon as practicable after an **Executive Officer** becomes aware such **Workplace Violence Event** has occurred, but in no event later than 90 days after the expiration of the **Policy Period**;

    up to the amount of the **Workplace Violence Expenses** Limit of Liability set forth in ITEM 5 of the Declarations of this **Liability Coverage**.

3.  The following is added to section **II. DEFINITIONS** of the **Liability Coverage**:

    **Premise** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

    **Workplace Violence Event** means any intentional:

    1.  use of deadly force; or
    2.  threat of deadly force with the display of a lethal weapon;

    which occurs on or in the **Premise** and which did or could result in bodily injury or death to an **Insured Person**.

    **Workplace Violence Expenses** means the reasonable fees, costs, and expenses incurred and paid by the **Insured Organization** for:

    1.  the services of an independent security consultant for 90 days following a **Workplace Violence Event**;
    2.  the services of an independent public relations consultant for 90 days following a **Workplace Violence Event**;
    3.  counseling services provided to employees by an independent consultant on the **Premises** for up to 120 days following a **Workplace Violence Event**;
    4.  the services of an independent security guard(s) and other reasonable costs to secure the **Premises** for up to 15 days following a **Workplace Violence Event**; or
    5.  the services of an independent private forensic analyst for 120 days following a **Workplace Violence Event**.

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106420159

© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00095

4.  The following is added to section **III. EXCLUSIONS** of the **Liability Coverage**:

The Company will not be liable for **Workplace Violence Expenses** based upon or arising out of a **Workplace Violence Event** arising out of war, invasion, acts of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, or confiscation, nationalization, requisition, or destruction of, or damage to, property by or under the order of any government, public or local authority; provided that this exclusion will not apply to any "act of terrorism" as defined in the Terrorism Risk Insurance Act of the United States of America as amended.

5.  The following is added to section **III. CONDITIONS**, **B. RETENTION**, of the Liability Coverage Terms and Conditions:

No retention shall apply to **Workplace Violence Expenses** Coverage.

6.  The following is added to section **III. CONDITIONS**, **C. LIMITS OF LIABILITY**, of the Liability Terms and Conditions:

The Company's maximum limit of liability for all **Workplace Violence Events** under the Employment Practices Liability coverage will not exceed the Workplace Violence Expenses Limit of Liability set forth in ITEM 5 of the Declarations.

The Workplace Violence Expenses Limit of Liability will be in addition to, and not part of, the **Liability Coverage Limit of Liability** as set forth in ITEM 5 of the Declarations.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00096

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## VIRGINIA CHANGES ENDORSEMENT

This endorsement modifies the following:

**Employment Practices Liability**

**It is agreed that**:

The following replaces section **IV. CONDITIONS**, **C** . **OUTSIDE POSITIONS – LIMIT OF LIABILITY**:

**C.       OUTSIDE POSITIONS – LIMIT OF LIABILITY**

If any **Claim** against an **Insured Person** for any **Wrongful Employment Practice** committed while serving in an **Outside Position** gives rise to an obligation both under this **Liability Coverage** and under any other coverage or policy of insurance issued by the Company or any of its affiliates, the Company's maximum aggregate limit of liability under all such policies for any **Loss**, for such **Claim** will not exceed the largest single available limit of liability under such coverage.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**Issuing Company: Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

BlueRidge-00097



**FIDUCIARY LIABILITY**

***THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ ALL TERMS CAREFULLY.***

## I.     INSURING AGREEMENTS

**A.**     The Company will pay on behalf of the **Insured**, **Loss** for any **Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Act**.

**B.**     The Company will pay on behalf of the **Insured**, **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice**; provided that participation by the **Insured** in any **Settlement Program** commences during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

## II.     DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in this section II. DEFINITIONS:

**A.**     ***Administration*** means**:**

   1.     giving counsel, advice, or notice to employees of the **Insured Organization**, participants, or beneficiaries with respect to **Employee Benefits**;

   2.     interpreting **Employee Benefits**;

   3.     handling records in connection with **Employee Benefits**; or

   4.     effecting enrollment, termination or cancellation of employees of the **Insured Organization**, participants, or beneficiaries under an **Employee Benefits** program.

**B.**     ***Claim*** means**:**

   1.     a written demand for monetary damages or non-monetary relief;

   2.     a civil proceeding commenced by service of a complaint or similar pleading;

   3.     a criminal proceeding commenced by filing of charges;

   4.     a formal administrative or regulatory proceeding commenced by filing of a notice of charges, formal investigative order, service of summons or similar document, including a fact-finding investigation by the Department of Labor, the Pension Benefit Guaranty Corporation, or a similar government agency that is located outside of the United States, including, in the United Kingdom, the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, or any successor body thereto;

   5.     an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

   6.     a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

   against an **Insured** for a **Wrongful Act**.

   A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives

written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

**C.**  *Employee Benefits* means benefits provided through an **Employee Benefit Plan** or a **Multiemployer Plan,** and also includes benefits provided under workers' compensation insurance, unemployment insurance, Social Security, disability insurance, and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and amendments thereto.

**D.**  *Employee Benefit Plan* means**:**

1.  any **Welfare Plan** which was, is now, or becomes sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**;

2.  any **Pension Plan**, including an **Employee Stock Ownership Plan**, which was, or is, sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization** and which existed on or before the Inception Date set forth in ITEM 2 of the Declarations;

3.  any group or group-type insurance program, including a Health Savings Account (HSA) program, that meets the safe harbor conditions set forth in 29 C.F.R. 2510.3-1(j)(1), or any benefit plan that is not subject to Title I of **ERISA**, including any fringe benefit or excess benefit plan, that was, is now, or becomes sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**; or

4.  any **Pension Plan** for which coverage is provided pursuant to section V. CONDITIONS B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN of this **Liability Coverage.**

**E.**  *Employee Stock Ownership Plan* means any plan so defined in Section 407(d)(6)(A) of ERISA, or any similar or related federal, state or local law or regulation.

**F.**  *ERISA* means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder or any similar common or statutory law.

**G.**  *ESOP Administration* means**:**

1.  giving notice to employees of the **Insured Organization**, participants, or beneficiaries with respect to **Employee Stock Ownership Plan** benefits;

2.  interpreting **Employee Stock Ownership Plan** benefits;

3.  handling records in connection with **Employee Stock Ownership Plan** benefits; or

4.  effecting enrollment, termination or cancellation of employees of the **Insured Organization**, participants, or beneficiaries under an **Employee Stock Ownership Plan**.

**H.**  *Executive Officer* means a member of the board of directors or governors, officer, member of the board of trustees, natural person general partner, principal, risk manager, **LLC Manager**, in-house general counsel of the **Insured Organization** or a functional equivalent thereof.  **Executive Officer** also includes any natural person trustee of any **Employee Benefit Plan**.

**I.**  *HIPAA* means the Health Insurance Portability and Accountability Act of 1996, as amended.

**J.**  *Insured* means the **Insured Persons**, the **Insured Organization**, and any **Employee Benefit Plan.**

**K.**  *Insured Organization* means the **Named Insured**, any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

**L.**  *Insured Person* means any natural person who was, is now or becomes a trustee, member of the board of directors or governors, management committee member, general partner, officer, **LLC Manager**, in-house general counsel, member of an **Employee Benefit Plan** committee, or employee of the **Insured Organization** or of an **Employee Benefit Plan**, while acting in his or her capacity as a fiduciary of an **Employee Benefit Plan** or as a person performing **Administration** or **ESOP Administration**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**M.**   *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages; prejudgment and post judgment interest; and legal fees and expenses awarded pursuant to a court order or judgment; and solely with respect to section I. INSURING AGREEMENTS B. of this **Liability Coverage**, **Settlement Fees**.  **Loss** does not include:

1.   civil or criminal fines (except **Settlement Fees** pursuant to Insuring Agreement B.;  civil penalties under Sections 502(i) and 502(l) of **ERISA** or the privacy provisions of  **HIPAA**; or, in the United Kingdom, civil penalties imposed by the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, Pensions Regulator, or any successor body thereto, provided that the funds or assets of the pension scheme will not be used to fund, pay or reimburse the premium for this coverage or any portion thereof); sanctions; liquidated damages; payroll or other taxes; or damages or types of relief deemed uninsurable under applicable law;

2.   payment of medical benefits, pension benefits, severance, or **Employee Benefits** which are or may become due, except to the extent that such sums are payable as a personal obligation of an **Insured Person**, because of such **Insured Person's Wrongful Act**; provided that this exclusion will not apply to:

   a.   the Company's obligation to defend any **Claim**, if applicable, or to pay, advance or reimburse **Defense Expenses**, regarding a **Claim** seeking such benefits; or

   b.   that portion of any damage, settlement or judgment covered as **Loss** under this **Liability Coverage** that represents a loss to any **Employee Benefit Plan**, or loss to any account of a participant in any **Employee Benefit Plan**, by reason of a change in value of any investments held by such **Employee Benefit Plan** or such account, including investments in the securities of the **Insured Organization**, notwithstanding that such portion of any such damage, settlement or judgment has been characterized by plaintiffs, or held by a court of law, to be "benefits"; or

3.   any amount allocated to non-covered loss pursuant to section III. CONDITIONS P. ALLOCATION of the Liability Coverage Terms and Conditions.

**N.**   *Multiemployer Plan* means a **Pension Plan** or **Welfare Plan** maintained pursuant to one or more collective bargaining agreements to which the **Insured Organization** and at least one other employer is required to contribute.

**O.**   *Pension Plan* means any plan so defined in Section 3(2) of ERISA or any similar or related federal, state, local, or foreign law or regulation.

**P.**   *Settlement Fees* mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insured** becomes legally obligated to pay as a result of a **Wrongful Act**.  **Settlement Fees** will not include any costs or expenses other than such fees, penalties or sanctions.

**Q.**   *Settlement Program* means any voluntary compliance resolution program or similar voluntary settlement program, administered by the Internal Revenue Service or Department of Labor of the United States, including the Employee Plans Compliance Resolution System, the Self Correction Program, the Audit Closing Agreement Plan, the Delinquent Filer Voluntary Compliance program, and the Voluntary Fiduciary Correction program, entered into by the **Insured Organization**.

**R.**   *Settlement Program Notice* means a prior written notice to the Company by the **Insured** of the **Insured's** intent to enter into a **Settlement Program**.

**S.**   *Subsidiary* means**:**

   1.    any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of  the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

   2.    any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

   3.    any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly 50% of the issued and outstanding voting stock and whose management and operation the **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

   4.    subject to the provisions set forth in section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

**T.**   *Welfare Plan* means any plan so defined in Section 3(1) of ERISA or any similar or related federal, state, local, or foreign law or regulation.

**U.**   *Workplace Misconduct* means**:**

   1.    any actual or alleged failure or refusal to hire or employ an applicant for employment with the **Insured Organization**;

   2.    any actual or alleged termination or constructive termination of an employment relationship with the **Insured Organization**;

   3.    any actual or alleged demotion of, refusal to train or promote an employee of the **Insured Organization**;

   4.    any other act or omission by which an **Insured** allegedly treats one employee of the **Insured Organization** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying employees of the **Insured Organization** or applicants for employment with the **Insured Organization** in their compensation terms, conditions, opportunities or privileges of employment on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance, including Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Americans With Disabilities Act or the Family Medical Leave Act;

   5.    any adverse employment action with regard to an employee of the **Insured Organization** on account of such employee's exercise or attempted exercise of rights protected by law, including the Family Medical Leave Act, or on account of the employee of the **Insured Organization** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law; or

   6.    any actual or constructive termination of an employment relationship with the **Insured Organization** in a manner or for a reason which is contrary to applicable law or in violation of a written, oral or implied agreement, other than a collective bargaining agreement, for continued employment.

---

**V.**   ***Wrongful Act***  means**:**

1.   any actual or alleged breach of fiduciary duty by or on behalf of the **Insured** with respect to any **Employee Benefit Plan**, including:

   a.      any actual or  alleged breach of  duties, obligations and responsibilities imposed by **ERISA,** COBRA, **HIPAA,** or by any similar or related federal, state, local, or foreign law or regulation, in the discharge of the **Insured's** duties with respect to an **Employee Benefit Plan**; or

   b.      any other matter claimed against an **Insured** solely because of the **Insured's** status as a fiduciary of an **Employee Benefit Plan**; or

2.   any actual or alleged negligent act, error or omission by or on behalf of the **Insured** in the **Administration** of **Employee Benefits.**

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the  **Policy Period**.

---

## *III.*   *EXCLUSIONS*

---

**A.**   **EXCLUSIONS APPLICABLE TO ALL LOSS**

1.   The Company will not be liable for **Loss** for any **Claim** for any damage to, or destruction of, loss of, or loss of use of, any tangible property including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

2.   The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, or humiliation.

3.   The Company will not be liable for **Loss** for any **Claim**:

   a.      based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

   b.      based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**, or

   c.      brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

   provided this exclusion will not apply to any **Claim** by or on behalf of a beneficiary of, or participant in, any **Employee Benefit Plan** based upon, arising from or in consequence of the diminution in value of any securities owned by the **Employee Benefit Plan** in any organization, other than the **Insured Organization**, if such diminution in value is allegedly as a result of a **Pollutant**.

4.   The Company will not be liable for **Loss** for any **Claim** for any liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, other than an **Employee Benefit Plan**, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement.

5.   The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation, or for any actual or alleged violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation other than COBRA, **HIPAA** or **ERISA.**

---

©2009 The Travelers Companies, Inc. All Rights Reserved

6. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

7. The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

8. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

9. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

10. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Workplace Misconduct**, other than **Claims** asserted under **ERISA**.

**B.    EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**

1. The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based upon or arising out of any **Insured**:

   a.    committing any intentionally dishonest or fraudulent act or omission;

   b.    committing any willful violation of any statute, rule, law; or

   c.    gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

   provided that this exclusion will not apply unless a final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

2. The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

**C.   EXCLUSIONS APPLICABLE TO INSURING AGREEMENT B**

The Company will pay no **Settlement Fees** or **Defense Expenses** with respect to any **Claim** or investigation in connection with a **Settlement Program**, of which any **Insured** first became aware or received notice prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

## *IV.    SEVERABILITY OF EXCLUSIONS*

No conduct of any **Insured** will be imputed to any other **Insured** to determine the application of any of the exclusions set forth in section III. EXCLUSIONS above.

## V.    CONDITIONS

### A.    SETTLEMENT

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for 30% of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for 30% of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

### B.    ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN

If, during the **Policy Period**, the **Insured Organization** acquires or forms an **Employee Benefit Plan**, which is then solely sponsored by the **Insured Organization** exclusively for the benefit of the employees of the **Insured Organization**, this **Liability Coverage** will provide coverage for that acquired or formed **Employee Benefit Plan** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Coverage**, but only for **Claims** for **Wrongful Acts** which occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Employee Benefit Plan**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within 90 days after the effective date of such acquisition or formation. Coverage for the acquired or formed **Employee Benefit Plan** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided that: (1) the total assets of the acquired or formed **Employee Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed 30% of the total plan assets shown on the most recent **Application** submitted by the **Insured Organization**, or (2) the acquisition or formation occurs fewer than 90 days prior to the end of the **Policy Period**.

Notwithstanding the foregoing, if such acquired or formed **Employee Benefit Plan** is an **Employee Stock Ownership Plan** that is not part of, and is separate from, any other **Pension Plan**, the coverage provided pursuant to this section V. CONDITIONS B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN to such **Employee Stock Ownership Plan** will be limited to any actual or alleged negligent act, error or omission by or on behalf of the **Insured** in the **ESOP Administration** of **Employee Benefits**.

### C.    MERGER OF PLANS

If, during the **Policy Period**, an **Employee Benefit Plan** is merged with another **Employee Benefit Plan**, this **Liability Coverage** will continue to provide coverage for both plans, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**.

If, during the **Policy Period**, an **Employee Benefit Plan** ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Liability Coverage** ("Uncovered Plan"), this **Liability Coverage** will continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**, but only for **Claims** for **Wrongful Acts** which occurred prior to the date of such merger.

©2009 The Travelers Companies, Inc. All Rights Reserved

BlueRidge-00104

**D.**     **SALE OF PLAN**

If, prior to or during the **Policy Period**, any **Employee Benefit Plan** is sold, this **Liability Coverage** will provide coverage for such plan, subject to all other terms, conditions and limitations of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**. The coverage provided pursuant to this section V. CONDITIONS D. SALE OF PLAN will apply only:

1.     for **Claims** for **Wrongful Acts** which occurred prior to the date of such sale;

2.     while such plan was sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**; and

3.     if notice of such sale is given to the Company prior to the end of such **Policy Period**.

**E**     **TERMINATION OF PLAN**

If before or during the **Policy Period** any **Employee Benefit Plan** is terminated, this **Liability Coverage** will provide coverage for such plan, subject to all other terms, conditions and limitations of this **Liability Coverage** for so long as this **Liability Coverage** remains in effect as to the **Named Insured**.

**F.**     **OTHER  INSURANCE**

This **Liability Coverage** will apply only as excess insurance over, and will not contribute with any other valid and collectible insurance available to the **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**.  This **Liability Coverage** will not be subject to the terms of any other insurance.

**G.**     **ORDER OF PAYMENTS**

If **Loss**, other than **Defense Expenses**, from any **Claim** exceeds the remaining applicable limit of liability as set forth in ITEM 5 of the Declarations:

1.     the Company will first pay such **Loss** for such **Claim** for which the **Insured Organization** is not permitted by law to indemnify any **Insured Person**, or is permitted or required to indemnify such **Insured Person** but does not do so by reason of **Financial Insolvency**; then

2.     to the extent that any amount of the applicable limit of liability remains available, the Company will pay such **Loss** for such **Claim** incurred by the **Insured Organization** directly or through indemnification.

Upon written request of the **Insured Organization** by and through any **Executive Officer**, the Company will either pay or withhold payment of **Loss** from such **Claim** pursuant to the order of payments set forth herein, as applicable. In the event of a written request to withhold payment, the Company will make any future payment only for unindemnified **Loss** from any such **Claim** as specified in 1. above, unless otherwise so instructed upon written request by and through an **Executive Officer** of the **Insured Organization**.

**H.**     **SETTLEMENT PROGRAM LIMIT OF LIABILITY AND RETENTION**

The Company's maximum limit of liability for all **Settlement Fees** and **Defense Expenses** in connection with a **Settlement Program Notice** will be the amount set forth in ITEM 5 of the Declarations as the Settlement Program Limit of Liability, which amount is included within, and not in addition to, any applicable limit of liability.  However, if ITEM 5 of the Declarations indicates that Additional Defense Coverage is applicable, **Defense Expenses** incurred in connection with a **Settlement Program Notice** will apply first to and reduce the remaining **Additional Defense Limit of Liability**; provided that the Settlement Program Limit of Liability will be reduced and may be exhausted by payment of such **Defense Expenses** under the **Additional Defense Limit of Liability**.

©2009 The Travelers Companies, Inc. All Rights Reserved

BlueRidge-00105

**Settlement Fees** and **Defense Expenses** incurred with respect to a **Settlement Program Notice** will be subject to the applicable Retention set forth in ITEM 5 of the Declarations.  If a **Claim** results in a **Settlement Program Notice**, the applicable Retentions will be applied separately to such **Claim** and **Settlement Program Notice**, respectively, but the sum of such Retentions will not exceed the largest of such Retentions.

**I.  SETTLEMENT PROGRAM EXTENDED REPORTING PERIOD AND RUN-OFF EXTENDED REPORTING PERIOD**

1. The Extended Reporting Period described in section III. CONDITIONS O. of the Liability Coverage Terms and Conditions, if purchased, will apply only to **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice** as a result of the **Insured's** participation during the Extended Reporting Period in a **Settlement Program**, but only if such participation commences during the Extended Reporting Period and involves an **Employee Benefit Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation before the effective date of such termination or nonrenewal.

2. The Run-Off Extended Reporting Period described in section III. CONDITIONS K. of the Liability Coverage Terms and Conditions, if purchased, will apply only to **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice** as a result of the **Insured's** participation during the Run-Off Extended Reporting Period in a **Settlement Program**, but only if such participation commences during the Run-Off Extended Reporting Period and involves an **Employee Benefit Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation before the effective date of the **Change of Control.**

**J.  HIPAA LIMIT OF LIABILITY**

The Company's maximum limit of liability for all civil money penalties under the privacy provisions of **HIPAA** will be the amount set forth in ITEM 5 of the Declarations as the HIPAA Limit of Liability, which amount is included within, and not in addition to, any applicable limit of liability.

**K.  INSURED'S DUTIES IN THE EVENT OF A SETTLEMENT PROGRAM NOTICE**

All **Settlement Program Notices** must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt. The **Insured** will not enter into a **Settlement Program** or incur any **Defense Expenses** in connection with a **Settlement Program Notice** or **Settlement Fees** without the Company's prior written consent, such consent not to be unreasonably withheld. The Company will not be liable for any such **Defense Expenses** or **Settlement Fees** to which it has not consented.

---
**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
---

## ADMINISTRATIVE ONLY COVERAGE FOR PARTICIPATION IN SPECIFIED NATIONAL PLANS ENDORSEMENT

This endorsement modifies the following:


**Fiduciary Liability**

---

**It is agreed that:**

1.  The following is added to section **II. DEFINITIONS**:

    ***National Plan*** means any plans as set forth in the National Plans schedule below.

2.  The following is added to section **II. DEFINITIONS, D. Employee Benefit Plan**:

    **Employee Benefit Plan** also means any National Plan.

3.  Solely with respect to any **National Plan**, the following replaces section **II. DEFINITIONS, V. Wrongful Act**:

    **V.    *Wrongful Act*** means any actual or alleged negligent act, error or omission by or on behalf of the **Insured** in the **Administration** of **Employee Benefits.**

    All **Related  Wrongful Acts**  are a single  **Wrongful Act**  for purposes of this **Liability Coverage**, and all **Related Wrongful Acts**  will be deemed to have occurred at the time the first  of  such  **Related Wrongful Acts**  occurred whether prior to or during the **Policy Period**.

    <u>**National Plans:**</u>
    **VBA Defined Contribution Plan for Virginia Community Bankshares, Inc.**

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.   This endorsement is part of such policy and incorporated therein.

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106420159

---

©2009 The Travelers Companies, Inc. All Rights Reserved

BlueRidge-00107

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## HEALTHCARE EXCHANGE ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

**It is agreed that:**

1. The following is added to **II. DEFINITIONS**, **C. Employee Benefits**:

   **Employee Benefits** also means benefits available to employees of the **Insured Organization** through a **Healthcare Exchange**.

2. The following is added to **II. DEFINITIONS**:

   *Healthcare Exchange* means any public, private, or government sponsored entity established to facilitate the purchase of health insurance in accordance with the Patient Protection and Affordable Care Act.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2014 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00108



**Financial Institution Professional Liability**

***THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.***

## I.   INSURING AGREEMENTS

**A.   LENDER LIABILITY COVERAGE**

The Company will pay on behalf of the **Insured**, **Loss** for any **Claim** first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, by a **Borrower** for a **Lending Act**.

**B.   PROFESSIONAL SERVICES LIABILITY COVERAGE**

The Company will pay on behalf of the **Insured**, **Loss** for any **Claim** first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, by a customer for a **Professional Services Act**.

**C.   TRUST SERVICES LIABILITY COVERAGE**

The Company will pay on behalf of the **Insured**, **Loss** for any **Claim** first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Trust Act**.

## II.   DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meaning set forth in this section **II. DEFINITIONS**:

**A.   *Affiliated Person* means:**

1.   any **Insured Person**;

2.   any shareholder of the **Insured Organization** that directly or indirectly, or acting through or in concert with one or more individuals or entities, owns, controls, or has the power to vote 10% or more of any class of voting securities of the **Insured Organization**; for purposes of this definition, securities owned or controlled by a member of an individual shareholder's immediate family (spouse, minor children and adult children residing with the individual) are considered to be held by such individual; or

3.   any entity in which any **Insured**:

a.   owns, either directly or indirectly, 25% or more of any class of voting securities; or

b.   has a controlling direct or beneficial interest;

at the time a loan, lease or extension of credit by the **Insured Organization** to such entity was made or agreed to, or was refused.

**B.   *Borrower* means:**

1.   any individual or entity that is not an **Affiliated Person** and to which the **Insured Organization** extends, agrees to extend, or refuses to extend, a loan, lease or extension of credit; or

© 2012 The Travelers Indemnity Company.  All rights reserved.                                                    BlueRidge-00109

2. any individual or entity that is not an **Affiliated Person** and that is a guarantor of any such loan, lease or extension of credit.

C. *Claim* means**:**

1. a written demand for monetary damages or non-monetary relief;

2. a civil proceeding commenced by service of a complaint or similar pleading;

3. a criminal proceeding commenced by filing of charges;

4. a formal administrative or regulatory proceeding commenced by a filing of charges, formal investigative order, service of summons or similar document;

5. an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6. a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** for a **Wrongful Act**.

A **Claim** will be deemed to have been made when such **Claim** is first commenced as set forth in this definition or, in the case of a written demand, when such written demand is first received by an **Insured**.

D. *Depositor Services* means only those services any **Insured** performs or is required to perform for a customer of the **Insured Organization** in connection with establishing, maintaining, administering or servicing any FDIC or NCUA insured deposit account or processing any transaction related to such account.

E. *Employee* means any natural person whose labor or service is or was engaged by and directed by the **Insured Organization**, including full-time, part-time, seasonal or temporary workers, volunteers, students, interns, or workers whose services have been leased to the **Insured Organization**.

**Employee** does not include an **Independent Contractor**.

F. *Executive Officer* means the chairperson, chief executive officer, chief financial officer, in-house general counsel or risk manager of the **Insured Organization**; the head of any **Trust Department** or **Trust Company**; any branch manager of the **Insured Organization**; or any functional equivalent thereof.

G. *Independent Contractor* means any natural person who is not an **Employee** but who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement. The status of an individual as an **Independent Contractor** will be determined as of the date of the alleged **Wrongful Act**.

H. *Insured* means the **Insured Persons** and the **Insured Organization**.

I. *Insured Organization* means the **Named Insured**, any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

J. *Insured Person* means any natural person who was, is, or becomes a member of the board of directors, board of trustees, board of managers, board of governors, officer, **Employee**, partner, or **LLC Manager** of the **Insured Organization**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**K.**   *Lending Act* means, only with respect to a loan, lease or extension of credit by the **Insured Organization**, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by the **Insured Organization**, or any **Insured Person** in his or her capacity as such, in connection with or relating to:

1.   an agreement or refusal to grant or extend any such loan, lease or extension of credit;

2.   the granting or extending of any such loan, lease or extension of credit;

3.   **Loan Servicing**, but only for any such loan, lease or extension of credit in which the **Insured Organization** has an ownership interest; or

4.   the restructure, termination, transfer, repossession, or foreclosure of any such loan, lease or extension of credit.

   **Lending Act** does not include a **Professional Services Act** or a **Trust Act**.

**L.**   *Loan Servicing* means the servicing of a loan, lease or extension of credit (not including financing for investment banking, or leveraged or management buy-outs), including the following servicing activities: record keeping, billing and disbursements of principal or interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of a customer's creditworthiness, and determination of the depreciation amount of property (but not projections of, or an appraisal for, residual or future value of property).

   **Loan Servicing** shall not include the purchase, acquisition or sale of any loan, lease or extension of credit, the restructuring, termination, transfer, repossession, or foreclosure of any such loan, lease or extension of credit, or any act based upon or arising out of the operation or control of any entity or property that the **Insured Organization** acquired as security or collateral for any loan, lease or extension of credit.

**M.**   *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a covered **Claim**, including settlements, judgments, compensatory damages, punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages, prejudgment and post judgment interest, and legal fees and expenses awarded pursuant to a court order or judgment.

   **Loss** does not include:

1.   civil or criminal fines, sanctions, liquidated damages, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law;

2.   amounts that constitute the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief;

3.   any unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit to any **Affiliated Person** or **Borrower**, including unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit which has been sold as a participation to other financial institutions;

4.   any loss, costs or expenses the **Insured Organization** agrees to incur, or incurs on behalf of another person or entity, when the **Insured Organization** is not legally obligated to incur such loss, costs or expenses under the Uniform Commercial Code or another common, case or tort law, statute, rule or code anywhere in the world, including any rule or code of any clearing or similar organization; or

5.   any amount allocated to non-covered loss pursuant to section *III. CONDITIONS*, **P. ALLOCATION** of the Liability Coverage Terms and Conditions.

**N.**   *Professional Services* means only those services the **Insured Organization**, or any **Insured Person** in his or her capacity as such, performs or is required to perform for a customer of the **Insured Organization** pursuant to a written agreement between such customer and the **Insured Organization** or,

with respect to **Loan Servicing**, pursuant to a written agreement between a third party and the **Insured Organization**:

1.     for a fee, commission or other monetary compensation;

2.     for no fee, commission or other monetary compensation, if a fee, commission, or other monetary compensation would usually be received by the **Insured Organization** for such services, but for business or other reasons is waived or not charged by the **Insured Organization**; or

3.      for other remuneration which inures to the benefit of the **Insured Organization**;

including **Depositor Services**, services performed outside of a **Trust Department** or a **Trust Company** by any **Insured** in the capacity as a trustee, custodian or administrator of any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan), or **Loan Servicing** that the **Insured Organization**, or any **Insured Person** in his or her capacity as such, performs or is required to perform for a customer of the **Insured Organization** on behalf of a third party.

**O.**    *Professional Services Act* means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by any **Insured** in the rendering of, or failure to render, **Professional Services**.

  **Professional Services Act** does not include a **Lending Act** or a **Trust Act**.

**P.**    *Subsidiary* means:

1.     any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

2.     any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

3.     any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly 50% of the issued and outstanding voting stock and whose management and operation the **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4.     subject to the provisions set forth in section *III. CONDITIONS*, **L. ACQUISITIONS** of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

**Q.**    *Trust Act* means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by the **Insured Organization**, or any **Insured Person** in his or her capacity as such, in the rendering of, or failure to render, services within a **Trust Department** or a **Trust Company** pursuant to a written agreement:

1.     for a fee, commission or other monetary compensation;

2.     for no fee, commission or other monetary compensation if a fee, commission, or other monetary compensation would usually be received by the **Insured Organization** for such services, but for business or other reasons is waived or not charged by the **Insured Organization**; or

3.    for other remuneration which inures to the benefit of the **Insured Organization**;

including such services by any **Insured** in the capacity as:

a.    trustee, custodian or administrator of any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan);

b.    executor, administrator, or personal representative of estates; administrator of guardianships; a trustee under a written personal or corporate trust agreement; or conservator of any person;

c.    trustee or co-trustee, fiduciary or co-fiduciary under a pension, profit sharing, health and welfare or other similar employee benefit plan or trust, other than any such pension, profit sharing, health and welfare or other similar employee benefit plan or trust sponsored by the **Insured Organization**;

d.    custodian, depository, or managing agent for securities or real property; manager of personal property; attorney-in-fact; escrow agent; transfer or dividend disbursing agent; registrar; fiscal paying agent; tax withholding agent; exchange agent; redemption or subscription agent; warrant or scrip agent; trustee under a bond indenture; or sinking fund agent; or

e.    trustee exercising any other trust or fiduciary powers permitted by law.

**Trust Act** does not include a **Lending Act** or a **Professional Services Act**.

**R.**    *Trust Company* means any **Insured Organization** specifically formed for the purpose of performing wealth management and fiduciary services, including agency services and acting as a trustee of, or administering, a trust or settling estates.

**S.**    *Trust Department* means a distinct unit or division of the **Insured Organization** specifically formed for the purpose of performing wealth management and fiduciary services, including agency services and acting as a trustee of, or administering, a trust or settling estates.

**T.**    *Wrongful Act* means any **Lending Act**, **Professional Services Act** or **Trust Act**.

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

---

**III.    EXCLUSIONS**

**A.**    **EXCLUSIONS APPLICABLE TO ALL LOSS**

1.    The Company will not be liable for **Loss** for any **Claim** for any damage to, or destruction of, loss of, or loss of use of, any tangible property or any data including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

2.    The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, humiliation, false arrest, detention or imprisonment, malicious prosecution, wrongful entry, wrongful eviction, invasion of the right of private occupancy, discrimination, libel, slander, disparagement, or violation of a person's or organization's right of privacy or publicity right; provided that this exclusion will not apply to the portion of any **Claim** for a **Lending Act** seeking **Loss** for emotional distress or mental anguish.

© 2012 The Travelers Indemnity Company.  All rights reserved.                        BlueRidge-00119

3.  The Company will not be liable for **Loss** for any **Claim**:

    a.  based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

    b.  based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

    c.  brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

    provided that this exclusion will not apply to the portion of any **Claim** based upon, arising out of, or in consequence of the diminution in value of any securities in connection with an **Insured's** investment on behalf of a customer in any organization, other than the **Insured Organization**, if such diminution in value is allegedly as a result of a **Pollutant**.

4.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Insured** committing any intentionally dishonest or fraudulent act or omission or any willful violation of any statute, rule or law; or gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled; provided that this exclusion will not apply unless a final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

5.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

6.  The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

7.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

8.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by any entity that is, or was, a **Subsidiary**, or by any **Insured Person** of such entity, occurring at any time during which such entity was not a **Subsidiary**.

9.  The Company will not be liable for **Loss** for any **Claim** by, or on behalf of, or in the name or right of:

    a.  any **Insured; or**

    b.  any organization that at the time the **Wrongful Act** is committed, or the date the **Claim** is made: (i) is owned, operated or controlled by any **Insured**; or (ii) owns, operates or controls any **Insured**,

    provided that this exclusion will not apply to:

       (1)     any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of, or results directly from, a **Claim** which is not otherwise excluded by the terms of this **Liability Coverage**; or

       (2)     any **Claim** brought by an **Insured Person** solely in his or her capacity as a customer of the **Insured Organization** for a **Professional Services Act** or a **Trust Act**; provided that such **Claim** is instigated totally independent of, and totally without the solicitation, assistance, active participation, or intervention of, any other **Insured**.

10.     The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Lending Act** in connection with a loan, lease or extension of credit that was, at the time of its making, in excess of the legal lending limit of the **Insured Organization**.

11.     The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Lending Act** in connection with a loan, lease or extension of credit:

    a.     to any **Affiliated Person**;

    b.     to any other person, or entity, if such loan, lease or extension of credit to such person or entity would be aggregated with a loan, lease or an extension of credit to any **Affiliated Person** for purposes of determining the **Insured Organization's** compliance with any applicable restriction on the concentration of the **Insured Organization's** loans, leases or extensions of credit.

12.     The Company will not be liable for **Loss** for any **Claim** for a **Lending Act**, **Professional Services Act** or a **Trust Act** by any **Insured Person** in their capacity as an employee, director, officer, trustee, governor, member of the board of managers, or any equivalent position, of any entity other than the **Insured Organization**, even if such service is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the **Insured Person** by the **Insured Organization**.

13.     The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any violation of federal or state laws or regulations relating to extensions or denials of credit, including the Truth-in-Lending Act, Equal Credit Opportunity Act, Fair Credit Reporting Act, Fair Debt Collection Practices Act, the Home Owners Equity Protection Act of 1994, Fair Credit Billing Act, and usury laws or regulations, as amended.

**B.**     **EXCLUSIONS APPLICABLE TO INSURING AGREEMENT A, LENDER LIABILITY COVERAGE**

1.     The Company will not be liable under Insuring Agreement A for **Loss** for any **Claim** based upon or arising out of any lending or advisory services where such services are not reasonably regarded as part of the process of extending a loan, lease or extension of credit to a **Borrower**.

2.     The Company will not be liable under Insuring Agreement A for **Loss** for any **Claim** based upon or arising out of **Financial Insolvency**.

3.     The Company will not be liable under Insuring Agreement A for **Loss** for any **Claim** based upon or arising out of any error, misstatement, misleading statement, act, omission, neglect or breach of duty arising out of the operation or control of any entity or property that the **Insured Organization** acquired as security or collateral for any loan, lease or extension of credit.

**C.**     **EXCLUSIONS APPLICABLE TO INSURING AGREEMENT B, PROFESSIONAL SERVICES LIABILITY COVERAGE AND INSURING AGREEMENT C, TRUST SERVICES LIABILITY COVERAGE**

1.     The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** for any liability of any **Insured** under any oral, written, or implied contract or agreement, regardless of whether such liability is direct or assumed; provided that this exclusion will not apply to:

© 2012 The Travelers Indemnity Company.  All rights reserved.

      a.    the extent that the **Insured Organization** would have been liable in the absence of the contract or agreement;

      b.    **Defense Expenses** to the extent that such **Claim** alleges a breach of contractual obligations because of a **Professional Services Act** or a **Trust Act**; or

      c.    the extent that the **Insured Organization** has agreed to indemnify an **Employee** whose services have been leased to the **Insured Organization**.

2.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of the **Insured Organization** serving as a receiver, trustee in bankruptcy, conservator or assignee for the benefit of creditors.

3.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of the insolvency, conservatorship, receivership, bankruptcy, or liquidation of, or financial inability to pay or suspension of payment by, any bank or banking firm, investment company, investment bank, broker or dealer in securities or commodities, insurance or reinsurance entity, or any other organization of a similar nature (other than the **Insured Organization**); provided, that this exclusion will not apply to the extent such **Claim** alleges a covered **Professional Services Act** or **Trust Act** solely in connection with an **Insured's** investment on behalf of a customer in the stock of any of the foregoing entities.

4.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of any dispute involving fees or charges for an **Insured's** services.

5.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of the mechanical or electronic failure, breakdown or malfunction of any machine or systems of machines.

6.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of the **Insured's** actual or written representations, promises or guarantees regarding the past performance or future value of any investment product.

7.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** for the depreciation, or failure to appreciate, in value of any investments, including securities, commodities, currencies, options or futures; provided that this exclusion will not apply to any such depreciation, or failure to appreciate, resulting from negligence on the part of any **Insured** in failing to effect a specific investment transaction in accordance with the specific prior instructions of a customer of the **Insured Organization**.

8.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of:

      a.    the **Insured Organization's** underwriting, syndication, or promotion of any securities;

      b.    the **Insured Organization's** investment banking activities, including the sale and distribution of a new offering of securities;

      c.    the **Insured Organization's** rendering advice, recommendations or services regarding any merger, tender offer, proxy contest, acquisition, restructuring, reorganization, recapitalization, divestiture, or similar transaction;

      d.    the **Insured Organization's** rendering of a "fairness opinion" regarding the valuation of any assets or business entity not held by an **Insured** as trustee; or

      e.    any disclosure requirements in connection with subparts a., b., c. or d. above.

9.    The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of a violation of the responsibilities, obligations or duties imposed by ERISA, or similar provisions of any federal, state, provincial or local statutory law, common law or civil law anywhere in the world, upon fiduciaries of any pension, profit sharing, health and welfare or other

© 2012 The Travelers Indemnity Company.  All rights reserved.
BlueRidge-00116

employee benefit plan or trust established or maintained for the purpose of providing benefits to **Employees** of the **Insured Organization**.

10. The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of the notarization or certification of a signature of a person unless that person, or someone claiming to be that person, physically appeared before the **Insured** at the time of such notarization or certification.

11. The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** for the actual physical loss of, or damage to, money, securities, property or other items of value in the care, custody or control of the **Insured Organization**, its correspondent bank or other authorized representative, including money, securities, property or other items of value stored in a safe deposit box at, or in transit while in the care, custody or control of, the **Insured Organization**, its correspondent bank or other authorized representative.

12. The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of the failure to comply with any notice of any customer of the **Insured Organization**, or any authorized representative of such customer, to stop payment on any check or draft made or drawn by such customer, or the wrongful dishonor of, or wrongful failure to certify, any check or draft made or drawn by any customer of the **Insured Organization** or any authorized representative of such customer.

13. The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** for:

    a. accepting, paying or cashing any instrument which bears a forged, altered or unauthorized signature or endorsement;

    b. acquiring, selling, transferring, paying or delivering any funds or property, extending any credit or giving any value, on the faith of any instruction or advice which:

        (1) bears a forged signature; or

        (2) has been altered without the knowledge and consent of the person or entity who signed or endorsed the instruction or advice; or

    c. guaranteeing in writing or witnessing any handwritten signature, which:

        (1) is on a transfer, assignment, bill of sale, power of attorney, evidence of debt, guarantee, endorsement or similar written document; and

        (2) is forged or altered.

14. The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of:

    a. services performed by an entity which the **Insured Organization** has acquired, or is in control of, as security or collateral for an extension of credit;

    b. medical or health care services;

    c. the practice of law or the rendering of legal services;

    d. architectural or construction management services;

    e. services provided to customers as an enrolled actuary as that term is used in or in connection with ERISA;

    f. the rental of a safe deposit box; or

    g. the designing, building or maintenance of any website or the content of any website.

*IV.*     *SEVERABILITY OF EXCLUSIONS*

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the exclusions set forth in section *III. EXCLUSIONS* above.

*V.*     *CONDITIONS*

**A.**     **LIMITS**

This section *V. CONDITIONS* **A. LIMITS** supplements and does not replace section *III. CONDITIONS*, **C. LIMITS OF LIABILITY** of the Liability Coverage Terms and Conditions.

This limits section applies as described herein regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds** and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established.

1.     The Financial Institution Professional Liability Aggregate Limit of Liability set forth in ITEM 5 of the Declarations is the maximum amount the Company will pay for all **Loss**, including **Defense Expenses**, under this **Liability Coverage**. Additionally, the Financial Institution Professional Liability Aggregate Limit of Liability set forth in ITEM 5 of the Declarations is the **Liability Coverage Limit of Liability** for this **Liability Coverage**.

2.     If the Financial Institution Professional Liability Aggregate Limit of Liability set forth in ITEM 5 of the Declarations is exhausted by the payment of **Loss**, including **Defense Expenses**, the premium for this **Liability Coverage** will be fully earned, all obligations of the Company under this **Liability Coverage** will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under this **Liability Coverage**.

3.     Subject to the Financial Institution Professional Liability Aggregate Limit of Liability set forth in ITEM 5 of the Declarations:

     a.     The Company's maximum limit of liability for **Loss**, including **Defense Expenses**, for all **Claims** under Insuring Agreements A, B or C will not exceed the applicable limit of liability for each Insuring Agreement, respectively, set forth in ITEM 5 of the Declarations for such Insuring Agreements.

     b.     If any **Claim** is covered under more than one of Insuring Agreements A, B or C, the limit of liability set forth in ITEM 5 of the Declarations for each applicable Insuring Agreement will apply separately to the part of **Loss** covered under such Insuring Agreement, provided that the Company's maximum limit of liability for such **Claim** will not exceed the largest applicable limit of liability set forth in ITEM 5 of the Declarations for any such applicable Insuring Agreement.

4.     Payment of **Loss**, including **Defense Expenses**, under the applicable limit of liability for each Insuring Agreement set forth in ITEM 5 of the Declarations, will reduce, and may exhaust, the Financial Institution Professional Liability Aggregate Limit of Liability set forth in ITEM 5 of the Declarations.

**B.**     **SETTLEMENT**

The Company may, with the written consent of the **Insured**, settle or compromise any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for 30% of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for 30% of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00118

**C.**     **ADDITION OF A NEW PROFESSIONAL SERVICE**

If, during the **Policy Period**, the **Insured** begins to offer a new type of **Professional Services** ("New Professional Service"), this **Liability Coverage** will provide coverage for such New Professional Service, pursuant to Insuring Agreement B and subject to all terms and conditions of this **Liability Coverage**, provided written notice of such New Professional Service has been given to the Company, together with such documentation and information as the Company may request, within 90 days after the **Insured** begins to offer such New Professional Service. Coverage for such New Professional Service will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions, and payment by the **Named Insured** of any additional premium, as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided that: (1) the total projected annual fee income or gross revenue to the **Insured Organization** from such New Professional Service does not exceed 10% of the annual fee income or gross revenue to the **Insured Organization** for all **Professional Services**, as reflected in the **Insured Organization's** most recent financial statements as of the inception date of the **Policy Period**, or (2) the **Insured Organization** begins to offer such New Professional Service less than 90 days prior to the end of the **Policy Period**.

Notwithstanding the foregoing, no coverage will be afforded under this section with respect to any New Professional Service specifically excluded from the definition of **Professional Services**.

**D.**     **OTHER INSURANCE**

This **Liability Coverage** will apply only as excess insurance over, and will not contribute with, any other valid and collectible insurance available to the **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**. This **Liability Coverage** will not be subject to the terms of any other insurance.

© 2012 The Travelers Indemnity Company.  All rights reserved.
BlueRidge-00119

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## REMOVE SECTION III. A. 11, INSIDER LOAN EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Financial Institution Professional Liability**

**It is agreed that:**

Section ***III. EXCLUSIONS***, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 11. is deleted.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2012 The Travelers Indemnity Company.  All rights reserved.                          BlueRidge-00120

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ADD COVERAGE FOR MENTAL ANGUISH AND EMOTIONAL DISTRESS FOR CLAIMS COVERED UNDER PROFESSIONAL SERVICES LIABILITY COVERAGE - REDUCED LIMIT OF LIABILITY ENDORSEMENT

This endorsement changes the following:

**Financial Institution Professional Liability**

**It is agreed that:**

1.	The following is added to section *II. DEFINITIONS* of this **Liability Coverage**:

	*Damages* means **Loss** consisting of the following:

	a.	compensatory damages;

	b.	punitive or exemplary damages; or

	c.	the multiple portion of any multiplied damage award.

2.	The following is added to ITEM 5 of the Declarations:

	**Mental Anguish and Emotional Distress Coverage Limit of Liability**	$100,000 for all **Claims**, which amount is part of, and not in addition to, the Insuring Agreement B Professional Services Liability Coverage Limit of Liability.

3.	The following is added to section *III. CONDITIONS*, **C. LIMITS OF LIABILITY** 1. of the Liability Coverage Terms and Conditions:

	However, the Company's maximum limit of liability for all **Damages** for all **Claims** for emotional distress or mental  anguish is further limited by the following:

	The Company's maximum limit of liability for all **Damages** for all **Claims** for emotional distress or mental anguish under Insuring Agreement B of this **Liability Coverage** will be the Mental Anguish and Emotional Distress Coverage Limit of Liability for all **Claims** set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, the Insuring Agreement B Professional Services Liability Coverage Limit of Liability.

4.	The following replaces section *III. EXCLUSIONS*, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 2. of this **Liability Coverage**:

	2.	The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, humiliation, false arrest, detention or imprisonment, malicious prosecution, wrongful entry, wrongful eviction, invasion of the right of private occupancy, discrimination, libel, slander, disparagement, or violation of a person's or organization's right of privacy or publicity right; provided that this exclusion will not apply to the portion of any **Claim** for a **Lending Act** or a **Professional Services Act** seeking **Loss** for emotional distress or mental anguish.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2012 The Travelers Indemnity Company.  All rights reserved.	BlueRidge-00121

---

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

---

## AUTOMATED TELLER MACHINE CLAIM DEFENSE EXPENSE COVERAGE ENDORSEMENT

This endorsement changes the following:

**Financial Institution Professional Liability**

---

**It is agreed that:**

1.      The following is added to section *II. DEFINITIONS*:

   ***Automated Teller Machine Claim*** means any **Claim** that alleges one or more violations of the Electronic Funds Transfer Act based on the actual or alleged failure of the **Insured Organization** to post notice to users of an Automatic Teller Machine owned and operated by the **Insured Organization** that fees are charged for conducting a transaction on such Automated Teller Machine.

2.      The following replaces section *II. DEFINITIONS*, **O.** *Professional Services Act*, in this **Liability Coverage**:

   ***Professional Services Act*** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by any **Insured** in the rendering of, or failure to render, **Professional Services,** including any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect related to the **Insured Organization's** operation of an Automated Teller Machine.

   **Professional Services Act** does not include a **Lending Act** or a **Trust Act**.

3.      The following replaces section *III. EXCLUSIONS*, **C. EXCLUSIONS APPLICABLE TO INSURING AGREEMENT B, PROFESSIONAL SERVICES LIABILITY COVERAGE AND INSURING AGREEMENT C, TRUST SERVICES LIABILITY COVERAGE**, 4.:

   4.      The Company will not be liable under Insuring Agreements B or C for **Loss** for any **Claim** based upon or arising out of any dispute involving fees or charges for an **Insured's** services; provided that this exclusion will not apply to **Defense Expenses** incurred on account of any **Automated Teller Machine Claim**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2012 The Travelers Indemnity Company.  All rights reserved.                                    BlueRidge-00122

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXTEND LENDER LIABILITY COVERAGE - CLAIMS BY NON-BORROWERS; EXTEND PROFESSIONAL SERVICES LIABILITY COVERAGE – CLAIMS BY NON-CUSTOMERS; ADD INTELLECTUAL PROPERTY EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Financial Institution Professional Liability**

**It is agreed that:**

1. The following replaces section **I. INSURING AGREEMENTS**, **A. LENDER LIABILITY COVERAGE** and **B. PROFESSIONAL SERVICES LIABILITY COVERAGE**, respectively:

    **A.    LENDER LIABILITY COVERAGE**

    The Company will pay on behalf of the **Insured**, **Loss** for any **Claim** first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Lending Act**.

    **B.    PROFESSIONAL SERVICES LIABILITY COVERAGE**

    The Company will pay on behalf of the **Insured** , **Loss** for any **Claim** first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Professional Services Act**.

2. The following is added to section **III. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**:

    The Company will not be liable for any **Loss** for any **Claim** based upon or arising out of any actual or alleged infringement or violation of any intellectual property rights or laws, including copyright, title, slogan, patent, service mark, service name, trade dress, trade name, trade secret, or trademark.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2013 The Travelers Indemnity Company. All rights reserved.                                     BlueRidge-00123

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## INSURED ORGANIZATION SECURITIES EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Financial Institution Professional Liability**

**It is agreed that:**

The following is added to section  **III. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS**:

The Company will not be liable for  **Loss**  for any  **Claim**  based upon or arising out of securities issued by the  **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2014 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00124

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CORPORATE TRUST SERVICES EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Financial Institution Professional Liability**

**It is agreed that:**

1.  The following is added to section  **II. DEFINITIONS**:

    ***Corporate Trust Services***   means services to corporate or municipal entities involving corporate or municipal securities, including tax-exempt and other municipal securities, or other debt securities (including unit investment trusts), or acting as a dividend agent, paying agent, or any other type of corporate or municipal trustee or agent appointment.

2.  The following is added to section  **III. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS:**

    The Company will not be liable for  **Loss**  for any  **Claim**  based upon or arising out of the rendering of, or failure to render,  **Corporate Trust Services.**

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2014 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00125

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**REPLACE SECTION III. EXCLUSIONS, A. 4. - FINAL NON-APPEALABLE ADJUDICATION – OTHER THAN A PROCEEDING INITIATED BY THE COMPANY ENDORSEMENT**

This endorsement changes the following:

**Financial Institution Professional Liability Coverage**

**It is agreed that:**

The following replaces section **III. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO LOSS,** 4.

4.      The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Insured** committing any intentionally dishonest or fraudulent act or omission or any willful violation of any statute, rule or law; or gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled; provided that this exclusion will not apply unless a final non-appealable adjudication in any proceeding other than a proceeding initiated by the Company establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

BlueRidge-00126

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### REPLACE EXCLUSION SECTION III. A. 13 ENDORSEMENT – LENDING ACT OR PROFESSIONAL SERVICES ACT INVOLVING OR RELATING TO LOAN SERVICING – EXCEPTION FOR DEFENSE EXPENSES

This endorsement changes the following:

**Financial Institution Professional Liability**

**It is agreed that:**

The following replaces section **III. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 13.:

13. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any violation of federal or state laws or regulations involving or relating to a:

   a. **Lending Act**; or

   b. **Professional Services Act** involving or relating to **Loan Servicing**,

   including the Truth-in-Lending Act, Equal Credit Opportunity Act, Fair Credit Reporting Act, Fair Debt Collection Practices Act, the Home Owners Equity Protection Act of 1994, Fair Credit Billing Act, or usury laws or regulations; provided this exclusion will not apply to **Defense Expenses**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## VIRGINIA CHANGES ENDORSEMENT

This endorsement changes the following:

**Financial Institution Professional Liability**

**It is agreed that:**

1.  The following replaces section ***V. CONDITIONS***, **A. LIMITS**, 2.:

    2.  If the Financial Institution Professional Liability Aggregate Limit of Liability set forth in ITEM 5 of the Declarations is exhausted by the payment of **Loss**, including **Defense Expenses**, the premium for this **Liability Coverage** will be fully earned, and any duty to defend the Company has under this **Liability Coverage** will be completely fulfilled and exhausted; provided that exhaustion of such Financial Institution Professional Liability Aggregate Limit of Liability will not end the Company's obligations under this **Liability Coverage** pertaining to the sending of notices of cancellation, premium increase or nonrenewal and will not limit the right of the **Named Insured** to elect any applicable Extended Reporting Period under this **Liability Coverage**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106420159**



### KIDNAP AND RANSOM COVERAGE

---

## CONSIDERATION CLAUSE

**IN CONSIDERATION** of the payment of the premium, subject to the Declarations, and pursuant to all the terms, conditions, exclusions, and limitations of this **Kidnap and Ransom Policy**, the Company and the **Insured** agree as follows:

## I. INSURING AGREEMENTS

The following Insuring Agreements apply to any **Insured Event** first occurring during the **Policy Period**. If ITEM 5 of the Declarations indicates that any Insuring Agreement is "*Not Covered*" or if no amount is shown for the Limit of Insurance for such Insuring Agreement, then such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Kidnap and Ransom Policy**.

### A. KIDNAP FOR RANSOM

The Company will indemnify the **Named Insured** for **Ransom**, paid or surrendered by an **Insured** or **Insured Person**, resulting from any **Kidnapping**.

### B. EXTORTION FOR RANSOM

The Company will indemnify the **Named Insured** for **Ransom**, paid or surrendered by an **Insured** or **Insured Person**, resulting from:

1. **Bodily Injury Extortion**;

2. **Cyber Extortion**;

3. **Property Damage Extortion**;

4. **Products Extortion**; or

5. **Trade Secrets Extortion**.

### C. LOSS OF RANSOM IN TRANSIT/DELIVERY

The Company will indemnify the **Named Insured** for loss of **Ransom** due to the actual damage or destruction, disappearance, confiscation, or wrongful appropriation of such **Ransom** while being delivered by anyone who is duly authorized by an **Insured** to have custody thereof to persons demanding such **Ransom**, provided that the **Kidnapping** or **Extortion** giving rise to the delivery is insured under this **Kidnap and Ransom Policy**.

### D. COVERED EXPENSES FOR KIDNAP OR EXTORTION

The Company will indemnify the **Named Insured** for **Covered Expenses** resulting from a **Kidnapping** or **Extortion**.

### E. COVERED EXPENSES FOR DETENTION OR HIJACK

The Company will indemnify the **Named Insured** for **Covered Expenses** resulting from a **Detention** or **Hijack**.

---

© 2016 The Travelers Indemnity Company. All rights reserved.
BlueRidge-00129

**F.   REST AND REHABILITATION EXPENSES**

The Company will indemnify the **Named Insured** for reasonable expenses incurred by an **Insured** or **Insured Person** for rest and rehabilitation, for a period of not more than 90 days, of any **Insured Person** and such **Insured Person's** spouse and children, following the:

1.      release of such **Insured Person** from a **Kidnapping**, **Detention**, or **Hijack**; or

2.      resolution of any **Extortion**;

provided that such expenses are incurred within 12 months following such release or resolution.

**G.   PERSONAL ACCIDENT**

The Company will indemnify the **Named Insured** for loss due to **Personal Accident** resulting from a **Kidnapping**, **Extortion**, **Detention**, or **Hijack**, or the prevention thereof.

**H.   LEGAL LIABILITY**

The Company will indemnify the **Named Insured** for loss due to awards or judgments, reasonable attorney's fees, court costs, and settlements made with the Company's prior written consent, imposed upon or paid by the **Insured**  as a result of any action for damages brought by or on behalf of any **Insured Person** or such **Insured Person's** legal representatives, heirs, or estate, for any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the **Insured**  resulting from a **Kidnap**, **Extortion**,  **Detention**, or **Hijack**.

**I.   CRISIS RESPONSE FIRM FEES AND EXPENSES**

The Company agrees to pay on behalf of the **Insured** the fees and expenses of the Crisis Response Firm set forth in ITEM 5 of the Declarations incurred as a result of an **Insured Event**.

## II.  GENERAL AGREEMENTS

**A.   JOINT INSURED**

1.   If the **Named Insured** consists of more than one entity, then the first entity named in ITEM 1 of the Declarations will act for itself and for every other **Insured** for the purposes of this **Kidnap and Ransom Policy**.

2.   If any **Insured** has knowledge of any information relevant to this **Kidnap and Ransom Policy**, that knowledge is considered knowledge of every **Insured**.

3.   The Company will not pay more for loss or expense sustained by more than one **Insured** than the amount the Company would pay if all loss or expenses had been sustained by one **Insured**.

4.   Payment by the Company to the **Named Insured** for loss or expenses incurred by any **Insured** under this **Kidnap and Ransom Policy** will fully release the Company on account of such loss or expense.

**B.   ADDITIONAL OFFICES**

If the **Insured** establishes any additional offices, other than by the consolidation with, merger with, purchase of, or acquisition of assets or liabilities of another organization while this **Kidnap and Ransom Policy** is in effect, this **Kidnap and Ransom Policy** will provide coverage for such offices from the date of such offices establishment through the remainder of the **Policy Period**, without the requirement of notice to the Company or the payment of additional premium.

**C.   CONSOLIDATION, MERGER, OR PURCHASE OF ASSETS**

1.   If, during the **Policy Period**, the **Insured** merges with, purchases, or acquires the assets or liabilities of another entity, this **Kidnap and Ransom Policy** will provide coverage for that merged, purchased, or

© 2016 The Travelers Indemnity Company. All rights reserved.
BlueRidge-00130

acquired entity, subject to all other terms and conditions of this **Kidnap and Ransom Policy**, but only for loss or expenses due to any **Insured Event** first occurring after the effective date of such merger, purchase, or acquisition, provided that:

    a.  the Company receives written notice of such merger, purchase, or acquisition; and

    b.  a specific application has been submitted on the Company's form in use at the time, together with any other documentation and information that the Company may require;

within 90 days after the effective date of such merger, purchase, or acquisition.

2. Coverage for the merged, purchased, or acquired entity will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid to the Company any additional premium as may be required.

3. The 90-day notice requirement and the 90-day limitation of coverage will not apply if: (i) the assets of the merged, purchased, or acquired entity do not exceed 30% of the total assets of the **Insured** as reflected in the **Insured's** most recent fiscal year-end financial statement; or (ii) the merger, purchase, or acquisition occurs less than 90 days prior to the end of the **Policy Period**.

## D.  ACQUISITIONS

1. If, during the **Policy Period**, the **Insured** acquires or forms a **Subsidiary**, this **Kidnap and Ransom Policy** will provide coverage for such **Subsidiary** and its respective **Insured Persons**, subject to all other terms and conditions of this **Kidnap and Ransom Policy**, but only for loss or expenses due to any **Insured Event** first occurring after the effective date of such acquisition or formation, provided that:

    a.  the Company receives written notice of such acquisition or formation; and

    b.  a specific application has been submitted on the Company's form in use at the time, together with any other documentation and information that the Company may require;

within 90 days after the effective date of such acquisition or formation.

2. Coverage for such **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required.

3. The 90-day notice requirement and the 90-day limitation of coverage will not apply if: (i) the assets of the acquired or formed **Subsidiary** do not exceed 30% of the total assets of the **Insured** as reflected in the **Insured's** most recent fiscal year-end financial statement; or (ii) the acquisition or formation occurs less than 90 days prior to the end of the **Policy Period**.

## E.  CHANGE OF CONTROL

If, during the **Policy Period**:

1. all, or substantially all, of the assets of the **Named Insured** are acquired by another entity;

2. the **Named Insured** merges or consolidates with another entity, and the **Named Insured** is not the surviving entity; or

3. any natural person, entity, or affiliated group of natural persons or entities obtains the right to elect, appoint, or designate more than 50% of the board of directors, board of trustees, or board of managers, or obtains the right to exercise a majority control of the board of directors, board of trustees, or board of managers of the **Named Insured**;

this **Kidnap and Ransom Policy** will not apply to an **Insured Event** first occurring after such acquisition, merger, consolidation, or change of control takes place.

© 2016 The Travelers Indemnity Company. All rights reserved.

In the event of such acquisition, merger, consolidation, or change of control of the **Named Insured**, the Company will refund any unearned premium computed on a pro rata basis.

**F.  REPRESENTATION OF INSURED**

No statement made by, or on behalf of, the **Insured**, whether contained in the application, underwriting information, or otherwise, will be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

## III.  DEFINITIONS

Wherever appearing in this **Kidnap and Ransom Policy**, the following words and phrases appearing in bold type will have the meanings set forth in this section III. DEFINITIONS:

**A.  *Bodily Injury Extortion*** means a threat, communicated to an **Insured** or **Insured Person**, to kill, physically injure, or **Kidnap** any **Insured Person**, where such threat is made for the purpose of demanding **Ransom** from the assets of an **Insured** or **Insured Person** as a condition of not carrying out such threat.

**B.  *Computer System*** means any:

1.  computer;

2.  input, output, processing, storage, or communication device, or any related network, operating system or application software, that is connected to, or used in connection with, such computer; or

3.  off-line media library;

that is rented by, owned by, leased by, licensed to, or under the direct operational control of an **Insured**.

**C.  *Computer Virus*** means any malicious code that could destroy, alter, contaminate, or degrade the integrity, quality, or performance of:

1.  electronic data used, or stored, in any **Computer System** or network; or

2.  a computer network, computer application software, computer operating system, or related network.

**D.  *Covered Expenses*** means any of the following amounts directly incurred or paid by an **Insured** or **Insured Person**:

1.  reasonable fees, costs, or expenses for:

    a.  independent negotiators engaged by the **Insured**;

    b.  independent public relations consultants or interpreters;

    c.  legal services necessary to secure the release of an **Insured Person**;

    d.  independent forensic analysts engaged by the **Insured**;

    e.  communication or recording equipment;

    f.  advertising solely and directly to obtain the release of an **Insured Person** as a result of a **Kidnapping**, **Detention**, or **Hijack**;

    g.  security guards temporarily retained solely and directly for the purpose of protecting an **Insured Person** or property during an **Insured Event**, subject to the specific recommendation of the Crisis Response Firm designated in ITEM 5 of the Declarations;

© 2016 The Travelers Indemnity Company. All rights reserved.

h.  necessary medical services or psychiatric care for an **Insured Person**, or cosmetic or plastic surgery medically necessary to correct any permanent disfigurement sustained by an **Insured Person**, solely and directly as a result of a **Kidnapping**, **Detention**, or **Hijack**, provided that such services, care, or surgery are provided to or performed for such **Insured Person** within 36 months following such **Insured Person's** release from the **Kidnapping**, **Detention**, or **Hijack**;

i.  electronic sweeps for bugs or other electronic listening devices on any **Premises**;

j.  required occupational job re-training of an **Insured Person** who is the victim of a **Kidnapping**, **Detention** or **Hijack**;

2. **Reward**;

3. interest on a loan made to the **Insured** for the sole purpose of paying **Ransom**, at an interest rate applicable during the period of the loan not to exceed the discount rate of the Federal Reserve Bank of New York by more than two percentage points, provided that the loan is taken out not more than 30 days before the payment of **Ransom** and repaid within 30 days of the **Insured** receiving reimbursement from the Company of the amount of the **Ransom** within the applicable limit of insurance;

4. reasonable costs of travel and accommodations, including:

a.  the costs to return an **Insured Person** and such **Insured Person's** family to the country of which the **Insured Person** is a national or resident alien upon the **Insured Person's** release from a **Kidnapping**, **Detention**, or **Hijack** or the resolution of an **Extortion**; and

b.  the costs to relocate an **Employee** and such **Employee's** family for the purposes of replacing such **Insured Person**, provided that these costs will apply only once per **Insured Person** per **Insured Event**;

5. **Salary**;

6. costs incurred by the **Insured** for the compensation of an **Employee** specifically designated to assist in negotiations associated with a **Kidnapping**, **Detention**, or **Hijack**, not to exceed the **Employee's** base rate of pay and all other reasonable expenses solely and directly incurred in connection with such negotiations, provided that the **Insured** forwards an itemized accounting of the **Employee's** time, services, and expenses to the Company;

7. personal financial loss suffered by an **Insured Person** solely and directly as a result of the physical inability of a victim of a **Kidnap**, **Extortion**, **Detention**, or **Hijack** to attend to personal financial matters, including the renewal of insurance contracts, exercise of stock options, and response to margin or loan calls by financial institutions; or

8. other reasonable expenses incurred solely and directly as a result of a **Kidnapping**, **Detention**, or **Hijack**, provided that such expenses are incurred after the **Insured Person's** release from the **Kidnapping**, **Detention**, or **Hijack** with the prior written consent of the Company and within 36 months following the release.

E. *Cyber Extortion* means a threat, communicated to an **Insured** or **Insured Person** by an individual other than an identifiable **Employee**, expressing an intention to:

1. cause the **Insured** to transfer, pay, or deliver funds or property using a **Computer System** without the permission, authorization, and consent of the **Insured**;

2. sell or disclose information about a customer of the **Insured** that is unique to the relationship of the customer and the **Insured** and is not otherwise publicly available, provided that such information is stored in an electronic medium in a **Computer System** and is retrievable in a perceivable form;

3. alter, damage, or destroy any computer program, software, or other electronic data that is stored within a **Computer System**;

© 2016 The Travelers Indemnity Company. All rights reserved.

4. maliciously or fraudulently introduce a **Computer Virus** into a **Computer System** when such threat is premised upon actual or alleged unauthorized access to the **Computer System**;

5. maliciously or fraudulently introduce  malware into a **Computer System**; or

6. initiate an intentional attack on a **Computer System** that depletes system resources or impedes system access available through the Internet to authorized external users of the **Computer System**,

where such threat is made for the purpose of demanding **Ransom** from the assets of an **Insured** or **Insured Person** as a condition of not carrying out such threats.

F. **Detention** means the holding under duress of an **Insured Person**, for a period in excess of four hours, for a reason other than **Kidnapping**, and whether by authorities legally constituted in the place of custody or by others.

G. **Employee** means a natural person whose labor or service is engaged by and directed by the **Insured** and who is:

1. on the payroll of the **Insured**;

2. temporarily furnished to the **Insured** to substitute for a natural person described in 1. above on leave or to meet seasonal or short-term workload conditions;

3. leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm;

4. a partner, proprietor, member of the board of directors, officer, member of the board of trustees, member of the board of managers, or functional equivalent, of the **Insured** or in such capacity while acting as a member of any elected or appointed committee of the **Insured**;

5. a former employee, partner, proprietor, member of the board of directors, officer, member of the board of trustees, member of the board of managers, or functional equivalent, of the **Insured** and who is retained as a consultant for the **Insured**;

6. a guest student or intern pursuing studies or duties in any office of the **Insured**; or

7. specifically scheduled by endorsement to this **Kidnap and Ransom Policy**.

**Employee** does not include any agent, broker, factor, commission merchant, consignee, independent contractor or representative of any **Insured**, not specified in 1. through 7. above.

H. **Extortion** means **Bodily Injury Extortion**, **Property Damage Extortion**, **Products Extortion**, **Trade Secrets Extortion**, or **Cyber Extortion**.

I. **Guest**  means a natural person who is: (i) visiting any **Premises**, or traveling with an **Employee** of the **Insured**, for social or business purposes; or (ii) traveling in a motor vehicle, aircraft or waterborne vessel owned, rented or leased by the **Insured**.

J. **Hijack** means illegal holding under duress, for any reason other than **Kidnapping**, of an **Insured Person**, for a period in excess of four hours, while such **Insured Person** is traveling in or on a motor vehicle, aircraft, train, waterborne vessel, or any form of public or private transportation, whether by authorities legally constituted in the place of custody or by others.

K. **Informant** means a natural person, other than an **Insured Person**, providing information not otherwise obtainable, solely in return for a **Reward** offered by the **Insured** or an **Insured Person**.

L. **Insured** means the **Named Insured** or any **Subsidiary**.

M. **Insured Event** means a singular act of **Kidnap**, **Extortion**, **Detention**, or **Hijack**, or a series of connected acts thereof. If multiple acts of **Kidnap**, **Extortion**, **Detention**, or **Hijack** are or were carried out in furtherance of another, or of a common scheme or plan, then all such acts will be deemed to be connected and to constitute a single **Insured Event**.

© 2016 The Travelers Indemnity Company. All rights reserved.

**N.** **Insured Person** means an **Employee**, **Guest**, **Relative**, or resident or individual employed in the household of an **Employee**.

**O.** **Kidnap** or **Kidnapping** means an actual or alleged event, or connected series of events, of seizing, detaining, abducting, or carrying away by force or fraud, of an **Insured Person** (except a minor by a parent thereof) by one person or collaborating persons for the purpose of demanding a **Ransom** from the assets of an **Insured** or **Insured Person** as a condition of the release of such **Insured Person**.

**P.** **Kidnap and Ransom Policy** means, collectively, the Declarations, the application, this policy form, and any endorsements attached thereto.

**Q.** **Loss of Extremity** means the permanent physical separation, or the total and irrevocable loss of use, of a digit, ear, nose, or genital organ, or any part thereof.

**R.** **Loss of Hearing** means the loss of hearing of one or both ears that is certified as being entire and irrevocable by a qualified medical practitioner who specializes in hearing loss and is approved by the Company.

**S.** **Loss of Limb** means the separation, or the total and irrevocable loss of use, of a hand at or above the wrist, or a foot at or above the ankle.

**T.** **Loss of Sight** means the loss of sight in one or both eyes that is certified as being entire and irrevocable by a qualified medical practitioner who specializes in ophthalmology and is approved by the Company.

**U.** **Loss of Speech** means the loss of speech that is certified as being entire and irrevocable by a qualified medical practitioner who specializes in loss of speech and is approved by the Company.

**V.** **Named Insured** means the entity named in ITEM 1 of the Declarations.

**W.** **Personal Accident** means **Loss of Extremity**, **Loss of Hearing**, **Loss of Limb**, **Loss of Sight**, **Loss of Speech**, **Permanent Total Disablement**, or death, sustained by an **Insured Person** within 12 months from the date of the **Kidnapping**, **Extortion**, **Detention**, or **Hijack** and subject to the limitations set forth within the schedule below:

| BENEFIT SCHEDULE | | | |
|---|---|---|---|
| Benefits per **Insured Person** expressed as a percentage of the Personal Accident Limit of Insurance set forth in ITEM 5 of the Declarations | | | |
| Death | 100% | **Loss of Sight** | 100% |
| **Loss of Limb** | 100% | **Permanent Total Disablement** | 100% |
| **Loss of Hearing** | 100% | **Loss of Extremity** | 50% |
| **Loss of Speech** | 100% | | |

**X.** **Permanent Total Disablement** means disablement that necessarily and continuously disables an **Insured Person** from attending to every aspect of such **Insured Person's** normal business or occupation for a period of 12 months and, at the end of such period is certified as being beyond hope of improvement by two qualified medical practitioners who are approved by the Company.  If the **Insured Person** has no business or occupation, the disablement must prevent such **Insured Person** from attending to his or her normal daily activities.

**Y.** **Policy Period** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations.  In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Kidnap and Ransom Policy**.

**Z.** **Premises** means that portion of any real property owned by or leased to the **Insured**, or a residence occupied by any **Employee**.

**AA.** **Products Extortion** means a threat, communicated to an **Insured** or **Insured Person**, that:

1. goods or products of the **Insured**, goods or products which are to be passed off as such, or goods or products which the **Insured** handles, will be or have been contaminated, polluted, or rendered substandard; or

© 2016 The Travelers Indemnity Company. All rights reserved.
BlueRidge-00135

2. publicity has been created stating that goods or products of the **Insured**, goods or products which are to be passed off as such, or goods or products which the **Insured** handles have been contaminated, polluted, or rendered substandard;

where such threat is made for the purpose of demanding **Ransom** from the assets of an **Insured** or any **Insured Person** as a condition of not carrying out such threats.

BB. *Property* means any:

1. land, building, or structure;

2. fixture, fitting, machinery, or equipment (fixed or mobile), work of art or other property located in or on such land, building, or structure;

3. vessel or aircraft;

4. bloodstock or livestock; or

that is owned by or leased to the **Insured** or for which the **Insured** is legally liable.

CC. *Property Damage Extortion* means a threat, communicated to an **Insured** or **Insured Person**, to cause loss of, physically damage, contaminate, or pollute **Property**, where such threat is made for the purpose of demanding **Ransom** from the assets of an **Insured** or **Insured Person** as a condition of not carrying out such threats.

DD. *Ransom* means cash, monetary instruments, or bullion, or the fair market value of securities, property, or services paid or surrendered, or to be paid or surrendered, by or on behalf of an **Insured** or **Insured Person**, at the direction and demand of one or more persons committing or allegedly committing a **Kidnap** or **Extortion**. The value of **Ransom** will be determined as of the date such **Ransom** is paid or surrendered.

EE. *Relative* means a spouse, domestic partner, fiancé, fiancée, child, stepchild, adopted child, adopted stepchild, foster child, spouse of a married child, grandchild, sister, brother, parent, parent-in-law, step-parent, grandparent, grandparent-in-law,  or any other  lineal descendant or living ancestor of an **Employee**, or of a resident or individual employed in the household of an **Employee**.

FF. *Reward* means a reasonable amount paid by an **Insured** or **Insured Person** to an **Informant** for information that contributes to the return of an **Insured Person** or such **Insured Person's** remains or to the resolution of the **Insured Event**.

GG. *Salary* means:

1. the amount of compensation paid by the **Insured**, including hourly wages, bonuses, commissions, allowances, cost of living adjustments, foreign tax reimbursements, or health and welfare and pension benefits (at the level in effect on the commencement date of the **Kidnapping**, **Detention**, or **Hijack**) that the **Insured** pays to an **Insured Person** who is a victim of the **Kidnapping**, **Detention**, or **Hijack**.   **Salary** will be paid under this paragraph until the earliest of:

   a. 60 days after the date of the release of, or escape by, the **Insured Person** from the kidnappers, detainers, or hijackers;

   b. the date of discovery  of the death of the **Insured Person**;

   c. 120 days after the Company receives the last credible evidence that the **Insured Person** is still alive; or

   d. 72 months after the commencement date of the **Kidnapping**, **Detention**, or **Hijack**;

2. the amount of compensation paid by the **Insured**, including hourly wages, bonuses, commissions, allowances, cost of living adjustments, foreign tax reimbursements, or health and welfare and pension benefits, for a temporary replacement of an **Insured Person** for the duration of the **Kidnapping**, **Detention**, or **Hijack** and 60 days thereafter, up to but not exceeding the level of such **Insured Person's** total amount of compensation in effect on the commencement date of the **Kidnapping**, **Detention**, or **Hijack**; or

© 2016 The Travelers Indemnity Company. All rights reserved.

3. the amount of compensation, including hourly wages, bonuses, commissions, allowances, cost of living adjustments, foreign tax reimbursements, or health and welfare and pension benefits, of an **Insured Person's Relative** who leaves his or her employment in order to assist in the negotiations for the release of such **Insured Person** from a **Kidnapping**, **Detention**, or **Hijack**, for the duration of the **Kidnapping**, **Detention**, or **Hijack** and 60 days thereafter, up to but not exceeding the level of such **Relative's** total amount of compensation in effect on the commencement date of the **Kidnapping**, **Detention**, or **Hijack**.

**HH. *Subsidiary*** means:

1. any corporation, partnership, limited liability company, or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint, or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent; or

2. subject to the provisions set forth in section II. GENERAL AGREEMENTS D. ACQUISITIONS, any entity that the **Named Insured** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint, or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent.

**II. *Trade Secrets Extortion*** means a threat, communicated to an **Insured** or **Insured Person**, to disseminate, utilize, or divulge information, including any formula, pattern, compilation of data, program, device, method, technique, or process, or other confidential or proprietary information that is particular to the Insured in the conduct of business, provided that the **Insured** makes constant and conscious efforts not to disclose such information to any unauthorized third party, where such threat is made for the purpose of demanding **Ransom** from the assets of an **Insured** or **Insured Person** as a condition of not carrying out such threats.

## IV. EXCLUSIONS

This **Kidnap and Ransom Policy** will not apply to:

**A. Ransom** paid or surrendered based upon or arising out of any fraudulent, dishonest, or criminal act of the **Insured**, an **Insured Person**, or any person authorized by the **Insured** to have custody of such **Ransom**;

**B. Ransom** surrendered in a face-to-face encounter involving the use or threat of force or violence, unless surrendered by a person who is in possession of such **Ransom** at the time of such surrender for the sole purpose of conveying it to pay a previously communicated demand for such **Ransom**;

**C. Ransom** paid or surrendered either at the location where the **Kidnap** of any **Insured Person** occurs or where the **Extortion** demand is first made, unless such **Ransom** is brought to such location after receipt of the **Ransom** demand for the sole purpose of paying such **Ransom** demand;

**D. Covered Expenses**, solely with respect to **Detention** under Insuring Agreement E, based upon or arising out of:

1. any act or alleged act of an **Insured** or **Insured Person** that, if committed by the same party in the country where the **Named Insured** is headquartered, or of which the **Insured Person** is a national, would be a criminal offense, unless the Company determines that the allegations were intentionally false, fraudulent, and malicious and made solely and directly to achieve a political, propaganda, or coercive effect upon, or to the detriment of the **Insured** or the **Insured Person** who was the subject of the **Detention**; or

2. the failure of an **Insured** or **Insured Person** to properly procure or maintain immigration, work, residence, or similar visas, permits, or other documentation.

© 2016 The Travelers Indemnity Company. All rights reserved.

## *V.  CONDITIONS*

### A.  INSURED'S DUTIES

1.  When an **Insured** first becomes aware of facts that would cause a reasonable person to assume an **Insured Event** has occurred or will occur, the **Insured** will:

    a.  give oral or written notice as soon as practicable to the Crisis Response Firm and the Company at the addresses provided in ITEMS 5 and 3, respectively, of the Declarations;

    b.  use all due diligence and do all things reasonably practicable to avoid or diminish any loss or expenses;

    c.  use all reasonable efforts not to disclose the existence of this **Kidnap and Ransom Policy**; and

    d.  give the Company assistance and cooperation as it may reasonably require.

2.  Under Insuring Agreements A and B, and prior to the payment or surrender of any **Ransom**, the **Insured** will:

    a.  make every reasonable effort to determine that the **Kidnapping** or **Extortion** has actually occurred and is not a hoax;

    b.  have approved the payment of any **Ransom**; and

    c.  make every reasonable effort to notify the Federal Bureau of Investigation, or other law enforcement agency having jurisdiction thereover, of the demand for **Ransom**, and comply with such agency's recommendations and instructions, or allow the Crisis Response Firm set forth in ITEM 5 of the Declarations to so notify, while having regard for the personal safety of any **Insured Person**.

3.  Under Insuring Agreement H, the **Insured** will:

    a.  not admit any liability for or settle any claim, or incur costs or expenses, without the prior written authorization of the Company;

    b.  notify the Company of any suit or legal proceeding at the earliest practicable time, not to exceed 60 days after the **Insured's** receipt of notice thereof, and at the request of the Company promptly furnish it with copies of all pleadings and documentation associated with such suit or proceeding;

    c.  defend any claim covered hereunder, provided that the Company will have no duty to defend any such claim and the Company will have the right to participate with the **Insured** in the investigation, defense, and settlement, including but not limited to the negotiation of a settlement of any claim that reasonably appears to be covered in whole or in part hereunder, and the selection of appropriate defense counsel; and

    d.  provide the Company with written request prior to any advance of amounts for costs and expenses with respect to any claim covered hereunder.  Such advanced payments by the Company will be repaid to the Company by the **Insured** in the event and to the extent that the **Insured** is not entitled to payments of such costs and expenses hereunder. As a condition of any payment of costs and expenses under this Condition A.3. d, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any costs or expenses paid to or on behalf of the **Insured** if it is finally determined that any such claim, or portion of any claim, is not covered hereunder.

### B.  RETENTION

The Company will have no obligation to pay loss or expenses under this **Kidnap and Ransom Policy**, until the applicable Retention amount set forth in ITEM 5 of the Declarations has been paid by the **Insured**.  The Company may, at its sole discretion, pay all or part of the Retention amount on behalf of the **Insured**, and in such event, the **Insured** agrees to repay the Company any amounts so paid.

© 2016 The Travelers Indemnity Company. All rights reserved.

## C.  LIMIT OF INSURANCE

1.  Policy Aggregate Limit of Insurance

If ITEM 5 of the Declarations indicates that this **Kidnap and Ransom Policy** includes a Policy Aggregate Limit of Insurance, then the maximum limit of insurance under all applicable Insuring Agreements, with the exception of Insuring Agreement I, will not exceed such Policy Aggregate Limit of Insurance. The Policy Aggregate Limit of Insurance will be reduced by the amount of any payment made under the terms of this **Kidnap and Ransom Policy**. If the Policy Aggregate Limit of Insurance is exhausted by any payments made under this **Kidnap and Ransom Policy**, the Company will have no further liability for loss or expenses, except under Insuring Agreement I, regardless of when incurred and whether previously reported to the Company.

If applicable, the Policy Aggregate Limit of Insurance will be reinstated to the extent of any net recovery pursuant to Condition E that is received by the Company during the **Policy Period** and before the Policy Aggregate Limit of Insurance is exhausted.  Recovery from reinsurance or indemnity, or both, for the Company's benefit will not be deemed a recovery as used herein.

If ITEM 5 of the Declarations indicates that this **Kidnap and Ransom Policy** does not include a Policy Aggregate Limit of Insurance, then, with the exception of Insuring Agreement G, payment of loss or expenses will not reduce any applicable Limit of Insurance available for other losses or expenses sustained during the **Policy Period**.

2.  Limit of Insurance

The maximum limit of insurance for each **Insured Event** under any applicable Insuring Agreement of this **Kidnap and Ransom Policy** will not exceed the Limit of Insurance for such applicable Insuring Agreement as set forth in ITEM 5 of the Declarations.

3.  Personal Accident Aggregate Limit of Insurance

The maximum limit of insurance for **Personal Accident** under Insuring Agreement G of this **Kidnap and Ransom Policy** as a result of all **Insured Events** will not exceed the Aggregate Limit of Insurance for Insuring Agreement G as set forth in ITEM 5 of the Declarations. Such Aggregate Limit of Insurance will be reduced by the amount of any payment for any **Personal Accident** as a result of an **Insured Event** first occurring during the **Policy Period**. Upon exhaustion of such Aggregate Limit of Insurance by such payments, the Company will have no further obligation under Insuring Agreement G.

4.  Crisis Response Firm Fees and Expenses

The fees and expenses of the Crisis Response Firm set forth in Insuring Agreement I ITEM 5 of the Declarations will not erode any Limit of Insurance under this **Kidnap and Ransom Policy** and will be borne by the Company.

## D.  ACTION AGAINST THE COMPANY

No suit, action, or proceeding for recovery of any claim for loss or expenses under this **Kidnap and Ransom Policy** will be brought in any court of law, equity, or other tribunal unless all the requirements of this **Kidnap and Ransom Policy** have been complied with and such suit, action, or proceeding has been commenced within 24 months after such claim for loss or expenses has been reported to the Company by the  **Insured**.

If the period of limitation in this Condition D is deemed to be inconsistent with applicable state law, such period of limitation is amended so as to equal the minimum period of limitation provided by such law.

## E.  RECOVERIES

All recoveries for payments made under this **Kidnap and Ransom Policy** should be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

---

KER-16001 Ed. 07-16
© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00139

1. first, to the **Insured** to reimburse the **Insured** for loss or expenses that would have been paid under this **Kidnap and Ransom Policy** but for the fact that it is in excess of the applicable Limit of Insurance;

2. second, to the Company in satisfaction of amounts paid or to be paid to the **Insured** in settlement of any covered claim;

3. third, to the **Insured** in satisfaction of any applicable Retention; and

4. fourth, to the **Insured** in satisfaction of any loss not covered under this **Kidnap and Ransom Policy**;

provided that recoveries do not include any recovery from insurance, suretyship, reinsurance, security, or indemnity taken for the Company's benefit.

## F.  LIBERALIZATION

If the Company adopts any revision to this **Kidnap and Ransom Policy** that would broaden coverage, and such revision does not require an additional premium or endorsement and is adopted within 45 days prior to or during the **Policy Period**, the broadened coverage will apply to this **Kidnap and Ransom Policy** as of the date the revision is approved for general use by the applicable department of insurance.

## G.  SUBROGATION

In the event of payment under this **Kidnap and Ransom Policy**, the Company will be subrogated to all of the **Insured's** rights of recovery against any person or organization to the extent of such payment, and the **Insured** will execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured will do nothing to prejudice such rights.

## H.  CANCELATION

The Company may cancel this **Kidnap and Ransom Policy** for failure to pay a premium when due in which case 20 days written notice will be given to the **Named Insured**, unless, payment in full is received within 20 days of the **Named Insured**'s receipt of such notice of cancellation. The Company has the right to the premium amount for the portion of the **Policy Period** during which the **Kidnap and Ransom Policy** was in effect.

The **Named Insured** may cancel this **Kidnap and Ransom Policy** by mailing the Company written notice stating when,  not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Named Insured** cancels, the Company will return any unearned premium on a pro rata basis. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this **Kidnap and Ransom Policy** upon its expiration. If the Company elects not to renew, it will provide to the **Named Insured** written notice to that effect at least 30 days before the Expiration Date set forth in ITEM 2 of the Declarations.

## I.  OTHER INSURANCE

This **Kidnap and Ransom Policy** will apply only as excess insurance over, and will not contribute with:

1. any other valid and collectible insurance available to the **Insured**, unless such insurance is written specifically excess of this **Kidnap and Ransom Policy** by reference in such other policy to the Policy Number of this **Kidnap and Ransom Policy**; and

2. indemnification to which the **Insured** is entitled from any other entity.

As excess insurance, this **Kidnap and Ransom Policy** will not apply or contribute to the payment of any loss or expenses until the amount of such other insurance or indemnity has been exhausted by payment of loss or expenses covered thereunder. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of loss or expenses, this **Kidnap and Ransom Policy** will apply only to that part of loss or expenses that is not recoverable or recovered under the other insurance or indemnity. This **Kidnap and Ransom Policy** will not be subject to the terms of any other insurance.

© 2016 The Travelers Indemnity Company. All rights reserved.

**J. VALUATION**

1. All premiums, limits of insurance, retentions, loss, expenses and other amounts under this **Kidnap and Ransom Policy** are expressed and payable in U.S. dollars.

2. In the case of marketable goods or services paid or surrendered as **Ransom**, the Company will pay the actual cash value thereof at the time of payment or surrender.

3. Any loss of cash or marketable goods or services in payment of a ransom demand will be paid, at the option of the **Insured**, in the money of the country in which the loss was sustained, or in the U.S. dollar equivalent determined at the rate of exchange published in *The Wall Street Journal* at the time of payment of such loss by the **Insured**.

**K. CHANGES**

Only the **Named Insured** is authorized to make changes in the terms of this **Kidnap and Ransom Policy** and solely with the Company's prior written consent.  This **Kidnap and Ransom Policy's** terms can be changed, amended, or waived only by endorsement issued by the Company and made a part of this **Kidnap and Ransom Policy**.  Notice to any representative of the **Insured**, or knowledge possessed by any agent or by any other natural person, will not effect a waiver or change to any part of this **Kidnap and Ransom Policy** or estop the Company from asserting any right under the terms, conditions, and limitations of this **Kidnap and Ransom Policy**; nor may the terms, conditions, and limitations hereunder be waived or changed, except by a written endorsement to this **Kidnap and Ransom Policy** issued by the Company.

**L. ASSIGNMENT**

This **Kidnap and Ransom Policy** may not be assigned or transferred, and any such attempted assignment or transfer will be void and without effect unless the Company has provided its prior written consent to such assignment or transfer.

**M. ENTIRE AGREEMENT**

This **Kidnap and Ransom Policy** constitutes the entire agreement between the Company and the **Insured**.

**N. HEADINGS**

The descriptions in the headings and sub-headings of this **Kidnap and Ransom Policy** are solely for convenience and form no part of the terms and conditions of coverage.

**O. SANCTIONS**

This **Kidnap and Ransom Policy** will provide coverage, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition, or restriction.

**P. TERRITORY**

This **Kidnap and Ransom Policy** applies to **Insured Events** that occur anywhere in the world.

© 2016 The Travelers Indemnity Company. All rights reserved.
BlueRidge-00141

---

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

---

## GLOBAL COVERAGE COMPLIANCE ENDORSEMENT

This endorsement changes the following:

**Kidnap and Ransom Coverage**

---

**It is agreed that:**

1. The following is added to section **III. DEFINITIONS**:

   **Financial Interest** means the insurable interest of the first entity named in ITEM 1 of the Declarations in an **Insured** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of such entity's:

   1. ownership of the majority of the outstanding securities or voting rights of the **Insured** representing the present right to elect, appoint, or exercise a majority control over such **Insured's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

   2. indemnification of, or representation that it has an obligation to indemnify, such **Insured** for loss sustained by such **Insured**; or

   3. election or obligation to obtain insurance for such **Insured**.

2. The following is added to section **V. CONDITIONS**:

   **UNLICENSED INSURANCE**

   a. This **Kidnap and Ransom Policy** does not apply to loss sustained or expenses incurred by an **Insured** domiciled in any country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

   b. In the event an **Insured** sustains loss referenced in a. above to which this **Kidnap and Ransom Policy** would have applied, the Company will reimburse the first entity named in ITEM 1 of the Declarations for its loss, on account of its  **Financial Interest** in such **Insured**.

3. The following is added to section **V. CONDITIONS**, **A. INSURED'S DUTIES**:

   In the event the Company reimburses the first entity named in ITEM 1 of the Declarations on account of its **Financial Interest** in an **Insured**, as a condition precedent to exercising rights under this **Kidnap and Ransom Policy**, the first entity named in ITEM 1 of the Declarations will cause the **Insured** to comply with the conditions of this **Kidnap and Ransom Policy**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106420159

KER-19053 Ed. 07-16
©2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00142

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADD DISAPPEARANCE INVESTIGATION INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Kidnap and Ransom Coverage**

**It is agreed that:**

1.     The following is added to **ITEM 5** of the Declarations:

| INSURING AGREEMENT | LIMIT OF INSURANCE | RETENTION |
|---|---|---|
| **Disappearance Investigation Insuring Agreement** | $25,000 for each **Disappearance** | $0 for each **Disappearance** |

2.     The following is added to section **I. INSURING AGREEMENTS**:

**DISAPPEARANCE INVESTIGATION**

The Company will indemnify the **Named Insured** for **Investigation Service Expenses** resulting from any **Disappearance**.

3.     The following is added to section **III. DEFINITIONS**:
**Disappearance** means the disappearance of an **Insured Person** for a period in excess of 48 consecutive hours from the last confirmed contact with such **Insured Person**. **Disappearance** does not include **Kidnapping**, **Detention** or **Hijack**.

**Investigation Service Expenses** means reasonable fees and expenses of an independent security company engaged by the **Insured** with the prior consent of the Company to investigate a **Disappearance**, provided that such fees and expenses are incurred within 90 days following discovery of the **Disappearance**.

4.     The following is added to section **V. CONDITIONS**, **C. LIMIT OF INSURANCE**:

Disappearance Investigation Limit of Insurance

The maximum limit of insurance for **Investigation Service Expenses** for each **Disappearance** under the Disappearance Investigation Insuring Agreement of this **Kidnap and Ransom Policy** will not exceed the Limit of Insurance for such Insuring Agreement set forth in ITEM 5 of the Declarations.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company:    Travelers Casualty and Surety Company of America
Policy Number:    106420159

© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00143

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### ADD THREAT RESPONSE SERVICES INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Kidnap and Ransom Coverage**

---

**It is agreed that:**

1.    The following is added to **ITEM 5** of the Declarations:

| INSURING AGREEMENT | LIMIT OF INSURANCE | RETENTION |
|---|---|---|
| Threat Response Services | $50,000 for each **Insured Event** and in the aggregate for the **Policy Period** | $0 for each **Insured Event** |

2.    The following is added to section **I. INSURING AGREEMENTS**:

**THREAT RESPONSE SERVICES**

The Company will indemnify the **Named Insured** for fees and expenses incurred for **Threat Response Services** resulting from a **Threat**.

3.    For purposes of this Endorsement only, the following is added to section **III. DEFINITIONS**:

**Proprietary Information** means any confidential, private, or secret information unique to the **Named Insured**.

**Threat** means any threat, without an accompanying **Ransom** or **Extortion** demand, communicated to an **Insured** or **Insured Person**, to:
1.    inflict bodily harm to, wrongfully abduct or detain an **Insured Person**;
2.    damage or destroy **Property**; or
3.    reveal **Trade Secrets** or other **Proprietary Information**.

**Threat Response Services** means the services provided by the Crisis Response Firm designated in ITEM 5 of the Declarations to:
1.    assess a **Threat**; and
2.    temporarily protect an **Insured Person**, **Insured Property** or **Insured Product** for a period not to exceed 21 days from the date the **Threat** is first received.

**Trade Secrets** means information that:
1.    is particular to the **Named Insured** in the conduct of its business; and
2.    for reason of its potential commercial value, the **Named Insured** consciously tries not to disclose to others.

4.    For purposes of this Endorsement only, section **III. DEFINITIONS**, **M**. *Insured Event* is replaced by the following:

*Insured Event* means a singular act of **Kidnap**, **Extortion**, **Detention** or **Hijack**, or a **Threat**, or a series of connected acts or **Threats** thereof. If multiple acts of **Kidnap**, **Extortion**, **Detention** or **Hijack**, or multiple **Threats** are or were carried out in furtherance of another, or of a common scheme or plan, then all such acts or **Threats** will be deemed to be connected and to constitute a single **Insured Event**.

---

Issuing Company:    Travelers Casualty and Surety Company of America
Policy Number:    106420159

© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00144

5.      For purposes of this Endorsement only, section **V. CONDITIONS**, **C**. **LIMIT OF INSURANCE**, 4. Crisis Response Firm Fees and Expenses, is replaced by the following:

Crisis Response Firm Fees and Expenses

The fees and expenses of the Crisis Response Firm set forth in ITEM 5 of the Declarations will be borne by the Company subject to the Threat Response Services Limit of Insurance set forth in ITEM 5 of the Declarations.

6.      The following is added to section **V. CONDITIONS**, **C. LIMIT OF INSURANCE**:

Threat Response Services Aggregate Limit of Insurance

Provided that the maximum limit of insurance for **Threat Response Services** under the Threat Response Services Insuring Agreement of this **Kidnap and Ransom Policy**, as a result of all **Insured Events** will not exceed the Aggregate Limit of Insurance for such Insuring Agreement, as set forth in ITEM 5 of the Declarations. Such Aggregate Limit of Insurance will be reduced by the amount of any payment for any **Threat Response Services** as a result of an **Insured Event** first occurring during the **Policy Period**. Upon exhaustion of such Aggregate Limit of Insurance by such payments, the Company will have no further obligation under the Threat Response Services Insuring Agreement.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00145

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ADD BUSINESS INTERRUPTION LOSS OF EARNINGS – CYBER EXTORTION INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Kidnap and Ransom Coverage**

**It is agreed that:**

1. The following is added to **ITEM 5** of the Declarations:

| INSURING AGREEMENT | LIMIT OF INSURANCE | RETENTION |
|---|---|---|
| **Business Interruption Loss of Earnings – Cyber Extortion** | $100,000 per day for each **Insured Event** not to exceed $500,000 in the aggregate for the **Policy Period** | $0 for each **Insured Event** |

2. The following is added to section **I. INSURING AGREEMENTS**:

   **BUSINESS INTERRUPTION LOSS OF EARNINGS – CYBER EXTORTION**

   The Company will indemnify the **Named Insured** for **Business Interruption Loss** resulting from **Cyber Extortion**.

3. For purposes of this Endorsement only, the following are added to section **III. DEFINITIONS**:

   **Business Day** means the period of twenty-four hours beginning at midnight during which the business operations of the **Insured** are, or normally would be, performed.

   **Earnings** means after-tax net profit that would have been earned or loss that would not have been incurred by the **Insured** plus continuing normal operating expenses that are unavoidably incurred by the **Insured**, including payroll, taxes, interest, and rents.

   **Business Interruption Loss** means loss of **Earnings** directly resulting from the necessary suspension of all or part of the **Insured's** business operations for up to but not exceeding the Indemnity Period as set forth in the Business Interruption Loss of Earnings – Cyber Extortion Schedule below, provided that the suspension exceeds the Franchise Period specified in such Schedule.

   **Investigating Accountants** means the accounting firm set forth in the Business Interruption Loss of Earnings – Cyber Extortion Schedule below. In the event that this firm declares itself unable to act in this capacity for any reason including potential conflict of interest, the Crisis Response Firm designated in ITEM 5 of the Declarations will appoint another firm of similar standing in the accountancy profession.

4. For purposes of this Endorsement only, the following replaces section **III. DEFINITIONS**, **E. Cyber Extortion**:

   **Cyber Extortion** means a threat, communicated to an **Insured** or **Insured Person** by an individual other than an identifiable **Employee**, expressing an intention to:

   1. alter, damage, or destroy any computer program, software, or other electronic data that is stored within a **Computer System**;

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106420159

©2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00146

2.      maliciously or fraudulently introduce a **Computer Virus** into a **Computer System** when such threat is premised upon actual or alleged unauthorized access to the **Computer System**;

3.      maliciously or fraudulently introduce malware into a **Computer System**; or

4.      initiate an intentional attack on a **Computer System** that depletes system resources or impedes system access available through the Internet to authorized external users of the **Computer System**;

where such threat is made for the purpose of demanding **Ransom** from the assets of an **Insured** or **Insured Person** as a condition of not carrying out such threats.

5.      For purposes of this Endorsement only, the following is added to section **V. CONDITIONS**:

1.      The **Investigating Accountants** will determine the amount of the **Business Interruption Loss**, taking into account any savings or recoveries or offsetting of losses that have been made or that the **Insured** could reasonably have been expected to make, and the ability of the **Insured** to resume operations. The fees and expenses of the **Investigating Accountants** will not erode any Limit of Insurance under this **Kidnap and Ransom Policy** and will be borne by the Company.

2.      **Earnings** for a period of closure will be arrived at by projection of **Earnings** for the affected operations for the identical calendar period during the preceding two years.

3.      In the event of a **Business Interruption Loss**, claims for payment by the Company will be made as soon as practicable and will be accompanied by a computation of loss prepared by a recognized accounting firm using standard accountancy procedures, that sets out in detail how the loss has been calculated and what assumptions have been made. The **Insured** will produce any documentary evidence, books of account, bills, invoices and other vouchers and copies of same that the **Investigating Accountants** may require and will afford them every assistance in their investigations including reasonable access to the **Premises**.

6.      The following is added to section **V. CONDITIONS, C. LIMIT OF INSURANCE**:

Business Interruption Loss of Earnings – Cyber Extortion Limit of Insurance

The maximum limit of insurance for **Business Interruption Loss** under the Business Interruption Loss of Earnings – Cyber Extortion Insuring Agreement of this **Kidnap and Ransom Policy** as a result of all acts of **Cyber Extortion** will not exceed the Aggregate Limit of Insurance for the Business Interruption Loss of Earnings – Cyber Extortion Insuring Agreement as set forth in ITEM 5 of the Declarations. Such Aggregate Limit of Insurance will be reduced by the amount of any payment for **Business Interruption Loss** as a result of an act of **Cyber Extortion** first occurring during the **Policy Period**. Upon exhaustion of such Aggregate Limit of Insurance by such payments, the Company will have no further obligation under the Business Interruption Loss of Earnings – Cyber Extortion Insuring Agreement.

7.      **Business Interruption Loss of Earnings – Cyber Extortion Schedule**:

| A. Indemnity Period: | 5 **Business Days** | |
|---|---|---|
| B. Franchise Period: | 6 hours | |
| C. **Investigating Accountants**: | As designated by Travelers Indemnity Company | |

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

BlueRidge-00147

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADD EXPRESS KIDNAP INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Kidnap and Ransom Coverage**

**It is agreed that:**

1. The following is added to **ITEM 5** of the Declarations:

| INSURING AGREEMENT | LIMIT OF INSURANCE | RETENTION |
|---|---|---|
| **Express Kidnap Insuring Agreement** | $100,000 for each **Insured Event**, not to exceed $100,000 in the aggregate for the **Policy Period** | $0 for each **Insured Event** |
| **Covered Expenses Sublimit for Express Kidnap** | $5,000 per **Insured Person**, not to exceed $50,000 for each **Insured Event** | |
| **Personal Accident Sublimit for Express Kidnap** | $100,000 in the aggregate for the **Policy Period** | |
| **Rest and Rehabilitation Expenses Sublimit for Express Kidnap** | $5,000 per **Insured Person** | |

2. The following is added to section **I. INSURING AGREEMENTS**:

   **EXPRESS KIDNAP**

   The Company will indemnify **Named Insured** for:

   1. loss of **Ransom**; and

   2. **Covered Expenses**,

   resulting from an **Express Kidnap**.

3. The following definition is added to section **III. DEFINITIONS**:

   ***Express Kidnap*** means an actual or alleged event, or connected series of events, of seizing, detaining, abducting or carrying away by force or fraud and holding under duress of an **Insured Person** (except a minor by a parent thereof) for a period of less than four hours, for a reason other than **Detention**, by one person or collaborating persons for the purpose of demanding a **Ransom** from the assets of that **Insured Person** as a condition of the release of such **Insured Person**.

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106420159

© 2016 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00148

4.   The following is added to section **III. DEFINITIONS**, **O.** *Kidnap or Kidnapping*:

    *Kidnap* or *Kidnapping* does not mean *Express Kidnap*.

5.   For the purposes of this Endorsement only, in section **I. INSURING AGREEMENTS**, **F. REST AND REHABILITATION EXPENSES**, **G. PERSONAL ACCIDENT**, section **III. DEFINITIONS, D. Covered Expenses**, **M. Insured Event**, **DD. Ransom** and **GG. Salary**, and section **IV. EXCLUSIONS, C**:

    1.   The word "**Kidnap**" is replaced with the phrase "**Kidnap, Express Kidnap**;" and

    2.   The word "**Kidnapping**" is replaced with the phrase "**Kidnapping, Express Kidnap**".

6.   The following is added section **IV. EXCLUSIONS, B**:

    Provided that this exclusion will not apply to the surrender of **Ransom** in the course of an **Express Kidnap**.

7.   For the purposes of this Endorsement only, the following replaces section **V. CONDITIONS**, **A. INSURED'S DUTIES**, 2:

    2.   Under Insuring Agreements A., B., and the Express Kidnap Insuring Agreement, and prior to the payment of any **Ransom**, the **Insured** will:

        a.   make every reasonable effort to determine that the **Kidnapping, Express Kidnap** or **Extortion** has actually occurred and is not a hoax;

        b.   have approved the payment of any **Ransom**; and

        c.   make every reasonable effort to notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction thereover, of the demand for **Ransom**, and comply with such agency's recommendations and instructions, or allow the Crisis Response Firm set forth in ITEM 5 of the Declarations to so notify, while having regard for the personal safety of any **Insured Person**.

8.   The following is added to section **V. CONDITIONS, C. LIMIT OF INSURANCE**:

Express Kidnap Aggregate Limit of Insurance

The maximum limit of insurance for **Ransom** under the Express Kidnap Insuring Agreement of this **Kidnap and Ransom Policy**, as a result of all **Insured Events** will not exceed the Aggregate Limit of Insurance for such Insuring Agreement as set forth in ITEM 5 of the Declarations.  Such Aggregate Limit of Insurance will be reduced by the amount of any payment for **Ransom** as a result of an **Insured Event** first occurring during the **Policy Period**.  Upon exhaustion of such Aggregate Limit of Insurance by such payments, the Company will have no further obligation under the Express Kidnap Insuring Agreement.

Covered Expenses Sublimit for Express Kidnap

The maximum limit of insurance for **Covered Expenses** for each **Insured Event** under the Express Kidnap Insuring Agreement of this **Kidnap and Ransom Policy** will not exceed the Covered Expenses Sublimit for Express Kidnap as set forth in ITEM 5 of the Declarations, which amount will be part of and not in addition to the Limit of Insurance for the Express Kidnap Insuring Agreement, as set forth in ITEM 5 of the declarations.

Rest and Rehabilitation Expenses Sublimit for Express Kidnap

The Limit of Insurance for Insuring Agreement F. as set forth in ITEM 5 of the Declarations does not apply to **Express Kidnap**. The maximum limit of insurance for each **Express Kidnap** under the Express Kidnap Insuring Agreement will not exceed the Rest and Rehabilitation Expenses Sublimit for Express Kidnap set forth in ITEM 5 of the declarations.

© 2016 The Travelers Indemnity Company.  All rights reserved.

9.      The following is added to section **V. CONDITIONS, C. LIMIT OF INSURANCE**, 3. Personal Accident Aggregate Limit of Insurance:

Personal Accident Sublimit for Express Kidnap

The maximum limit of insurance for **Personal Accident** under Insuring Agreement G. of this **Kidnap and Ransom Policy** as a result of all **Express Kidnaps** will not exceed the Personal Accident Sublimit for Express Kidnap set forth in Item 5 of the Declarations, which amount will be part of and not in addition to the Aggregate Limit of Insurance for Insuring Agreement G, as set forth in ITEM 5 of the declarations.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

KER-19050 Ed. 07-16                                                                                      Page 3 of 3
© 2016 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### ADD BUSINESS INTERRUPTION LOSS OF EARNINGS INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Kidnap and Ransom Coverage**

**It is agreed that:**

1. The following is added to **ITEM 5** of the Declarations:

| | Limit of Insurance | Retention |
|---|---|---|
| **Business Interruption Loss of Earnings** | $33,333 per day for each **Insured Event** not to exceed $1,000,000 in the aggregate for the **Policy Period** | $0  for each **Insured Event** |

2. The following is added to section  **I. INSURING AGREEMENTS**:

   **BUSINESS INTERRUPTION LOSS OF EARNINGS**

   The Company will indemnify the **Named Insured** for **Business Interruption Loss** resulting from an **Insured Event**.

3. For purposes of this Endorsement only, the following is added to section **III. DEFINITIONS**:

   **Business Day** means the period of twenty-four hours beginning at midnight during which the business operations of the **Insured** are, or normally would be, performed.

   **Contingent Extortion** means any threat, communicated to an **Insured** or **Insured Person** to cause loss of, physically damage, contaminate, or pollute any property adjacent to a **Premises**, that results in an order from a civil authority to cease, wholly or in part, the **Insured's** business activities.

   **Earnings** means after-tax net profit that would have been earned or loss that would not have been incurred by the **Insured** plus continuing normal operating expenses that are unavoidably incurred by the **Insured**, including payroll, taxes, interest, and rents.

   **Business Interruption Loss** means loss of **Earnings** directly resulting from the necessary suspension of all or part of the **Insured's** business operations for up to but not exceeding the Indemnity Period as set forth in the Business Interruption Loss of Earnings Schedule  below, provided that the suspension exceeds the Franchise Period specified in such Schedule.

   **Investigating Accountants** means the accounting firm as set forth in the Business Interruption Loss of Earnings Schedule below.  In the event that this firm declares itself unable to act in this capacity for any reason including potential conflict of interest, the Crisis Response Firm designated in ITEM 5 of the Declarations will appoint another firm of similar standing in the accountancy profession.

4. For purposes of this Endorsement only, the following replaces section **III. DEFINITIONS**, **H**.  *Extortion*:

   **Extortion** means **Bodily Injury Extortion**, **Property Damage Extortion**, **Products Extortion**, **Trade Secrets Extortion**, and **Contingent Extortion**.  **Extortion** does not mean **Cyber Extortion**.

---

Issuing Company:    Travelers Casualty and Surety Company of America
Policy Number:    106420159

---

5.      For purposes of this Endorsement only, the following is added to section **V. CONDITIONS**:

   1.      The **Investigating Accountants** will determine the amount of the **Business Interruption Loss**, taking into account any savings or recoveries or offsetting of losses that have been made or that the **Insured** could reasonably have been expected to make, and the ability of the **Insured** to resume operations.   The fees and expenses of the **Investigating Accountants** will not erode any Limit of Insurance under this **Kidnap and Ransom Policy** and will be borne by the Company.

   2.      **Earnings** for a period of closure will be calculated based on a review of earnings for the affected operations for the identical calendar period during the preceding two years.

   3.      In the event of a **Business Interruption Loss**, claims for payment by the Company will be made as soon as practicable and will be accompanied by a computation of loss prepared by a recognized accounting firm  using standard accountancy procedures, that sets out in detail how the loss has been calculated and what assumptions have been made.   The **Insured** will produce any documentary evidence, books of account, bills, invoices and other vouchers and copies of same that the **Investigating Accountants** may require and will afford them every assistance in their investigations including reasonable access to the **Premises**.

6.      The following is added to section **V. CONDITIONS, C. LIMIT OF INSURANCE**:

Business Interruption Loss of Earnings Aggregate Limit of Insurance

The maximum limit of insurance for **Business Interruption Loss** under the Business Interruption Loss of Earnings Insuring Agreement of this **Kidnap and Ransom Policy** as a result of all **Insured Events** will not exceed the Aggregate Limit of Insurance for the Business Interruption Loss of Earnings Insuring Agreement as set forth in ITEM 5 of the Declarations.  Such Aggregate Limit of Insurance will be reduced by the amount of any payment for **Business Interruption Loss** as a result of an **Insured Event** first occurring during the **Policy Period**.  Upon exhaustion of such Aggregate Limit of Insurance by such payments, the Company will have no further obligation under the Business Interruption Loss of Earnings Insuring Agreement.


**Business Interruption Loss of Earnings Schedule**:

| A.  Indemnity Period: | 30 **Business Days** |
|---|---|
| B.  Franchise Period: | 6 hours |
| C.  **Investigating Accountants**: | As designated by Travelers Indemnity Company. |

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2016 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## VIRGINIA CHANGES ENDORSEMENT

This endorsement changes the following:

**Kidnap and Ransom Coverage**

**It is agreed that:**

1.  The following replaces section **I. INSURING AGREEMENT**, **F. REPRESENTATION OF INSURED**:

    No statement made by, or on behalf of, the **Insured**, whether contained in the application, underwriting information, or otherwise, will be deemed to be a representation of anything except that it is true to the best of the knowledge and belief of the person making the statement.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106420159**

KER-17025 Ed. 07-16
©2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00153



**CYBERRISK**

*THE THIRD PARTY LIABILITY INSURING AGREEMENTS ARE CLAIMS MADE COVERAGES WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ ALL TERMS CAREFULLY.*

### CONSIDERATION CLAUSE

IN CONSIDERATION of the payment of the premium, in reliance on the statements in the **Application,** subject to the Declarations, and pursuant to all the terms, conditions, exclusions and limitations of this **CyberRisk Policy**, the Company and the **Insureds** agree as follows:

### I.      INSURING AGREEMENTS

#### THIRD PARTY LIABILITY INSURING AGREEMENTS

**A.      NETWORK AND INFORMATION SECURITY LIABILITY**

The Company will pay on behalf of the **Insured**, **Loss** for any **Claim**, other than a **Regulatory Claim**, first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Network and Information Security Wrongful Act**.

**B.      COMMUNICATIONS  AND MEDIA LIABILITY**

The Company will pay on behalf of the **Insured**, **Loss** for any **Claim**, other than a **Regulatory Claim**, first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Communications and Media Wrongful Act**.

**C.      REGULATORY DEFENSE EXPENSES**

The Company will pay on behalf of the **Insured**, **Defense Expenses** for any **Regulatory Claim** first made during the   **Policy Period**   or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Communications and Media Wrongful Act** or a **Network and Information Security Wrongful Act**.

#### FIRST PARTY INSURING AGREEMENTS

**D.      CRISIS MANAGEMENT EVENT EXPENSES**

The Company will pay the **Insured Organization** for **Crisis Management Event Expenses** incurred by the **Insured Organization** within 12 months of, and as a result of, any **Network and Information Security Wrongful Act** or **Communications and Media Wrongful Act** taking place prior to the expiration of the **Policy Period** and reported to the Company during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

**E.      SECURITY  BREACH  REMEDIATION AND NOTIFICATION EXPENSES**

The Company will pay the **Insured Organization** for **Security Breach Notification Expenses** incurred by the **Insured Organization** within 12 months of, and as a result of, any **Network and Information Security Wrongful Act** taking place prior to the expiration of the P**olicy Period** and reported to the Company during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

**F.      COMPUTER PROGRAM AND ELECTRONIC DATA RESTORATION EXPENSES**

The Company will pay the **Insured Organization** for **Restoration Expenses** incurred by the **Insured Organization** which are directly caused by a **Computer Violation** taking place prior to the expiration of the **Policy Period** and **Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss.

**G.      COMPUTER FRAUD**

The Company will pay the **Insured Organization** for **Computer Fraud Loss** incurred by the **Insured Organization** prior to the expiration of the **Policy Period** which is directly caused by **Computer Fraud Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss.

**H.      FUNDS TRANSFER FRAUD**

The Company will pay the **Insured Organization** for **Funds Transfer Fraud Loss** incurred by the **Insured Organization** prior to the expiration of the **Policy Period** which is directly caused by **Funds Transfer Fraud Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss.

**I.      E-COMMERCE  EXTORTION**

The Company will pay the **Insured Organization** for **E-Commerce Extortion Expenses** resulting from **E-Commerce Extortion** taking place anywhere in the world during the **Policy Period** and **Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss.

**J.      BUSINESS INTERRUPTION AND ADDITIONAL EXPENSES**

The Company will pay the **Insured Organization** for **Business Interruption Loss** incurred by the **Insured Organization** which is directly caused by a **Computer System Disruption** taking place during the **Policy Period** and **Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss.

---

## II.      *DEFINITIONS*

Wherever appearing in this **CyberRisk Policy**, the following words and phrases appearing in bold type will have the meanings set forth in this section *II. DEFINITIONS*:

**A.**      *Application* means the application deemed to be attached to and forming a part of this **CyberRisk Policy**, including any materials submitted and statements made in connection with that application.  If the **Application** uses terms or phrases that differ from the terms defined in this **CyberRisk Policy**, no inconsistency between any terms or phrases used in the **Application** and any terms defined in this **CyberRisk Policy** will waive or change any of the terms, conditions and limitations of this **CyberRisk Policy**.

**B.**      *Approved Service Provider* means a service provider approved in writing by the Company.

**C.**      *Business Income Loss* means, before income taxes, and only with respect to the **Insured Organization's** business operations that are dependent on a **Computer System**, net profit the **Insured Organization** would have earned, or net loss the **Insured Organization** would not have incurred or would have avoided, if there had been no **Computer System Disruption**.

**D.**      *Business Interruption Loss* means the sum of **Business Income Loss** and **Extra Expense** directly resulting from a **Computer System Disruption**.

The **Business Interruption Loss** will be calculated based on the actual **Business Interruption Loss** the **Insured Organization** sustains per hour during the **Business Interruption Period of Restoration**.

---

**Business Interruption Loss** does not include:

1.     contractual penalties of any nature;

2.     costs or expenses incurred to update, restore, replace, or otherwise improve a **Computer System** to a level of functionality beyond that which existed prior to the loss event;

3.     costs or expenses incurred to identify or remediate computer system errors or vulnerabilities;

4.     any other consequential loss or damage;

5.     legal cost or legal expense of any nature;

6.     loss arising out of liability to any person or entity that is not an **Insured**; or

7.     bank interest or investment income.

E.     *Business Interruption Period of Restoration* means the period of time that:

1.     begins with the date and time that a **Computer System Disruption** is **Discovered** and after application of the **Waiting Period** set forth in ITEM 5 of the Declarations; and

2.     ends with the earlier of:

    a.     the date and time a **Computer System** is restored to substantially the level of operation that had existed prior to the **Computer System Disruption**; or

    b.     30 days from the time that such **Computer System Disruption** was **Discovered**.

F.     *Change of Control* means:

1.     the acquisition of the **Named Insured**, or all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

2.     the obtaining by any person, entity or affiliated group of persons or entities, of the right to elect, appoint or designate more than fifty percent of the board of directors, board of trustees, board of managers, or functional equivalent thereof, or to exercise a majority control of the board of directors, board of trustees, board of managers, or a functional equivalent thereof, of the **Named Insured**.

G.     *Claim* means**:**

1.     a written demand for monetary damages or non-monetary relief;

2.     a civil proceeding commenced by service of a complaint or similar pleading;

3.     a criminal proceeding commenced by filing of charges;

4.     a formal administrative or regulatory proceeding commenced by filing of charges, formal investigative order, service of summons or similar document;

5.     an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.     a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** for a **Wrongful Act** .

A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**.  However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim** .

H.     *Communications and Media Wrongful Act* means any actual or alleged:

  1.     unauthorized use of, or infringement of, copyright, title, slogan, trademark, trade dress, service mark, domain name, logo or service name in the **Insured Organization's Covered Material**;

  2.     plagiarism or unauthorized use of a literary or artistic format, character, or performance in the **Insured Organization's Covered Material**;

  3.     invasion or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness in the **Insured Organization's Covered Material**; or

  4.     defamation, libel, slander, trade libel, or other tort related to disparagement or harm to the reputation or character of any person or organization in the **Insured Organization's Covered Material**,

by, or asserted against, an **Insured Person**, in his or her capacity as such, or the **Insured Organization**.

I.     *Computer Fraud* means an intentional, unauthorized and fraudulent entry of data or computer instructions directly into, or change of data or computer instructions within, a **Computer System** by a natural person or entity, other than an **Employee, Independent Contractor** or any individual under the direct supervision of the **Insured Organization**, including any such entry or change made via the internet or a **Network**, provided that such entry or change causes:

  1.     **Money**, **Securities** or **Other Property** to be transferred, paid or delivered;

  2.     an account of the **Insured Organization**, or of its customer, to be added, deleted, debited or credited; or

  3.     an unauthorized or fictitious account to be debited or credited.

J.     *Computer Fraud Loss* means the **Insured Organization's** direct loss of **Money**, **Securities** or **Other Property** directly caused by **Computer Fraud**.

K.     *Computer System* means:

  1.     any computer; and

  2.     any input, output, processing, storage or communication device, or any related network, operating system or application software, that is connected to, or used in connection with, such computer,

which is rented by, owned by, leased by, licensed to, or under the direct operational control of, the **Insured Organization**.

L.     *Computer System Disruption* means the actual and measurable interruption, suspension or failure of a **Computer System** resulting directly from:

  1.     a **Computer Violation**; or

  2.     an intentional attack of a **Computer System** with protocols or instructions transmitted over the internet or another computer communication network, which triggers the use of a **Computer**

**System's** resources to the extent that the capacity of those resources to accommodate authorized users of such **Computer System** is depleted or diminished,

provided that the **Insured Organization** is the specific target of such **Computer Violation** or intentional attack.

**M.**  *Computer Violation*  means:

1.  the introduction of a **Computer Virus** into a **Computer System**; or

2.  damage to, or destruction of, computer programs, software or other electronic data stored within a **Computer System** by a natural person, including an **Employee**, who has: (a) gained unauthorized access to a **Computer System**; or (b) authorized access to a **Computer System** but uses such access to cause such damage or destruction.

**N.**  *Computer Virus* means any malicious code which could destroy, alter, contaminate, or degrade the integrity, quality, or performance of:

1.  electronic data used, or stored, in any computer system or network; or

2.  a computer network, any computer application software, or a computer operating system or related network.

**O.**  *Covered Material* means any content made known, displayed or disseminated via any electronic means, including websites and electronic mail.

**P.**  *Crisis Management Event Expenses* means reasonable fees, costs, and expenses incurred and paid by the **Insured Organization**, with the Company's prior written consent, for public relations services recommended and provided by an **Approved Service Provider** to the **Insured Organization** to mitigate any actual or potential negative publicity resulting from any **Wrongful Act**.

Crisis Management Event Expenses do not include:

1.  costs to notify any individual or entity of a **Wrongful Act or** to develop such notification documents or materials;

2.  costs to determine the scope of, or whether any, **Wrongful Act**  has occurred;

3.  costs paid by any **Insured** intended as compensation for any individual or entity as a result of a **Wrongful Act**;

4.  fees, costs or expenses the **Insured Organization** incurs to comply with any law or regulation;

5.  taxes, fines, penalties, punitive, exemplary or liquidated damages, or the multiple portion of any multiplied damage award; or

6.  costs or expenses incurred to replace, upgrade, improve, or maintain a **Computer System**.

**Q.**  *CyberRisk Policy* means, collectively, the Declarations, the **Application**, each purchased **Third Party Liability Insuring Agreement** and **First Party Insuring Agreement**, and any endorsements attached thereto.

**R.**  *CyberRisk Policy Aggregate Limit* means the amount set forth as such in ITEM 5 of the Declarations.

**S.**  *Defense Expenses* means reasonable and necessary legal fees and expenses incurred by the Company or the **Insured**, with the Company's prior written consent, in the investigation, defense, settlement and appeal of a **Claim**, including costs of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such  **Claim;** provided, that **Defense Expenses** will not include the salaries, wages, benefits or overhead of, or paid to, any **Insured** or any employee of such **Insured**.

T.    ***Discover, Discovered or Discovery*** means the moment when any **Executive Officer**:

    1.    first becomes aware of facts that would cause a reasonable person to assume that a loss of the type covered by **Insuring Agreements F**, **G**, **H**, **I** or **J** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known; or

    2.    first receives notice in which it is alleged that the **Insured Organization** is liable to a third party under circumstances which, if true, would constitute a loss under **Insuring Agreements F**, **G**, **H**, **I** or **J**,

whichever is earlier.

U.    ***E-Commerce Extortion*** means any threat made to the **Insured Organization** by an individual other than an identifiable **Employee**, expressing an intention to:

    1.    cause the **Insured Organization** to transfer, pay or deliver any funds or property using a **Computer System** without the permission, authorization, and consent of the **Insured Organization**;

    2.    sell or disclose information about a customer of the **Insured Organization** which is unique to the relationship of the customer and the **Insured Organization** and is not otherwise publicly available, provided such information is stored in an electronic medium in a **Computer System** and is retrievable in a perceivable form;

    3.    alter, damage, or destroy any computer program, software or other electronic data that is stored within a **Computer System**;

    4.    maliciously or fraudulently introduce a **Computer Virus** into a **Computer System** when such threat is premised upon actual or alleged unauthorized access to a **Computer System**; or

    5.    initiate an intentional attack on a **Computer System** that depletes system resources or impedes system access available through the internet to authorized external users of such **Computer System**,

where such threat is made for the purpose of demanding **Money**, **Securities**, property or services.

V.    ***E-Commerce Extortion Expenses*** means any **Money** or **Securities** the **Insured Organization** pays, with the Company's prior written consent and pursuant to a recommendation by an **Approved Service Provider**, at the direction and demand of any person committing or allegedly committing **E-Commerce Extortion**, or loss incurred solely in, and directly from, the process of making or attempting to make such payment.  The value of **E-Commerce Extortion Expenses** will be determined as of the date such **E-Commerce Extortion Expenses** are paid or lost.

E-Commerce Extortion Expenses include reasonable costs, fees and expenses incurred by the **Insured Organization**, with the Company's prior written consent and pursuant to a recommendation by an **Approved Service Provider**, to prevent or mitigate **E-Commerce Extortion Expenses**.

W.    ***Employee*** means any natural person whose labor or service is or was engaged by and directed by the **Insured Organization**, including full-time, part-time, seasonal or temporary workers, volunteers, students, interns, or workers whose services have been leased to the **Insured Organization**.

With respect only to **Insuring Agreements F**, **G**, **H**, **I** or **J**, **Employee** also means any natural person who was or is a member of the board of directors, trustees or governors, an officer, **LLC Manager**, management committee member, general partner, or in-house general counsel of the **Insured Organization**.

**Employee** does not include an **Independent Contractor**.

X.    **Executive Officer** means a member of the board of directors, board of trustees, board of managers, board of governors, officer, natural person partner, principal, risk manager, **LLC Manager**, in-house general counsel, or branch manager of the **Insured Organization**, or a functional equivalent thereof.

Y.    **Extra Expense** means necessary expenses incurred by the **Insured Organization**, with the Company's prior written consent, and directly as a result of a **Computer System Disruption**, but only to the extent such expenses are in excess of the **Insured Organization's** normal operating expenses and reduce **Business Income Loss** and would not have been incurred had there been no **Computer System Disruption**.

Z.    **Financial Insolvency** means:

    1.    the court appointment of an examiner, receiver, conservator, liquidator, trustee, or rehabilitator, or any functional equivalent position, to take control of, supervise, manage or liquidate the **Insured Organization**; or

    2.    the **Insured Organization** becoming a debtor in possession under Chapter 11 of the United States Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law or regulation.

AA.    **Financial Institution** means:

    1.    a bank, trust company, savings bank, credit union, savings and loan association, or similar thrift institution; or

    2.    a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution,

    provided that **Financial Institution** does not include any such entity, institution or organization that is an **Insured Organization**.

BB.    **First Party Insured Event** means:

    1.    a **Computer Violation**, **Computer Fraud**, **Funds Transfer Fraud**, **E-Commerce Extortion** or **Computer System Disruption**; or

    2.    with respect to **Insuring Agreements D** and **E**, a **Wrongful Act**.

CC.    **First Party Insuring Agreements** means **Insuring Agreements D**, **E**, **F**, **G**, **H**, **I** and **J**.

DD.    **First Party Loss or Expenses** means **Crisis Management Event Expenses**, **Security Breach Notification Expenses**, **Restoration Expenses**, **Computer Fraud Loss**, **Funds Transfer Fraud Loss**, **E-Commerce Extortion Expenses** and **Business Interruption Loss**.

EE.    **Funds Transfer Fraud** means an intentional, unauthorized and fraudulent instruction transmitted by electronic means (including via telefacsimile, voice, electronic mail or electronic text) to a **Financial Institution** directing such institution to debit an account and to transfer, pay or deliver **Money** or **Securities** from such account, which instruction purports to have been transmitted by the **Insured Organization**, but was in fact transmitted by someone other than an **Employee** without the **Insured Organization's** knowledge or consent.

FF.    **Funds Transfer Fraud Loss** means the **Insured Organization's** direct loss of **Money** or **Securities** directly caused by **Funds Transfer Fraud**.

GG.    **Identity Information** means:

    1.    information concerning any natural person that constitutes "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to such Act;

© 2010 The Travelers Indemnity Company All Rights Reserved

2. medical or health care information concerning a natural person, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to such Act;

3. any private personal information concerning any natural person that is protected under any local, state, federal or foreign act, statute, rule, regulation, requirement, ordinance, common or other law, for any **Claim** subject to such act, statute, rule, regulation, requirement, ordinance, common or other law; or

4. a natural person's driver's license or state identification number; social security number; unpublished telephone number; credit, debit, or charge card numbers, or other financial account numbers and associated security codes, access codes, passwords or PIN numbers associated with such credit, debit, or charge card numbers, or other financial account numbers.

HH. *Independent Contractor* means any natural person who is not an **Employee** but who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement. The status of an individual as an **Independent Contractor** will be determined as of the date of the alleged **Wrongful Act** or **First Party Insured Event**.

II. *Insured* means the **Insured Persons** and the **Insured Organization**.

JJ. *Insured Organization* means the **Named Insured**, any **Subsidiary**, and, only with respect to **Insuring Agreements A**, **B** and **C**, any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

KK. *Insured Person* means any natural person who was, is, or becomes a member of the board of directors, board of trustees, board of managers, board of governors, officer, **Employee**, partner, or **LLC Manager** of the **Insured Organization** for a **Wrongful Act** committed in the discharge of his or her duties as such.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

LL. *LLC Manager* means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of an **Insured Organization** that is a limited liability company.

MM. *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements, judgments, compensatory damages, punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages, prejudgment and post judgment interest, and legal fees and expenses awarded pursuant to a court order or judgment.

**Loss** does not include:

1. civil or criminal fines, sanctions, liquidated damages, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law;

2. amounts that constitute the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief; or

3. any amount allocated to non-covered loss pursuant to section *V. CONDITIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS*, **B. ALLOCATION** .

NN. *Money* means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

**OO.**   ***Named Insured*** means any entity named in ITEM 1 of the Declarations.

**PP.**   ***Network*** means:

  1.   any and all services provided by or through the facilities of any electronic or computer communication system, including Fedwire, Clearing House Interbank Payment System (CHIPS), Society for Worldwide Interbank Financial Telecommunication (SWIFT) and similar interbank payment or settlement systems; and

  2.   automated teller machines, point of sale terminals, and other similar operating systems,

including any shared networks, internet access facilities, or other similar facilities for such systems in which the **Insured Organization** participates, allowing the input, output, examination or transfer of data or programs from one computer to a **Computer System**.

**QQ.**   ***Network and Information Security Wrongful Act***  means any actual or alleged:

  1.   failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing **Identity Information**;

  2.   failure to prevent the transmission of a **Computer Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network, that is not rented, owned, leased by, licensed to, or under the direct operational control of, the **Insured Organization**;

  3.   failure to provide any authorized user of the **Insured Organization's** website or **Computer System** with access to such website or **Computer System**; or

  4.   failure to provide notification of any actual or potential unauthorized access to, or use of, data containing private or confidential information of others if such notification is required by any **Security Breach Notification Law**,

by, or asserted against, an **Insured Person**, in his or her capacity as such, or the **Insured Organization**.

**RR.**   ***Other Property*** means any tangible property other than **Money** and **Securities** that has intrinsic value.

**SS.**   ***Policy Period***  means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations.  In no event will the   **Policy Period**   continue past the effective date of cancellation or termination of this **CyberRisk Policy**.

**TT.**   ***Pollutant*** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**UU.**   ***Potential Claim*** means any **Wrongful Act** that may subsequently give rise to a **Claim**.

**VV.**   ***Regulatory Claim*** means any **Claim**, in whole or in part, brought by, or on behalf of, any state attorney's general, the Federal Trade Commission, the Federal Communications Commission, or any federal, state, local, or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

**WW.**   ***Related Wrongful Act***  means all **Wrongful Acts** that have as a common nexus, or are causally connected by reason of, any act or event, or a series of acts or events.

**XX.**   ***Restoration Expenses*** means reasonable costs incurred by the **Insured Organization**, with the Company's prior written consent, to restore, replace or reproduce damaged or destroyed computer programs, software or other electronic data stored within a **Computer System**, or leased by the **Insured Organization,**  or for which the **Insured Organization** is legally liable, to the condition that existed immediately preceding a **Computer Violation**; provided that if it is determined by the **Insured Organization** that such computer programs, software or other electronic data cannot reasonably be

restored, replaced or reproduced, then **Restoration Expenses** means only the reasonable costs incurred by the **Insured Organization**, with the Company's prior written consent, to reach such determination.

**Restoration Expenses** do not include:

1.  expenses incurred as a result of the reconstruction of computer programs, software or other electronic data which the **Insured Organization** did not have a license to use;

2.  expenses incurred to restore, replace or reproduce damaged or destroyed computer programs, software or other electronic data if such damage or destruction was caused by computer programs, software or other electronic data which the **Insured Organization** did not have a license to use;

3.  expenses incurred to design, update, improve or perfect the operation or performance of computer programs, software or other electronic data; or

4.  expenses incurred to redo the work product, research or analysis that was the basis of, or resulted in, any computer programs, software or other electronic data stored.

YY.   *Securities* means:

1.  written negotiable and non-negotiable instruments or contracts representing **Money** or **Other Property**; or

2.  uncertificated securities,

but **Securities** does not include **Money**.

ZZ.   *Security Breach* means unauthorized access to, or acquisition of, **Identity Information** owned, licensed, maintained or stored by the **Insured Organization** .

AAA.  *Security Breach Notification Expenses* mean any of the following reasonable fees, costs or expenses incurred and paid by the **Insured Organization**, with the Company's prior written consent, for services recommended and provided by an **Approved Service Provider** which can be directly attributed to a **Security Breach**:

1.  fees, costs or expenses to determine the persons whose **Identity Information** was accessed or acquired without their authorization;

2.  fees, costs or expenses to develop documents or materials to notify the persons whose **Identity Information** was accessed or acquired without their authorization;

3.  costs of mailings or other communications required to notify the persons whose **Identity Information** was accessed or acquired without their authorization;

4.  costs of providing up to 365 days of credit monitoring services to persons whose **Identity Information** was accessed or acquired without their authorization, starting with the date that the **Insured Organization** first notified such persons of the **Security Breach**;

5.  costs of establishing and maintaining a call center to be used by persons whose **Identity Information** was accessed or acquired without their authorization; or

6.  any other fees, costs, or expenses necessary to comply with any **Security Breach Notification Law** that applies to the **Insured Organization**.

**Security Breach Notification Expenses** also include fees, costs or expenses associated with the purchase of an identity fraud insurance policy specifically designed to provide reimbursement of identity fraud related expenses, or similar coverage if such similar coverage is available as part of credit monitoring services, to benefit persons whose **Identity Information** was accessed or acquired without their authorization.

© 2010 The Travelers Indemnity Company All Rights Reserved

**Security Breach Notification Expenses** do not include:

1. remuneration paid to **Employees**;

2. fees, costs or expenses of outside consultants, other than the **Approved Service Provider**, retained by the **Insured Organization**, unless the Company agrees in writing to reimburse the **Insured Organization** for such fees, costs or expenses;

3. taxes, fines, penalties, punitive, exemplary or liquidated damages, or the multiple portion of any multiplied damage award imposed by law or that any **Insured** has agreed to pay for any reason;

4. gratis amounts that any **Insured** voluntarily agrees to pay to any person whose **Identity Information** was accessed or acquired without their authorization; or

5. **Crisis Management Event Expenses**.

BBB. *Security Breach Notification Law* means any law or regulation that requires an organization to notify persons that their personal information was or may have been accessed or acquired without their authorization.

CCC. *Single First Party Insured Event* means:

1. an individual **First Party Insured Event**; or

2. multiple **First Party Insured Events** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event or decision.

A **Single First Party Insured Event** will be deemed to have occurred at the time the first of such **First Party Insured Events** occurred whether prior to or during the **Policy Period**.

DDD. *Subsidiary* means:

1. any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

2. any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

3. any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly 50% of the issued and outstanding voting stock and whose management and operation the **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4. subject to the provisions set forth in section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **H. ACQUISITIONS OR CREATIONS OF SUBSIDIARIES; PURCHASE OF ASSETS OR ASSUMPTION OF LIABILITIES**, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

EEE. *Third Party Liability Insuring Agreements* means **Insuring Agreements A**, **B** and **C**.

© 2010 The Travelers Indemnity Company All Rights Reserved

FFF.   **Waiting Period** means the number of hours following a **Computer System Disruption** before the Company is first obligated to pay **Business Interruption Loss** covered under **Insuring Agreement J**. The **Waiting Period** incepts immediately following the **Computer System Disruption**.

GGG.  **Wrongful Act** means any **Network and Information Security Wrongful Act** or **Communications and Media Wrongful Act**.

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **CyberRisk Policy**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

---

## III.   *EXCLUSIONS*

A.   **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**

1.   This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or to any related act or incident.

2.   This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of war, invasion, acts of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, confiscation, nationalization, requisition, or destruction of, or damage to, property by or under the order of any government, public or local authority; provided that this exclusion will not apply to any "act of terrorism" as defined in the Terrorism Risk Insurance Act, as amended.

3.   This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of damage to, or destruction of, loss of, or loss of use of, any tangible property including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

4.   This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** for any actual or alleged bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, humiliation or loss of reputation; provided that this exclusion will not apply to that portion of any **Claim** for a **Communications and Media Wrongful Act** seeking **Loss** for emotional distress, mental anguish, humiliation or loss of reputation.

5.   This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event**:

a.   based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

b.   based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

c.   brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**.

6.   This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any fact, circumstance, situation or event that is, or reasonably would be regarded as, the basis for a **Claim** or **Single First Party Insured Event** about which any **Executive Officer** had knowledge prior to the Continuity Date set forth in ITEM 5 of the Declarations.

---

7. This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act** or **Single First Party Insured Event** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **CyberRisk Policy** is a direct renewal or replacement or which it succeeds in time.

8. This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any **Insured**:

   a. committing any intentionally dishonest or fraudulent act or omission;

   b. committing any willful violation of any statute, rule, law; or

   c. gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled,

   provided that:

   (1) with respect to the **Third Party Liability Insuring Agreements**:

      (a) this exclusion will not apply to **Defense Expenses** and will not apply unless a final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled; and

      (b) no fact pertaining to, knowledge possessed by or conduct of any **Insured Person** will be imputed to any other **Insured Person**, and only facts pertaining to, knowledge possessed by or conduct of an **Executive Officer** will be imputed to the **Insured Organization**; and

   (2) with respect to **Insuring Agreements F** and **J**, this exclusion will not apply to an intentionally dishonest or fraudulent act or omission, or willful violation of any statute, rule or law, by an **Employee**, or any **Employee** gaining any profit, remuneration or advantage to which such **Employee** was not legally entitled.

**B.** **EXCLUSIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS AND INSURING AGREEMENTS D AND E**

1. The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding against any **Insured** as of or prior to the Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations.

2. The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

3. The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any **Wrongful Act** taking place, in whole or in part, prior to the Retroactive Date set forth in ITEM 5 of the Declarations.

4. The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of false, deceptive or unfair business practices or a violation of any consumer protection law, other than **Loss** or **First Party Loss or Expenses** directly resulting from such deceptive or unfair business

practice, or such violation, which constitutes a **Network and Information Security Wrongful Act** or a **Communications and Media Wrongful Act**.

5.    The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any **Network and Information Security Wrongful Act** that results in:

    a.    the failure to provide access to the **Insured Organization's** website or **Computer System** that was expected or intended by any **Insured**; provided that this exclusion shall not apply if the failure to provide access occurred because the **Insured Organization** suspended its website or **Computer System** to mitigate loss arising out of:

        (1)    a **Computer Virus** that affected the **Insured Organization's** website or **Computer System**;

        (2)    an intentional attack on a **Computer System** that depletes system resources or impedes system access available through the internet to authorized external users of a **Computer System**; or

        (3)    an unauthorized breach of a **Computer System** that prevented authorized users from accessing the **Insured Organization's** website or **Computer System**; or

    b.    any internet service interruption or failure; provided that this exclusion will not apply if the interruption or failure was caused by an **Insured**.

6.    The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any actual or alleged infringement of copyrighted software.

7.    The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any false, factually incorrect or inaccurate **Covered Material**, provided that the **Insured** knew the material was false, factually incorrect or inaccurate at the time such **Covered Material** was first made known, displayed, or disseminated.

8.    The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**  will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of the actual or alleged obligation to make licensing fee or royalty payments, including the amount or timeliness of such payments.

9.    The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services, cost guarantees, cost representations, or contract price estimates, the authenticity of any goods, products or services, or the failure of any goods or services to conform with any represented quality or performance.

10.    The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any:

    a.    misappropriation, infringement, or violation of any patent or trade secret;

    b.    distribution or sale of, or offer to distribute or sell, any goods, products or services; or

    c.    other use of any goods, products or services that actually infringes or violates any intellectual property law or right relating to the appearance, design or function of any goods, products or services.

11.    The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** by, or on behalf of, any independent contractor, joint venture or venture

partner based upon or arising out of any dispute over ownership rights in the **Insured Organization's Covered Material** or services provided by such independent contractor, joint venturer or venture partner.

12.  The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of loss sustained by any person or organization that:

    a.  creates, designs, develops or provides any content, material, or services for any **Insured**; or

    b.  is an assign or heir of any such person or organization,

provided that this exclusion applies regardless of whether such content, material or services were jointly created, designed, developed or provided by any **Insured**.

13.  The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** by, or on behalf of, or in the name or right of:

    a.  any **Insured;** or

    b.  any organization that at the time the **Wrongful Act** is committed, or the date the **Claim** is made: (i) is owned, operated or controlled by any **Insured**; or (ii) owns, operates or controls any **Insured**,

provided that this exclusion will not apply to:

    (1)  any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this **CyberRisk Policy;** or

    (2)  any **Claim** under **Insuring Agreements A** or **B** by or on behalf of an **Employee** for a **Wrongful Act**, but only if such **Employee** did not commit or participate in the **Wrongful Act**.

14.  The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any liability assumed by an **Insured** under any contract or agreement, whether oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement.

## C.  EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS F, G, H, I AND J

1.  **Insuring Agreements F**, **G**, **H**, **I** and **J** will not apply to any fees, costs and expenses incurred by the **Insured Organization** in:

    a.  establishing the existence or amount of **First Party Loss or Expenses**; or

    b.  the preparation of the **Insured Organization's** proof of loss in support of **First Party Loss or Expenses**.

2.  **Insuring Agreements F**, **G**, **H**, **I** and **J** will not apply to any indirect or consequential loss of any nature, including court costs and attorneys' fees incurred and paid by the **Insured Organization** in defending any suit or legal proceeding brought against the **Insured Organization**.

## D.  EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS G AND H

1.  **Insuring Agreements G** and **H** will not apply to loss of confidential information, including trade secrets, formulas, patents, customer information, negatives, drawings, manuscripts, prints and

other records of a similar nature, or other confidential information, intellectual property of any kind, data or computer programs.

2.   **Insuring Agreements G** and **H** will not apply to **Computer Fraud Loss** or **Funds Transfer Fraud Loss** resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification or other cards:

   a.   in obtaining credit or funds;

   b.   in gaining access to automated teller machines which, on behalf of the **Insured Organization**, disburse **Money**, accept deposits, cash checks, drafts or similar written instruments or make credit card loans; or

   c.   in gaining access to point of sale devices, customer-bank communication devices, or similar electronic devices or electronic funds transfer systems,

   whether such cards were issued, or purport to have been issued, by the **Insured Organization** or by anyone other than the **Insured Organization**.

3.   **Insuring Agreements G** and **H** will not apply to the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase, whether or not fraudulent.

4.   **Insuring Agreements G** and **H** will not apply to potential income, including interest and dividends, not realized by the **Insured Organization** or a customer of the **Insured Organization**.

5.   **Insuring Agreements G** and **H** will not apply to damages of any type for which the **Insured Organization** is legally liable, except direct compensatory damages, but not multiples thereof, arising directly from **Computer Fraud Loss** or **Funds Transfer Fraud Loss** covered under **Insuring Agreements G** and **H**.

6.   **Insuring Agreements G** and **H** will not apply to **Computer Fraud Loss** or **Funds Transfer Fraud Loss** caused by an employee or director of an automated clearing house (including a Federal Reserve Bank), service bureau, electronic communications system or similar interbank payment or settlement systems (including Fedwire, CHIPS and SWIFT) or merchants who have contracted with the **Insured Organization** to perform electronic funds transfer services.

7.   **Insuring Agreements G** and **H** will not apply to **Computer Fraud Loss** or **Funds Transfer Fraud Loss** resulting directly or indirectly from a fraudulent instruction if the sender, or anyone acting in collusion with the sender, ever had authorized access to the **Insured Organization's** password, PIN or other security code.

8.   **Insuring Agreements G** and **H** will not apply to **Computer Fraud Loss** or **Funds Transfer Fraud Loss** resulting directly or indirectly from forged, altered or fraudulent negotiable instruments, securities, documents or written instructions or instructions used as source documentation to enter electronic data or send instructions.

9.   **Insuring Agreements G** and **H** will not apply to loss, costs or expenses the **Insured Organization** agrees to incur, or incurs on behalf of another person or entity, when the **Insured Organization** is not legally obligated to incur such loss, costs or expenses under the Uniform Commercial Code or any other common, case or tort law, statute, rule or code anywhere in the world, including any rule or code of any clearing or similar organization.

---

**IV.   CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**

---

**A.   TERRITORY**

This **CyberRisk Policy** applies to **Claims** made or **First Party Insured Events** occurring anywhere in the world.

---

B.    **RELATED  CLAIMS**

All **Claims** or **Potential Claims** arising out of the same **Wrongful Act** or **Related Wrongful Acts** are deemed one **Claim** or **Potential Claim**, whichever is applicable, and any such **Claim** or **Potential Claim** is deemed to be first made on the date the earliest of such **Claims** or **Potential Claims** is first made, regardless of whether such date is before or during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

C.    **RETENTION**

If any  **Claim**  gives rise to coverage under a **Third Party Liability Insuring Agreement**, or any **Single First Party Insured Event** gives rise to coverage under a **First Party Insuring Agreement**, the Company has no obligation to pay **Loss**, including **Defense Expenses**, or **First Party Loss or Expenses**, until the applicable Retention amount set forth in ITEM 5 of the Declarations has been paid by the **Insured**.

If any **Claim** is covered under more than one **Third Party Liability Insuring Agreement**, the Retention set forth in ITEM 5 of the Declarations for each applicable **Third Party Liability Insuring Agreement** will apply separately to the part of such **Claim** covered under such **Third Party Liability Insuring Agreement**, but the sum of such Retentions for such **Claim** will not exceed the largest applicable Retention set forth in ITEM 5 of the Declarations for any such **Third Party Liability Insuring Agreement**.

If a **Single First Party Insured Event** is covered under more than one **First Party Insuring Agreement**, the Retention set forth in ITEM 5 of the Declarations for each applicable **First Party Insuring Agreement** will apply separately to the part of such **Single First Party Insured Event** covered under such **First Party Insuring Agreement,** but the sum of such Retentions for such **Single First Party Insured Event** will not exceed the largest applicable Retention set forth in ITEM 5 of the Declarations for any such **First Party Insuring Agreement**.

Only with respect to a **Third Party Liability Insuring Agreement**, no Retention will apply to an **Insured Person** if indemnification by the **Insured Organization** is not permitted by law or if the **Insured Organization** is unable to make such indemnification solely by reason of its **Financial Insolvency**.  The **Insured Organization** will be conclusively deemed to have indemnified all **Insured Persons** to the extent that the **Insured Organization** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Insured Organization**.

The Company, at its sole discretion, may pay all or part of the Retention amount on behalf of any **Insured**, and in such event, the **Insureds** agree to repay the Company any amounts so paid.

D.    **LIMITS**

This limits section applies as described herein regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds** and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established.

1.    The **CyberRisk Policy Aggregate Limit** is the maximum amount the Company will pay for all **Loss,** including **Defense Expenses,** and for all **First Party Loss or Expenses**.

2.    If  the **CyberRisk Policy Aggregate Limit** is exhausted by the payment of **Loss**, including **Defense Expenses**, or **First Party Loss or Expenses**, the premium for this **CyberRisk Policy** will be fully earned, all obligations of the Company under this **CyberRisk Policy** will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under this **CyberRisk Policy**.

3.    Subject to the **CyberRisk Policy Aggregate Limit**:

a.    The Company's maximum limit of liability for **Loss**, including **Defense Expenses**, for each **Claim**  under **Insuring Agreements A** or **B** will  not exceed the  applicable limit of

liability for each **Claim** set forth in ITEM 5 of the Declarations for such Insuring Agreements.

b. The Company's maximum limit of liability for **Defense Expenses** for each **Regulatory Claim** under **Insuring Agreement C** will not exceed the applicable limit of liability for each **Regulatory Claim** set forth in ITEM 5 of the Declarations for such Insuring Agreement.

c. If any **Claim** is covered under more than one of **Insuring Agreements A**, **B** or **C**, the limit of liability set forth in ITEM 5 of the Declarations for each applicable Insuring Agreement will apply separately to the part of **Loss** or, with respect to **Insuring Agreement C**, **Defense Expenses**, covered under such Insuring Agreement, provided that the Company's maximum limit of liability for such **Claim** will not exceed the largest applicable limit set forth in ITEM 5 of the Declarations for any such applicable Insuring Agreement.

d. The Company's maximum limit of insurance for **First Party Loss or Expenses** for each **Single First Party Insured Event** under **Insuring Agreements D**, **E**, **F**, **G**, **H**, **I** or **J** will not exceed the applicable limit of insurance set forth in ITEM 5 of the Declarations for such Insuring Agreements.

e. If any **Single First Party Insured Event** is covered under more than one of **Insuring Agreements D**, **E**, **F**, **G**, **H**, **I** or **J**, the limit of insurance set forth in ITEM 5 of the Declarations for each applicable Insuring Agreement will apply separately to the part of **First Party Loss or Expenses** covered under such Insuring Agreement, provided that the Company's maximum limit of insurance for such **Single First Party Insured Event** will not exceed the largest applicable limit set forth in ITEM 5 of the Declarations for any such applicable Insuring Agreement.

4. Payment of **Loss**, including **Defense Expenses**, under the applicable limit of liability for each **Claim** set forth in ITEM 5 of the Declarations, or payment of **First Party Loss or Expenses** under the applicable limit of insurance for each **Single First Party Insured Event** set forth in ITEM 5 of the Declarations, will reduce, and may exhaust, the **CyberRisk Policy Aggregate Limit**.

## E.   INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT

**1.** The **Insured's** duty to report a **Claim** commences on the earliest date a written notice thereof is received by an **Executive Officer**. If an **Executive Officer** becomes aware that a **Claim** has been made against any **Insured**, the **Insured**, as a condition precedent to any rights under any **Third Party Liability Insuring Agreement**, must give to the Company written notice of the particulars of such **Claim**, including all facts related to any alleged **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable. The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

**2.** The **Insured's** duty to report a **First Party Insured Event** under **Insuring Agreements D** or **E** commences on the earliest date an **Executive Officer** reasonably believes that a **Wrongful Act** has occurred. If an **Executive Officer** reasonably believes that a **Wrongful Act** has occurred, the **Insured**, as a condition precedent to any rights under **Insuring Agreements D** or **E**, must give to the Company written notice of the particulars of such **First Party Insured Event**, including all facts related to the **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable. The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

**3.** After the **Insured Organization Discovers** a **First Party Insured Event** under **Insuring Agreements F**, **G**, **H** or **I**, or a situation that may result in **First Party Loss or Expenses** under **Insuring Agreements F**, **G**, **H** or **I** that exceeds 25% of the applicable Retention, the **Insured Organization** must:

a.  notify the Company as soon as possible;

b.  notify law enforcement authorities if the **Insured Organization** has reason to believe that any **First Party Insured Event** involves a violation of law;

c.  submit to examination under oath at the Company's request and give the Company a signed statement of the **Insured Organization's** answers;

d.  give the Company a detailed, sworn proof of loss within 120 days; and

e.  cooperate with the Company in the investigation and settlement of such matter.

4.  After the **Insured Organization Discovers** a **First Party Insured Event** under **Insuring Agreement J**, the **Insured Organization**, as a condition precedent to any rights under **Insuring Agreement J**, must give the Company written notice of the particulars of such **First Party Insured Event**, including all facts related to any alleged **Computer System Disruption**, the identity of the business operations affected by such **Computer System Disruption**, and the dates of the alleged events, as soon as practicable.  The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

5.  All notices under this section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **E. INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT**, must be sent by email, facsimile or mail in accordance with ITEM 3 of the Declarations and will be effective upon receipt.

6.  With respect to the **Third Party Liability Insuring Agreements**, the **Insured** agrees not to voluntarily settle any **Claim**, make any settlement offer, assume or admit any liability or, except at the **Insured's** own cost, voluntarily make any payment, pay or incur any **Defense Expenses**, or assume any obligation or incur any other expense, without the Company's prior written consent, such consent not to be unreasonably withheld.  The Company is not liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

## F.  SUBROGATION

In the event of payment of **Loss**, including **Defense Expenses**, or **First Party Loss or Expenses**, the Company is subrogated to all of the **Insured's** rights of recovery against any person or organization to the extent of such payment and the **Insured** agrees to execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** will do nothing to prejudice such rights.

## G.  RECOVERIES

All recoveries from third parties for payments of **Loss**, including **Defense Expenses**, or **First Party Loss or Expenses**, will be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

1.  first, to the Company to reimburse the Company for any Retention amount it has paid on behalf of any **Insured**;

2.  second, to the **Insured** to reimburse the **Insured** for any amount that would have been paid under this **CyberRisk Policy** but for the fact that it is in excess of the applicable limits hereunder;

3.  third, to the Company to reimburse the Company for any amount paid to the **Insured** under this **CyberRisk Policy**;

4.  fourth, to the **Insured** in satisfaction of any applicable Retention; and

5.  fifth, to the **Insured** in satisfaction of any loss or expenses not covered under this **CyberRisk Policy**.

CYB-3001 Ed. 07-10
© 2010 The Travelers Indemnity Company All Rights Reserved

Provided, however, that such recoveries do not include any recovery:

    a.    from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit; or

    b.    of **First Party Loss or Expenses** that consist of original **Securities** after duplicates of them have been issued.

**H.**    **ACQUISITIONS OR CREATIONS OF SUBSIDIARIES; PURCHASE OF ASSETS OR ASSUMPTION OF LIABILITIES**

If, during the **Policy Period**, the **Insured Organization**:

1.    acquires or creates another entity that as a result of such acquisition or creation becomes a **Subsidiary**;

2.    acquires any entity by such entity's merger into, or consolidation with, the **Insured Organization** such that the **Insured Organization** is the surviving entity; or

3.    purchases assets or assumes liabilities of another entity, without acquiring such entity,

then this **CyberRisk Policy** will provide coverage with respect to such acquisition, creation, purchased assets, or assumed liabilities, subject to all of its terms, conditions and limitations, as follows:

    a.    If the total assets of any such acquired or created entity, or the combined total amount of the purchased assets or assumed liabilities of such other entity, are less than 30% of the consolidated assets of the **Insured Organization** as of the **Insured Organization's** most recent financial statements prior to the inception date of the **Policy Period**, then such acquisition, creation, purchased assets, or assumed liabilities will be covered, subject to the following:

        (1)    with respect to **Insuring Agreements A**, **B**, **C**, **D** and **E**, such coverage will only extend to **Wrongful Acts** taking place after such acquisition, creation, purchase, or assumption, unless the Company agrees, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for **Wrongful Acts** taking place before such acquisition, creation, purchase or assumption; and

        (2)    with respect to **Insuring Agreements F**, **G**, **H**, **I** and **J**, such coverage will only extend to any **First Party Insured Event** taking place in its entirety, and which is **Discovered**, after such acquisition, creation, purchase, or assumption, and only if:

            (a)    such acquisition, creation, purchase, or assumption was not regulatory-assisted or was not the subject of any regulatory cease and desist order, memorandum of understanding or letter of agreement; and

            (b)    the entity acquired, or from which the assets were purchased or liabilities were assumed, had no paid or pending losses during the three year period before the date of such acquisition, purchase, or assumption of the type covered by **Insuring Agreements F**, **G**, **H**, **I** or **J** in excess of the applicable retention for such entity.

    b.    With respect to any other acquisition, creation, purchase of assets, or assumption of liabilities not described within a. above, such acquisition, creation, purchased assets, or assumed liabilities will be covered, but only for the lesser of the remainder of the **Policy Period** or 90 days following the effective date of such acquisition, creation, purchase or assumption (the "Automatic Coverage Period"), subject to the following:

(1)     with respect to **Insuring Agreements A**, **B**, **C**, **D** and **E**, such coverage will only extend to **Wrongful Acts** taking place after such acquisition, creation, purchase, or assumption; and

(2)     with respect to **Insuring Agreements F**, **G, H**, **I** and **J**, such coverage will only extend to any **First Party Insured Event** taking place in its entirety, and which is **Discovered**, after such acquisition, creation, purchase, or assumption.

As a condition precedent to further coverage with respect to such acquisition, creation, purchased assets, or assumed liabilities after such Automatic Coverage Period, the **Named Insured** must give written notice of such acquisition, creation, purchase, or assumption as soon as practicable but in no event later than 60 days following the effective date of such acquisition, creation, purchase, or assumption, and must promptly provide the Company such information as the Company may request.  Upon receipt of such notice and other information, the Company will, at its option, provide the **Named Insured** a quotation for coverage under this **CyberRisk Policy** with respect to such acquisition, creation, purchased assets, or assumed liabilities for the remainder of the **Policy Period**.  If the **Named Insured** fails to comply with such condition precedent, or within 60 days following receipt of any such quotation, the **Named Insured** fails to pay any additional premium or fails to agree to any additional or amended coverage terms, conditions, exclusions or limitations set forth in such quotation, coverage otherwise afforded by this section for such acquisition, creation, purchased assets, or assumed liabilities will terminate upon expiration of the Automatic Coverage Period.

**I.     CANCELLATION OR TERMINATION**

1.     Cancellation

The Company may cancel this **CyberRisk Policy** for failure to pay a premium when due by mailing to the **Named Insured**, at the **Named Insured's** last mailing address known to the Company, written notice of cancellation at least 20 days before the effective date of such cancellation, provided that if the Company receives payment in full of such premium within such 20 days, such cancellation by the Company shall not be effective.  The Company has the right to the premium amount for the portion of the  **Policy Period**  during which this **CyberRisk Policy** was in effect.

Subject to the provisions set forth in section *IV*. *CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **S. CHANGE OF CONTROL**, the **Named Insured** may cancel any one, or all, of the Insuring Agreements of this **CyberRisk Policy** by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective.

The Company shall refund the unearned premium computed at customary short rates if this **CyberRisk Policy** is cancelled by the **Named Insured**.  If the Company initiates cancellation, the Company shall refund the unearned premium computed pro rata.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this **CyberRisk Policy** upon its expiration.  If the Company elects not to renew, it will provide the **Named Insured** written notice to that effect at least 30 days before the Expiration Date set forth in ITEM 2 of the Declarations.

2.     Termination

**Insuring Agreements F**, **G**, **H**, **I** and **J** of this **CyberRisk Policy** will terminate effective immediately:

a.      upon  a **Change of Control**; or

b.     upon the voluntary liquidation or dissolution of the **Named Insured**.

**J.     ACTION AGAINST THE COMPANY**

No action will lie against the Company unless there has been full compliance with all of the terms of this **CyberRisk Policy**.

1.     Only with respect to the **Third Party Liability Insuring Agreements**  and  **Insuring Agreements D** and **E**:

      a.     no person or organization has any right to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor may the Company be impleaded by an **Insured** or said **Insured's** legal representative; and

      b.     bankruptcy or insolvency of any **Insured** or an **Insured's** estate does not relieve the Company of any of its obligations hereunder.

2.     Only with respect to the **Insuring Agreements F**, **G**, **H**, **I** and **J**:

The **Insured Organization** may not bring any legal action against the Company involving **First Party Loss or Expenses**:

      a.     until 60 days after the **Insured Organization** has filed proof of loss with the Company; and

      b.     unless such legal action is brought within two years from the date the **Insured Organization Discovers** the **First Party Insured Event**.

3.     If any limitation in this section is deemed to be inconsistent with applicable law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**K.     CHANGES**

Only the **Named Insured** is authorized to make changes in the terms of this **CyberRisk Policy** and solely with the Company's prior written consent.  This **CyberRisk Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **CyberRisk Policy**.  Notice to any representative of the **Insured Organization** or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **CyberRisk Policy** or estop the Company from asserting any right under the terms, conditions and limitations of this **CyberRisk Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this  **CyberRisk Policy** issued by the Company.

**L.     ASSIGNMENT**

This **CyberRisk Policy**, and any rights or duties herein, may not be assigned or transferred, and any such attempted assignment or transfer is void and without effect unless the Company has provided its prior written consent to such assignment or transfer.

**M.     REPRESENTATIONS**

By acceptance of the terms set forth in this **CyberRisk Policy**, each **Insured** represents and agrees that the statements contained in the **Application**, which is deemed to be attached hereto, incorporated herein, and forming a part hereof, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **CyberRisk Policy** is issued in reliance upon the truth of such representations, and that this **CyberRisk Policy** embodies all agreements existing between said **Insured** and the Company or any of its agents.

If any statement or representation in the **Application** is untrue, then no coverage will be afforded under this **CyberRisk Policy**, but only with respect to:

a.   any **Insured Person** who knew, as of the Inception Date set forth in ITEM 2 of the Declarations, that the statement or representation was untrue; and

b.   the **Insured Organization**, if the person who signed the **Application** knew that the statement or representation was untrue.

Whether an **Insured Person** had such knowledge will be determined without regard to whether the **Insured Person** actually knew the **Application** , or any other application completed for this **CyberRisk Policy**, contained any such untrue statement or representation.

**N.    LIBERALIZATION**

If during the **Policy Period** the Company is required by law or by any insurance supervisory authority of the state in which this **CyberRisk Policy** was issued, to make any changes in the form of this **CyberRisk Policy**, by which the insurance provided by this **CyberRisk Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance will inure to the benefit of the **Insured** as of the date the revision or change is approved for general use by the applicable department of insurance.

**O.    AUTHORIZATION**

By acceptance of the terms herein, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due hereunder, and the receiving of notices of cancellation, nonrenewal, or change of coverage, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**; provided, that nothing herein will relieve the **Insureds** from giving any notice to the Company that is required under this **CyberRisk Policy**.

**P.    ENTIRE  AGREEMENT**

The Declarations, the **Application**, each **Third Party Liability Insuring Agreement,** each **First Party Insuring Agreement**, and any endorsements attached thereto, constitute the entire agreement between the Company and the **Insured**.

**Q.    HEADINGS**

The titles of the various paragraphs of this **CyberRisk Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

**R.    OTHER  INSURANCE**

1.   This **CyberRisk Policy** will apply only as excess insurance over, and will not contribute with, any other valid and collectible insurance available to the **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **CyberRisk Policy** by reference in such other policy to the Policy Number of this **CyberRisk Policy**. This **CyberRisk Policy** will not be subject to the terms of any other insurance.

2.   Only with respect to **Insuring Agreements F**, **G**, **H**, **I** and **J**:

a.   This **CyberRisk Policy** applies only as excess insurance over, and will not contribute with, any indemnification to which any **Insured Organization** is entitled from any entity other than any **Insured Organization**.

b.   As excess insurance, this **CyberRisk Policy** will not apply or contribute to the payment of any loss to the **Insured Organization** until the amount of such other insurance or indemnity has been exhausted by loss covered thereunder.  If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this

**CyberRisk Policy** will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity. This **CyberRisk Policy** will not be subject to the terms of any other insurance.

c. Any loss that is applicable to this section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **R**. **OTHER INSURANCE**, is subject to both the applicable limit of insurance for each **Single First Party Insured Event** set forth in ITEM 5 of the Declarations and any applicable Retention set forth in ITEM 5 of the Declarations.

d. If this **CyberRisk Policy** replaces prior insurance that provided the **Insured Organization** with an extended period of time after the termination or cancellation of such prior insurance in which to **Discover** a **First Party Insured Event,** then, and with respect to any **First Party Insured Event Discovered** during such extended period involving **First Party Loss or Expenses** incurred by the **Insured Organization** prior to the termination of such prior insurance, the coverage afforded by this **CyberRisk Policy** applies as follows:

(1) the Company will have no liability for **First Party Loss or Expenses** directly caused by such **First Party Insured Event**, unless the amount of such **First Party Loss or Expenses** exceeds the limit of insurance of that prior insurance; provided, that in such case, the Company will pay the **Insured Organization** for the excess of such **First Party Loss or Expenses** subject to the terms and conditions of this **CyberRisk Policy**; and

(2) any payment the Company makes to the **Insured Organization** for such excess **First Party Loss or Expenses** will not be greater than the difference between the limit of insurance of the **Insured Organization's** prior insurance and the applicable limit for each **First Party Insured Event** set forth in ITEM 5 of the Declarations. The Company will not apply the applicable Retention set forth in ITEM 5 of the Declarations to **First Party Loss or Expenses** directly caused by such **First Party Insured Event**.

**S.      CHANGE OF CONTROL**

1. Only with respect to the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**:

If, during the **Policy Period**, a **Change of Control** occurs, the coverage provided under the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will continue in full force and effect with respect to **Claims** for **Wrongful Acts**, or, with respect to **Insuring Agreements D** or **E**, **Wrongful Acts**, committed before such **Change in Control**, but coverage will cease with respect to **Claims** for **Wrongful Acts,** or, with respect to **Insuring Agreements D** or **E**, **Wrongful Acts**, committed after such **Change in Control**.

No coverage will be available hereunder for **Loss**, including **Defense Expenses**, for any **Claim**, or for **Crisis Management Event Expenses** or **Security Breach Notification Expenses**, based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Wrongful Act** committed or allegedly committed after such **Change in Control**. After any **Change in Control**, the **CyberRisk Policy** may not be canceled by the **Named Insured** and the entire premium for the **CyberRisk Policy** will be deemed fully earned.

Upon the occurrence of any **Change of Control**, the **Named Insured** will have the right to give the Company notice that it desires to purchase a Run-Off Extended Reporting Period for the **Third Party Liability Insuring Agreements** or **Insuring Agreements D** or **E**, for the period set forth in ITEM 9 of the Declarations following the effective date of such **Change of Control**, regarding **Claims** made during such Run-Off Extended Reporting Period against persons or entities who at the effective date of the **Change of Control** are **Insureds**, or regarding **Wrongful Acts** under **Insuring Agreements D** or **E**, but only for **Wrongful Acts** occurring wholly prior to such **Change of Control** and which otherwise would be covered by the **Third Party Liability Insuring Agreements** or **Insuring Agreements D** or **E**2, subject to the following provisions:

      a.      such Run-Off Extended Reporting Period will not provide new, additional or renewed limits; and

      b.      the Company's total liability for all such **Claims** made, or with respect to **Insuring Agreements D** or **E**, **Wrongful Acts** occurring wholly prior to such **Change of Control**, and reported during such Run-Off Extended Reporting Period will be only the remaining portion of the applicable limit set forth in the Declarations as of the effective date of the **Change of Control**.

The premium due for the Run-Off Extended Reporting Period will equal the percentage set forth in ITEM 9 of the Declarations of the annualized premium of the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Period** prior to the **Change of Control**. The entire premium for the Run-Off Extended Reporting Period will be deemed fully earned at the commencement of such Run-Off Extended Reporting Period.

The right to elect the Run-Off Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 30 days of the **Change of Control**. In the event the Run-Off Extended Reporting Period is purchased, the option to purchase the Extended Reporting Period in section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, T. AUTOMATIC EXTENDED PERIOD TO DISCOVER LOSS AND EXTENDED REPORTING PERIOD will terminate. In the event the Run-Off Extended Reporting Period is not purchased, the **Named Insured** will have the right to purchase the Extended Reporting Period under the terms of section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, T. AUTOMATIC EXTENDED PERIOD TO DISCOVER LOSS AND EXTENDED REPORTING PERIOD.

If, at any time during the **Policy Period**, the **Insured Organization** eliminates or reduces its ownership interest in, or control over a **Subsidiary**, such that it no longer meets the definition of a **Subsidiary**, coverage under the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will continue for such entity but only with regard to **Claims** for **Wrongful Acts**, or, with respect to **Insuring Agreements D** or **E**, **Wrongful Acts,** which occurred wholly during the time that the entity was a **Subsidiary**.

2.      If any entity ceases to be an **Insured Organization**, **First Party Loss or Expenses** sustained by such **Insured Organization** under **Insuring Agreements F, G, H, I** or **J** is covered only if incurred by such **Insured Organization** prior to the time such entity ceased to be an **Insured Organization** and **Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss pursuant to the terms set forth in section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, T. AUTOMATIC EXTENDED PERIOD TO DISCOVER LOSS AND EXTENDED REPORTING PERIOD.

**T.**      **AUTOMATIC EXTENDED PERIOD TO DISCOVER LOSS AND EXTENDED REPORTING PERIOD**

1.      Automatic Extended Period to Discover Loss

Only with respect to **Insuring Agreements F**, **G**, **H**, **I** or **J**:

Effective the date of termination or cancellation of **Insuring Agreements F, G, H, I** or **J** for any reason other than nonpayment of premium, the **Insured Organization** will automatically be provided a period of 90 days following the effective date of such termination or cancellation to **Discover First Party Insured Events** wholly taking place prior to the effective date of such termination or cancellation, subject to the following provisions:

      a.      such Automatic Extended Reporting Period to Discover Loss will not provide a new, additional or renewed limit;

      b.      the Company's maximum limit for all **Single First Party Insured Events Discovered** during such Automatic Extended Reporting Period to Discover Loss will be only the

remaining portion of the applicable limit set forth in ITEM 5 of the Declarations as of the effective date of the termination or cancellation;

c.    such Automatic Extended Reporting Period to Discover Loss will not be made available in the event of termination or cancellation arising out of **Financial Insolvency**; and

d.    this Automatic Extended Reporting Period to Discover Loss terminates immediately upon the effective date of any other insurance obtained by the **Insured Organization** replacing  in whole or in part the insurance afforded by **Insuring Agreements F**, **G**, **H**, **I** or **J**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

2.    Extended Reporting Period

Only with respect to the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**:

At any time prior to or within 60 days after the effective date of termination or cancellation of any **Third Party Liability Insuring Agreement** or **Insuring Agreements D** or **E** for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the Declarations following the effective date of such termination or cancellation, regarding  **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation are  **Insureds** , or regarding **Wrongful Acts** under **Insuring Agreements D** or **E**, but only for **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation and which otherwise would be covered by such **Third Party Liability Insuring Agreements** or **Insuring Agreements D** or **E**, subject to the following provisions:

a.    such Extended Reporting Period will not provide a new, additional or renewed limit; and

b.    the Company's maximum limit for all **Claims** made, or with respect to **Insuring Agreements D** or **E**, all **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation, and reported during such Extended Reporting Period will be only the remaining portion of the applicable limit set forth in the Declarations as of the effective date of the termination or cancellation.

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Third Party Liability Insuring Agreement** and **Insuring Agreements D** and **E**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Period**. The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 60 days of the effective date of the termination or cancellation.

## V.    *CONDITIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS*

### A.    CLAIM  DEFENSE

1.

If Duty-to-Defend coverage is provided with respect to the **Third Party Liability Insuring Agreements** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend any **Claim** covered by a **Third Party Liability Insuring Agreement**, even if the allegations are groundless, false or fraudulent, including the right to select defense counsel with respect to such **Claim**; provided that the Company will not be obligated to defend or to continue to defend any **Claim** after the applicable limit of liability has been exhausted by payment of **Loss**.

2.  If Reimbursement coverage is provided with respect to the **Third Party Liability Insuring Agreements** as indicated in ITEM 7 of the Declarations:

    a.  the Company will have no duty to defend any **Claim** covered by a **Third Party Liability Insuring Agreement**. It will be the duty of the **Insureds** to defend such **Claims**; and the Company will have the right to participate with the **Insureds** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by such **Third Party Liability Insuring Agreement** and the selection of appropriate defense counsel; and

    b.  upon written request, the Company will advance **Defense Expenses** with respect to such **Claim**.  Such advanced payments by the Company will be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses** under such **Third Party Liability Insuring Agreement**.  As a condition of any payment of **Defense Expenses** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of any **Claim** is not covered under such **Third Party Liability Insuring Agreement**.

3.  The **Insureds** agree to cooperate with the Company and, upon the Company's request, assist in making settlements and in the defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insureds** because of an act or omission covered under any **Third Party Liability Insuring Agreement**, and will attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

**B.    ALLOCATION**

1.  If Duty-to-Defend coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Third Party Liability Insuring Agreement** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Third Party Liability Insuring Agreement** and also loss that is not covered by such **Third Party Liability Insuring Agreement** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then such covered **Loss** and uncovered loss will be allocated as follows:

    a.  100% of **Defense Expenses** incurred by the **Insureds** who are afforded coverage for such **Claim** will be allocated to covered **Loss**; and

    b.  all loss other than **Defense Expense** will be allocated between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons** , the **Insured Organization**, and others not insured under such **Third Party Liability Insuring Agreement**.  In making such a determination, the **Insured Organization**, the **Insured Persons** and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts.  In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Third Party Liability Insuring Agreement** and applicable law.

2.  If Reimbursement coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Third Party Liability Insuring Agreement** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Third Party Liability Insuring Agreement** and also loss that is not covered by such **Third Party Liability Insuring Agreement** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, the **Insureds** and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts.  In making such a determination, the parties will take into account the relative legal and financial exposures of, and relative benefits

obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under the applicable **Third Party Liability Insuring Agreement**. In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Third Party Liability Insuring Agreement** and applicable law.

**C.      SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.   In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for 30% of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for 30% of all   **Loss** , other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under any **Third Party Liability Insuring Agreement**  for such **Claim** will not exceed the remaining applicable limit of liability.

**D.      SPOUSAL AND DOMESTIC PARTNER LIABILITY COVERAGE**

The **Third Party Liability Insuring Agreements** will, subject to all of the terms, conditions, and limitations, be extended to apply to  **Loss**  resulting from a **Claim** made against a person who, at the time the  **Claim**  is made, is a lawful spouse or a person qualifying as a domestic partner under the provisions of any applicable federal, state or local law (a "Domestic Partner") of an **Insured Person**, but only if and so long as:

1.      the **Claim** against such spouse or Domestic Partner results from a **Wrongful Act** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, or who is joined with the Domestic Partner; and

2.      such **Insured Person** and his or her spouse or Domestic Partner are represented by the same counsel in connection with such **Claim**.

No spouse or Domestic Partner of an **Insured Person** will, by reason of this subsection, have any greater right to coverage under the **Third Party Liability Insuring Agreements** than the **Insured Person** to whom such spouse is married, or to whom such Domestic Partner is joined.

The Company has no obligation to make any payment for  **Loss**  in connection with any **Claim** against a spouse or Domestic Partner of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse or Domestic Partner.

**E.      NOTICE OF POTENTIAL CLAIMS**

If an **Insured** becomes aware of a **Potential Claim** and gives the Company written notice of the particulars of such **Potential Claim**, including all facts related to the **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, the dates of the alleged events, and the reasons for anticipating a **Claim**, as soon as practicable during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, any **Claim** subsequently made against any **Insured** arising out of such **Wrongful Act** will be deemed to have been made during the **Policy Period**.

All notices under this section *V. CONDITIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS*, **E. NOTICE OF POTENTIAL CLAIMS**, must be sent by email, facsimile or mail in accordance with ITEM 3 of the Declarations and will be effective upon receipt.

---

## VI.    CONDITIONS APPLICABLE TO INSURING AGREEMENTS F, G, H, I AND J

---

**A.    COOPERATION**

The **Insured Organization** must cooperate with the Company in all matters pertaining to **Insuring Agreements F, G, H, I** or **J** as stated in the terms, conditions and limitations of this **CyberRisk Policy**.

**B.    JOINT INSURED**

1.    If the **Insured Organization** consists of more than one entity, then the **Named Insured** acts for itself and for every other **Insured Organization** for all purposes of **Insuring Agreements F, G, H, I** or **J**.  Payment by the Company to the **Named Insured** of **First Party Loss or Expenses** incurred by any **Insured Organization** shall fully release the Company of liability for such **First Party Loss or Expenses**.  The **Named Insured** is responsible for the payment of all premiums and will be the payee for any return premiums the Company pays.

2.    If any **Insured Organization**, or any **Executive Officer**, has knowledge of, or **Discovers**, any information relevant to **Insuring Agreements F, G, H, I** or **J**, that knowledge or **Discovery** is considered knowledge or **Discovery** of every **Insured Organization**.

3.    The Company will not pay the **Insured Organization** more for **First Party Loss or Expenses** incurred by more than one **Insured Organization** than the amount the Company would have paid if all **First Party Loss or Expenses** had been sustained by one **Insured Organization**.

**C.    OWNERSHIP OF PROPERTY; INTERESTS COVERED**

The property covered under **Insuring Agreements F, G, H, I** or **J** is limited to property:

1.    that the **Insured Organization** owns or leases;

2.    that the **Insured Organization** holds for others on the **Insured Organization's** premises or the **Insured Organization's Financial Institution** premises; or

3.    for which the **Insured Organization** is legally liable, except property covered under **Insuring Agreements F, G, H, I** or **J** does not include property located inside the **Insured Organization's** client's premises or the **Insured Organization's** client's **Financial Institution** premises.

Notwithstanding the above, **Insuring Agreements F, G, H, I** or **J** are for the **Insured Organization's** benefit only and provides no rights or benefits to any other person or organization.  Any claim for loss that is covered under this **CyberRisk Policy** must be presented by the **Insured Organization**.

**D.    VALUATION/SETTLEMENT**

Subject to the **CyberRisk Policy Aggregate Limit**, and the applicable limit of insurance for each **Single First Party Insured Event** set forth in ITEM 5 of the Declarations, the Company will pay the **Insured Organization** for:

1.    loss of **Money,** or loss payable in **Money**, in, at the option of the **Insured Organization**, the **Money** of the country in which the **Single First Party Insured Event** took place or in the United States of America dollar equivalent thereof determined at the rate of exchange published by the Wall Street Journal at the time of payment of such loss.

2.    loss of **Securities**, but only up to and including their value at the close of business on the day the **Single First Party Insured Event** was **Discovered**, and at the Company's option:

a.    pay the **Insured Organization** the value of such **Securities** or replace them in kind, in which event the **Insured Organization** must assign to the Company all the **Insured Organization's** rights, title and interest in those **Securities**; or

---

       b.       pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**; provided, the Company will be liable only for the cost of the Lost Securities Bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the **Securities** at the close of business on the day the **Single First Party Insured Event** was **Discovered**.

3.      loss of, or loss from damage to, **Other Property** or premises including its exterior for the replacement cost without deduction for depreciation; provided, the Company will pay the **Insured Organization** the lesser of the following:

       a.       the applicable limit of insurance for each **Single First Party Insured Event** set forth in ITEM 5 of the Declarations;

       b.       the cost to replace **Other Property** or premises including its exterior with property of comparable material and quality, and used for the same purpose; or

       c.       the amount the **Insured Organization** actually spends that is necessary to repair or replace such property,

provided, the Company will, at its option, pay the **Insured Organization** for loss of, or loss from damage to, **Other Property** or premises including its exterior in the **Money** of the country in which the **Single First Party Insured Event** took place, or in the United States of America dollar equivalent of the **Money** of the country in which the **Single First Party Insured Event** took place determined by the rate of exchange published in the Wall Street Journal on the day the **Single First Party Insured Event** was **Discovered**.

The Company will not pay the **Insured Organization** on a replacement cost basis for any loss or damage until such property is actually repaired or replaced, and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.  If the lost or damaged property is not repaired or replaced, the Company will pay the **Insured Organization** actual cash value on the day the **Single First Party Insured Event** was **Discovered**.

Any property that the Company pays the **Insured Organization** for or replaces becomes the Company's property.

© 2010 The Travelers Indemnity Company All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## GLOBAL COVERAGE COMPLIANCE ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

**It is agreed that:**

1. The following is added to section **II. DEFINITIONS**:

   *Financial Interest* means the **Named Insured's** insurable interest in an **Insured Organization** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **Named Insured's**:

   1. ownership of the majority of the outstanding securities or voting rights of such **Insured Organization** representing the present right to elect, appoint, or exercise a majority control over such **Insured Organization's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

   2. indemnification of, or representation that it has an obligation to indemnify, such **Insured Organization** for **Loss** or **First Party Loss or Expense** incurred by such **Insured Organization**; or

   3. election or obligation to obtain insurance for such **Insured Organization**.

2. The following is added to section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**:

   **SANCTIONS**

   This **CyberRisk Policy** will provide coverage or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition, or restriction.

3. The following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **A. TERRITORY**:

   **A. TERRITORY AND VALUATION**

   1. This **CyberRisk Policy** applies anywhere in the world; provided, this **CyberRisk Policy** does not apply to **Loss** or **First Party Loss or Expense** incurred by an **Insured** residing or domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

   2. In the event an **Insured Organization** incurs **Loss** or **First Party Loss or Expense** referenced in 1. above to which this insurance would have applied, the Company will reimburse the **Named Insured** for its **Loss** or **First Party Loss or Expense** on account of its **Financial Interest** in such **Insured Organization**. As a condition precedent to such reimbursement, or any rights under this **CyberRisk Policy**, the **Named Insured** will cause the **Insured Organization** or its **Insured Persons** to comply with the conditions of this **CyberRisk Policy**.

   3. All premiums, Limits of Liability, Retention, **Loss**, and other amounts under this **CyberRisk Policy** are expressed and payable in the currency of the United States. If a judgment is rendered, settlement is denominated, or another element of **Loss** under this **CyberRisk Policy** is stated in a currency other than United States dollars, payment under this **CyberRisk Policy** will be made in United States dollars at the rate

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00184

of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon, or any other element of **Loss** is due, respectively.

4.  The following is added to section **V. CONDITIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS, A. CLAIM DEFENSE**:

In the event of a **Claim** against an **Insured** that resides or is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance and if Duty-to-Defend coverage is provided with respect to this **CyberRisk Policy** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend such **Claim** as set forth in this section V. CONDITIONS, A. CLAIM DEFENSE, 1. to the extent that doing so would not violate the laws or regulations of such country or jurisdiction.

If the Company is prohibited from defending such **Claim** or if Reimbursement coverage is provided with respect to this **CyberRisk Policy** as indicated in ITEM 7 of the Declarations, then this section V. CONDITIONS, A. CLAIM DEFENSE, 2. applies to such **Claim**; provided, any such **Claim** is subject to section V. CONDITIONS, B. ALLOCATION, 2.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00185

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND ACQUISITION OR CREATION OF SUBSIDIARIES CONDITION ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

**It is agreed that:**

The following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **H. Acquisitions or Creations of Subsidiaries; Purchase of Assets or Assumption of Liabilities**, 3.a.:

    a.    If the total assets of any such acquired or created entity, or the combined total amount of the purchased assets or assumed liabilities of such other entity, are less than 35% of the consolidated assets of the **Insured Organization** as of the **Insured Organization's** most recent financial statements prior to the inception date of the **Policy Period**, then such acquisition, creation, purchased assets, or assumed liabilities will be covered, subject to the following:

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00186

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## 180 DAY BUSINESS INTERRUPTION PERIOD OF DISRUPTION ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

**It is agreed that:**

The following replaces section **II. DEFINITIONS**, **E. Business Interruption Period of Restoration**, 2.b:

b.       180 days from the time that such **Computer System Disruption** was **Discovered**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

CYB-19039 Ed. 02-17
© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00187

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PRIVACY POLICY ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

**It is agreed that:**

1.    All references to "12 months" in section **I. INSURING AGREEMENTS**, **FIRST PARTY INSURING AGREEMENTS**, **D.** and **E.** are amended to "24 months".

2.    The following is added to section **II. DEFINITIONS**:

      *Identity Information Provision* means any provision in the **Insured Organization's Privacy Policy** that:

      a.    prevents or prohibits wrongful or improper collection of Identity Information;

      b.    requires notice to a person of the collection or use of Identity Information;

      c.    provides a person the ability to agree to or withhold permission for the collection or use of Identity Information;

      d.    prohibits or restricts the disclosure, sharing or selling of Identity Information;

      e.    requires the correction of incomplete or inaccurate Identity Information after such request is made to the Insured Organization; or

      f.    mandates procedures and requirements to prevent the loss of Identity Information.

      *Privacy Policy* means any publicly available written document that sets forth the **Insured Organization's** policies, standards, or procedures for the collection, use and disclosure of **Identity Information**.

3.    For the purpose of **Insuring Agreement A.** only, the following is added to section **II. DEFINITIONS**, **MM. Loss**:

      **Loss** also does not include any amount imposed upon the Insured by a payment card association or financial institution that processes payment card transactions, in connection with the Insured's failure to adhere to PCI-DSS or similar payment card security standards that resulted in a **Security Breach**.

4.    The following replaces section **II. DEFINITIONS**, **AAA. Security Breach Notification Expenses**:

      *Security Breach Notification Expenses* mean any of the following reasonable fees, costs or expenses incurred and paid by the **Insured Organization**, with the Company's prior written consent, for services recommended and provided by an **Approved Service Provider** that can be directly attributed to a **Security Breach**:

      1.    fees, costs, or expenses, including computer forensics expenses and legal services expenses, to determine:

            a.    the cause of the **Security Breach**; or

            b.    the persons whose **Identity Information** was accessed or acquired without their authorization,

            provided that such fees, costs or expenses do not include **Defense Expenses**;

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number:    **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00188

2.  fees, costs or expenses to develop documents or materials to notify the persons whose **Identity Information** was accessed or acquired without their authorization, whether such notification is provided on a voluntary basis or to comply with any **Security Breach Notification Law**;

3.  costs of mailings or other communications used to notify the persons whose **Identity Information** was accessed or acquired without their authorization, whether such notification is provided on a voluntary basis or to comply with any **Security Breach Notification Law**;

4.  costs of providing credit or identity monitoring services for up to 24 months, or longer where required by law, to persons whose **Identity Information** was accessed or acquired without their authorization, starting with the date that the **Insured Organization** first notified such persons of the **Security Breach**;

5.  costs of establishing and maintaining a call center to be used by persons whose **Identity Information** was accessed or acquired without their authorization; or

6.  any other fees, costs, or expenses necessary to comply with any **Security Breach Notification Law** that applies to the **Insured Organization**.

**Security Breach Notification Expenses** also include fees, costs or expenses associated with the purchase of an identity fraud insurance policy specifically designed to provide reimbursement of identity fraud related expenses, or similar coverage if such similar coverage is available as part of credit monitoring services, to benefit persons whose **Identity Information** was accessed or acquired without their authorization.

**Security Breach Notification Expenses** do not include:

1.  remuneration paid to **Employees**;

2.  fees, costs, or expenses of outside consultants, other than the **Approved Service Provider**, retained by the **Insured Organization**, unless the Company agrees in writing to reimburse the **Insured Organization** for such fees, costs, or expenses;

3.  taxes, fines, penalties, punitive, exemplary or liquidated damages, or the multiple portion of any multiplied damage award imposed by law or that any **Insured** has agreed to pay for any reason;

4.  gratis amounts that any **Insured** voluntarily agrees to pay to any person whose **Identity Information** was accessed or acquired without their authorization; or

5.  **Crisis Management Event Expenses**.

5.  The following replaces section **II. DEFINITIONS**, **QQ. Network and Information Security Wrongful Act**:

*Network and Information Security Wrongful Act* means any actual or alleged:

1.  failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing private or confidential information of others or **Identity Information**, including such data stored, maintained or processed:

    a.  by the **Insured Organization**; or

    b.  on the **Insured Organization's** behalf pursuant to a written contract or agreement, including but not limited to such failure based upon or arising out of:

        (1)  Maintaining, managing, or controlling a **Computer System**;

        (2)  Hosting or facilitating the **Insured's** website;

        (3)  Providing other information technology services to the **Insured** including cloud services; or

        (4)  Performing any other services related to the conduct of the **Insured's** business;

2.   failure to prevent the transmission of a **Computer Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network, that is not rented, owned, leased by, licensed to, or under the direct operational control of, the **Insured Organization**;

3.   failure to provide any authorized user of the **Insured Organization's** website or **Computer System** with access to such website or **Computer System**;

4.   failure to provide notification of any actual or potential unauthorized access to, or use of, data containing private or confidential information of others if such notification is required by any **Security Breach Notification Law**; or

5.   failure to comply with any **Identity Information Provision** in the **Insured Organization's Privacy Policy**,

by, or asserted against, an **Insured Person**, in his or her capacity as such, or the **Insured Organization**.

6.   The following replaces section **II. DEFINITIONS**, **ZZ. Security Breach**:

*Security Breach* means actual or alleged unauthorized access to, or acquisition of, private or confidential information of others, including **Identity Information**, that is:

a.   owned, licensed, maintained, or stored by the **Insured Organization**; or

b.   maintained, stored, or processed on the **Insured Organization's** behalf, pursuant to a written contract or agreement.

7.   Section **III. EXCLUSIONS**, **B. EXCLUSIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS AND INSURING AGREEMENTS D AND E**, 4. is deleted.

8.   The following is added to section **III. EXCLUSIONS**, **A. Exclusions Applicable To All Insuring Agreements**, 4.:

This exclusion will also not apply to that portion of any **Claim** for a **Network and Information Security Wrongful Act** seeking **Loss** for emotional distress, mental anguish, humiliation or loss of reputation.

9.   The following is added to section **III. EXCLUSIONS**, **B. EXCLUSIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS AND INSURING AGREEMENTS D AND E**:

The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** arising out of any actual or alleged violation of any law that restricts or prohibits the sending, transmitting, or distributing of any communication, in any form, that the recipient of such communication did not specifically request to receive.

The **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E** will not apply to any **Claim** or **Single First Party Insured Event** arising out of any actual or alleged violation of the Insured Organization's Privacy Policy that restricts or prohibits eavesdropping, wiretapping or audio or video recording by the Insured Organization or Independent Contractor.

10.  The following is added to section **III. EXCLUSIONS**:

**Insuring Agreement A** will not apply to any **Claim** for any loss, transfer, or theft of **Money**, **Securities**, or **Other Property** of others that is in the care, custody, or control of the **Insured Organization**.

11.  The following is added to section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **C. Retention**:

If a **Claim** giving rise to coverage under a **Third Party Liability Insuring Agreement** and a **Single First Party Insured Event** giving rise to coverage under a **First Party Insuring Agreement** have a common nexus, or are causally connected by reason of any act or event, or a series of acts or events, then the applicable Retentions set forth in ITEM 5 of the Declarations will apply separately to such **Claim** or **Single First Party Insured Event**,

BlueRidge-00190

provided that the sum of such Retentions for such **Claim** or **Single First Party Insured Event** will not exceed the largest applicable Retention set forth in ITEM 5 of the Declarations for any such **Third Party Insuring Agreement** or **First Party Insuring Agreement**.

12.   The following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **D. Limits**, 3.e.:

   e.   If any **Single First Party Insured Event** is covered under more than one of **Insuring Agreements D**, **E**, **F**, **G**, **H**, **I**, or **J**, the limit of insurance set forth in ITEM 5 of the Declarations for each applicable Insuring Agreement will apply separately to the part of the **First Party Loss or Expenses** covered under such Insuring Agreement.

13.   The following is added to section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**:

**COMPANY'S CONSENT**

The Company will not unreasonably withhold its consent with respect any provision in this **CyberRisk Policy** where the Company's consent is required.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00191

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## INDEMNIFIED INDEPENDENT CONTRACTORS ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

**It is agreed that:**

1.  The following replaces the final sentence of section **II. DEFINITIONS**, **W. Employee**:

    **Employee** also means any **Independent Contractor**, but only if the **Insured Organization** provides indemnification to such **Independent Contractor** in the same manner as that provided to other **Employees**. **Employee** does not mean any **Independent Contractor** for whom the **Insured Organization** does not provide indemnification in the same manner as that provided to other **Employees**.

2.  The following replaces section **II. DEFINITIONS, HH. Independent Contractor**:

    *Independent Contractor* means any natural person who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement. That status of **Independent Contractor** will be determined as of the date of the alleged **Wrongful Act** or **First Party Insured Event**.

3.  The following is added to section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS, D. LIMITS**:

    The Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, to an **Independent Contractor** the **Insured Organization** agreed to provide indemnification to in the same manner as that provided to other **Employees**, will be the amount that the **Insured Organization** provides indemnification to such **Independent Contractor**, or the applicable limit shown in ITEM 5 of the Declarations, whichever is less.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106420159**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXPAND E-COMMERCE EXTORTION TO INCLUDE ACTS BY EMPLOYEES ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

**It is agreed that:**

The phrase "other than an identifiable **Employee**," is deleted from the first sentence of section **II. DEFINITIONS**, **U. E-COMMERCE EXTORTION**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00193

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FINES AND PENALTIES/CONSUMER REDRESS FUNDS/PAYMENT CARD CONTRACT PENALTIES/SOFTWARE AND HARDWARE UPGRADE AND SCANNING SERVICES EXPENSES ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

**It is agreed that:**

1.     The following is added to ITEM 5 of the Declarations:

The **Payment Card Contract Penalties Limit of Insurance** for each **Single First Party Insured Event** is equal to 100% of the Regulatory Defense Expenses Limit of Liability, which is part of, and not in addition to, the Regulatory Defense Expenses Limit of Liability for each **Regulatory Claim**.

The **Software and Hardware Upgrade and Scanning Services Limit of Insurance** for each **Single First Party Insured Event** is equal to 5% of the Regulatory Defense Expenses Limit of Liability, which is part of, and not in addition to, the Regulatory Defense Expenses Limit of Liability for each **Regulatory Claim**.

The **Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement Retention** for each **Single First Party Insured Event** is equal to the dollar amount of the Retention for each **Regulatory Claim** under Insuring Agreement C.

2.     The following replaces section **I. INSURING AGREEMENTS**, **THIRD PARTY LIABILITY INSURING AGREEMENTS**, **C. REGULATORY DEFENSE EXPENSES**:

**C.     REGULATORY DEFENSE EXPENSES**

The Company will pay on behalf of the **Insured**, **Defense Expenses**, **Regulatory Fines and Penalties** and **Consumer Redress Funds** for any **Regulatory Claim** first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Network and Information Security Wrongful Act**.

The Company will pay on behalf of the **Insured**, **Defense Expenses**, for any **Regulatory Claim** first made during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Communications and Media Wrongful Act**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

3.      The following is added to section **I. INSURING AGREEMENTS**, **FIRST PARTY INSURING AGREEMENTS**:

**PAYMENT CARD CONTRACT PENALTIES AND SOFTWARE AND HARDWARE UPGRADE AND SCANNING SERVICES EXPENSES**

The Company will pay the **Insured Organization** for **Contract Penalties and Software and Hardware Expenses** incurred by the **Insured Organization** which are directly caused by any actual or alleged **Security Breach** that:

a.      is directly caused by a **Network and Information Security Wrongful Act** taking place after the Retroactive Date set forth in ITEM 5 of the Declarations;

b.      takes place during the **Policy Period**; and

c.      is reported to the Company during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

4.      The following definitions are added to section **II. DEFINITIONS**:

***Consumer Redress Funds*** means money which an **Insured** is legally obligated to deposit into a fund for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Claim**.

***Contract Penalties and Software and Hardware Expenses*** means any of the following reasonable fees, costs, or expenses incurred and paid by the **Insured Organization**, with the Company's prior written consent:

1.      **Payment Card Contract Penalties**; or

2.      **Software and Hardware Upgrade and Scanning Services Expenses**.

**Contract Penalties and Software and Hardware Expenses** do not include:

1.      remuneration paid to **Employees** for work beyond their normal scheduled hours;

2.      fees, costs, or expenses of outside consultants, unless the Company agrees in writing to reimburse the **Insured Organization** for such fees, costs, or expenses;

3.      amounts that the **Insured Organization** voluntarily agrees to pay to any person whose **Identity Information** was accessed or acquired without his or her authorization;

4.      fees, costs, or expenses in:

a.      retaining a public relations consultant or firm, or a crisis management consultant or firm; or

b.      planning or executing the **Insured Organization's** public relations campaign to mitigate any actual or potential negative publicity generated from the **Security Breach**; or

5.      **Security Breach Notification Expenses**.

***Merchant Service Agreement*** means a contract between the **Insured Organization** and an acquiring bank or other acquiring institution that establishes the terms and conditions for accepting and processing **Payment Card** transactions.

***Payment Card*** means a credit card, debit card or charge card issued by a financial institution.

***Payment Card Contract Penalties*** means fines, penalties, or assessments, imposed against the **Insured Organization** by an acquiring bank or other acquiring institution under a **Merchant Service Agreement** after a **Security Breach**, because of the **Insured Organization's** non-compliance with **Payment Card Security Standards**.

© 2017 The Travelers Indemnity Company. All rights reserved.

**Payment Card Contract Penalties** do not include **Regulatory Fines and Penalties**.

*Payment Card Security Standards* means:

1. the most current edition of security standards contained in:

   a. The Payment Card Industry Data Security Standards program (PCI DSS);

   b. Visa's Cardholder Information Security Program (CISP);

   c. MasterCard's Site Data Protection Program (SDP);

   d. American Express's Data Security Operating Policy; or

   e. Discover's Information Security and Compliance program (DISC); or

2. Other security standards similar to those described above in this definition that the **Insured Organization** has agreed to in a **Merchant Service Agreement** with a financial institution;

that apply to the **Insured Organization**.

*PCI Forensic Investigation* means a professional review of the **Insured Organization's** computer systems by a **Qualified Forensic Investigator** to determine its compliance with **Payment Card Security Standards**.

*Qualified Forensic Investigator* means an organization approved by the applicable **Payment Card** issuing bank to conduct forensic investigations after a **Security Breach**.

*Qualified Security Assessor* means a person or organization certified by the Payment Card Industry Security Standards Council to assess compliance with **Payment Card Security Standards**.

*Regulatory Fines and Penalties* means civil monetary fines or civil monetary penalties imposed by a government agency, or governmental licensing or regulatory organization, pursuant to an order resulting from a **Regulatory Claim**; but only to the extent that they are insurable under the applicable law most favorable to the insurability of such **Regulatory Fines and Penalties**; provided that **Regulatory Fines and Penalties** do not include: (i) **Payment Card Contract Penalties**; or (ii) fines or penalties imposed by any private or industry association regulatory organization.

*Software and Hardware Upgrade and Scanning Services Expenses* means:

1. costs or expenses to purchase and install anti-virus software, point-of-sale systems software, firewall protection software, or firewall protection hardware that satisfies the requirements of the **Payment Card Security Standards**, if, after a **Security Breach**, it is determined through a **PCI Forensic Investigation** that the **Insured Organization** is out of compliance with **Payment Card Security Standards**; or

2. costs for the scanning services of a **Qualified Security Assessor** to certify that the **Insured Organization's** upgraded software and hardware systems meet the requirements of the **Payment Card Security Standards**, but only for the first such scanning services after such software or hardware systems, or both, are upgraded.

5. The following replaces section **II. DEFINITIONS**, **BB. First Party Insured Event**, 2:

   2. with respect to **Insuring Agreements D**, **E**, and the **Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement**, a **Wrongful Act**.

6. The following replaces section **II. DEFINITIONS**, **CC. First Party Insuring Agreements**:

   CC. *First Party Insuring Agreements* means **Insuring Agreements D**, **E**, **F**, **G**, **H**, **I**, **J**, and the **Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement**.

© 2017 The Travelers Indemnity Company. All rights reserved.

7.      The following is added to section **II. DEFINITIONS**, **DD. First Party Loss or Expenses**:

       **First Party Loss or Expenses** also means **Contract Penalties and Software and Hardware Expenses**.

8.      The following is added to section **II. DEFINITIONS**, **MM. Loss**, 1:

       provided that only with respect to section I. Insuring Agreements, C. Regulatory Defense Expenses, **Loss** will include **Regulatory Fines and Penalties**;

9.      The following is added to section **II. DEFINITIONS**, **MM. Loss**:

       Only with respect to section **I. Insuring Agreements**, **C. Regulatory Defense Expenses**, **Loss** also includes **Consumer Redress Funds**.

10.     The following is added to section **II. DEFINITIONS**, **AAA. Security Breach Notification Expenses**:

       **Security Breach Notification Expenses** do not include **Contract Penalties and Software and Hardware Expenses**.

11.     The following is added to section **III. EXCLUSIONS**, **B. EXCLUSIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS AND INSURING AGREEMENTS D, E AND THE PAYMENT CARD CONTRACT PENALTIES AND SOFTWARE AND HARDWARE UPGRADE AND SCANNING SERVICES EXPENSES INSURING AGREEMENT**, 14:

       Provided that, solely with respect to the Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement, this exclusion will not apply to any **Payment Card Contract Penalties** incurred by the **Insured Organization**.

12.     The following is added to section **III. EXCLUSIONS**:

       **EXCLUSIONS APPLICABLE TO THE PAYMENT CARD CONTRACT PENALTIES AND SOFTWARE AND HARDWARE UPGRADE AND SCANNING SERVICES EXPENSES INSURING AGREEMENT**

       The Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement will not apply to any **Payment Card Contract Penalties** unless the **Insured Organization** has agreed to pay such **Payment Card Contract Penalties** in a **Merchant Service Agreement** that the **Insured Organization** entered into prior to the date of the **Security Breach**.

13.     The following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **D. LIMITS**, 3. b.:

       b.     The Company's maximum limit of liability for **Defense Expenses**, **Regulatory Fines and Penalties** and **Consumer Redress Funds** for each **Regulatory Claim** under **Insuring Agreement C** will not exceed the applicable limit of liability for each **Regulatory Claim** set forth in ITEM 5 of the Declarations for such Insuring Agreement.

14.     The following is added to section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **D. LIMITS**, 3:

       f.     The Company's maximum limit of insurance for all **Payment Card Contract Penalties** for each **Single First Party Insured Event** will not exceed the Payment Card Contract Penalties Limit of Insurance set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, the Regulatory Defense Expenses Limit of Liability set forth in ITEM 5 of the Declarations.

            The Company's maximum limit of insurance for all **Software and Hardware Upgrade and Scanning Services Expenses** for each **Single First Party Insured Event** will not exceed the Software and Hardware Upgrade and Scanning Services Limit of Insurance set forth in ITEM 5 of the Declarations,

© 2017 The Travelers Indemnity Company. All rights reserved.

which amount is included within, and not in addition to, the Regulatory Defense Expenses Limit of Liability set forth in ITEM 5 of the Declarations.

If a **Regulatory Claim** has a common nexus, or is causally connected by reason of any act or event, or series of acts or events, to a **Network and Information Security Wrongful Act** that directly causes a **Security Breach** that results in the payment of **Contract Penalties and Software and Hardware Expenses** covered under the Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement, such payments will reduce, and may exhaust, the Regulatory Defense Expenses Limit of Liability for such **Regulatory Claim**.

Payment of **Defense Expenses**, **Regulatory Fines and Penalties** and **Consumer Redress Funds** will reduce, and may exhaust, the Payment Card Contract Penalties Limit of Insurance set forth in ITEM 5 of the Declarations, but only for such payments that are for a **Regulatory Claim** that has a common nexus, or is causally connected by reason of any act or event, or series of acts or events, to a **Network and Information Security Wrongful Act** that directly causes a **Security Breach** that results in the payment of **Payment Card Contract Penalties** covered under the Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement.

Payment of **Defense Expenses**, **Regulatory Fines and Penalties** and **Consumer Redress Funds** will reduce, and may exhaust, the Software and Hardware Upgrade and Scanning Services Limit set forth in ITEM 5 of the Declarations, but only for such payments that are for a **Regulatory Claim** that has a common nexus, or is causally connected by reason of any act or event, or series of acts or events, to a **Network and Information Security Wrongful Act** that directly causes a **Security Breach** that results in the payment of **Software and Hardware Upgrade and Scanning Services Expenses** covered under the Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement.

The Company's maximum limit of liability for all **Regulatory Fines and Penalties** and **Consumer Redress Funds**, and **Contract Penalties and Software and Hardware Expenses**, combined, for all **Regulatory Claims** and **Single First Party Insured Events**, combined, will be the lesser of the **CyberRisk Policy Aggregate Limit** or $10,000,000.

15.   All references to "**Insuring Agreements D** or **E**" in section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **E. INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT**, 2., are replaced with "**Insuring Agreements D**, **E**, or the **Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement**".

16.   Throughout the **CyberRisk Policy**:

a.    all references to "the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**" are replaced with "the **Third Party Liability Insuring Agreements**, **Insuring Agreements D** and **E**, and the **Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement**";

b.    all references to "the **Third Party Liability Insuring Agreements** or **Insuring Agreements D** or **E**" are replaced with "the **Third Party Liability Insuring Agreements**, **Insuring Agreements D** or **E**, or the **Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement**"; and

c.    all references to "with respect to **Insuring Agreements A**, **B**, **C**, **D**, and **E**" are replaced with "with respect to **Insuring Agreements A**, **B**, **C**, **D**, **E**, and the **Payment Card Contract Penalties and Software and Hardware Upgrade and Scanning Services Expenses Insuring Agreement**".

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DESIGNATED OFFICER ENDORSEMENT

This endorsement changes the following:

**CyberRisk Policy**

---

**It is agreed that:**

1.  The following replaces the last paragraph of section **II. DEFINITIONS**, **G**. **Claim**:

    A **Claim** is deemed to be made on the earliest date that a **Designated Officer** first receives written notice of such **Claim**.  However, if any **Insured Person** who is not a **Designated Officer** first receives written notice of a **Claim** during the **Policy Period**, but no **Designated Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

2.  The following definition is added to section **II. DEFINITIONS**:

    *Designated Officer* means a natural person holding one or more positions with the **Insured Organization** that are set forth in the Designated Officers schedule.

3.   The following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **E. INSURED'S DUTIES IN EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT**, 1. and 2.:

    1.   The **Insured's** duty to report a **Claim** commences on the earliest date a written notice thereof is received by a **Designated Officer**. If a **Designated Officer** becomes aware that a **Claim** has been made against any **Insured**, the **Insured**, as a condition precedent to any rights under this **Liability Policy**, must give to the Company written notice of the particulars of such **Claim**, including all facts related to any alleged **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable. The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

    2.   The Insured's duty to report a **First Party Insured Event** under **Insuring Agreements D** or **E** commences on the earliest date a **Designated Officer** reasonably believes that a **Wrongful Act** has occurred.  If a **Designated Officer** reasonably believes that a **Wrongful Act** has occurred, the Insured, as a condition precedent to any rights under **Insuring Agreements D** or **E**, must give to the Company written notice of the particulars of such **First Party Insured Event**, including all facts related to the **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable.  The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

**Designated Officers**:

President, SVP-HR, CFO, CISO

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number:    **106420159**

CYB-19042 Ed. 02-17
© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00199

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### TELECOMMUNICATIONS FRAUD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| Insuring Agreement | Limit of Insurance | Retention |
|---|---|---|
| **Telecommunications Fraud** | $100,000 for each **Single First Party Insured Event** | $5,000 for each **Single First Party Insured Event** |

2. The following is added to section **I. INSURING AGREEMENTS**, **FIRST PARTY INSURING AGREEMENTS**: **TELECOMMUNICATIONS FRAUD**

   The Company will pay the **Insured Organization** for **Telecommunications Fraud Loss** directly caused by **Telecommunications Fraud Discovered** during the **Policy Period**.

3. The following is added to section **II. DEFINITIONS**, **BB.**:

   **First Party Insured Event** also means **Telecommunications Fraud**.

4. The following is added to section **II. DEFINITIONS**, **CC.**:

   **First Party Insuring Agreements** also means the **Telecommunications Fraud Insuring Agreement**.

5. The following is added to section **II. DEFINITIONS**, **DD.**:

   **First Party Loss or Expenses** also means **Telecommunications Fraud Loss**.

6. The following are added to section **II. DEFINITIONS** :

   ***Telecommunications Fraud*** means the intentional, unauthorized, and fraudulent gaining of access to outgoing long distance telephone service through infiltration and manipulation of **Telecommunications Services** by a person or organization other than an **Executive Officer**.

   ***Telecommunications Fraud Loss*** means amounts incurred by the **Insured Organization** for charges directly caused by **Telecommunications Fraud**.

   ***Telecommunications Services*** mean telephone, fax, data, or computer transmission services provided by or to the **Insured Organization**.

7. Solely with respect to this Telecommunications Fraud Insuring Agreement Endorsement, all references to "**Insuring Agreements D or E**" in section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS, E. INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT**, 2., are replaced with "**Insuring Agreements D,  E, or the Telecommunications Fraud Insuring Agreement**".

8. Solely with respect to this Telecommunications Fraud Insuring Agreement Endorsement, throughout the **CyberRisk Policy**:

   a. all references to "the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**" are replaced with "the **Third Party Liability Insuring Agreements**, **Insuring Agreements D** and **E**, and the **Telecommunications Fraud Insuring Agreement**";

   b. all references to "the **Third Party Liability Insuring Agreements** or **Insuring Agreements D** or **E**" are replaced with "the **Third Party Liability Insuring Agreements**, **Insuring Agreements D** or **E**, or the **Telecommunications Fraud Insuring Agreement**";

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

CYB-19052 Ed. 08-17
© 2017 The Travelers Indemnity Company. All rights reserved.

Page 1 of 2

BlueRidge-00201

c.  all references to "with respect to **Insuring Agreements A**, **B**, **C**, **D**, and **E**" are replaced by "with respect to **Insuring Agreements A**, **B**, **C**, **D**, **E**, and the **Telecommunications Fraud Insuring Agreement**";

d.  all references to "**Insuring Agreements D**, **E**, **F**, **G**, **H**, **I**, or **J**" are replaced with "**Insuring Agreements D**, **E**, **F**, **G**, **H**, **I**, **J**, or the **Telecommunications Fraud Insuring Agreement**";

e.  all references to "**Insuring Agreements F**, **G**, **H**, or **I** are replaced with "**Insuring Agreements F**, **G**, **H**, **I**, or the **Telecommunications Fraud Insuring Agreement**";

f.  all references to "**Insuring Agreements F**, **G**, **H**, **I**, or **J**" are replaced with "**Insuring Agreements F**, **G**, **H**, **I**, **J**, or the **Telecommunications Fraud Insuring Agreement**"; and

g.  all references to "**Insuring Agreements F**, **G**, **H**, **I**, and **J**" are replaced with "**Insuring Agreements F**, **G**, **H**, **I**, **J**, and the **Telecommunications Fraud Insuring Agreement**".

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00202

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### REPUTATIONAL HARM INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| Insuring Agreement | Limit of Insurance | Retention |
|---|---|---|
| **Reputational Harm** | $100,000 for the sum of all **Reputational Harm Loss** | $5,000 for each **Single First Party Insured Event** |

2. The following is added to section **I. INSURING AGREEMENTS**, **FIRST PARTY INSURING AGREEMENTS**:

   **REPUTATIONAL HARM**

   The Company will pay the  **Insured Organization** for **Reputational Harm Loss**, directly caused by a **Network and Information Security Wrongful Act** for which **Notification** is paid by the Company pursuant to **Insuring Agreement E**.

3. The following are added to section **II. DEFINITIONS**:

   **Notification** means any communication by an **Approved Service Provider** to notify the persons whose **Identity Information** was accessed or acquired without their authorization, whether such notification is provided on a voluntary basis or to comply with any **Security Breach Notification Law**.

   **Period of Indemnity**  means the 30-day period beginning with the date and time that  **Notification**  was  provided.

   **Reputational Harm Loss** means, before income taxes, net profit the **Insured Organization** was prevented from earning during the **Period of Indemnity**, due to damage to the **Insured Organization's** reputation directly caused by a **Network and Information Security Wrongful Act**.

   **Reputational Harm Loss** does not include:

   1. contractual penalties of any nature;

   2. costs or expenses incurred to update, restore, replace, or otherwise improve a **Computer System** to a level of functionality beyond that which existed prior to the loss event;

   3. costs or expenses incurred to identify or remediate computer system errors or vulnerabilities;

   4. any other consequential loss or damage;

   5. legal cost or legal expense of any nature;

   6. loss arising out of liability to any person or entity that is not an **Insured**;

   7. bank interest or investment income;

   8. loss incurred as a result of unfavorable business conditions or loss of market; or

   9. internal salary, costs, or overhead expenses of the **Insured Organization**.

4. The following is added to section **II. DEFINITIONS, BB.**:

   With respect to the **Reputational Harm Insuring Agreement**, **First Party Insured Event** means a **Network and Information Security Wrongful Act**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

CYB-19053 Ed. 08-17
© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00203

5. The following is added to section **II. DEFINITIONS**, **CC.**:

   **First Party Insuring Agreements** also means the **Reputational Harm Insuring Agreement**.

6. The following is added to section **II. DEFINITIONS**, **DD.**:
   **First Party Loss or Expenses** also means **Reputational Harm Loss**.

7. The following is added to section **III. EXCLUSIONS**:

   The **Reputational Harm Insuring Agreement** will not apply to any **First Party Loss or Expenses** based upon or arising out of price discounts, prizes, awards, coupons, or any other valuable consideration given in excess of the contracted or expected amount.

8. The following is added to section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**:

   **REPUTATIONAL HARM LOSS APPRAISAL PROCESS**

   If, after submission of the proof of loss as required by section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **E. INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT**, 3.d., the Company and the **Insured** do not agree on the amount of **Reputational Harm Loss**, each party will select a competent and impartial appraiser to value the **Reputational Harm Loss**. If the two appraisers do not agree on the amount of **Reputational Harm Loss**, they shall select an umpire. Each appraiser shall submit the amount of the **Reputational Harm Loss** to the umpire, and agreement by the umpire and at least one of the appraisers as to the amount of **Reputational Harm Loss** shall be binding. Each party will pay its chosen appraiser and bear the expenses of the umpire equally.

9. Solely with respect to this Reputational Harm Insuring Agreement Endorsement, all references to "**Insuring Agreements D** or **E**" in section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **E. INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT**, 2., are replaced with "**Insuring Agreements D**, **E**, or the **Reputational Harm Insuring Agreement**".

10. Solely with respect to this Reputational Harm Insuring Agreement Endorsement, throughout the **CyberRisk Policy**:

    a. all references to "the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**" are replaced with "the **Third Party Liability Insuring Agreements**, **Insuring Agreements D** and **E**, and the **Reputational Harm Insuring Agreement**";

    b. all references to "the **Third Party Liability Insuring Agreements** or **Insuring Agreements D** or **E**" are replaced with "the **Third Party Liability Insuring Agreements**, **Insuring Agreements D** or **E**, or the **Reputational Harm Insuring Agreement**";

    c. all references to "with respect to   **Insuring Agreements A**, **B**, **C**, **D**, and **E**" are replaced with "with respect to **Insuring Agreements A**, **B**, **C**, **D**, **E**, and the **Reputational Harm Insuring Agreement**";

    d. all references to "**Insuring Agreements D**, **E**, **F**, **G**, **H**, **I**, or **J**" are replaced with "**Insuring Agreements D**, **E**, **F**, **G**, **H**, **I**, **J**, or the **Reputational Harm Insuring Agreement**";

    e. all references to "**Insuring Agreements F**, **G**, **H**, or **I**" are replaced with "**Insuring Agreements F**, **G**, **H**, **I**, or the **Reputational Harm Insuring Agreement**";

    f. all references to "**Insuring Agreements F**, **G**, **H**, **I**, or **J**" are replaced with "**Insuring Agreements F**, **G**, **H**, **I**, **J**, or the **Reputational Harm Insuring Agreement**"; and

    g. all references to "**Insuring Agreements F**, **G**, **H**, **I**, and **J**" are replaced with "**Insuring Agreements F**, **G**, **H**, **I**, **J**, and the **Reputational Harm Insuring Agreement**".

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### BUSINESS INTERRUPTION – SYSTEM FAILURE ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

1. The following is added to section **I. FIRST PARTY INSURING AGREEMENTS, J.**:

   The Company will pay the **Insured Organization** for **System Failure Loss** incurred by the **Insured Organization** that is directly caused by a **System Failure**, taking place during the **Policy Period** and **Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss.

2. The following are added to section **II. DEFINITIONS**:

   **System Failure** means any unintentional or unplanned outage of a **Computer System**; provided **System Failure** does not include: (i) an unintentional or unplanned outage resulting from a **Computer System Disruption**; or (ii) an unintentional or unplanned outage of a third party computer system or network.

   **System Failure Income Loss**  means:

   1. before income taxes, and only with respect to the **Insured Organization's** business operations that are dependent on a **Computer System**, net profit the  **Insured Organization**  would have earned, or net loss the **Insured Organization** would not have incurred or would have avoided, if there had been no **System Failure**; and

   2. continuing normal operating expenses incurred by the **Insured Organization**, including payroll, but only to the extent that: (i) such operating expenses must necessarily continue during the **System Failure Period of Restoration**; and (ii) such expenses would have been incurred by the **Insured Organization** had such **System Failure** not occurred.

   **System Failure Loss** means the sum of **System Failure Income Loss** and **Extra Expense** directly resulting from **System Failure**.

   **System Failure Loss** will be calculated based on the actual **System Failure Loss** the **Insured Organization** sustains per hour during the **System Failure Period of Restoration**.

   **System Failure Loss** does not include:

   1. contractual penalties of any nature;

   2. costs or expenses incurred to update, replace, or otherwise improve a **Computer System** to a level of functionality beyond that which existed prior to the **System Failure**;

   3. costs or expenses incurred to identify or remediate **Computer System** errors or vulnerabilities;

   4. any other consequential loss or damage;

   5. legal cost or legal expense of any nature;

   6. loss arising out of liability to any person or entity that is not an **Insured**; or

   7. bank interest or investment income.

   **System Failure Period of Restoration** means the period of time that:

   1. begins with the date and time that a **System Failure** is **Discovered** and after application of the **System Failure Waiting Period** set forth in ITEM 5 of the Declarations; and

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

CYB-19050 Ed. 08-17                                                                                                    Page 1 of 2
© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00205

2. ends with the earlier of:

    a. the date and time a **Computer System** is restored to substantially the level of operation that existed prior to the **System Failure**; or

    b. 30 days from the time that impairment of the **Insured Organization's** business activities as a result of such **System Failure** was **Discovered**.

*System Failure Waiting Period* means the number of hours following a **System Failure** before the Company is first obligated to pay **System Failure Loss** covered under **Insuring Agreement J**. The **System Failure Waiting Period** incepts immediately following the **System Failure**.

3. For purposes of this Business Interruption - System Failure Endorsement only, the following replaces section **II. DEFINITIONS, Y.**:

*Extra Expense* means necessary expenses incurred by the **Insured Organization**, with the Company's prior written consent, directly as a result of a **System Failure**, but only to the extent such expenses are in excess of the **Insured Organization's** normal operating expenses, reduce **System Failure Loss**, and would not have been incurred had there been no **System Failure**.

4. The following is added to section **II. DEFINITIONS, BB.**:

**First Party Insured Event** also means a **System Failure**.

5. The following is added to section **II. DEFINITIONS, DD.**:

**First Party Loss or Expenses** also means **System Failure Loss**.

6. For the purposes of this Business Interruption – System Failure Endorsement only, the following is added to section **III. EXCLUSIONS**:

**Insuring Agreement J** will not apply to any **System Failure** based upon or arising out of the failure of infrastructure not under the control of the **Insured**, including: (i) satellite failure; (ii) electrical or mechanical failures or interruption, including electrical disturbance, spike, brownout, or blackout; (iii) gas, water, or other utilities; or (iv) telephone, cable, telecommunications, or the Internet.

**Insuring Agreement J** will not apply to any **System Failure** based upon or arising out of fire, smoke, explosion, lightning, windstorm, flood, surface water, waves, overflow of any body of water, earthquake, earth movement, earth sinking, mudslide, landslide, volcanic eruption or explosion, hail, collapse, wear and tear, rust, corrosion, erosion, deterioration, extremes of temperature or humidity, or any other physical event or peril, however caused.

**Insuring Agreement J** will not apply to any **System Failure** based upon or arising out of strikes or labor disputes.

7. For purposes of this Business Interruption – System Failure Endorsement only, the following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS, D. LIMITS, 3.**:

The Company's maximum limit of insurance for **First Party Loss or Expenses** for the sum of all **System Failure Loss** will not exceed Limit of Insurance for **Insuring Agreement J**. Any payment of **First Party Loss or Expenses** under this Business Interruption – System Failure Endorsement will reduce, and may exhaust, the Limit of Insurance for **Insuring Agreement J**.

8. For purposes of this Business Interruption – System Failure Endorsement only, the following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS, E. INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT, 4.**:

After the **Insured Organization Discovers** a **First Party Insured Event** under **Insuring Agreement J**, the **Insured Organization**, as a condition precedent to any rights under **Insuring Agreement J**, must provide the Company written notice of the particulars of such **First Party Insured Event**, including all facts related to any alleged impairment of the **Insured Organization's** business operations caused by a **System Failure**, the identity of the business operations affected by such **System Failure**, and the dates of the alleged events, as soon as practicable. The **Insured** agrees to provide the Company such information, assistance, and cooperation as it may reasonably require.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00206

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## BUSINESS INTERRUPTION WAGE AND OVERHEAD COVERAGE ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

The following replaces section **II. DEFINITIONS**, **C.**:

*Business Income Loss* means:

1. before income taxes, and only with respect to the **Insured Organization's** business operations that are dependent on a **Computer System**, net profit the **Insured Organization** would have earned, or net loss the **Insured Organization** would not have incurred or would have avoided, if there had been no **Computer System Disruption**; and

2. continuing normal operating expenses incurred by the **Insured Organization**, including payroll, but only to the extent that: (i) such operating expenses must necessarily continue during the **Business Interruption Period of Restoration**; and (ii) such expenses would have been incurred by the **Insured Organization** had such **Computer System Disruption** not occurred.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## EXPAND DEFINITION OF COMMUNICATIONS AND MEDIA WRONGFUL ACT ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

1.  The following is added to section **II. DEFINITIONS, H.**:

    5.  misappropriation of ideas under implied contract in the **Insured Organization's Covered Material**;

    6.  improper deep-linking or framing in the **Insured Organization's Covered Material**; or

    7.  violation of the rights of privacy of an individual in the **Insured Organization's Covered Material**;

2.  The following is added to section **III. EXCLUSIONS, B. EXCLUSIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS AND INSURING AGREEMENTS D AND E**, 14.:

    Provided that this exclusion will not apply to any **Claim** under **Insuring Agreement B** for misappropriation of ideas under implied contract in the **Insured Organization's Covered Material**.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## SUSPEND NOTICE REQUIREMENT FOR INFORMATION SUBJECT TO LAW ENFORCEMENT OR COURT ORDER ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

The following is added to section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **E. INSURED'S DUTIES IN THE EVENT OF A CLAIM OR A FIRST PARTY INSURED EVENT**, 1.:

Provided, if any facts or information regarding a **Claim** are subject to a court order or law enforcement instruction, the **Insured** must provide the Company written notice of the particulars of such **Claim** as soon as practicable after such order or instruction is no longer in effect.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00209

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### CYBER TERRORISM CARVEBACK TO WAR EXCLUSION ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

**It is agreed that:**

1. The following is added to section **II. DEFINITIONS**:

   *Cyber Terrorism* means an actual or threatened attack against any **Computer System** by an individual or group of individuals with the intention to cause harm, or to further social, ideological, religious, political, or similar objectives.

   **Cyber Terrorism** does not include any such activities which are part of, or in support of, any military action, war, or warlike operation.

2. The following replaces section **III. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, 2.:

   This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of: (i) war, including undeclared or civil war; (ii) warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereignty, or other authority using military personnel or other agents; (iii) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; or (iv) confiscation, nationalization, requisition, or destruction of, or damage to, property by or under the order of any government, public, or local authority; provided that this exclusion will not apply to **Cyber Terrorism** or any "act of terrorism" as defined in the Terrorism Risk Insurance Act, as amended.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## VIRTUAL CURRENCY COVERAGE ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

**It is agreed that:**

1. The following is added to section **II. DEFINITIONS, NN.**:

   **Money** also means **Virtual Currency**.

2. The following is added to section **II. DEFINITIONS**:

   ***Virtual Currency*** means a digital or electronic medium of exchange that is used and accepted as a means of payment, but that is not issued by, or guaranteed by, a central bank, government, or public authority.

3. The following is added to section **VI. CONDITIONS APPLICABLE TO INSURING AGREEMENTS F**, **G**, **H**, **I**, **AND J**, **D.**:

   Subject to the **CyberRisk Policy Aggregate Limit**, and the applicable Limit of Insurance for each **Single First Party Insured Event** set forth in ITEM 5 of the Declarations, the Company will pay the **Insured Organization** for loss of **Virtual Currency** in the United States dollar equivalent thereof determined at the rate of exchange at the time of the **Discovery** of the loss.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00211

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REMOVE SPECIFIC TARGET REQUIREMENT FOR COMPUTER SYSTEM DISRUPTION ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

**It is agreed that:**

The following replaces section **II. DEFINITIONS, L.**:

*Computer System Disruption* means the actual and measurable interruption, suspension, or failure of a **Computer System** resulting directly from:

1. a **Computer Violation**; or

2. an intentional attack of a **Computer System** with protocols or instructions transmitted over the Internet or another computer communication network, which triggers the use of a **Computer System's** resources to the extent that the capacity of those resources to accommodate authorized users of such **Computer System** is depleted or diminished.

**Computer System Disruption** does not mean a measurable interruption, suspension, or failure of a third party computer system or network.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

BlueRidge-00212

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND DEFINITION OF CLAIM TO INCLUDE CIVIL INVESTIGATIVE DEMANDS AND REQUESTS FOR INFORMATION ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

**It is agreed that:**

The following replaces section **II. DEFINITIONS**, **G. Claim**, 4.:

a formal administrative or regulatory proceeding commenced by filing of charges, formal investigative order, service of summons, or a similar document; a civil investigative demand; or a request for information;

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### PAYMENT ON BEHALF OF THE INSURED ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

**It is agreed that:**

1. With respect to section **I. INSURING AGREEMENTS**, **FIRST PARTY INSURING AGREEMENTS**, **D**, **E**, and **I**, the phrase "The Company will pay the **Insured Organization** for" is replaced with "The Company will reimburse, or pay on behalf of, the **Insured Organization**,".

2. The phrase "and paid" is deleted from the first sentence of section **II. DEFINITIONS**, **P.** and **AAA.**.

3. The following replaces the first paragraph of section **II. DEFINITIONS**, **V.**:

   *E-Commerce Extortion Expenses* means any **Money** or **Securities** paid or surrendered, with the Company's prior written consent and pursuant to a recommendation by an **Approved Service Provider**, at the direction and demand of any person committing or allegedly committing **E-Commerce Extortion**, or loss incurred solely in, and directly from, the process of making or attempting to make such payment. The value of **E-Commerce Extortion Expenses** will be determined as of the date such **E-Commerce Extortion Expenses** are paid or lost.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

CYB-19055 Ed. 08-17                                                                                      Page 1 of 1
© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FINAL NON-APPEALABLE ADJUDICATION IN THE UNDERLYING ACTION EXCLUSION ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

The following replaces section **III. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, 8.:

This **CyberRisk Policy** will not apply to any **Claim** or **Single First Party Insured Event** based upon or arising out of any **Insured**:

a.  committing any intentionally dishonest or fraudulent act or omission;

b.  committing any willful violation of any statute, rule, law; or

c.  gaining any profit, remuneration, or advantage to which such **Insured** was not legally entitled,

provided that:

(1)  with respect to the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**:

(a)  this exclusion will not apply to **Defense Expenses** and will not apply unless a final non-appealable adjudication in the underlying action establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule, or law, or gained such profit, remuneration, or advantage to which such **Insured** was not legally entitled; and

(b)  no fact pertaining to, knowledge possessed by, or conduct of any **Insured Person** will be imputed to any other **Insured Person**, and only facts pertaining to, knowledge possessed by, or conduct of an **Executive Officer** will be imputed to the **Insured Organization**; and

(2)  with respect to **Insuring Agreements F** and **J**, this exclusion will not apply to any intentionally dishonest or fraudulent act or omission, or willful violation of any statute, rule, or law, by an **Employee**, or any **Employee** gaining any profit, remuneration, or advantage to which such **Employee** was not legally entitled.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### CONTINGENT BUSINESS INTERRUPTION – IT PROVIDER ENDORSEMENT

This endorsement changes the following:

**CyberRisk**

---

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

   **IT Provider Contingent Business Interruption Limit**

   $100,000 for each **Single First Party Insured Event**

   **IT Provider Contingent Business Interruption Waiting Period**

   8

2. The following is added to section **I. FIRST PARTY INSURING AGREEMENTS**, **J.**:

   The Company will pay the **Insured Organization** for **IT Contingent Business Interruption Loss** incurred by the **Insured Organization** due to the impairment of the **Insured Organization's** business operations directly caused by a **Disruption** to an **IT Provider's System** taking place during the **Policy Period** and **Discovered** during the **Policy Period** or the Automatic Extended Period to Discover Loss.

3. The following are added to section **II. DEFINITIONS**:

   **Disruption** means the actual and measurable interruption, suspension, or failure of a **System** resulting directly from:

   1. the introduction of a **Computer Virus** into a **System**;

   2. an attack of a **System** with protocols or instructions transmitted over the Internet or another computer communication network, which triggers the use of a **System's** resources to the extent that the capacity of those resources to accommodate authorized users of such **System** is depleted or diminished; or

   3. any unintentional or unplanned outage of a **System**.

   **IT Contingent Business Income Loss** means:

   1. before taxes, and only with respect to the **Insured Organization's** business operations that are dependent on an **IT Provider**, net profit the **Insured Organization** would have earned, or net loss the **Insured Organization** would not have incurred or would have avoided, if there had been no **Disruption** to an **IT Provider's System**; and

   2. continuing normal operating expenses incurred by the **Insured Organization**, including payroll, but only to the extent that: (i) such operating expenses must necessarily continue during the **IT Contingent Business Interruption Period of Restoration**; and (ii) such expenses would have been incurred by the **Insured Organization** had such **Disruption** to an **IT Provider's System** not occurred.

   **IT Contingent Business Interruption Loss** means the sum of **IT Contingent Business Income Loss** and **Extra Expense** directly resulting from **Disruption** to an **IT Provider's System**.

   **IT Contingent Business Interruption Loss** will be calculated based on the actual **IT Contingent Business Interruption Loss** the **Insured Organization** sustains per hour during the **IT Contingent Business Interruption Period of Restoration**.

   **IT Contingent Business Interruption Loss** does not include:

   1. contractual penalties of any nature;

   2. costs or expenses incurred to identify or remediate **System** errors or vulnerabilities;

   3. any other consequential loss or damage;

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

© 2017 The Travelers Indemnity Company. All rights reserved.

                                                                                                    BlueRidge-00216

4.  legal cost or legal expense of any nature;

5.  loss arising out of liability to any person or entity that is not an **Insured**; or

6.  bank interest or investment income.

*IT Contingent Business Interruption Period of Restoration* means the period of time that:

1.  begins with the date and time that the impairment of the **Insured Organization's** business activities is **Discovered** and after application of the **IT Contingent Business Interruption Waiting Period** set forth in ITEM 5 of the Declarations; and

2.  ends with the earlier of:

    a.  the date and time **Insured Organization's** business activities are restored to substantially the level of operation that had existed prior to the **Disruption** to the **IT Provider's System**; or

    b.  180 days from the time that such impairment of the **Insured Organization's** business activities was **Discovered**.

*IT Contingent Business Interruption Waiting Period* means the number of hours following the impairment of the **Insured Organization's** business activities before the Company is first obligated to pay **IT Contingent Business Interruption Loss** covered under **Insuring Agreement J**. The **IT Contingent Business Interruption Waiting Period** incepts immediately following the **Disruption** to the **IT Provider's System**.

*IT Provider* means any provider, other than an **Outsource Provider**, that the **Insured** does not own, operate, or control, that performs IT services for the **Insured** pursuant to a written contract.

*Outsource Provider* means any provider, other than an **IT Provider**, that the **Insured** does not own, operate, or control, that performs services, other than IT services, for the **Insured** pursuant to a written contract.

*System* means:

1.  any computer; and

2.  any input, output, processing, storage, or communication device, or any related network, operating system, or application software, that is connected to, or used in connection with, such computer.

4.  For purposes of this Contingent Business Interruption – IT Provider Endorsement only, the following is added to section **II. DEFINITIONS, Y.**:

**Extra Expense** also means necessary expenses incurred by the **Insured Organization**, with the Company's prior written consent, directly as a result of a **Disruption** to an **IT Provider's System**, but only to the extent such expenses are in excess of the **Insured Organization's** normal operating expenses, reduce **IT Contingent Business Income Loss**, and would not have been incurred had there been no **Disruption** to an **IT Provider's System**.

5.  The following is added to section **II. DEFINITIONS, BB.**:

**First Party Insured Event** also means a **Disruption**.

6.  The following is added to section **II. DEFINITIONS, DD.**:

**First Party Loss or Expenses** also means **IT Contingent Business Interruption Loss**.

7.  The following is added to section **III. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**:

**IT Provider Business Interruption Loss** will not apply to any **Single First Party Insured Event** based upon or arising out of the failure of infrastructure the **Insured** does not own or control, including the electronic power grid or Internet services.

8.  For purposes of this Contingent Business Interruption – IT Provider Endorsement only, the following replaces section **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **E.** 4.:

After the **Insured Organization Discovers** a **First Party Insured Event** under **Insuring Agreement J**, the **Insured Organization**, as a condition precedent to any rights under **Insuring Agreement J**, must provide the Company written notice of the particulars of such **First Party Insured Event**, including all facts related to any alleged impairment of the **Insured Organization's** business operations caused by a **Disruption** to an **IT Provider's System**, the identity of the business operations affected by such **Disruption**, and the dates of the alleged events, as soon as practicable. The **Insured** agrees to provide the Company such information, assistance, and cooperation as it may reasonably require.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00218

---

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

---

## VIRGINIA CHANGES ENDORSEMENT

This endorsement modifies the following:

**CyberRisk**

---

**It is agreed that:**

1.　The following replaces section *II. DEFINITIONS*, **MM.** :

　　*Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements, judgments, compensatory damages, punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages, prejudgment interest, and legal fees and expenses awarded pursuant to a court order or judgment. **Loss** does not include:

　　　　1.　civil or criminal fines, sanctions, liquidated damages, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law;

　　　　2.　amounts that constitute the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief; or

　　　　3.　any amount allocated to non-covered loss pursuant to section *V. CONDITIONS APPLICABLE TO ALL THIRD PARTY LIABILITY INSURING AGREEMENTS*, **B. ALLOCATION**.

2.　The following replaces section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **D. LIMITS**, 2.:

　　2. Payment of **Loss**, including **Defense Expenses**, or **First Party Loss or Expenses**, will reduce, and may exhaust, the **CyberRisk Policy Aggregate Limit**. In the event the amount of **Loss**, or **First Party Loss or Expenses**, exceeds the portion of the **CyberRisk Policy Aggregate Limit** remaining after prior payments of **Loss**　or　**First Party Loss or Expenses**, the Company's liability will not exceed the remaining amount of the **CyberRisk Policy Aggregate Limit**. In such event the Company will not be obligated to make any payment of **Loss**, including　**Defense Expenses**, or **First Party Loss or Expenses**, for any pending **Claims** or **First Party Insured Events**; provided, however, that this provision will not limit the right of the **Named Insured** to elect an Extended Reporting Period as set forth herein.

3.　The following replaces the fourth paragraph of section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **I. CANCELLATION OR TERMINATION**, 1. Cancellation:

　　The Company will not be required to renew this **CyberRisk Policy** upon its expiration.  If the Company elects not to renew, it will provide the **Named Insured** written notice to that effect at least 45 days before the Expiration Date set forth in ITEM 2 of the Declarations.

4.　Section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **J. ACTION AGAINST THE COMPANY**, 3. is deleted.

5.　The following is added to *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **M. REPRESENTATIONS**

　　Policies may only be voided by court order.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

6.     The following replaces section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **T. AUTOMATIC EXTENDED PERIOD TO DISCOVER LOSS AND EXTENDED REPORTING PERIOD**, 2. Extended Reporting Period:

2.     Extended Reporting Period

Only with respect to the **Third Party Liability Insuring Agreements** and **Insuring Agreements D** and **E**:

It is agreed that at any time prior to or within 30 days after:

a. the effective date of termination or cancellation of any **Third Party Liability Insuring Agreement** or **Insuring Agreements D** or **E** for any reason other than nonpayment of premium,

b. the advancement of any prior acts date; or

c. the renewal of this **CyberRisk Policy** on other than a claims made basis;

the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for a period of 12, 24 or 36 months, which will be set forth in ITEM 8 of the Declarations, following the effective date of any such termination, cancellation, advancement of any prior acts date, or renewal on other than a claims made basis, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of such termination, cancellation, advancement of any prior acts date, or renewal on other than a claims made basis are **Insureds**, or regarding **Wrongful Acts** under **Insuring Agreements D** or **E**, but only for **Wrongful Acts** occurring wholly prior to the effective date of such termination, cancellation, advancement of any prior acts date, or renewal on other than a claims made basis and which otherwise would be covered by such **Third Party Liability Insuring Agreements** or **Insuring Agreements D** or **E**.

It is further agreed that if the Company reduces coverage during the **Policy Period** or when this **CyberRisk Policy** is renewed, at any time prior to or within 30 days after the effective date of such reduction in coverage, the **Named Insured** will have the right, upon written notice and payment of an additional premium to the Company using the rates in effect at the time this **CyberRisk Policy** was issued, to an Extended Reporting Period for a period of 12, 24 or 36 months, which will be set forth in ITEM 8 of the Declarations, following the effective date of such reduction in coverage, but only for the portion of coverage reduced and only regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of such reduction in coverage are **Insureds**, or regarding **Wrongful Acts** under **Insuring Agreements D** or **E**, but only for **Wrongful Acts** occurring wholly prior to the effective date of such reduction in coverage.

The Extended Reporting Period is subject to the following provisions:

a.     Such Extended Reporting Period will be deemed to be part of the **Policy Period** and will not provide a new, additional or renewed limit;

b.     The Company's maximum limit for all **Claims** made, or with respect to **Insuring Agreements D** or **E**, all **Wrongful Acts** occurring wholly prior to the effective date of such termination, cancellation, advancement of any prior acts date, renewal on other than a claims made basis or reduction in coverage, and reported during such Extended Reporting Period will be only the remaining portion of the applicable limit set forth in the Declarations as of the effective date of the termination or cancellation; and

c.     Such Extended Reporting Period will be excess over any insurance purchased or obtained by the **Named Insured** or its successors in business, which replaces in whole or in part the insurance afforded by this **CyberRisk Policy**.

© 2011 The Travelers Indemnity Company All Rights Reserved

d.    Notwithstanding the provisions of this section ***IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS***, **T. AUTOMATIC EXTENDED PERIOD TO DISCOVER LOSS AND EXTENDED REPORTING PERIOD**, 2. Extended Reporting Period, the **Named Insureds** will also be given the option to purchase any available Extended Reporting Period described above with a reinstated limit.

If the **Named Insureds** elects such reinstated limit option, the Company's maximum limit for all **Claims** made, or with respect to **Insuring Agreements D** or **E**, all **Wrongful Acts** occurring wholly prior to the effective date of such termination, cancellation, advancement of any prior acts date, renewal on other than a claims made basis or reduction in coverage, and reported during such Extended Reporting Period will be equal to the limit set forth in the Declarations as of the effective date of such termination, cancellation, advancement of any prior acts date, renewal on other than a claims made basis or reduction in coverage.

The premium due for the Extended Reporting Period, other than for an Extended Reporting Period for the portion of coverage reduced, will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Third Party Liability Insuring Agreement** and **Insuring Agreements D** and **E**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Period**. The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 60 days of the effective date of the termination or cancellation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

© 2011 The Travelers Indemnity Company All Rights Reserved

BlueRidge-00221

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND TERMINATION ENDORSEMENT

This endorsement modifies the following:

**CyberRisk Policy**

**It is agreed that:**

The following replaces section *IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS*, **I. CANCELLATION OR TERMINATION,** 2.Termination

**Insuring Agreements F**, **G**, **H**, **I** and **J** of this **CyberRisk Policy** will terminate effective immediately:

    a.    upon a **Change of Control**;
    b.    upon the voluntary liquidation or dissolution of the **Named Insured**; or
    c.    upon **Financial Insolvency**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106420159**



*IDENTITY FRAUD EXPENSE REIMBURSEMENT*

*IDENTITY FRAUD EXPENSE REIMBURSEMENT TERMS AND CONDITIONS*
*PLEASE READ ALL TERMS CAREFULLY.*

## CONSIDERATION CLAUSE

**IN CONSIDERATION** of the payment of the premium, subject to the Declarations, and pursuant to all the terms, conditions, exclusions, and limitations of this **Identity Fraud Expense Reimbursement Policy**, the Company and the **Insurance Representative** agree as follows:

## I.     INSURING  AGREEMENT

The Company will reimburse any **Insured Person** for **Expenses** incurred by the **Insured Person** as a direct result of any **Identity Fraud Discovered** during the **Policy Period**.

Only **Insured Persons** will be entitled to coverage under this Insuring Agreement.

## II.    DEFINITIONS

Wherever appearing in this **Identity Fraud Expense Reimbursement Policy**, the following words and phrases appearing in bold type will have the meanings set forth in this section II. DEFINITIONS:

**A.**     ***Discovers***, ***Discovered,*** or ***Discovery*** means the moment when the **Insured Person** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Identity Fraud Expense Reimbursement Policy** has been or will be incurred, even though the exact details of loss may not then be known.

**B.**     ***Expenses*** means:
   1.     costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required that such affidavits be notarized;
   2.     costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;
   3.     costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to report or discuss any actual **Identity Fraud**;
   4.     lost wages, up to a maximum payment of $1,000 per week for a maximum period of five weeks, as a result of absence from employment:
      a.     to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;
      b.     to complete fraud affidavits or similar documents; or
      c.     due to wrongful incarceration arising solely from someone having committed a crime in the **Insured Person's** name; provided, that lost wages will not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;
   5.     loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;
   6.     reasonable attorney fees incurred, with the Company's prior written consent, for:
      a.     defense of lawsuits brought against the **Insured Person** by financial institutions, merchants, other credit grantors or their collection agencies;
      b.     the removal of any criminal or civil judgments wrongly entered against the **Insured Person**; or

c.      challenging the accuracy or completeness of any information in a consumer credit report; and

7.      costs for daycare and eldercare incurred solely as a direct result of any **Identity Fraud Discovered** during the **Policy Period**.

**Expenses** does not include any expense or loss not listed in paragraphs 1. through 7. of this Definition B.

**C.**      *Identity Fraud* means the act of knowingly transferring or using, without lawful authority, a means of identification of any **Insured Person** with the intent to commit, aid, or abet any unlawful activity that constitutes a violation of federal law or a felony under any applicable jurisdiction.

**D.**      *Identity Fraud Expense Reimbursement Policy* means, collectively, the Declarations, the Application, the Identity Fraud Expense Reimbursement Terms and Conditions, and any endorsements attached thereto.

**E.**      *Insurance Representative* means the entity named in ITEM 1 of the Declarations.

**F.**      *Insured Person* means any natural person:

1.      whose labor and service is engaged by and directed by the **Insurance Representative** or any **Subsidiary** and who is on the payroll of the **Insurance Representative** or any **Subsidiary**;

2.      who is a duly elected or appointed member of the board of directors, officer, member of the board of trustees, or member of the board of managers, or a functional equivalent thereof, of the **Insurance Representative** or any **Subsidiary**;

3.      who is specifically scheduled as an **Insured Person** by endorsement to this **Identity Fraud Expense Reimbursement Policy**;

4.      who is the lawful spouse, or person qualifying as a domestic partner under the provisions of any applicable federal, state or local law, of any person that meets the criteria set forth in paragraphs 1., 2., or 3. of this Definition F;

5.      who is a child of any person that meets the criteria set forth in paragraphs 1., 2., 3., or 4. of this Definition F. and is:

     a.      under the age of 18 years of age; and

     b.      a resident of the same household of such **Insured Person**; or

6.      who is a parent of any person that meets the criteria set forth in paragraphs 1., 2., 3., or 4. of this Definition F. and is a resident of the same household of such **Insured Person**.

**G.**      *Policy Period* means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations.   In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Identity Fraud Expense Reimbursement Policy**.

**H.**      *Subsidiary* means:

1.      any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before to the Inception Date set forth in ITEM 2 of the Declarations, the **Insurance Representative** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent; or

2.      subject to the provisions set forth in section IV. CONDITIONS H. ACQUISITIONS, any organization that the **Insurance Representative** acquires or forms during the **Policy Period** in which the **Insurance Representative** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent.

## III. EXCLUSIONS

**A.**  This Identity Fraud Expense Reimbursement Policy will not apply to loss other than Expenses.

**B.**  This Identity Fraud Expense Reimbursement Policy will not apply to, and the Company will have no obligation to reimburse Expenses for:

1.  loss due to any fraudulent, dishonest or criminal act by the **Insured Person** who is seeking reimbursement of **Expenses** under this **Identity Fraud Expense Reimbursement Policy** or any person acting in collusion with such **Insured Person**;

2.  an **Identity Fraud Discovered** during such time that an individual was not an **Insured Person**;

3.  loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing.

## IV. CONDITIONS

**A.  TERRITORY**

This **Identity Fraud Expense Reimbursement Policy** applies to Identity Fraud occurring anywhere in the world.

**B.  PERIOD TO REPORT DISCOVERED LOSS**

This **Identity Fraud Expense Reimbursement Policy** applies only to **Identity Fraud** that is **Discovered** during the **Policy Period** and reported to the Company during the **Policy Period** or within 30 days thereafter.

**C.  INSURED PERSON'S DUTIES IN THE EVENT OF LOSS**

Upon knowledge or **Discovery** of a loss or an occurrence that may give rise to a claim under the terms of this **Identity Fraud Expense Reimbursement Policy** the **Insured Person** will:

1.  give the Company notice thereof as soon as practicable, but in no event later than 30 days after the end of the **Policy Period**;

2.  keep books, receipts, bills and other records in such manner that the Company can accurately determine the amount of any loss;

3.  file a detailed proof of loss, duly sworn to, with the Company within four months after the **Discovery** of such loss;

4.  notify law enforcement authorities;

5.  at the request of the Company, submit to examination under oath and give the Company a signed statement of the answers;

6.  at the request of the Company, produce for the Company's examination all pertinent books, receipts, bills, and other records, at such reasonable times and places as the Company will designate; and

7.  cooperate with the Company in all matters pertaining to loss or claims with respect thereto.

Compliance with all terms and conditions of this **Identity Fraud Expense Reimbursement Policy** is a condition precedent to recovery under this **Identity Fraud Expense Reimbursement Policy**.

**D.  RETENTION**

The Company will be liable only for the amount by which any loss exceeds the applicable Retention amount set forth in ITEM 5 of the Declarations.  This Retention amount applies to each and every loss and will have no aggregate limitation.

**E.      LIMIT OF INSURANCE**

The maximum limit of insurance per **Insured Person** for each **Identity Fraud** covered under this **Identity Fraud Expense Reimbursement Policy** will not exceed the applicable Limit of Insurance stated in ITEM 5 of the Declarations.  All acts incidental to an **Identity Fraud**, any series of related **Identity Frauds**, and all **Identity Frauds** arising from the same method of operation or a common scheme or plan, whether committed by one or more persons, will be deemed to arise out of one act and will be treated as one **Identity Fraud**.  If an act causes a covered loss to more than one **Insured Person**, the applicable Limit of Insurance under this **Identity Fraud Expense Reimbursement Policy** and the applicable Retention amount will apply to each **Insured Person** separately.

**F.      ACTION AGAINST THE COMPANY**

No action will lie against the Company, unless:

1.      there will have been full compliance with all the terms of this **Identity Fraud Expense Reimbursement Policy**;

2.      it is brought 90 days after the **Insured Person** has filed proof of loss with us; and

3.      it is brought within two years from the date when the **Insured Person**  first  **Discovers** the loss.

If any limitation in this Condition F. is deemed to be inconsistent with applicable state law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**G.      RECOVERIES**

All recoveries for payments made under this **Identity Fraud Expense Reimbursement Policy** will be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

1.      first, to the **Insured Person** to reimburse such **Insured Person** for **Expenses** he or she has paid which would have been paid under this **Identity Fraud Expense Reimbursement Policy** but for the fact that it is in excess of the applicable Limit of Insurance;

2.      second, to the Company in satisfaction of amounts paid or to be paid to the **Insured Person** in settlement of any covered claim; and

3.      third, to the **Insured Person** in satisfaction of any applicable Retention;

provided, recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit.

**H.      ACQUISITIONS**

If, during the **Policy Period**, the **Insurance Representative** acquires or forms a **Subsidiary**, this **Identity Fraud Expense Reimbursement Policy** will provide coverage for the **Insured Persons** of such **Subsidiary**, subject to all other terms and conditions of this **Identity Fraud Expense Reimbursement Policy**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such acquisition or formation. Coverage for the **Insured Persons** of such acquired or formed **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Insurance Representative** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired or formed **Subsidiary** do not exceed 30% of the total assets of the **Insurance Representative** as reflected in the **Insurance Representative's** most recent fiscal year-end financial statement; or (2) the acquisition or formation occurs less than 90 days prior to the end of the **Policy Period.**

**I.**    **SUBROGATION**

In the event of payment under this **Identity Fraud Expense Reimbursement Policy**, the Company will be subrogated to all of the **Insured Person's** rights of recovery against any person or organization to the extent of such payment and the **Insured Person** will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured Person** will do nothing to prejudice such rights.

**J.**    **CANCELLATION**

The Company may cancel this **Identity Fraud Expense Reimbursement Policy** for failure to pay a premium when due, in which case 20 days written notice will be given to the **Insurance Representative**, unless, payment in full is received within 20 days of the **Insurance Representative's** receipt of such notice of cancellation. The Company will have the right to the premium amount for the portion of the **Policy Period** during which this **Identity Fraud Expense Reimbursement Policy** was in effect.

The **Insurance Representative** may cancel this **Identity Fraud Expense Reimbursement Policy** by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Insurance Representative** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this **Identity Fraud Expense Reimbursement Policy** upon its expiration.  If the Company elects not to renew, it will provide to the **Insurance Representative** written notice to that effect at least 30 days before the Expiration Date set forth in ITEM 2 of the Declarations.

**K.**    **OTHER INSURANCE**

This **Identity Fraud Expense Reimbursement Policy** will apply only as excess insurance over, and will not contribute with any other valid and collectible insurance available to the **Insured Person**.  As excess insurance, this **Identity Fraud Expense Reimbursement Policy** will not apply or contribute to the payment of any loss or **Expenses** until the amount of such other insurance or indemnity has been exhausted by payment of loss or **Expenses** covered thereunder.  If the limit of the other insurance or indemnity is insufficient to cover the entire amount of loss or **Expenses**, this **Identity Fraud Expense Reimbursement Policy** will apply to that part of **Expenses** not recoverable or recovered under the other insurance or indemnity. This **Identity Fraud Expense Reimbursement Policy** will not be subject to the terms of any other insurance.

**L.**    **ASSIGNMENT**

This **Identity Fraud Expense Reimbursement Policy** will not be assigned or transferred, and any such attempted assignment or transfer will be void and without effect unless the Company has provided its prior written consent to such assignment or transfer.

**M.**    **INTERESTS COVERED**

This **Identity Fraud Expense Reimbursement Policy** will be for the sole use and benefit of the **Insured Persons** and the **Insurance Representative**. It provides no rights or benefits to any other person, entity, or organization.

**N.**    **CONCEALMENT OR MISREPRESENTATION**

This **Identity Fraud Expense Reimbursement Policy** is void as to any **Insured Person** if, at any time, such **Insured Person** intentionally conceals or misrepresents a material fact concerning either this insurance or a claim under this **Identity Fraud Expense Reimbursement Policy**.

**O.**   **CHANGES**

Only the **Insurance Representative** is authorized to make changes in the terms of this **Identity Fraud Expense Reimbursement Policy** and solely with the Company's prior written consent. This **Identity Fraud Expense Reimbursement Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **Identity Fraud Expense Reimbursement Policy**. Notice to any representative of the **Insurance Representative** or **Insured Person** or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **Identity Fraud Expense Reimbursement Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Identity Fraud Expense Reimbursement Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Identity Fraud Expense Reimbursement Policy** issued by the Company.

**P.**   **LIBERALIZATION**

If, during the **Policy Period**, the Company is required, by law or by insurance supervisory authorities of the state in which this **Identity Fraud Expense Reimbursement Policy** was issued, to make any changes in the form of this **Identity Fraud Expense Reimbursement Policy**, by which the insurance afforded by this **Identity Fraud Expense Reimbursement Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance will inure to the benefit of the **Insured Person** as of the date the revision or change is approved for general use by the applicable department of insurance.

**Q.**   **ENTIRE AGREEMENT**

The Declarations, the Application, the Identity Fraud Expense Reimbursement Terms and Conditions, and any endorsements attached thereto, constitute the entire agreement between the Company, the **Insurance Representative**, and the **Insured Person**.

**R.**   **HEADINGS**

The titles of the various paragraphs of this **Identity Fraud Expense Reimbursement Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## IDENTITY FRAUD PLUS+ ENHANCEMENT

This endorsement modifies the following:

**Identity Fraud Expense Reimbursement**

**It is agreed that:**

Section **II. DEFINITIONS B** . *Expenses* is replaced by the following:

*Expenses* means:

1. costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, healthcare providers, merchants or other credit grantors that have required that such affidavits be notarized;

2. costs for certified mail to law enforcement agencies, credit agencies, financial institutions, healthcare providers, merchants or other credit grantors;

3. costs for long distance telephone calls, cellular telephone calls and facsimiles, to law enforcement agencies, credit agencies, financial institutions, healthcare providers, merchants or other credit grantors to report or discuss any actual **Identity Fraud**;

4. lost wages or salaried earnings, up to a maximum payment of $1,000 per week for a maximum period of five weeks, during absence from employment:

   a. to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, healthcare providers, merchants or other credit grantors;

   b. to complete fraud affidavits or similar documents; or

   c. due to wrongful incarceration arising solely from someone having committed a crime in the **Insured Person's** name; provided, that lost wages will not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;

5. loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

6. reasonable attorney fees incurred, with the Company's prior written consent, for:

   a. defense of lawsuits brought against the **Insured Person** by financial institutions, healthcare providers, merchants, other credit grantors or their collection agencies;

   b. the removal of any criminal or civil judgments wrongly entered against the **Insured Person**;

   c. challenging the accuracy or completeness of any information in a consumer credit report;

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

BlueRidge-00229

     d.      pursuing the release of medical records solely for the purpose of investigating medical-related **Identity Fraud**, upon the exhaustion of the healthcare provider's medical record and personal information request and appeal process;

     e.      contesting wrongfully incurred tax liability; or

     f.      contesting the wrongful transfer of ownership of an **Insured Person's** tangible property;

7.     costs for daycare and eldercare incurred solely as a direct result of any **Identity Fraud Discovered** during the **Policy Period;**

8.     reasonable costs for travel and accommodations incurred by the **Insured Person**, up to a maximum payment of $1,000 per week for a maximum period of five weeks, to:

     a.      participate in the defense of lawsuits brought against the **Insured Person** by financial institutions, healthcare providers, merchants, other credit grantors or their collection agencies;

     b.      challenge the accuracy or completeness of any information in a consumer credit report;

     c.      participate in the criminal prosecution of the perpetrators of the **Identity Fraud**; or

     d.      file in person loss affidavits and civil or criminal complaints with local law enforcement in the jurisdiction in which the **Identity Fraud** occurred, as required by local law;

9.     fees for the re-application and re-issuance of government issued personal identification documentation, including passports, commercial and non-commercial drivers licenses, state and federal personal identification cards, and social security cards, compromised as a result of **Identity Fraud**; and

10.     fees charged for copies of medical records, including x-rays, obtained solely for the purpose of investigating medical-related **Identity Fraud**.

**Expenses** does not include any expense or loss not listed in paragraphs 1. through 10. of this Definition B.

Section **IV. CONDITIONS B. PERIOD TO REPORT DISCOVERED LOSS** is replaced by the following:

PERIOD TO REPORT DISCOVERED LOSS

This **Identity Fraud Expense Reimbursement Policy** applies only to **Identity Fraud** that is **Discovered** during the **Policy Period** and reported to the Company during the **Policy Period** or within 90 days thereafter.

Section **IV. CONDITIONS C. INSURED PERSON'S DUTIES IN THE EVENT OF LOSS** is replaced by the following:

**INSURED PERSON'S DUTIES IN THE EVENT OF LOSS**

Upon knowledge or **Discovery** of a loss or an occurrence that may give rise to a claim under the terms of this **Identity Fraud Expense Reimbursement Policy** the **Insured Person** will:

1.     give the Company notice thereof as soon as practicable, but in no event later than 90 days after the end of the **Policy Period**;

2.     keep books, receipts, bills and other records in such manner that the Company can accurately determine the amount of any loss;

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

IDF-7019 Ed. 01-10 Printed in U.S.A.                        Page 2 of 3
©2010 The Travelers Companies, Inc. All Rights Reserved

BlueRidge-00230

3.      file a detailed proof of loss, duly sworn to, with the Company within six months after the **Discovery** of such loss and provide any subsequently obtained supplemental information within twelve months after the **Discovery** of such loss;

4.      notify law enforcement authorities;

5.      at the request of the Company, submit to examination under oath and give the Company a signed statement of the answers;

6.      at the request of the Company, produce for the Company's examination all pertinent books, receipts, bills, and other records, at such reasonable times and places as the Company will designate; and

7.      cooperate with the Company in all matters pertaining to loss or claims with respect thereto.

Compliance with all terms and conditions of this **Identity Fraud Expense Reimbursement Policy** is a condition precedent to recovery under this **Identity Fraud Expense Reimbursement Policy**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## IDENTITY FRAUD RESOLUTION SERVICES ENDORSEMENT

This endorsement modifies the following:

**Identity Fraud Expense Reimbursement**

---

**It is agreed that:**

1.     The following is added to section **I. INSURING AGREEMENT**:

       Additionally, an **Insured Person** will have access to:

       1.     **Identity Management Services** at any time during the **Policy Period;** and
       2.     **Identity Resolution Services** in response to a **Identity Resolution Event** involving such **Insured Person** that is **Discovered** during the **Policy Period**.

2.     The following is added to section **II. DEFINITIONS**:

       *Identity Management Services* means:

       1.     the following services from an identity fraud specialist:
              a.     consultation on best practices for preventing **Identity Fraud**;
              b.     assistance in recovery or replacement of lost or stolen personal identification; and
              c.     placement of a fraud alert in the event an **Insured Person's** personal information has been compromised; and
       2.     an identity fraud risk management website that includes educational information, risk management guides, an identity fraud newsletter, and other tools to assess exposure to **Identity Fraud**.

       *Identity Resolution Services* means assistance from an identity fraud specialist in the process of restoring an **Insured Person**'s identity. This includes managing the notification and documentation process, alerting credit reporting agencies, review of a credit report and one year of credit and fraud monitoring.

       *Identity Resolution Event* means the act of using, without authorization, a means of identification of any **Insured Person** to fraudulently obtain any benefit, cash, credit, property, goods or services or commit any other crime in the **Insured Person's** name.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

---

IDF-7005 Rev. 05-13                                                                   Page 1 of 1
© 2013 The Travelers Indemnity, Inc. All Rights Reserved

BlueRidge-00232

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## GLOBAL COVERAGE COMPLIANCE ENDORSEMENT

This endorsement changes the following:

**Identity Fraud Expense Reimbursement**

---

**It is agreed that:**

1.      The following is added to section **IV. CONDITIONS**, **A. TERRITORY**:

Provided this **Identity Fraud Expense Reimbursement Policy** does not apply to **Expenses** incurred by an **Insured Person** who resides in a country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

2.      The following is added to section **IV. CONDITIONS**:

**SANCTIONS**

This **Identity Fraud Expense Reimbursement Policy** will provide coverage, or otherwise will provide any benefit only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition or restriction.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
 Policy Number: **106420159**

IDF-19002 Ed. 03-15                                                                                                                      Page 1 of 1
© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00233



I.   *CONSIDERATION CLAUSE* ......................................................................................................... 3

II.  *INSURING AGREEMENTS* ......................................................................................................... 3

     A. FIDELITY ............................................................................................................................. 3

          Coverage A.1. Employee Dishonesty ............................................................................... 3

          Coverage A.2. Trading Loss ............................................................................................. 3

          Coverage A.3. ERISA ....................................................................................................... 3

          Coverage A.4. Restoration Expenses .............................................................................. 4

     B. ON PREMISES ..................................................................................................................... 4

     C. IN TRANSIT .......................................................................................................................... 5

     D. FORGERY OR ALTERATION ............................................................................................... 5

     E. SECURITIES ........................................................................................................................ 6

     F. KIDNAP AND RANSOM ....................................................................................................... 7

     G. COUNTERFEIT MONEY AND COUNTERFEIT MONEY ORDERS ......................................8

     H. CLAIM EXPENSE ................................................................................................................. 8

     I. INDEMNITY FOR INJURY OR DEATH OF DIRECTORS OR EMPLOYEES ..........................8

     J. SERVICING CONTRACTORS .............................................................................................. 9

     K. AUTOMATED TELLER MACHINES ..................................................................................... 9

     L. TRANSIT CASH LETTERS .................................................................................................. 9

     M. SAFE DEPOSIT BOX ......................................................................................................... 10

          Coverage M.1.     Legal Liability ................................................................................... 10

          Coverage M.2.     Loss of Customers' Property ............................................................ 10

     N. REAL PROPERTY MORTGAGES - DEFECTIVE SIGNATURES ...................................... 10

     O. STOP PAYMENT ORDERS OR WRONGFUL DISHONOR OF CHECKS .......................... 10

     P. COMPUTER SYSTEMS ...................................................................................................... 11

          Coverage P.1.     Computer Fraud ................................................................................ 11

          Coverage P.2.     Fraudulent Instructions ..................................................................... 11

          Coverage P.3.     Remote Access PBX System Fraud .................................................. 11

          Coverage P.4.     Restoration Expenses ....................................................................... 11

     Q. EXCESS SECURITIES ....................................................................................................... 11

          Coverage Q.1.     On Premises ...................................................................................... 11

          Coverage Q.2.     In Transit ........................................................................................... 12

III. *GENERAL AGREEMENTS* ..................................................................................................... 12

     A. NOMINEES ........................................................................................................................ 12

B. ORGANIC GROWTH ........................................................................................................ 12

C. CONSOLIDATION - MERGER - PURCHASE OF ASSETS ............................................ 12

D. CHANGE OF OWNERSHIP - NOTICE ......................................................................... 13

E. REPRESENTATION OF INSURED ............................................................................... 14

F. JOINT INSURED ............................................................................................................ 14

G. COURT COSTS AND ATTORNEY'S FEES - LEGAL PROCEEDINGS - ELECTION TO DEFEND ...................... 14

H. REWARD PAYMENTS ................................................................................................... 15

*IV. DEFINITIONS* ............................................................................................................... 15

*V. EXCLUSIONS* .......................................................................................................... ... 23

*VI. CONDITIONS* ............................................................................................................... 28

A. DISCOVERY ................................................................................................................. 28

B. BOND PERIOD ............................................................................................................. 28

C. SINGLE LOSS ............................................................................................................. 28

D. SINGLE LOSS LIMIT OF INSURANCE ....................................................................... 29

E. AGGREGATE LIMIT OF INSURANCE ........................................................................ 29

F. DEDUCTIBLE ............................................................................................................... 29

G. NON-ACCUMULATION OF LIMITS ............................................................................ 30

H. NOTICE - PROOF OF LOSS - LEGAL PROCEEDINGS ........................................... 30

I. VALUATION .................................................................................................................. 30

J. ASSIGNMENT .............................................................................................................. 31

K. SUBROGATION ........................................................................................................... 31

L. RECOVERIES ............................................................................................................... 31

M. COOPERATION ........................................................................................................... 32

N. ANTI-BUNDLING .......................................................................................................... 32

O. LIMIT OF INSURANCE UNDER THIS BOND AND PRIOR INSURANCE ................. 32

P. OTHER INSURANCE OR INDEMNITY ....................................................................... 32

Q. COVERED PROPERTY ................................................................................................ 33

R. JOINT LOSS PAYEES ................................................................................................. 33

S. CANCELLATION OR TERMINATION ......................................................................... 33

T. DISCOVERY PERIOD .................................................................................................. 35

U. HEADINGS ................................................................................................................... 35



*Financial Institution Bond*
*with Extended Coverages*

### I. CONSIDERATION CLAUSE

**IN CONSIDERATION** of the payment of an agreed premium and subject to the Declarations and pursuant to all the terms, conditions, exclusions and limitations of this bond, the Company agrees to indemnify the Named Insured as set forth in ITEM 1 of the Declarations (herein called Insured) for:

### II. INSURING AGREEMENTS

#### A. FIDELITY

Coverage A.1.  Employee Dishonesty

Loss resulting directly from dishonest or fraudulent acts committed by an **Employee** acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the **Employee** with the intent:

1. to cause the Insured to sustain such loss; or

2. to obtain improper financial benefit for the **Employee** or another person or entity.

If, however, some or all of the Insured's loss results directly or indirectly from any **Loan**, that portion of the loss is not covered unless:

a. the **Employee** acted with the intent to cause the Insured to sustain such loss; and

b. the **Employee** has received, in connection therewith, an improper financial benefit, or other persons with whom the **Employee** was dishonestly or fraudulently acting in collusion received proceeds from such **Loan**, and the Insured establishes that the **Employee** intended to share or participate in the proceeds of such **Loan**.

Coverage A.2.  Trading Loss

Loss resulting directly from dishonest or fraudulent acts, with respect to trading, whether in a genuine or fictitious account, in the name of the Insured or otherwise, committed by an **Employee** acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the **Employee** with the intent:

1. to cause the Insured to sustain such loss; and

2. to obtain improper financial benefit for the **Employee**, or another person or entity.

Such loss is not covered unless:

a. the **Employee** has received, in connection therewith, an improper financial benefit; or

b. other persons, with whom the **Employee** was dishonestly or fraudulently acting in collusion, received proceeds from the trading, and the Insured establishes that the **Employee** intended to share or participate in the proceeds of such trading.

Coverage A.3.  ERISA

Loss of, or damage to, **Property** that belongs to an **Employee Benefit Plan**, resulting directly from fraud or dishonesty committed by an **Employee** acting alone or in collusion with others. Such fraud or dishonesty

must be committed by the **Employee** with the intent:

    a.  to cause the **Employee Benefit Plan** to sustain such loss; or

    b.  to obtain improper financial benefit for the **Employee** or another person or entity.

As used within Insuring Agreement A.3., "fraud or dishonesty" has the meaning set forth in Title 29, Code of Federal Regulations, Section 2580.412-9.

As used throughout Coverage A.1., A.2., and A.3. of this Insuring Agreement, "financial benefit" does not include any employee benefits earned in the normal course of employment or performance of specified contractual duties, including: wages, salaries, commissions, fees, bonuses, promotions, awards, profit sharing, or pensions.

Coverage A.4.  Restoration Expenses

    **Restoration Expenses** resulting from a **Computer Violation** by an **Employee**.

## B. ON PREMISES

1. Loss of **Property** resulting directly from:

    a.  robbery, burglary, mysterious unexplainable disappearance or misplacement, damage, or destruction; or

    b.  theft, false pretenses, or common law or statutory larceny, committed by a person physically present in the Insured's office or on the Insured's premises at the time the **Property** was surrendered,

while the **Property** is lodged or deposited within offices or premises located anywhere. The premises of The Depository Trust & Clearing Corporation will be deemed premises of the Insured, but solely as respects loss of **Certificated Securities**. Coverage for **Certificated Securities** held by such depository is limited to the extent of the Insured's interest therein as effected by the making of appropriate entries on the books and records of such depository.

2. Loss of **Property**:

    a.  through any hazard specified in Insuring Agreement B.1., while such **Property** is within any of the Insured's offices and in the possession of any customer of the Insured, any representative of such customer, or an **Employee**;

    b.  through robbery of any customer of the Insured or representative of such customer, while such customer or representative is actually transacting business with the Insured at an outside window, or other similar facility offered to the public, that is attended by an **Employee**, at any of the Insured's offices covered hereunder; or

    c.  through robbery of any customer of the Insured, any representative of such customer, or any **Employee** during normal business hours while such customer, representative, or **Employee** is present, for the purpose of transacting business with the Insured, in a building, or on a driveway, parking lot, or similar facility maintained by the Insured as a convenience for such customers, representatives, or **Employees** using motor vehicles,

whether or not the Insured is liable for the loss thereof, and provided such loss, at the option of the Insured, is included in the Insured's proof of loss, but excluding, in any event, loss caused by such customer, any representative of such customer or any **Employee**.

3. Loss of or damage to:

    a.  furnishings, fixtures, supplies, or equipment within an office of the Insured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or by vandalism or malicious mischief;

b.  such office, or the interior of such office, resulting from larceny or theft in, or by burglary or robbery of  such office or attempt thereat, or by vandalism or malicious mischief; or

c.  any of the Insured's buildings in which the Insured's offices or branches are located, caused by larceny, theft, burglary, robbery or attempt thereat,

provided that: (i) the Insured is the owner of such furnishings, fixtures, supplies, equipment, office or building or is liable for such loss or damage; and (ii) the loss or damage is not caused by fire.

## C. IN TRANSIT

Loss of **Property** resulting directly from robbery, common law or statutory larceny, theft, mysterious unexplainable disappearance or misplacement, damage, or destruction, while the **Property** is in transit anywhere in the custody of:

1. a **Messenger**, including while such **Property** is temporarily within the living quarters of a **Messenger**;

2. a **Transportation Company** while being transported in an armored motor vehicle; or

3. a **Transportation Company** while being physically (not electronically) transported in a conveyance other  than an armored motor vehicle, provided that covered **Property** transported in such manner is limited to the  following:

a.  books of account and other records stored on tangible media;

b. **Certificated Securities** issued in registered form and not endorsed, or with restrictive endorsements;

c.  **Negotiable Instruments** not payable to bearer, not endorsed, or with restrictive endorsements; and

d. United States Savings Bonds or Armed Forces Leave Bonds paid or redeemed by the Insured, while in  the course of collection for payment or redemption by the United States.

Coverage under Insuring Agreement C. begins immediately upon the receipt of such **Property** by the **Messenger** or **Transportation Company** and ends immediately upon delivery to the designated recipient or its agent, but  only while the **Property** is being conveyed.

## D. FORGERY OR ALTERATION

Loss resulting directly from the Insured having, in good faith, paid or transferred any **Property** in reliance on any **Original Written**:

1. **Negotiable Instrument** (except an **Evidence of Debt**);

2. **Certificate of Deposit**;

3. **Letter of Credit**;

4. **Withdrawal Order**;

5. **Acceptance**;

6. receipt for the withdrawal of **Property**; or

7. instruction or advice directed to the Insured and purportedly signed by a customer of the Insured or by a **Financial Institution**,

that: (i) bears a handwritten signature that is a **Forgery**; or (ii) is **Altered**, but only to the extent the **Forgery** or **Alteration** directly causes the loss.

© 2016 The Travelers Indemnity Company.  All rights reserved.

Actual physical possession by the Insured of the items listed in 1. through 7. is a condition precedent to the Insured having relied on the faith of such items.

For purposes of Insuring Agreement D., a **Negotiable Instrument** submitted directly to the Insured by a customer for deposit in the customer's pre-existing account with the Insured will be deemed a **Original Written** in the physical possession of the Insured if, prior to receiving credit for the **Negotiable Instrument**, the customer submitted the deposit by an electronic communication that included an image of the **Negotiable Instrument** in a format that would enable the Insured to print a copy of the **Negotiable Instrument**. It is not necessary for the Insured to actually have printed a copy of the **Negotiable Instrument**. A **Negotiable Instrument** will be considered submitted directly to the Insured if it is transmitted by the customer to the Insured, or to a third party under written contract with the Insured to process such deposits on the Insured's behalf.

## E. SECURITIES

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others:

1. acquired, sold, delivered, or given value, extended credit or assumed liability on the faith of any **Original Written** document that is a (an):

   a. **Certificated Security**;

   b. **Document of Title**;

   c. deed, mortgage, or other instrument conveying title to, or creating or discharging a lien on, real property;

   d. **Certificate of Origin or Title**;

   e. **Certificate of Deposit**;

   f. **Evidence of Debt**;

   g. corporate, partnership, or personal **Guarantee**;

   h. **Security Agreement**;

   i. **Instruction**; or

   j **Statement of Uncertificated Security**,

   that: (i) bears a handwritten signature that is material to the validity or enforceability of the security, and is a **Forgery**, but only to the extent the **Forgery** directly causes the loss; (ii) is **Altered**, but only to the extent the **Alteration** directly causes the loss; or (iii) is lost or stolen;

2. guaranteed in writing, or witnessed any handwritten signature upon any transfer, assignment, bill of sale, power of attorney, **Guarantee**, endorsement, or any items listed in items 1.a. through 1.i. above which is a **Forgery**;

3. acquired, sold or delivered, given value, extended credit or assumed liability, on the faith of any item listed in 1.a. through 1.d. above, that is a **Counterfeit**; or

4. become liable to any issuer of securities, transfer agent, registrar, redemption agent, depository, trustee, **Financial Institution**, or paying, distributing, or disbursing agent, or their respective legal representatives, successors, or assigns (collectively, "Agents and Issuers") by reason of having executed an indemnity agreement with Agents and Issuers wherein such liability arises from the unauthorized use of the Insured's Securities Transfer Agents Medallion Program (STAMP) imprint, STAMP Attorney Release imprint, Stock Exchange Medallion Program (SEMP) imprint, New York Stock Exchange Medallion Signature Program (MSP) imprint, Signature Validation Program (SVP) imprint, or other similar signature validation program for the purpose of:

    a. executing guarantees of signatures (within the meaning of § 8-312 of the Uniform Commercial Code) and executing other certifications and guarantees incident to the transfer, payment, exchange, or purchase of **Certificated Securities**, including erasure guarantees and one-and-the-same guarantees; and

    b. executing powers of substitution;

provided the imprint device used by the Insured is proven to have been lost, stolen, or counterfeited and then used for the unauthorized purpose stated above.

Actual physical possession of the items listed in 1.a. through 1.j. above by the Insured is a condition precedent to the Insured having relied on the faith of such items. Actual physical possession of the items listed in 1.a. through 1.j. above by a correspondent **Financial Institution**, or other representative authorized to possess such items on behalf of the Insured, will satisfy the actual physical possession requirement if Loan Participation Coverage is indicated as included under Insuring Agreement E. in ITEM 5 of the Declarations.

## F. KIDNAP AND RANSOM

1. Loss of **Ransom** paid by the Insured or any **Insured Person** resulting from any **Kidnap**.

2. Loss of **Ransom** paid by the Insured or any **Insured Person** resulting from an extortion threat communicated to the Insured or an **Insured Person**:

    a. to **Kidnap** or do bodily harm to an **Insured Person**;

    b. to damage the premises or **Property** of the Insured or an **Insured Person**; or

    c. to perpetrate **Cyber Extortion**,

where such threat is made for the purpose of demanding a **Ransom** as a condition of not carrying out such threat.

3. Expense incurred by the Insured or an **Insured Person** in connection with a **Kidnap** covered by Insuring Agreement F., paragraph 1., an extortion threat covered under Insuring Agreement F., paragraph 2., or in connection with a **Hijack** or **Detention** for:

    a. investigating an extortion threat;

    b. negotiating a release of any **Insured Person**;

    c. paying a reasonable and lawful reward to an **Informant** for information leading to the arrest and conviction of the parties responsible for any loss under Insuring Agreement F., paragraphs 1. or 2.;

    d. paying a reasonable amount to independent public relations consultants, interpreters, or crisis response firms to resolve the threat, or to secure the release of any **Insured Person**;

    e. wages, salaries, commissions, or other financial benefits paid by the Insured to an **Insured Person** in the amount in effect on the date of the **Kidnap**, **Detention** or **Hijack** for a period not to exceed 5 years; provided such expense ceases at the earliest of: (i) 30 days following the **Insured Person's** release or the date the **Insured Person** returns to work; (ii) discovery of the **Insured Person's** death; or (iii) 120 days after the Insured receives the last credible evidence that the **Insured Person** is still alive;

    f. paying reasonable fees for independent psychiatric care, medical care (including costs of cosmetic or plastic surgery required to correct any permanent disfigurement sustained by an **Insured Person**), or legal advice incurred prior to the **Insured Person's** release and within 36 months following the **Kidnap**, **Hijack**, or **Detention**;

    g. paying reasonable personal financial loss of an **Insured Person** because of his or her physical inability to attend to personal financial matters due to a **Kidnap**, **Detention**, or **Hijack**; or

h.  paying other reasonable expenses, with the consent of the Company, that are directly related to the **Kidnap**, **Detention**, **Hijack**, or extortion threat.

Indemnification for expenses described in Insuring Agreement F., paragraph 3. is in addition to the applicable Single Loss Limit of Insurance; provided that the amount payable for expenses incurred with respect to any one loss under Insuring Agreement F. will not exceed 50% of the Single Loss Limit of Insurance for Insuring Agreement F.

4.  Loss due to destruction, disappearance, or wrongful appropriation of **Ransom** in a **Kidnap**, **Detention**, or **Hijack** situation, while such **Ransom** is being delivered to persons demanding the **Ransom** by anyone who is authorized by the Insured, or an **Insured Person**, to have custody of such **Ransom**.

5.  Legal liability of the Insured for settlements, awards, fees, or judgments imposed upon, and paid by, the Insured as a result of an action for damages brought by or on behalf of an **Insured Person** or such **Insured Person's** legal representative or shareholders, solely and directly as a result of a **Kidnap**, **Detention**, **Hijack**, or extortion threat.

As conditions precedent to the Company's liability under Insuring Agreement F.:

a.  The **Kidnap** referred to in Insuring Agreement F., paragraph 1. or the extortion threat to **Kidnap** or do bodily harm referred to in Insuring Agreement F., paragraph 2. must occur solely and directly as the result of the **Insured Person's** association with the Insured and not as the result of such **Insured Person's** association or position with any other entity.

b.  The Insured agrees to reimburse an **Insured Person** for loss of **Ransom** paid by such **Insured Person**.

c.  The Insured or **Insured Person** must approve the payment of **Ransom** prior to the surrender thereof, and make every reasonable attempt to:

(1)  determine that the **Kidnap** or extortion threat has actually occurred or determine with reasonable certainty that the **Cyber Extortion** is technologically credible;

(2)  give immediate notice to the Company;

(3)  notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction over the demand for **Ransom** and comply with their recommendations and instructions; and

(4)  notify the Insured.

## G.  COUNTERFEIT MONEY AND COUNTERFEIT MONEY ORDERS

Loss resulting directly from the receipt by the Insured, in good faith, of **Counterfeit Money** of the United States, including U.S. territories and possessions, Canada, or any other country, or of **Counterfeit** money orders denominated in United States or Canadian currency.

## H. CLAIM EXPENSE

Reasonable expenses necessarily incurred and paid by the Insured in preparing any covered claim for loss under any Insuring Agreement covered under this bond, which loss exceeds the Single Loss Deductible Amount applicable to such Insuring Agreement. Such expenses include costs incurred, including necessary wages of **Employees**, for that part of audits or examinations performed, whether or not required by state or federal supervisory authorities and whether conducted by such authorities, or by independent accountants, by reason of the discovery of loss sustained by the Insured.

## I.  INDEMNITY FOR INJURY OR DEATH OF DIRECTORS OR EMPLOYEES

1.  Payments of **Money** the Insured, at its own discretion, makes to any of its directors or **Employees**, who, during the term of this bond and while performing services anywhere for the Insured, have sustained bodily injury inflicted by a person who is committing or attempting to commit any act of larceny, theft, robbery, or burglary; provided, that the Company's maximum liability for the total payments made to any one director or

**Employee** are limited to no more than $500 per week during the period the director or **Employee** requires medical or surgical treatment, hospital confinement, or the services of a trained nurse, or psychiatric consultation or counseling by a licensed professional, as a result of injury inflicted during such an event, not to exceed a total of $10,000.

2. Payments of **Money** the Insured, at its own discretion, makes to the survivors or estates of its directors or **Employees**, who during the term of this bond were performing services anywhere for the Insured, and die as the result of bodily injury inflicted by a person who is committing or attempting to commit any act of larceny, theft, robbery, or burglary; provided, such payments will not exceed $10,000, and will be reduced by any amounts paid under Insuring Agreement I., paragraph 1.

## J. SERVICING CONTRACTORS

1. Loss resulting directly from any dishonest or fraudulent acts committed by a **Servicing Contractor**, acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by such **Servicing Contractor** with the intent:

   a. to cause the Insured to sustain such loss; and

   b. to obtain improper financial benefit for the **Servicing Contractor** or another person or entity.

2. Loss of **Money** collected or received for the Insured by a **Servicing Contractor** through the failure of such **Servicing Contractor** to pay to the Insured the **Money** collected or received as is discovered to be due and payable while Insuring Agreement J. is in force, except, however, **Money** disbursed by such **Servicing Contractor** in accordance with instructions from the Insured.

As used throughout Insuring Agreement J., financial benefit does not include any benefits earned in the normal course of employment or performance of the servicing contract, including: wages, salaries, commissions, fees, bonuses, promotions, awards, profit sharing, or pensions.

## K. AUTOMATED TELLER MACHINES

Loss of **Property** while such **Property** is located within an **Automated Teller Machine** caused by burglary, damage to, or destruction of the **Property**, and for the damage to, or destruction of such **Automated Teller Machine** caused by burglary or attempt thereat; provided Insuring Agreement K. does not cover:

1. damage to the interior of a building containing an **Automated Teller Machine**, to which the public has  access, resulting from vandalism or malicious mischief; or

2. loss sustained by any customer of the Insured, or any representative of such customer, while such person is on premises containing an **Automated Teller Machine**, unless such person is transacting business at the **Automated Teller Machine** and the loss is caused by robbery; or

3. loss caused by fire, except for loss of **Money**.

## L. TRANSIT CASH LETTERS

1. Loss of any item or electronic image, or data representing such item, enclosed in or attached to a **Transit  Cash Letter** (which item, electronic image, or data representing such item, has been lost or missing for at  least 20 days after the Insured learns that the same has not arrived at its destination), while in transit during  the course of collection, presentation or payment, between any office of the Insured and any place in the  United States, including U.S. territories or possessions, or Canada;

2. loss of a canceled check drawn by a customer, or electronic image or data representing such check, after  such check has been charged to the customer's account and after a statement of the condition of that account purporting to enclose such check, or electronic image or data representing such check, has been delivered or dispatched to the customer;

3. overtime wages paid to regular **Employees**, wages paid to extra **Employees** engaged in identifying the depositor of the lost item, or the item whose electronic image or data was lost, and assisting the depositor in

obtaining a duplicate thereof, and necessary costs incurred for the use of mechanical devices and materials in obtaining a duplicate of the **Transit Cash Letter** item, electronic image, or data representing such item,  where such devices and materials are not owned by the Insured; or

4.  loss of a check, promissory note, draft, or similar item, or electronic image or data representing such item,  sent by the Insured to an **Electronic Data Processor** while such item, or electronic image or data  representing such item, is in transit either from the Insured to the **Electronic Data Processor** or from the **Electronic Data Processor** to the Insured or between offices of the Insured; provided that all such items are  endorsed, stamped, or otherwise marked in a manner that impairs further negotiability.

As a condition precedent to recovery under Insuring Agreement L., the Insured will (i) to the best of its ability, take and retain a photograph or digital image of the front (face) of each item bearing not more than one endorsement and the front (face) and the back of each item bearing more than one endorsement; or (ii) make a record of the name of the issuer, drawer or maker of each check, promissory note, draft or similar item with all other descriptive data necessary for the purpose of reconstruction. Provided, nothing in this paragraph bars the Insured from recovery where no photograph or digital image is available because of the mechanical failure of the device used  in making such photograph or digital image, failure of the film or digital imaging system to reveal the image,  damage or destruction to film (developed or undeveloped) from any cause, or error or omission of an  **Employee** in operating microfilming, digital imaging, or similar equipment. This condition does not apply to checks enclosed  with customers' statements.

## M.  SAFE DEPOSIT BOX

Coverage M.1.  Legal Liability

Sums which the Insured becomes legally obligated to pay by reason of liability for loss, damage, or destruction of **Money**, bonds, drafts, **Acceptances**, other **Certificated Securities**, valuable papers, valuable documents,  jewelry, silverware, and other customer property, while in the customers' safe deposit boxes in vaults on the  premises of the Insured. Such legal liability includes liability for loss arising from relocation of the Insured's safe  deposit boxes between offices of the Insured, or vaults within the same premises of the Insured.

Coverage M.2.  Loss of Customers' Property

Loss of customers' **Property**, except **Money** (unless **Money** is stated as being included in Insuring Agreement M.2. in ITEM 5 of the Declarations), while in customers' safe deposit boxes in vaults on the premises of the Insured, by burglary or robbery or attempt thereat or for damage to or destruction of such items, provided such  loss is included in the Insured's proof of loss.

Customer **Property** described in Insuring Agreement M.2. is covered while stored in such vaults by or for customers, or temporarily elsewhere on the premises of the Insured, and in the course of deposit in, or removal from, such boxes or vaults. Such **Property** may be owned by customers or held by them in any capacity, whether or not the customers are liable to others for loss thereof.

## N.  REAL PROPERTY MORTGAGES - DEFECTIVE SIGNATURES

Loss resulting directly from the Insured, in good faith and in the course of business, in connection with any **Loan**, having accepted, received, or acted upon the faith of any **Original Written**:

a.  real property mortgages, real property deeds of trust, or like instruments pertaining to realty; or

b.  assignments of such mortgages, deeds of trust, or instruments,

that prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud, or false pretenses, or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by, or on behalf of, such mortgagor or grantor through trick, artifice, fraud, or false pretenses.

## O.  STOP PAYMENT ORDERS OR WRONGFUL DISHONOR OF CHECKS

Damages that the Insured becomes legally liable to pay its customers resulting directly from the Insured having:

1.  failed to comply with a notice from its customer, or any authorized representative of such customer, to stop payment on a check or draft made or drawn by such customer; or

2.  wrongfully dishonored or wrongfully failed to certify a check or draft made or drawn by its customer or any authorized representative of such customer.

Notwithstanding any other provision of this bond, damages under paragraph 2. do not include the amount of any check or draft in question, or any amounts paid to the payee, endorser, or accommodation party of such check or draft.

## P. COMPUTER SYSTEMS

Coverage P.1.  Computer Fraud

Loss resulting directly from **Computer Fraud**.

Coverage P.2.  Fraudulent Instructions

A.  Loss resulting directly from the Insured having, in good faith, transferred funds on deposit in a **Customer's** account as a result of a **Fraudulent Instruction** when the Insured, prior to transferring the funds, used its reasonable best efforts to verify the identity of the person transmitting the instruction;  provided that if the instruction is purported to be from a **Customer**, the Insured  performed  an **Out-of-Band Verification** and followed a **Security Procedure** with respect to such instruction.

Such **Fraudulent Instruction** received and, if applicable, **Out-of-Band Verification** performed, must be either recorded, logged, or documented by the Insured. With respect to **Commercial Customers**, coverage only applies if the transmittal method by which the Insured received the **Fraudulent Instruction** was a transmittal method authorized by the **Commercial Customer** in the **Funds Transfer Agreement**.

B.  Loss resulting directly from a fraudulent ACH debit from a  **Customer's**  account that was originated through a  **Financial Institution** , provided: (i) such  **Customer**  provides a sworn affidavit stating that the debit was not authorized; and (ii) the Insured attempted to recover the fraudulent ACH debit as allowed under the ACH rules.

Coverage P.3.  Remote Access PBX System Fraud

Loss resulting directly from **Remote Access PBX System Fraud**.

Coverage P.4.  Restoration Expenses

**Restoration Expenses** incurred by the Insured resulting from a **Computer Violation** by someone other than an **Employee**.

## Q. EXCESS SECURITIES

Coverage Q.1.  On Premises

Loss of **Certificated Securities** exceeding the Single Loss Limit of Insurance of Insuring Agreement B. resulting directly from:

a.  robbery, burglary, mysterious unexplainable disappearance or misplacement, damage, or destruction; or

b.  theft, false pretenses or common-law or statutory larceny, committed by a person physically present in an office of, or on the premises of, the Insured at the time the  **Certificated Securities**  were surrendered,

while such **Certificated Securities** are lodged or deposited within offices or premises located anywhere. The premises of The Depository Trust & Clearing Corporation will be deemed premises of the Insured, but solely as respects loss of **Certificated Securities**. Coverage for **Certificated Securities** held by such depository is

limited to the extent of the Insured's interest therein as effected by the making of appropriate entries on the books and records of such depository.

Coverage Q.2.  In Transit

Loss of **Certificated Securities** exceeding the Single Loss Limit of Insurance of Insuring Agreement C., resulting directly from robbery, common law or statutory larceny, theft, mysterious unexplainable  disappearance or misplacement, damage, or destruction, while the **Certificated Securities** are in transit  anywhere in the custody of:

    a. a **Messenger** including while such **Certificated Securities** are temporarily within the living quarters of a **Messenger**;

    b. a **Transportation Company** while being transported in an armored motor vehicle; or

    c. a **Transportation Company** while being transported in a conveyance other than an armored motor vehicle, provided that **Certificated Securities** transported in such a manner are issued in registered form and not endorsed, or with restrictive endorsements.

Coverage under Insuring Agreement Q.2. begins immediately upon receipt of such **Certificated Securities** by the **Messenger** or **Transportation Company**, and ends immediately upon delivery to the designated  recipient or its agent, but only while the **Certificated Securities** are being conveyed.

## III. GENERAL AGREEMENTS

### A. NOMINEES

Loss sustained by any nominee organized by the Insured for the purpose of handling certain of its business transactions and composed exclusively of its **Employees** will, for all the purposes of this bond be deemed to be loss sustained by the Insured, whether or not any partner of such nominee is implicated in such loss.

### B. ORGANIC GROWTH

If the Insured, while this bond is in force, establishes additional offices or adds **Employees**, other than by consolidation or merger with, or purchase or acquisition of assets or liabilities of, another institution, such offices and **Employees** will automatically be covered under this bond from the date of such establishment without the requirement of notice to the Company or the payment of additional premium for the remainder of the Policy Period as set forth in ITEM 2 of the Declarations.

Any newly established or created entity not resulting from a consolidation or merger with, or purchase or  acquisition of assets or liabilities of another institution, of which greater than 50% is owned by an Insured covered  under this bond, will be automatically covered under this bond from the date of such establishment or creation  without the requirement of notice to the Company or the payment of additional premium for the remainder of the  Policy Period as set forth in ITEM 2 of the Declarations.

### C. CONSOLIDATION - MERGER - PURCHASE OF ASSETS

If the Insured, while this bond is in force, consolidates or merges with, or purchases or acquires assets or  liabilities of, or purchases or acquires more than 50% voting stock or total ownership interest of, another institution (hereinafter referred to as a "Transaction"), coverage under this bond for loss that:

1. has occurred or will occur in the offices or premises of such institution;

2. has been caused or will be caused by any employee or employees of such institution; or

3. has arisen or will arise out of the assets or liabilities acquired by the Insured as a result of such Transaction,

is provided as follows:

a. Automatic Loss Sustained Coverage

If a Transaction involves assets and liabilities in an amount that is:

(1) more than 30% of the consolidated assets of all Insureds as of the most recent calendar year-end preceding the date of the Transaction; or

(2) 30% or less of the consolidated assets of all Insureds as of the most recent calendar year-end preceding the date of the Transaction, and:

(a) the Transaction was regulatory-assisted;

(b) the organization merged or acquired was the subject of any regulatory prompt corrective action directive, cease and desist order, consent order, memorandum of understanding, letter of agreement, or any other similar regulatory directive, order or agreement, at the time of the Transaction; or

(c) the organization merged or acquired had paid or pending losses during the three-year period before the Transaction date, of the type covered by this bond, which were in excess of the single loss deductible amount applicable under the prior coverage carried by the organization merged or acquired,

then coverage of this bond as respects the Transaction will be afforded for a **Single Loss** that is both discovered and for which the acts giving rise to the loss occur in their entirety on or after the effective date of the Transaction. This coverage terminates 90 days after the Transaction date, or the termination date of the bond, whichever is earlier, unless the Insured obtains the written consent of the Company and pays the Company an additional premium, if required.

b. Automatic Discovery Coverage

If a Transaction involves assets and liabilities in an amount that is 30% or less of the consolidated assets of all Insureds as of the most recent calendar year-end preceding the date of the Transaction, and:

(1) the Transaction was not regulatory-assisted;

(2) the organization merged or acquired was not the subject of any regulatory prompt corrective action directive, cease and desist order, consent order, memorandum of understanding, letter of agreement, or any other similar regulatory directive, order or agreement, at the time of the Transaction; and

(3) the organization merged or acquired had no paid or pending losses during the three-year period before the Transaction date, of the type covered by this bond, that were in excess of the single loss deductible amount applicable under the prior coverage carried by the organization merged or acquired,

then coverage of this bond as respects the Transaction will be afforded for a **Single Loss** that is discovered on or after the effective date of the Transaction, for the remainder of the Policy Period, without additional premium or notice to the Company of the Transaction.

## D. CHANGE OF OWNERSHIP - NOTICE

When an Insured learns of a change of ownership by a single stockholder or by a group of affiliated stockholders, of more than 10% of the voting stock or ownership interest of the Insured, or of a holding company or a parent corporation that owns or controls the Insured, it must give written notice to the Company as soon as practicable, but no later than 30 days after such change of ownership. Failure to give the required notice will result in termination of coverage, effective upon the date of the transfer of stock or ownership interest, for any loss involving a transferee of such stock or ownership interest.

## E. REPRESENTATION OF INSURED

No statement made by or on behalf of the Insured, whether contained in the application or otherwise, is deemed to be a warranty of anything, except that it is true to the best of the knowledge and belief of the person making the statement.

## F. JOINT INSURED

This bond does not indemnify or hold harmless any Insured for loss sustained by a proprietorship, partnership, or corporation that is owned, controlled, or operated by such Insured but is not named as an Insured, except as may be provided on a limited basis within General Agreement B.; provided this paragraph does not apply to loss sustained by a nominee organized by an Insured hereunder other than a holding company.

If two or more Insureds are covered under this bond, the first named Insured will act for all Insureds. Payment by the Company to the first named Insured of loss sustained by any Insured fully releases the Company on account of such loss. If the first named Insured ceases to be covered under this bond, the Insured next named will thereafter be considered the first named Insured. In the absence of an Insured being specifically next named, the Insured entity having the greatest consolidated assets of all remaining Insureds then becomes the first named Insured. Knowledge possessed or discovery made by any Insured constitutes knowledge or discovery by all Insureds for all purposes of this bond. The liability of the Company for loss or losses sustained by all Insureds will not exceed the amount for which the Company would have been liable had all such loss or losses been sustained by one Insured.

If this bond covers loss sustained by two or more **Employee Benefit Plans** or one **Employee Benefit Plan** and an Insured other than such plan, it is the obligation of the Insured or the plan administrator under regulations published by the Secretary of Labor implementing Section 13 of the Welfare and Pension Plans Disclosure Act of 1958 to obtain (under one or more bonds issued by one or more insurers) an amount of coverage for each such plan at least equal to that which would be required if such plans were bonded separately.

In compliance with the foregoing paragraph, payment by the Company in accordance with provisions of this bond will be held by the first named Insured, for the use and benefit of any **Employee Benefit Plan** sustaining loss so covered. To the extent that such payment is in excess of the amount of coverage required by regulations applicable to said plan sustaining such loss, such excess will be held for the use and benefit of any other **Employee Benefit Plan** also covered in the event that such other plan discovers that it has sustained loss covered under this bond.

If **Money** or other **Property** of two or more **Employee Benefit Plans** covered under this bond is commingled, recovery for loss of such **Money** or other **Property** through fraudulent or dishonest acts of **Employees** will be shared by each **Employee Benefit Plan** sustaining such loss, in the proportion that the limit of insurance required under the Employee Retirement Income Security Act of 1974 (ERISA) for each such **Employee Benefit Plan** bears to the total of such limits of insurance.

## G. COURT COSTS AND ATTORNEY'S FEES - LEGAL PROCEEDINGS - ELECTION TO DEFEND

The Company will indemnify the Insured for court costs and reasonable attorney's fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability, or alleged liability, on account of any loss, claim, or damage that, if established against the Insured, would constitute a collectible loss under this bond in excess of any Single Loss Deductible Amount. Such indemnity is part of, and not in addition to, the Single Loss Limit of Insurance for the applicable Insuring Agreement or Coverage.

The Insured must notify the Company at the earliest practicable moment, not to exceed 90 days after notice thereof, of any such suit or legal proceeding, and at the request of the Company will furnish copies of all pleadings and other papers therein. At the Company's election the Insured will permit the Company to conduct the defense of such suit or legal proceeding, in the Insured's name, through attorneys of the Company's selection. In such event, the Insured will give all reasonable information and assistance, other than pecuniary, that the Company deems necessary to the defense of such suit or legal proceeding.

If the amount of the Insured's liability or alleged liability is greater than the amount recoverable under this bond, or if a Single Loss Deductible Amount is applicable, or both, then the liability of the Company under General Agreement G. is limited to the proportion of court costs and attorney's fees incurred and paid by the Insured or by

© 2016 The Travelers Indemnity Company.  All rights reserved.

the Company that the amount recoverable under this bond bears to the total amount of the Insured's liability or alleged liability. Any amount not recoverable because the Insured's liability or alleged liability is greater than the amount recoverable under any insuring agreement of this bond, does not serve to reduce the Single Loss Deductible Amount applicable to such Insuring Agreement or coverage.

If the Company pays court costs and attorney's fees in excess of its proportionate share of such costs and fees, the Insured will promptly reimburse the Company for such excess.

## H. REWARD PAYMENTS

The Company agrees to indemnify the Insured up to an amount of $15,000 per event, for any reward paid by the Insured for information leading to the apprehension of any person who, while this bond is in effect, robbed any of the Insured's messengers, or robbed or burglarized the Insured's offices or branches, or made an attempt thereat.

## IV. DEFINITIONS

Where appearing in this bond, in either the singular or the plural, words and phrases appearing in bold type have the meanings set forth below. Where such words or phrases appear consecutively, each will retain its individual meaning.

*Acceptance* means a **Written** draft that the drawee has, by signature thereon, engaged to honor as presented.

*Alteration* means: (i) an unauthorized change in a validly issued **Original Written** document that purports to modify in any respect the obligation of a party; or (ii) an unauthorized addition of words or numbers, or other change to a validly issued **Original Written** document relating to the obligation of a party. **Altered** means having been subjected to an **Alteration**.

*Automated Teller Machine* means any automated mechanical device, point of sale terminal, video teller machine, or similar operating system that, on behalf of the Insured, disburses **Money**, accepts deposits, cashes checks, drafts, or similar written instruments, or makes credit card **Loans**.

*Bond Period* has the meaning set forth in section **VI. CONDITIONS**, **B. BOND PERIOD**.

*Certificate of Deposit* means a **Written** acknowledgment by an Insured or a **Financial Institution** of receipt of **Money** with an engagement to repay it.

*Certificate of Origin or Title* means a **Written** document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

*Certificated Security* means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, that is:

1. represented by a **Written** instrument issued in bearer or registered form;

2. of a type commonly dealt in on securities exchanges or markets, or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

3. either one of a class or series, or by its terms divisible into a class or series of shares, participations, interests, or obligations.

*Change of Control* means:

1. the acquisition of an Insured, or of all or substantially all of an Insured's assets, by an entity other than another Insured, or the merger or consolidation of an Insured into or with an entity other than another Insured, such that the acquired entity is not the surviving entity; or

2. the obtaining by any person, entity, or affiliated group of persons or entities, other than another Insured, the right to elect, appoint, or designate more than 50%, or exercise a majority control, of the board of directors, board of trustees, board of managers, or functional equivalent of the Insured.

***Commercial Customer*** means an entity or natural person maintaining an account with the Insured, other than primarily for personal, family or household purposes, that has a **Funds Transfer Agreement** with the Insured.

***Computer Fraud*** means an intentional, unauthorized, and fraudulent entry of data or computer instructions directly into, or change of data or computer instructions within, a **Computer System** by a natural person or entity other than an **Employee**, including any such entry or change made via the Internet or a **Network**, provided that such entry or change causes:

1. **Property** to be transferred, paid or delivered;

2. an account of the Insured, or of its customer, to be added, deleted, debited or credited; or

3. an unauthorized or fictitious account to be debited or credited.

***Computer System*** means:

1. any computer; and

2. any input, output, processing, storage or communication device, or any related network, cloud service, operating system, or application software, that is connected to, or used in connection with, such computer,

that is rented by, owned by, leased by, licensed to, or under the direct operational control of, the Insured.

***Computer Violation*** means:

1. the introduction of a **Computer Virus** into a **Computer System**; or

2. damage to, or destruction of, computer programs, software, or other electronic data stored within a **Computer System** by a natural person, who has (i) gained unauthorized access to such **Computer System**; or (ii) authorized access to such **Computer System**, but uses such access to cause such damage or destruction.

***Computer Virus*** means any malicious code that could destroy, alter, contaminate, or degrade the integrity, quality, or performance of:

1. electronic data used, or stored, in any **Computer System**; or

2. a computer network, computer application software, or a computer operating system or related network.

***Consumer Customer*** means a natural person maintaining an account with the Insured primarily for personal, family or household purposes.

***Counterfeit*** means a **Written** imitation of an actual, valid, or verifiable **Original** that is intended to deceive and to be taken as the **Original**.

***Customer*** means, only with respect to Insuring Agreement P.2., a **Commercial Customer** or a **Consumer Customer**.

***Cyber Extortion*** means any threat made to the Insured by an individual, other than an identifiable **Employee**, expressing an intention to:

1. cause the Insured to transfer, pay, or deliver any funds or **Property** using a **Computer System** without the permission, authorization, and consent of the Insured;

2. sell or disclose information about a customer of the Insured that is unique to the relationship of the customer and Insured and is not otherwise publicly available; provided such information is stored in an electronic medium in a **Computer System** and is retrievable in a perceivable form;

3. alter, damage, or destroy any computer program, software, or other electronic data that is stored within a **Computer System**;

4.  maliciously or fraudulently introduce a **Computer Virus** into a **Computer System** when such threat is premised upon actual or alleged unauthorized access to such **Computer System**;

5.  initiate an intentional attack on a **Computer System** that depletes system resources or impedes system access available through the Internet to authorized external users of such **Computer System**; or

6.  maliciously or fraudulently introduce malware into a **Computer System**.

**Detention** means the holding under duress of an **Insured Person**, for a period in excess of four hours, for whatever reason other than **Kidnap.**

**Document of Title** means a **Written** document that is a bill of lading, dock warrant, dock receipt, warehouse receipt, order for the delivery of goods, or other **Written** document that in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold, and dispose of the document and the goods it covers, and purports to be issued by or addressed to a bailee and to cover goods in the bailee's possession that are either identified or are fungible portions of an identified mass.

**Electronic Data Processor** means a natural person, partnership, or corporation with the Insured's **Written** authorization to perform services as a data processor of checks presented to the Insured by a customer or **Financial Institution**. **Electronic Data Processor** does not include a Federal Reserve Bank or clearinghouse.

**Electronic Record** means information created, generated, sent, communicated, received, or stored by electronic means that is retrievable in a perceivable form.

**Employee** means:

1.  an officer or other natural person performing services for the Insured, while in the Insured's service and subject to the Insured's direction and control, and whom the Insured directly compensates by wages, salaries, or commissions; or for 60 days after such individual's termination of service, provided such termination is not due to employee fraud or dishonesty;

2.  a guest student or intern pursuing studies or duties in any of the Insured's offices or premises covered hereunder, while such person is subject to the Insured's direction and control and is performing services for the Insured;

3.  any attorney retained by the Insured, and any employee of such attorney, but only while performing legal services for the Insured;

4.  a person provided by an employment contractor to perform employee duties for the Insured under the Insured's supervision at any of the Insured's offices or premises covered hereunder including a natural person whose services are leased by the Insured under a written agreement between the Insured and a labor leasing firm, to perform duties related to the conduct of the Insured's business;

5.  an employee of an institution merged or consolidated with the Insured prior to the effective date of this bond, or, subject to General Agreement C., after the effective date of this bond, but only with respect to acts while an employee of such institution, causing said institution to sustain a loss, that was not known to the Insured or to the institution at the time of the merger or consolidation;

6.  each natural person, partnership, or corporation authorized by the Insured to perform services as an **Electronic Data Processor** (each such **Electronic Data Processor**, and the partners, officers and employees of such **Electronic Data Processor** will collectively be deemed to be one **Employee** for all the purposes of this bond, except with respect to Condition S.2.);

7.  a director or trustee of the Insured, other than one employed as a salaried, pensioned, or elected official or an employee of the Insured, when performing acts coming within the scope of the usual duties of an employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured;

8.  any natural person director or trustee of the Insured while engaged in handling funds or other property of any **Employee Benefit Plan**;

9. any natural person volunteer while subject to the Insured's direction and control and performing services for the Insured; and

10. any natural person former employee retained as a consultant, pursuant to a **Written** agreement with the Insured, while subject to the Insured's direction and control and performing services for the Insured.

**Employee** also means an individual described above while on medical, military, or other leave of absence from the Insured, regardless of whether such person remains subject to the Insured's direction and control during the time of leave.

**Employee** does not mean any agent, broker, factor, commission merchant, consignee, independent contractor, representative, or other person of the same general character not specified above.

*Employee Benefit Plan* means an employee welfare benefit plan or an employee pension benefit plan, as set forth in the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), that is controlled, operated, or sponsored solely by an Insured for the benefit of employees of the Insured.

*Evidence of Debt* means a **Written** instrument, including a **Negotiable Instrument**, executed, or purportedly executed, by a customer of the Insured and held by the Insured, which in the regular course of business is treated as evidencing the customer's debt to the Insured.

*Financial Institution* means: (i) a bank, trust company, savings bank, credit union, savings and loan association, or similar thrift institution; or (ii) a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution; provided that **Financial Institution** does not include any such entity, institution or organization that is an Insured.

*Forgery* means signing the name of another person or organization with a handwritten signature directly applied to a **Written** document without authority, and with the intent to deceive.

A signature written on an electronic pad that captures the signature for purposes of creating an electronic digitized image of a handwritten signature, or a reproduction of a handwritten signature, is treated the same as a handwritten signature. Any other form of electronic signature or digital signature is not treated the same as a handwritten  signature.

**Forgery** does not mean a signature that consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

*Fraudulent Instruction* means an intentional, fraudulent, and unauthorized instruction directed to the Insured, that is transmitted:

1. via telefacsimile, and:

    a. purports and reasonably appears to be from a **Customer**, a **Financial Institution**, or another office of the Insured;

    b. was in fact transmitted by someone other than a **Customer** , a **Financial Institution**, or another office of the Insured; and

    c. purports and reasonably appears to contain the handwritten signature of a person authorized to initiate such transfer that proves to have been used by an unauthorized person;

2. verbally, other than in person, and purports to be from:

    a. an officer, director, partner, or employee of a **Customer**, who is authorized by the **Customer** to instruct the Insured to make such a transfer; or

    b. a **Customer** who is a natural person; or

c.  an **Employee** in another office of the Insured, who was authorized by the Insured to instruct other **Employees** to transfer funds on deposit in a **Customer's** account; and was received by an **Employee** specifically designated to receive and act upon such instructions,

but was in fact transmitted by someone other than a person described in this paragraph 2.; or

3.  via electronic mail or through an Internet banking system operated by or on behalf of the Insured and purports and reasonably appears to be from a  **Customer**  of the Insured, but was in fact transmitted by someone other than such  **Customer** .

**Funds Transfer Agreement** means an **Original Written** agreement, signed by the **Commercial Customer**, that:

1.  authorizes the Insured to rely on voice, telefacsimile, electronic mail, or Internet banking system instructions to make funds transfers;

2.  provides the Insured with the names of persons authorized to initiate funds transfers; and

3.  establishes a specific  **Security Procedure**  that the Insured is obligated to follow to verify the authenticity of a funds transfer request.

**Guarantee** means a **Written** undertaking obligating the signer to pay the debt of another to the Insured or its  assignee, or to a **Financial Institution** from which the Insured has purchased participation in the debt, if the debt is not paid in accordance with its terms.

**Guest** means any person visiting the premises of the Insured or a residence occupied by any **Insured Person**.

**Hijack** means the illegal holding of an **Insured Person** under duress, for a period in excess of four hours, while the **Insured Person** is traveling on an aircraft, motor vehicle, or waterborne vessel.

**Informant** means a person, other than an **Insured Person**, who provides information not otherwise obtainable by the Insured or an **Insured Person**, solely in return for a reward offered by the Insured or an **Insured Person**.

**Instruction** means a **Written** order to the issuer of an **Uncertificated Security** requesting that the transfer, pledge,  or release from pledge of the **Uncertificated Security** specified be registered.

**Insured Person** means any **Employee**, **Guest**, relative of an **Employee**, or resident of or individual employed in the household of an **Employee**.

**Kidnap** means any event or connected series of events of seizing, detaining, abducting or carrying away by force or fraud, of one or more **Insured Persons** (except a minor by a parent thereof) by one person or collaborating persons for the purpose of demanding **Ransom**.

**Letter of Credit** means a **Written** engagement by a **Financial Institution** or other person made at the request of a customer that the **Financial Institution** or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the **Letter of Credit**.

**Loan** means all extensions of credit by the Insured, all transactions creating a creditor relationship in favor of the Insured, and all transactions by which the Insured assumes an existing creditor relationship.

**Messenger** means an **Employee** while in possession of the Insured's **Property** away from the Insured's premises  and any other natural person acting as custodian of the **Property** during an emergency arising from the incapacity of the original **Employee**.

**Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

**Negotiable Instrument** means a **Written** document, that:

1.  is signed by the maker or drawer;

2. contains an unconditional promise or order to pay a sum certain in **Money** and no other promise, order, obligation or power given by the maker or drawer;

3. is payable on demand or at a definite time; and

4. is payable to order or bearer.

**Negotiable Instrument** also means a **Counterfeit** check or **Substitute Check**.

*Network* means:

1. any and all services provided by or through the facilities of any electronic or computer communication system, including Fedwire, Clearing House Interbank Payment System (CHIPS), Society for Worldwide Interbank  Financial Telecommunication (SWIFT), National Automated Clearing House Association (NACHA) and similar   interbank payment or settlement systems; and

2. **Automated Teller Machines**, point of sale terminals, and other similar operating systems,

including any shared networks, internet access facilities, or other similar facilities for such systems in which the  Insured participates, allowing the input, output, examination, or transfer of data or programs from one computer to a **Computer System**.

*Original* means the first rendering or archetype and does not include photocopies or electronic transmissions even if received and printed. Solely for the purposes of Insuring Agreement D., a **Substitute Check** will be considered **Original**.

*Out-of-Band Verification* means a communication with a purported **Customer**, to verify the identity of the **Customer** and the authenticity of a funds transfer request, when such verification communication is made:

1. in person while the purported **Customer** is physically present on the Insured's premises and presenting a government-issued photo identification, or

2. using a communication method different than the communication method by which the purported **Customer** made the funds transfer request, provided such verification communication must be made using **Pre-Determined Customer Contact Information**.

**Out-of-Band Verification** does not include an electronic text message sent to a telephone number.

*Pre-Determined Customer Contact Information* means a telephone number, facsimile number, or electronic mail address that:

1. was provided by the **Customer** when the **Customer** opened the account with the Insured;

2. was provided in person by the **Customer** after the **Customer** opened the account with the Insured, while the **Customer** was physically present on the Insured's premises, presenting a government-issued photo  identification;

3. was provided in a **Funds Transfer Agreement**;

4. replaced a telephone number, facsimile number, or electronic mail address previously provided for the **Customer's** account; provided that confirmation of the legitimacy of the change was achieved through separate  verbal contact, initiated by the Insured, with the **Customer** at a telephone number described in subparts 1., 2., or  3. of this definition; or

5. replaced a telephone number, facsimile number, or electronic mail address previously provided for the **Customer's** account, and was received by the Insured at least 30 days prior to the receipt of the **Fraudulent  Instruction**.

*Property* means **Money**, **Certificated Securities**, **Uncertificated Securities**, **Negotiable Instruments**,  **Certificates of Deposit**, **Documents of Title**, **Acceptances**, **Evidences of Debt**, **Security Agreements**, **Withdrawal Orders**,

**Certificates of Origin or Title**, **Letters of Credit**, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold state lottery tickets, books of account and other records whether **Written** or recorded electronically, gems, jewelry, precious metals of all kinds and in any form, and tangible items of personal property which are not hereinbefore enumerated.

*Ransom* means **Property** or **Virtual Currency** surrendered, or to be surrendered, by or on behalf of the Insured or any **Insured Person**, at the direction and demand of a person or persons committing, or allegedly committed, a **Kidnap** or **Extortion**. The value of **Ransom** will be determined as of the date such **Ransom** is lost or surrendered.

*Remote Access PBX System* means a computerized private branch exchange voice telephone switching system operated by and located on the premises of the Insured that provides internal telephone communications between stations located on a given network, as well as between the Insured and other public or private telephone networks, excluding however, those systems for which the Insured does not retain sole control over system administration (performing security functions or activating system features controlled by hardware or software options).

*Remote Access PBX System Fraud* means the intentional, unauthorized and fraudulent gaining of access to  outgoing long distance telephone services from a location other than the Insured's premises by either the fraudulent manipulation or unauthorized use of passwords or access codes designed to identify and authenticate users of or access to the Insured's **Remote Access PBX System** by a natural person other than an identifiable **Employee**, resulting in charges for long distance toll calls which the Insured is legally obligated to pay a long distance carrier. Provided however, such charges will not be covered hereunder because of the Insured's failure to either:

1.  incorporate a system password or access code feature of at least eight characters with such passwords being changed at least monthly; or

2.  activate and continue the operation of a call-disconnect feature that automatically terminates a caller's password or access code after 3 unsuccessful sign-on attempts.

*Restoration Expenses* means reasonable costs incurred by the Insured, with the Company's prior written consent, to restore, replace or reproduce damaged, or destroyed computer programs, software, or other electronic data stored within a **Computer System**, or which the Insured owns, holds or is responsible for, to the condition that existed immediately preceding a **Computer Violation**; provided that if it is determined by the Insured that such computer programs, software, or other electronic data cannot reasonably be restored, replaced, or reproduced, then **Restoration Expenses** means only the reasonable costs incurred by the Insured, with the Company's prior written  consent, to reach such determination.

**Restoration Expenses**  do not include expenses incurred:

1.  as a result of the reconstruction of computer programs, software, or other electronic data which the Insured did  not have a license to use;

2.  to restore, replace, or reproduce damaged or destroyed computer programs, software, or other electronic data if such damage or destruction was caused by computer programs, software, or other electronic data which the Insured did not have a license to use;

3.  to design, update, improve, or perfect the operation or performance of computer programs, software, or other electronic data; or

4.  to redo the work product, research, or analysis that was the basis of, or resulted in, any computer programs, software, or other electronic data stored.

*Security Agreement* means a **Written** agreement that creates an interest in personal property or fixtures and  secures payment or performance of an obligation.

*Security Procedure* means an authentication process, other than voice recognition, that requires the use of  algorithms or other codes, identifying words or numbers, encryption, or similar security devices or procedures. The  following are not a  **Security Procedure**:

1.  a general statement that the Insured may establish security procedures;

2. a statement that the Insured may perform a callback or other security procedure; or

3. a statement that the Insured will only accept requests from persons named on the account.

*Servicing Contractor* means a natural person, partnership, or corporation, other than an **Employee** or officer of the Insured, duly authorized by the Insured to:

1. collect and record payments on real estate mortgage or home improvement **Loans** made by, held by, or assigned to, the Insured, and establish tax and insurance escrow accounts;

2. manage real property owned by, or under the supervision or control of, the Insured; or

3. perform other acts directly related to the above,

but only while such natural person, partnership, or corporation is actually performing such services within the United States, including U.S. territories and possessions, or Canada. In no event will any activity described in paragraphs 1., 2. or 3. above include the sale of real property mortgages to the Insured by the **Servicing Contractor** or by any affiliate of the **Servicing Contractor**.

**Servicing Contractor** includes the partners, officers, and employees of such entity and each such **Servicing Contractor** and its partners, officers and employees will collectively be deemed to be one person for all purposes of Condition C. Single Loss, paragraph 3., of this bond.

*Single Loss* has the meaning set forth in section **VI. CONDITIONS**, **C. SINGLE LOSS**.

*Statement of Uncertificated Security* means a **Written** statement of the issuer of an **Uncertificated Security** containing:

1. a description of the issue of which the **Uncertificated Security** is a part;

2. the number of shares or units:

    a. transferred to the registered owner;

    b. pledged by the registered owner to the registered pledgee;

    c. released from pledge by the registered pledgee;

    d. registered in the name of the registered owner on the date of the statement; or

    e. subject to pledge on the date of the statement;

3. the name and address of the registered owner and registered pledgee;

4. a notation of any liens and restrictions of the issuer and any adverse claims to which the **Uncertificated Security** is or may be subject to, or a statement that there are none of those liens, restrictions or adverse claims; and

5. the date:

    a. the transfer of the shares or units to the new registered owner of the shares or units was registered;

    b. the pledge of the registered pledgee was registered; or

    c. of the statement, if it is a periodic or annual statement.

*Substitute Check* means a paper reproduction of an **Original Written** check as defined in the Check Clearing for the 21st Century Act of 2003.

---

***Transit Cash Letter*** means any letter or **Electronic Record**:

1. dispatched by the Insured, an authorized representative with whom the Insured has contracted to dispatch such letters or **Electronic Records**, any of the Insured's correspondent **Financial Institutions**, or any Federal Reserve Bank or branch thereof;

2. itemizing by separate amounts all checks, drafts, promissory notes or other similar items, which have been accepted by the Insured for deposit, payment, collection or encashment; and

3. enclosing such items or including electronic images or data representing such items.

***Transportation Company*** means an organization that provides its own or leased vehicles for transportation, or provides freight forwarding or air express services.

***Uncertificated Security*** means a share, participation, or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, that is:

1. not represented by a **Written** instrument issued in bearer or registered form, and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer;

2. of a type commonly dealt in on securities exchanges or markets, or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

3. either one of a class or series, or by its terms divisible into a class or series of shares, participations, interests, or obligations.

***Virtual Currency*** means a digital or electronic medium of exchange that is used and accepted as a means of payment but that is not issued by, or guaranteed by, a central bank, government, or public authority.

***Withdrawal Order*** means a non-negotiable **Written** instrument, other than an **Instruction**, signed by a customer of the Insured, authorizing the Insured to debit the customer's account in the amount of funds stated therein.

***Written*** means expressed through letters or marks placed upon paper and visible to the eye. **Written** does not include information contained in an **Electronic Record**.

## V. EXCLUSIONS

**A.** This bond does not cover loss resulting directly or indirectly from forgery or alteration, except when covered under Insuring Agreement A., D., E., G., J., K., M, or P.2.

**B.** This bond does not cover loss due to war, invasion, acts of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, confiscation, nationalization, requisition, or destruction of, or damage to, property by or under the order of any government, public, or local authority, unless such loss occurs in transit in the circumstances recited in Insuring Agreement C., F., or Q.2., and unless, when such transit was initiated, there was no knowledge of such act or condition related to any of the foregoing on the part of any person acting for the Insured in initiating such transit.

**C.** This bond does not cover loss resulting directly or indirectly from nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or to any related act or incident.

**D.** This bond does not cover loss resulting directly or indirectly from any acts of a director or trustee of the Insured, other than one employed as a salaried, pensioned, or elected official, or an **Employee**, except when performing acts coming within the scope of the usual duties of an **Employee**, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured.

**E.** This bond does not cover loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, a **Loan** or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes,

agreements, or **Evidences of Debt**, whether such **Loan**, transaction or extension was procured in good faith or through trick, artifice, fraud, or false pretenses, except when covered under Insuring Agreement A., E., or N.

**F.**  This bond does not cover loss of **Property** contained in customers' safe deposit boxes unless:

1.  the Insured is legally liable therefor and the loss is covered under Insuring Agreement A. or M.1.; or

2.  the loss is covered under Insuring Agreement M.2.

**G.**  This bond does not cover loss of unsold travelers' checks or unsold money orders placed in the custody of the Insured with authority to sell, unless:

1.  the Insured is legally liable for such loss; and

2.  such checks or money orders are later paid or honored by the drawer thereof,

    except when covered under Insuring Agreement A.

**H.**  This bond does not cover loss caused by an **Employee**, except:

1.  when covered under Insuring Agreement A.; or

2.  when covered under Insuring Agreement B., C., L. or Q. and resulting directly from mysterious  unexplainable disappearance or misplacement, or unintentional destruction of, or damage to, **Property**.

**I.**  This bond does not cover under Insuring Agreement M.:

1.  property held by the Insured in trust for more than 30 days or as collateral;

2.  under Insuring Agreement M.1., liability of the Insured under any agreement to be responsible for loss;

3.  under Insuring Agreement M.2., loss by moths, vermin, wear and tear, gradual deterioration or inherent  vice; and

4.  loss of securities verified and recorded by the Insured and held by it in any capacity and loss of **Money** segregated and identified as payroll or other funds for delivery to the Insured or a customer.

**J.**  This bond does not cover loss involving an **Automated Teller Machine**, except when covered under Insuring Agreements A., K., or P.

**K.**  This bond does not cover loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any **Employee** in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreement A.2., D.1., E. or P.1.

**L.**  This bond does not cover shortage in any teller's cash due to error.

**M.**  This bond does not cover loss resulting directly or indirectly from the use, or purported use, of credit, debit, charge, access, convenience, identification, or other cards:

1.  in obtaining credit or funds;

2.  in gaining access to an **Automated Teller Machine**; or

3.  in gaining access to a point of sale terminal, customer-bank communication terminal, or similar electronic terminal of any electronic funds transfer system,

    whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured, except when covered under Insuring Agreement A.

**N.**   This bond does not cover loss, including loss of **Property**, involving an **Automated Teller Machine** resulting from:

    1.   damage to such **Automated Teller Machine** caused by vandalism or malicious mischief, unless such vandalism or malicious mischief is perpetrated from within an office of the Insured;

    2.   the mechanical breakdown or failure of such **Automated Teller Machines** to function properly; or

    3.   mysterious unexplainable disappearance or misplacement while such **Property** or **Money** is located within any such **Automated Teller Machine**,

except when covered under Insuring Agreement A.

**O.**   This bond does not cover loss through the surrender of **Property** away from an office of the Insured as a result of a threat:

    1.   to do bodily harm to any person, except loss of **Property** in transit in the custody of a **Messenger** provided that when such transit was initiated there was no knowledge by the Insured of any such threat; or

    2.   to damage the premises or property of the Insured,

except when covered under Insuring Agreement A. or F.

**P.**   This bond does not cover loss resulting directly or indirectly from payments made to, or withdrawals from, a depositor's account involving erroneous credits to such account, except when covered under Insuring Agreement A., B., or P.1.

**Q.**   This bond does not cover loss resulting directly or indirectly from payments made to, or withdrawals from, a depositor's account involving items of deposit which are not finally paid for any reason, including forgery or any other fraud, except when covered under Insuring Agreement A., however, this exclusion does not apply to United States Government checks or drafts which are returned to the Insured by the United States Government for any reason after the funds for said checks or drafts have been remitted to the Insured or credited to the Insured's account.

**R.**   This bond does not cover loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreement A., D.1. (but only as respects **Negotiable Instruments** other than **Evidences of Debt** or **Substitute Checks**), E., or G.

**S.**   This bond does not cover loss of any tangible item of personal property which is not specifically enumerated in Section IV., DEFINITIONS, **Property**, if such property is specifically insured by other insurance of any kind and in any amount obtained by the Insured, and in any event, loss of such property occurring more than 60 days after the Insured has become aware that it owns, holds or is responsible for such property, except when covered under Insuring Agreement A. or B.3.

**T.**   This bond does not cover under Insuring Agreement L., loss:

    1.   caused or contributed to by any dishonest or fraudulent act of any employee of a correspondent or drawee **Financial Institution** to which the **Transit Cash Letter** giving rise to the loss is transmitted or addressed, whether acting alone or in collusion with others; or

    2.   of any bonds or of any interest coupons detached from any instruments.

**U.**   This bond does not cover loss of **Property** while:

    1.   in the mail;

    2.   in the custody of any **Transportation Company**, unless covered under Insuring Agreement C. or Q.2., provided however that non-negotiable instruments while in the possession and custody of any **Transportation Company** will be deemed to be covered under Insuring Agreement C. or Q.2.; or

    3. located on the premises of any **Transportation Company**,

except when covered under Insuring Agreement A. or L.

**V.**    This bond does not cover potential income, including interest or dividends not realized by the Insured.

**W.**    This bond does not cover damages of any type for which the Insured is legally liable, except direct compensatory damages arising directly from a loss covered under this bond, but not multiples thereof.

**X.**    This bond does not cover any fees, costs, or other expenses incurred by the Insured in establishing the existence or amount of loss covered under this bond, except when covered under Insuring Agreement H.

**Y.**    This bond does not cover indirect or consequential loss of any nature.

**Z.**    This bond does not cover loss resulting from a violation by the Insured or by any **Employee**:

    1. of law regulating: (i) the issuance, purchase, or sale of securities; (ii) securities transactions upon security exchanges or over the counter market; (iii) investment companies; or (iv) investment advisers; or

    2. of any rule or regulation made pursuant to any such law,

unless it is established by the Insured that the act or acts which caused said loss involved fraudulent or dishonest conduct that would have caused a covered loss to the Insured in a similar amount in the absence of such laws, rules, or regulations.

**AA.**    This bond does not cover loss resulting directly or indirectly from the failure of a financial or depository institution, or its receiver or liquidator, to pay or deliver, on demand of the Insured, funds or **Property** of the Insured held by it in any capacity, except when covered under Insuring Agreement A., B.1.a., or Q.1.a.

**BB.**    This bond does not cover loss involving any **Uncertificated Security** except an **Uncertificated Security** of any U.S. Federal Reserve Bank or when covered under Insuring Agreement A., E., or P.

**CC.**    This bond does not cover under Insuring Agreement P., loss:

    1. resulting directly or indirectly from entries or changes made by an individual authorized to have access to a **Computer System**, who acts in good faith on instructions or advices received by telegraph, teletype, human voice over a telephone or by any other means, unless such instructions or advices are given to that individual by a software contractor (or by a partner, officer, or employee thereof) authorized by the Insured to design, develop, prepare, supply, service, write, or implement programs for the Insured's **Computer System**, except when covered under Insuring Agreement P.2;

    2. caused by an employee or director of an automated clearing house (including a U.S. Federal Reserve Bank), service bureau, electronic communications systems (including Fedwire, CHIPS, and SWIFT), or merchants who have contracted with the Insured to perform electronic funds transfer services; or

    3. resulting directly or indirectly from entries or changes made by an **Employee** acting in good faith on any electronic communication, except when covered under Insuring Agreement P.2.

**DD.**    This bond does not cover loss resulting directly or indirectly from **Computer Fraud** or mechanical breakdown or failure to function properly of a **Computer System**, except when covered under Insuring Agreement A., B., P., or Q.1.

**EE.**    This bond does not cover under Insuring Agreement J.:

    1. loss resulting from the insolvency, bankruptcy, or taking over by a receiver or other liquidator or by State or Federal Officials of a **Financial Institution**, unless such **Financial Institution** is a **Servicing Contractor** covered under this bond and unless such insolvency, bankruptcy, or taking over results from fraud or dishonesty of officers or employees of such **Financial Institution**;

© 2016 The Travelers Indemnity Company. All rights reserved.

2. under Insuring Agreement J.2., loss through the failure of a **Servicing Contractor** covered under this bond to collect or receive **Money** for the account of the Insured, notwithstanding an agreement between such **Servicing Contractor** and the Insured to the contrary;

3. under Insuring Agreement J.2., loss of **Money** collected or received for the account of the Insured by any **Servicing Contractor** covered under this bond unless such **Servicing Contractor** is legally liable to the Insured on account of the loss of such **Money**; or

4. loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, a **Loan** made to a **Servicing Contractor**, including a **Loan** established to provide funds for interim financing or warehousing of mortgage loans, whether procured in good faith or through fraud or false pretenses, or loss resulting directly or indirectly from the failure of the **Servicing Contractor** to pay over **Property** held as security for any such **Loan**.

**FF.** This bond does not cover under Insuring Agreement F.:

1. a confiscation or expropriation of reward or **Property** by any governmental authority;

2. the surrender of **Property** in any face to face encounter involving the use or threat of force or violence, unless surrendered by a person who is in possession of such **Property** at the time of surrender for the sole purpose of conveying such to pay a previously communicated demand for **Property**;

3. the surrender of **Property** on the premises where the demand is made, unless brought onto such premises after receipt of the demand pursuant to an extortion threat for such **Property** for the sole purpose of paying such demand, and only to the extent that any **Property** on such premises at the time was insufficient to pay such a demand; or

4. a fraudulent or criminal act of the Insured or an **Insured Person** or agent thereof whether acting alone or in collusion with others.

**GG.** This bond does not cover under Insuring Agreement A.1., loss resulting directly or indirectly from the alleged or actual destruction of **Property** by an **Employee**.

**HH.** This bond does not cover loss, costs, or expenses the Insured agrees to incur, or incurs on behalf of another person or entity, when the Insured is not legally obligated to incur such loss, costs, or expenses under the Uniform Commercial Code or any other common, case or tort law, statute, rule or code anywhere in the world, including any rule or code of any clearing or similar organization, except when covered under Insuring Agreement P.2.

**II.** This bond does not cover loss resulting directly or indirectly from the dishonest or fraudulent acts of an **Employee** or **Servicing Contractor**, if any employee of the risk management, compliance, internal audit, or legal department, or any titled officer, branch manager, risk manager, or any director or trustee of the Insured not in collusion with such person knows, or knew at any time, of any dishonest or fraudulent acts committed by such **Employee** at any time; provided this exclusion does not apply to loss of any **Property** already in transit in the custody of such **Employee** or **Servicing Contractor** at the time the bond terminated, or to loss resulting directly from dishonest or fraudulent acts occurring prior to the time the bond terminated.

**JJ.** This bond does not cover loss of or damage to **Property** that belongs to an **Employee Benefit Plan**, except when covered under Insuring Agreement A.3.

**KK.** This bond does not cover loss resulting from the unauthorized online computer access to a customer account maintained by the Insured, through the use of fraudulently obtained customer login, identification, password, or authentication information, except: (i) where such information has been obtained directly from unauthorized fraudulent access to a secure file containing such information on a **Computer System**; or (ii) when covered under Insuring Agreement P.2.

**LL.** This bond does not cover damages resulting from any civil, criminal, or other legal proceeding in which the Insured is adjudicated to have engaged in racketeering activity, except when the Insured establishes that the act or acts giving rise to such damages were committed by an **Employee** under circumstances resulting directly

© 2016 The Travelers Indemnity Company.  All rights reserved.

in a loss to the Insured covered by Insuring Agreement A. For purposes of this exclusion, "racketeering activity" is defined in 18 U.S.C. § 1961 et seq.

**MM.** This bond does not cover any loss resulting directly or indirectly from a **Fraudulent Instruction**, except when covered under Insuring Agreement P.2.

**NN.** This bond does not cover loss or disclosure of, intangible property or confidential information, including trade secrets, confidential processing methods, formulas, patents, customer lists, computer programs, negatives, drawings, manuscripts, prints, and other records of a similar nature, unless such theft, disappearance, destruction or disclosure subsequently results in a direct loss that is covered under this bond.

**OO.** This bond does not cover expenses arising from a data security breach or incident, including forensic audit expenses, fines, penalties, expenses to comply with federal and state laws, payment card industry data security standards (if applicable) or expenses related to notifying affected individuals when the affected individual's personally identifiable customer, financial, or medical information was stolen, accessed, downloaded, shared, or misappropriated while in the Insured's care, custody, or control.

**PP.** This bond does not cover loss resulting directly or indirectly from the input of data or computer instructions into a **Computer System**, either on the premises of a customer of the Insured, or under the control of such a customer, by a customer or other person who had authorized access to the customer's authentication mechanism.

**QQ.** This bond does not cover loss resulting from the Insured's acceptance or reliance upon forged or altered documents, where the documents describe, identify, or value collateral that is later determined to have been fictitious or worthless at the time the Insured acquired, sold, delivered, or gave value, extended credit, or assumed liability on the faith of such forged or altered documents.

**RR.** This bond does not cover that portion of any claim involving the loss or use of **Virtual Currency** except where such claim is otherwise covered under Insuring Agreement F.

---

## VI. CONDITIONS

### A. DISCOVERY

This bond applies to loss discovered by the Insured during the **Bond Period**. Discovery occurs when an **Employee** of the risk management, compliance, internal audit, or legal departments, or any titled officer, branch manager, risk manager, director, or trustee of the Insured first becomes aware of facts that would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when an **Employee** of the risk management, compliance, internal audit, or legal departments, or any titled officer, branch manager, risk manager, director, or trustee of the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances that, if true, would constitute a loss under this bond.

### B. BOND PERIOD

**Bond Period** means the period of one year following the inception date of this bond or any annual anniversary thereof, or if the time between the inception or annual anniversary date and the expiration date of this bond is less than one year, then such lesser period.

### C. SINGLE LOSS

**Single Loss** means all covered loss, including court costs and attorney's fees incurred by the Company under General Agreement G., resulting from:

1. one act, or series of related acts, of burglary, robbery, or attempt thereat, in which no **Employee** is implicated;

2. one act, or series of related unintentional or negligent acts or omissions, on the part of any person (whether an **Employee** or not) resulting in damage to, or destruction or misplacement of, **Property**;

3. all acts or omissions other than those specified in 1. and 2. above, caused by a person (whether an **Employee** or not) or for which such person is implicated; or

4. any one casualty or event not specified in 1., 2. or 3. above.

### D.  SINGLE LOSS LIMIT OF INSURANCE

Subject to the Aggregate Limit of Insurance, the Company's liability for each **Single Loss** will not exceed the applicable Single Loss Limit of Insurance set forth in ITEM 5 of the Declarations. If a **Single Loss** is covered under more than one Insuring Agreement or Coverage, the Single Loss Limit of Insurance for each applicable  Insuring Agreement or Coverage will apply separately to such part of the loss covered under such Insuring  Agreement or Coverage, provided that the maximum payable for such **Single Loss** will not exceed the largest  applicable Single Loss Limit of Insurance, or the remaining Aggregate Limit of Insurance, whichever is less.

### E.  AGGREGATE LIMIT OF INSURANCE

The Company's total liability for all loss discovered during any one **Bond Period**, regardless of when paid, will not exceed the applicable Aggregate Limit of Insurance as set forth in ITEM 6 of the Declarations. Such Aggregate Limit of Insurance for a **Bond Period** will be reduced, and may be exhausted, by the amount of any payment  under any applicable Insuring Agreement for any loss discovered during that **Bond Period**. Upon exhaustion of  such Aggregate Limit of Insurance by any such payment:

1. the Company will have no further liability under any applicable Insuring Agreement for any loss discovered during that **Bond Period**, whether or not previously reported to the Company; and

2. upon notice by the Company to the Insured that such Aggregate Limit of Insurance has been exhausted, the Company will have no further obligation for payment or indemnification of court costs and attorney's fees as  set forth in General Agreement G., with respect to any loss, claim, or damage under any applicable Insuring Agreement, whether or not the Company has elected to defend any action thereunder.

The Aggregate Limits of Insurance for any **Bond Period** will be reinstated by the amount of any applicable cash  or ultimate cash equivalent recovery made by the Company and applied in accordance with Conditions J., K., and  L. The Aggregate Limits of Insurance for any **Bond Period** will not, however, be increased or reinstated by any remaining portion of any Aggregate Limits of Insurance from any previous **Bond Period**.

The amount of any cash or ultimate cash equivalent recovery as set forth in the preceding paragraph will be net of any and all expenses incurred by the Company in effecting such recovery, and will only serve to reinstate the applicable Aggregate Limit of Insurance for the **Bond Period** in which the loss was discovered.

In the event that loss of **Property** is settled by the Company through the use of a lost instrument bond, such loss will not reduce any Aggregate Limit of Insurance.

### F. DEDUCTIBLE

The Company is liable hereunder only for the amount by which any **Single Loss** exceeds the Single Loss Deductible Amount for the Insuring Agreement or Coverage applicable to such loss, subject to the applicable Single Loss Limit of Insurance and the applicable Aggregate Limit of Insurance.

If a **Single Loss** is covered under more than one Coverage within an Insuring Agreement, the Single Loss Deductible Amount set forth in ITEM 5 of the Declarations for each applicable Coverage will apply separately to the part of such **Single Loss** covered under such Coverage; provided the sum of such Single Loss Deductible Amounts for such **Single Loss** will not exceed the highest applicable Single Loss Deductible Amount for any such Coverage.

No Single Loss Deductible Amount will apply to that portion of any  **Single Loss** covered under Coverage A.3.

The Insured will, in the time and in the manner prescribed in this bond, give the Company notice of any loss of the kind covered by the terms of this bond that exceeds 25% of the Single Loss Deductible Amount applicable to such loss, whether the Company is liable therefor, and upon the request of the Company the Insured will file with it a brief statement giving the particulars concerning such loss.

## G.  NON-ACCUMULATION OF LIMITS

Neither the Aggregate Limit of Insurance nor the Single Loss Limit of Insurance is cumulative in amount from **Bond Period** to **Bond Period**, regardless of the number of years this bond is in force, the number of times this  bond may be renewed or replaced, or the number of premiums which are payable or paid.

## H.  NOTICE - PROOF OF LOSS - LEGAL PROCEEDINGS

It is a condition precedent to any liability of the Company that:

1. At the earliest practicable moment, not to exceed 90 days, after discovery of loss, the Insured will give the Company notice thereof.

2. Within six months after such discovery, the Insured will furnish to the Company proof of loss, duly sworn to, with full particulars.

3. Lost **Certificated Securities** listed in a proof of loss will be identified by certificate or bond numbers if such securities were issued therewith.

4. Legal proceedings for the recovery of any loss hereunder will not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Company or after the expiration of 24 months from the discovery of such loss, except that any action or proceeding to recover hereunder on account of any judgment against  the Insured in any suit mentioned in General Agreement G., or to recover attorney's fees paid in any such  suit, will be brought within 24 months from the date upon which the judgment and such suit will become final.

If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation will be deemed to be amended so as to equal the minimum period of limitation provided by such law.

This bond is for the use and benefit only of the Insured, and the Company will not be liable hereunder for loss sustained by anyone other than the Insured. No suit, action or legal proceedings will be brought hereunder by anyone other than the Insured.

## I. VALUATION

1. Money

Any loss of **Money**, or loss payable in **Money**, will be paid, at the option of the Insured, in the **Money** of the country in which the loss was sustained or in the United States dollar equivalent thereof determined at the  rate of exchange at the time of payment of such loss.

2. Securities

The Company will settle in kind its liability under this bond on account of a loss of any securities or, at the option of the Insured, will pay to the Insured the cost of replacing such securities, determined by their highest quoted market value at any time between the business day next preceding the discovery of the loss and the day on which the loss is settled. In case of a loss of subscription, conversion, or redemption privileges through the misplacement or loss of securities, the amount of such loss will be the value of such privileges  immediately preceding the expiration thereof. If such securities cannot be replaced or have no quoted market  value, or if such privileges have no quoted market value, their value will be determined by agreement or  arbitration.

If the applicable coverage of this bond is subject to a Single Loss Deductible Amount or is not sufficient in amount to indemnify the Insured in full for the loss of securities for which a claim is made hereunder, the liability of the Company under this bond is limited to the payment for, or the duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

© 2016 The Travelers Indemnity Company.  All rights reserved.                BlueRidge-00263

If, at the instance of the Company, the Insured or any customer of the Insured becomes principal upon any bonds, or gives any undertakings, required as a prerequisite to the reissuing or duplicating of any securities for the loss of which the Company is liable under this bond, the Company will become surety upon such bonds or undertakings without premium charge and will indemnify the Insured or such customer against any loss which the Insured or such customer may sustain by reason of having become principal upon any such bonds or having given any such undertakings. The amount of indemnity under this paragraph will not exceed the amount stated in ITEM 5 of the Declarations for the applicable Insuring Agreement.

3. Books of Account and Other Records

In case of loss of, or damage to, any books of account or other records used by the Insured in its business, the Company will be liable under this bond only if such books or records are actually reproduced, and then for not more than the cost of the blank books, blank pages or other materials plus the cost of labor for the actual transcription or copying of data that has been furnished by the Insured in order to reproduce such books and other records.

4. Property other than Money, Securities, Books of Account or Other Records

In case of loss of, or damage to, any **Property** other than **Money**, securities, books of account, or other records, except damage covered under Insuring Agreement B.2., B.3. or K., the Company will not be liable for more than the actual cash value of such **Property**. The Company may, at its election, pay the actual cash value of, repair, or replace such **Property**.

With respect to damage of property covered under Insuring Agreement B.2., B.3. or K., the Company will be liable for the full cost of repair or replacement of such property, without deduction for depreciation.

Disagreement between the Company and the Insured as to the cash value, replacement value, or as to the adequacy of repair or replacement will be resolved by arbitration.

## J. ASSIGNMENT

In the event of payment under this bond, the Insured will deliver, if so requested by the Company, an assignment of such of the Insured's rights, title, interest, and causes of action as it has against any person or entity to the extent of the loss payment.

## K. SUBROGATION

In the event of payment under this bond, the Company will be subrogated to all of the Insured's rights of recovery therefor against any person or entity to the extent of such payment. If the rules of the depository specified in Insuring Agreement B. provide that the Insured will be assessed for a portion of any judgment (or agreed settlement) taken by the Company based upon the assignment set forth in Condition J. and the Insured actually pays such assessment, the Company will reimburse the Insured for the amount of the assessment. However, such reimbursement will not exceed the amount of the loss payment by the Company.

## L. RECOVERIES

1. All recoveries, whether effected by the Company or by the Insured, will be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

   a. first, to the Insured to reimburse the Insured for loss sustained which would have been paid under this bond but for the fact that such loss is in excess of either the Single Loss Limit of Insurance or Aggregate Limit of Insurance, provided such loss does not include claim expense payments made by the Insured in excess of the Single Loss Limit of Insurance of Insuring Agreement H.;

   b. second, to the Company in satisfaction of amounts paid or to be paid to the Insured in settlement of the Insured's claim;

   c. third, to the Insured in satisfaction of any Single Loss Deductible Amount; and

    d. fourth, to the Insured in satisfaction of any loss not covered under this bond, including any claim expense payments made by the Insured in excess of the Single Loss Limit of Insurance of Insuring Agreement H.

2.  Recovery on account of loss of securities as set forth in Condition I.2., or recovery from reinsurance or indemnity of the Company, will not be deemed a recovery as used herein.

In determining the amount of any loss covered under this bond, all **Money** received by the Insured from any  source whatsoever in connection with any matter from which a loss has arisen, including payments and receipts  of principal, interest, dividends, commission, and the like, received prior to a loss settlement under this bond, will  be deducted from the amount actually paid out, advanced, withdrawn, taken, or otherwise lost or stolen. The  value of all property received by the Insured from any source whatever and whenever received, in connection with  any matter from which a loss has arisen, will be valued as of the date received and will likewise be deducted from  the claimed loss.

## M. COOPERATION

Upon the Company's request and at reasonable times and places designated by the Company the Insured will:

1.  submit to examination by the Company and subscribe to the same under oath;

2.  produce for the Company's examination all pertinent records; and

3.  cooperate with the Company in all matters pertaining to the loss, including recovery or subrogation matters.

The Insured will execute all papers and render assistance to secure to the Company the rights and causes of action provided for herein.

The Insured will do nothing after discovery of loss to prejudice such rights or causes of action, and must do everything reasonably necessary to secure those rights and causes of action.

## N. ANTI-BUNDLING

If any Insuring Agreement requires that an enumerated type of document be **Altered** or **Counterfeit**, or contain a signature that is a **Forgery** or obtained through trick, artifice, fraud, or false pretenses, the **Alteration**, **Counterfeit** or signature must be on or of the enumerated document itself, not on or of some other document  submitted with, accompanying or incorporated by reference into, the enumerated document.

## O. LIMIT OF INSURANCE UNDER THIS BOND AND PRIOR INSURANCE

With respect to any **Single Loss** which is recoverable or recovered in whole or in part under any other bonds or policies issued by the Company to the Insured, or to any predecessor in interest of the Insured and canceled or terminated or allowed to expire, and in which the period for discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Company under this bond and under such other bonds or policies will not exceed, in the aggregate, the amount carried hereunder on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss if the latter amount be the larger.

If the coverage of this bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an insurer other than the Company and canceled, terminated or allowed to expire, the Company, with respect to any loss sustained prior to such cancellation, termination, or expiration and discovered within the  period permitted under such other bond or policy for the discovery of loss thereunder, will be liable under this  bond only for that part of such loss covered by this bond as is in excess of the amount recoverable or recovered  on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy  notwithstanding.

## P. OTHER INSURANCE OR INDEMNITY

Coverage afforded hereunder applies only as excess over any valid and collectible insurance or indemnity  obtained by:

1. the Insured;

2. anyone other than the Insured on **Property** subject to Exclusion S.;

3. a **Transportation Company**;

4. another entity on whose premises the loss occurred or which employed the person causing the loss; or

5. the messenger conveying the **Property** involved.

## Q. COVERED PROPERTY

This bond applies to loss of  **Property**:

1. owned by the Insured;

2. held by the Insured in any capacity; or

3. for which the Insured was responsible prior to the occurrence of the loss.

This bond is for the sole use and benefit of the Insured.

## R. JOINT LOSS PAYEES

At the written request of the Insured, any payment in satisfaction of loss covered by this bond involving **Money** or other **Property** in which the Federal Home Loan Mortgage Corporation, Federal National Mortgage Association, Government National Mortgage Association, any quasi-governmental authority, or another legal entity has an interest, will be paid by an instrument issued to such organization and the Insured as joint loss payees. Any such payment will be subject to the following conditions and limitations:

1. The organizations specified in the preceding paragraph are not considered Insureds under this bond, nor do they otherwise have any rights or benefits under this bond.

2. Notwithstanding any payment made under the terms of this provision, the amount paid for any **Single Loss** will not exceed the applicable Single Loss Limit of Insurance as set forth in ITEM 5 of the Declarations.

## S. CANCELLATION OR TERMINATION

1. Cancellation

   a. This bond is canceled in its entirety immediately upon receipt by the Company of a written notice from the Insured of its desire to cancel this bond.

   b. This bond is canceled in its entirety 90 days after the receipt by the Insured of a written notice from the Company of its desire to cancel this bond.

   c. Coverage is canceled as to any **Employee**, or as to any partner, officer, or employee of any **Electronic Data Processor** 15 days after the receipt by the Insured of a written notice from the Company of its  desire to cancel coverage under this bond as to such person.

2. Termination

   a. This bond terminates in its entirety immediately upon occurrence of any of the following:

      (1) a **Change of Control** of the first named Insured;

      (2) exhaustion of the Aggregate Limit of Insurance set forth in ITEM 6 of the Declarations, if applicable;  or

      (3) the expiration date set forth in ITEM 2 of the Declarations.

b.  This bond terminates as to any Insured immediately upon occurrence of any of the following:

    (1)  a  **Change of Control** of such Insured;

    (2)  the surrender of such Insured's charter to any governmental authority; or

    (3)  the taking over of such Insured by a receiver or other liquidator or by any State or Federal official.

Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured that  is discovered after the effective date of such termination.

After termination or cancellation, no receiver, liquidator, or state or federal government, official, or agency acting in the capacity of supervisor, liquidator, receiver, regulator, or any other capacity, and no person or entity that has acquired, received, obtained, or been assigned any rights from or by any receiver,  liquidator, or state or federal government, official, or agency will have the right to make, pursue, or take  any other action related to any claim either under this bond or against the Company unless a proof of  loss, duly sworn to, with full particulars and complete documentation proving a covered loss has been  received by the Company prior to the termination or cancellation of this bond. Such proof of loss must  fully document all facts that prove the loss is a type of loss covered by this bond and fully document all  facts that prove the amount of such covered loss. No receiver, liquidator, state or federal government,  official, or agency, acquirer, obtainer, or assignee will be allowed to provide additional facts, documents  or information to supplement such proof of loss.

c.  Coverage terminates as to any **Employee**, or as to any partner, officer, or employee of any **Electronic Data Processor**:

    (1) as soon as an **Employee** of the risk management, compliance, internal audit, or legal department, or any titled officer, branch manager, risk manager, or any director or trustee of the Insured not in collusion with such person, learns of any dishonest or fraudulent employment related act; or

    (2) 60 days after an **Employee** of the risk management, compliance, internal audit or legal department,  or any titled officer, branch manager, risk manager, or any director or trustee of the Insured not in collusion with such person, learns of any dishonest or fraudulent non-employment related act which resulted in a loss of **Property** in excess of $25,000,

that was committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement A., against the Insured or any other person or entity, without prejudice to the loss of any **Property** then in transit in the custody of such person.

However, termination of coverage as to any **Employee** as set forth in c.(1) and c.(2) of the preceding paragraph, will not apply to any such person provided the Insured has received and retains an original letter signed by a prior insurer reinstating coverage for such individual for whom the Insured discovered  had committed a dishonest or fraudulent act prior to the effective date of this bond.

No termination under this Condition S.2. will be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.3.

d.  Coverage terminates as to any **Servicing Contractor**:

    (1) immediately upon discovery by an **Employee** of the risk management, compliance, internal audit, or legal department, or any titled officer, branch manager, or risk manager of the Insured of any  dishonest or fraudulent act on the part of such **Servicing Contractor**, unless within 5 days after  discovery of such act, the Insured gives the Company written notice thereof and in such event this  bond will be deemed canceled as to such **Servicing Contractor** at the expiration of 30 days after  such discovery of such act; or

    (2) at 12:01 A.M. standard time upon the effective date specified in a written notice served upon the Insured or sent by mail. Such date, if the notice is served, will be no less than 30 days after such

service, or if sent by mail, no less than 35 days after the date of mailing. The mailing by the Company of notice to the Insured at its principal office is sufficient proof of such written notice.

## T. DISCOVERY PERIOD

At any time prior to the cancellation or termination of this bond in its entirety, whether by the Insured or the Company, the Insured may give to the Company written notice that it desires under this bond an additional period of 12 months within which to discover loss sustained by the Insured prior to the effective date of such cancellation or termination and will pay an additional premium therefor.

Upon receipt of such notice from the Insured, the Company will give its written consent thereto; provided that such additional period of time terminates immediately:

1. on the effective date of any other insurance obtained by the Insured, its successor in business or any other party, replacing in whole or in part the insurance afforded by this bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

2. upon any takeover of the Insured's business by any state or federal official or agency, or by any receiver or liquidator acting or appointed for this purpose,

whichever occurs first, without the necessity of the Company giving notice of such termination. In the event that such additional period of time is terminated, as provided above, the Company will refund on a pro-rata basis, unearned premium.

The right to purchase such additional period for the discovery of loss may not be exercised by any state or federal official or agency, or by any receiver or liquidator, acting or appointed to take over the Insured's business for the operation or liquidation thereof, or for any other purpose.

The Company's total liability for any loss discovered during such additional period of time is part of, and not in addition to, the Single Loss Limit of Insurance or the Aggregate Limit of Insurance, whichever is less, of the **Bond Period** that terminates immediately preceding the effective date of such additional period.

## U. HEADINGS

The titles of the various paragraphs of this bond and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit, expand, or affect the provision to which they relate.

**THIS ENDORSEMENT CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

## UNAUTHORIZED SIGNATURE ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

**It is agreed that:**

1. The following is added to section **II. INSURING AGREEMENTS**, D. FORGERY OR ALTERATION:

    Loss resulting directly from the Insured, in good faith, accepting, paying or cashing any **Negotiable Instrument** or **Withdrawal Order** made or drawn on a customer's account, which bears an unauthorized signature or an unauthorized endorsement, provided that the Insured has on file the signatures of all persons authorized to sign or endorse such **Negotiable Instrument** or **Withdrawal Order**.

2. The following replaces section **VI. CONDITIONS**, N. ANTI-BUNDLING:

    **N. ANTI-BUNDLING**

    If any Insuring Agreement requires that an enumerated type of document be **Altered** or **Counterfeit**, or contain a signature or endorsement that is a **Forgery** or that is unauthorized, or obtained through trick, artifice, fraud or false pretenses, the **Alteration**, **Counterfeit**, signature, or endorsement must be on or of the enumerated document itself, not on or of some other document submitted with, accompanying or incorporated by reference into, the enumerated document.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned bond, except as expressly stated herein.  This endorsement is part of such bond and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Bond Number:  **106420159**

**THIS ENDORSEMENT CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

## CHECK KITING FRAUD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| INSURING AGREEMENT | SINGLE LOSS LIMIT OF INSURANCE | SINGLE LOSS DEDUCTIBLE AMOUNT |
|---|---|---|
| **CHECK KITING FRAUD** | **$250,000** | **$50,000** |

2. The following is added to ITEM 6 of the Declarations:

   **Aggregate Limit of Insurance –**
   **Check Kiting Fraud Insuring Agreement:**          **$250,000**

   The Aggregate Limit of Insurance for each **Bond Period** is defined in section **VI. CONDITIONS**, **E. AGGREGATE LIMIT OF INSURANCE** of this bond.

3. The following is added to section **II. INSURING AGREEMENTS**:

   **CHECK KITING FRAUD**

   Loss resulting from checks which are not finally paid because of a check kiting fraud against the Insured. Such fraud must be perpetrated by a depositor of the Insured establishing two or more accounts in different institutions, one of which is an Insured hereunder, and making constant systematic, back and forth deposits between such accounts utilizing checks of approximately the same amount to create the appearance of valid funds in the accounts, and involving Insured deposits drawn against uncollected funds deposited in another institution to create the appearance of valid funds in the account at the other institution provided:

   1. such deposits are made by the Insured's customer with the clear and obvious intent to defraud the Insured; and

   2. the Insured is, in fact, deceived by such deposits.

   It is a condition precedent to the Insured's right of recovery under the Check Kiting Fraud Insuring Agreement that the Insured stop the payment of any checks drawn on the depositor's account immediately upon discovery by the Insured of a check kiting fraud and to return the checks drawn against uncollected funds.

4. The following is added to section **VI. CONDITIONS**, **E. AGGREGATE LIMIT OF INSURANCE**:

   Solely with regard to the Check Kiting Fraud Insuring Agreement, the Company's total liability for all loss discovered during a **Bond Period**, regardless of when paid, will not exceed the **Aggregate Limit of Insurance – Check Kiting Fraud Insuring Agreement** set forth in ITEM 6 of the Declarations.  Any payment for loss under the Check Kiting Fraud Insuring Agreement will reduce, and may exhaust, such Aggregate Limit of Insurance.  This reduced Aggregate Limit of Insurance will then become the remaining Limit of Insurance.  Upon exhaustion of such Aggregate Limit of Insurance of this Insuring Agreement by such payments:

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Bond Number:  **106420159**

    a.    the Company will have no further liability under the Check Kiting Fraud Insuring Agreement for loss discovered during that **Bond Period**, whether or not previously reported to the Company; and

    b.    upon notice by the Company to the Insured that such Aggregate Limit of Insurance has been exhausted, the Company will have no further obligation for payment or indemnification of court costs and attorney fees as set forth in General Agreement G, whether or not the Company has elected to defend any action thereunder.

The Check Kiting Fraud Insuring Agreement Aggregate Limit of Insurance for each **Bond Period** is part of, and not in addition to, the bond Aggregate Limit of Insurance, if applicable. Even if the Aggregate Limit of Insurance for this bond is "Not Applicable", the Check Kiting Fraud Insuring Agreement Aggregate Limit of Insurance nevertheless applies.

5.    The following replaces section *V. EXCLUSIONS*, **E.** and **Q.**:

**E.**    This bond does not cover loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, a **Loan** or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or **Evidences of Debt**, whether such **Loan**, transaction or extension was procured in good faith or through trick, artifice, fraud, or false pretenses, except when covered under Insuring Agreement A., E., N. or the Check Kiting Fraud Insuring Agreement.

**Q.**    This bond does not cover loss resulting directly or indirectly from payments made to, or withdrawals from, a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to **Forgery** or any other fraud, except when covered under Insuring Agreement A. or the Check Kiting Fraud Insuring Agreement, however this exclusion does not apply to United States Government checks or drafts which are returned to the Insured by the United States Government for any reason after the funds for said checks or drafts have been remitted to the Insured or credited to the Insured's account.

6.    The following is added to section *VI. CONDITIONS*, **A. DISCOVERY**:

Discovery occurs when the Insured becomes aware of facts, which would cause a reasonable person to assume that a check kiting fraud has occurred or is occurring against the Insured, even though the exact amount or details of the check kiting fraud may not then be known, or upon notice to the Insured by a third party of a possible check kiting fraud, whichever occurs first.

7.    The following is added to section *VI. CONDITIONS*, **S. CANCELLATION OR TERMINATION**:

This bond terminates as to coverage under the Check Kiting Fraud Insuring Agreement as to any future act of a customer of the Insured immediately upon discovery by the Insured of any check kiting fraud by that customer, whether or not the Insured has sustained a loss.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned bond, except as expressly stated herein. This endorsement is part of such bond and incorporated therein.

BOND-7021 Rev. 01-16
© 2016 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00271

**THIS ENDORSEMENT CHANGES THE BOND. PLEASE READ IT CAREFULLY.**

## FRAUDULENT INSTRUCTIONS ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

---

**It is agreed that:**

1. The following replaces section **II. INSURING AGREEMENTS**, **P. COMPUTER SYSTEMS**, Coverage P.2.A. Fraudulent Instructions:

    A. Loss resulting directly from the Insured having, in good faith, transferred funds on deposit in a **Customer's** account as a result of a **Fraudulent Instruction** when the Insured, prior to transferring the funds, used its reasonable best efforts to verify the identity of the person transmitting the instruction; provided that if the instruction is purported to be from a **Customer** and does not involve the use of a **Security Token**, the Insured performed either an **Out of Band Verification** or a **Callback Verification** with respect to such instruction.

    Such **Fraudulent Instruction** received and, if applicable, **Out of Band Verification** or **Callback Verification** performed, must be either recorded, logged, or documented by the Insured. With respect to **Commercial Customers**, coverage only applies if the transmittal method by which the Insured received the **Fraudulent Instruction** was a transmittal method authorized by the **Commercial Customer** in the **Funds Transfer Agreement**.

2. The following replaces section **IV. DEFINITIONS**, **Out of Band Verification**:

    *Out-of-Band Verification* means a communication with a purported **Customer**, to verify the identity of the **Customer** and the authenticity of a funds transfer request, when such verification communication is made:

    1. in person while the purported **Customer** is physically present on the Insured's premises and presenting a government-issued photo identification, or

    2. using a communication method different than the communication method by which the purported **Customer** made the funds transfer request, provided such verification communication must be made using **Pre-Determined Customer Contact Information**.

3. The following is added to section **IV. DEFINITIONS**, **Fraudulent Instruction**:

    4. or transmitted electronically using a **Security Token**.

4. The following are added to section **IV. DEFINITIONS**:

    *Callback Verification* means a verbal conversation with the purported **Customer**, using a **Pre-Determined Telephone Number**, to verify the identity of the **Customer** and the authenticity of a funds transfer request.

    *Pre-Determined Telephone Number* means a telephone number that:

    a. was provided by the **Customer** when the **Customer** opened the account with the Insured;

    b. was provided in person by the **Customer** after the **Customer** opened the account with the Insured, while the **Customer** was physically present on the Insured's premises and presenting a government-issued photo identification;

    c. was provided in a **Funds Transfer Agreement**;

    d. replaced a telephone number previously provided for the **Customer's** account, provided that confirmation of the legitimacy of the change was achieved through verbal contact initiated by the Insured, with the **Customer** at a telephone number described in subpart a., b., or c. of this definition; or

---

| | |
|---|---|
| Issuing Company: | **Travelers Casualty and Surety Company of America** |
| Bond Number: | **106420159** |

BlueRidge-00272

e.  replaced a telephone number previously provided for the **Customer's** account and was received by the Insured at least 30 days prior to the receipt of the **Fraudulent Instruction**.

***Security Token*** means a security device or a software application issued to a **Customer** that generates a single-use digital code each time the **Customer** initiates a funds transfer request.

5.  The following replaces section **V. EXCLUSIONS**, **KK.**:

This bond does not cover loss resulting from the unauthorized **Network**, **Computer System**, or internet access to a **Customer** account maintained by the Insured, through the use of fraudulently obtained customer login, identification, password, or authentication information, except: (i) where such information has been obtained directly from unauthorized fraudulent access to a secure file containing such information on a **Computer System**; or (ii) when covered under Insuring Agreement P.2.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned bond, except as expressly stated herein. This endorsement is part of such bond and incorporated therein.

**THIS ENDORSEMENT CHANGES THE BOND. PLEASE READ IT CAREFULLY.**

## PLASTIC CARD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

**It is agreed that:**

1.　　The following is added to ITEM 5 of the Declarations:

| INSURING AGREEMENT | PER PLASTIC CARD LIMIT OF INSURANCE | PER PLASTIC CARD DEDUCTIBLE AMOUNT |
|---|---|---|
| **PLASTIC CARD** | $5,000 | $750 |
| **Plastic Card Aggregate Deductible Amount:** | | $30,000 |
| **Plastic Card Insuring Agreement Co-Insurance Percentage:** | | 0 % |

2.　　The following is added to ITEM 6 of the Declarations:

**Aggregate Limit of Insurance - Plastic Card Insuring Agreement:**　　　$250,000

**Aggregate Limit of Insurance - Per Plastic Card:**　　　$5,000

3.　　The following is added to section *II. INSURING AGREEMENTS*:

**PLASTIC CARD**

Loss resulting directly from any debit established against the Insured and arising from the unauthorized use of any lost or stolen **Plastic Card** or **Counterfeit Plastic Card** which was issued or purports to have been issued by the Insured and is used to:

1.　　gain access to any **Automated Teller Machine**;

2.　　obtain **Money**, traveler's checks, money orders, drafts or any similar written promise, order or direction to pay a sum certain in **Money** from the Insured on its premises or from any **Financial Institution** acting upon authorization received from the Insured; or

3.　　purchase or lease goods or services.

4.　　Solely with regard to the Plastic Card Insuring Agreement, the following are added to section *IV. DEFINITIONS*:

***Card Association*** means an association of **Financial Institutions** that allows its members to issue **Plastic Cards** under the brand or logo of the association.

***Chargeback*** means a formal process to charge the amount of the transaction back to the acquiring **Financial Institution** because the merchant has not fully complied with **Card Association** rules.

| | |
|---|---|
| Issuing Company: | **Travelers Casualty and Surety Company of America** |
| Bond Number: | **106420159** |

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00274

*Counterfeit Plastic Card* means a **Plastic Card** which:

1.    was not issued by the Insured, but bears an account number assigned to the Insured, if the Insured has such an account number on a validly issued card;

2.    bears a symbol or other identification customarily used by the Insured on its validly issued cards to indicate that such cards are those of the Insured, but was not authorized by the Insured to be printed or embossed; or

3.    has been validly issued by the Insured but has been altered.

*Discovery Date* means the earliest date that the Insured discovers or the **Plastic Card** processor first becomes aware:

1.    of an unauthorized use of a **Plastic Card**;

2.    that a **Plastic Card** was lost, altered or stolen; or

3.    that a **Counterfeited Plastic Card** was used.

All losses resulting from the use of a single **Plastic Card** will be considered to have the same **Discovery Date**.

*Issuer Authorization System* means the Insured's, or the Insured's third-party processor's, system that:

1.    maintains the cardholder authorization file or cardholder reference file; and

2.    responds to a merchant's request for a transaction authorization.

*Per Plastic Card Loss* has the meaning set forth in section *VI. CONDITIONS*, **C. PER PLASTIC CARD LOSS**.

*Plastic Card* means any credit, debit, charge, access, convenience, identification or other similar card that is encoded, embossed or printed with a customer's account number.

*Stand-in-limits* means the dollar thresholds below which a **Card Association** can respond to a merchant's request for a transaction authorization in the place of an **Issuer Authorization System**.

5.    The following replaces section *V. EXCLUSIONS*, **J.**, **M.** and **R.**:

**J.**    This bond does not cover loss involving any **Automated Teller Machine**, except when covered under Insuring Agreement A., K., P., or the Plastic Card Insuring Agreement.

**M.**    This bond does not cover loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification or other cards:

1.    in obtaining credit or funds;

2.    in gaining access to any **Automated Teller Machine**; or

3.    in gaining access to any point of sale terminal, customer-bank communication terminal, or similar electronic terminal of any electronic funds transfer system;

whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured, except when covered under Insuring Agreement A. or the Plastic Card Insuring Agreement.

**R.**    This bond does not cover loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreement A., D.1.a., (but only as respects **Negotiable Instruments** except **Evidences of Debt** or **Substitute Checks**), E., G., or the Plastic Card Insuring Agreement.

6.   The following is added to section **V. EXCLUSIONS**:

This bond does not cover under the Plastic Card Insuring Agreement, any loss resulting directly or indirectly from:

1.   the use of a **Plastic Card** to obtain **Money**, checks, traveler's checks, money orders, drafts or any similar written promise, order or direction to pay a sum certain in money from anyone other than:

   a.   the Insured,

   b.   a **Financial Institution** acting upon authorization received from the Insured; or

   c.   a **Card Association** or clearing house representing the Insured;

2.   any situation in which the Insured could, at the time of the transaction or later, legally **Chargeback,** or obtain reimbursement from:

   a.   its **Plastic Card** holder;

   b.   any person, firm or corporation agreeing to honor the Insured's **Plastic Card**; or

   c.   any other **Financial Institution**, **Card Association** or clearing house representing the Insured;

3.   any **Plastic Card** issued to a customer without a completed application to the Insured by such customer, other than the replacement of an initial **Plastic Card** previously issued by the Insured to such customer for which the Insured has a completed application on file;

4.   a loss of interest or that part of such loss due to a discount by any person, firm or corporation agreeing to honor the Insured's **Plastic Cards**;

5.   the extension of credit against or payment of, any **Negotiable Instrument**, share draft, or a cash advance;

6.   the use of one or more **Counterfeit Plastic Cards** unless such loss is in excess of the amount recovered or received by the Insured under any clause under which the Insured is to be reimbursed for loss sustained by the Insured on account of such **Counterfeit Plastic Card**;

7.   a processing system malfunction, error or omission in programming, or transactional error by the data processor;

8.   the application of a "hold harmless" clause given to a data processor by the Insured;

9.   any antitrust law violation, actual or alleged, including any such violation involving sharing of electronic funds transfer hardware or software systems or card programs;

10.   any violation, actual or alleged, of any federal or state electronic funds transfer laws;

11.   noncompliance with any statutory error resolution procedure;

12.   the exercise by consumers of any contractual or statutory right of reversibility;

13.   the unauthorized use of any unissued **Plastic Card** number where **Stand-In-Limits** are above the minimum dollar amounts set forth by the **Card Association**;

14.   a transaction in which the Insured failed to provide address verification after the request was made by the merchant;

15.   the use of a new, additional, renewal or replacement **Plastic Card** issued on an Insured's cardholder account unless a **Plastic Card** activation system is used.This exclusion does not apply to an additional **Plastic Card** when another **Plastic Card** exists with the same card number in use at the time of the request for an additional **Plastic Card**;

16.     the Insured's failure to comply with **Card Association** operating regulation timelines to pursue recovery for **Chargeback**;

17.     the Insured's failure to mitigate a loss by using a **Card Association** process to charge the amount of the transaction back to the acquiring **Financial Institution** due to merchant noncompliance with the **Card Association** operating regulations;

18.     a **Counterfeit Plastic Card** with a Visa ® or MasterCard ® logo.However, this Exclusion does not apply to a **Counterfeit Plastic Card** with a Visa ® or MasterCard ® logo provided:

   a.     the **Counterfeit Plastic Card** is encoded with CVV (Visa ®) or CVC (MasterCard ®) and is being validated for CVV or CVC;
   b.     the Insured's authorization response code is set to decline for CVV or CVC mismatch; and
   c.     the insured's authorization response code is set to decline for an expiration date mismatch;

19.     the Insured's failure to:

   a.     validate CVV2 (Visa ®), CVC2 (MasterCard ®) or CID (Discover ®) on any verification request from a merchant; or
   b.     decline a transaction when the CVV2, CVC2, or CID is not an exact match;

20.     the insured's failure, with regard to a **Plastic Card** transaction, to:

   a.     validate the exact **Plastic Card** expiration date; and
   b.     decline the transaction when the **Plastic Card** expiration date is not an exact match or is missing;

21.     any card not present transaction;

22.     any violation of a **Card Association** operating regulation;

23.     a **Plastic Card** with a VISA or MasterCard logo sent to a customer but not received by that customer. However, this exclusion does not apply to a **Plastic Card** subject to an activation program; or

24.     the Insured's inability to exercise a **Chargeback** due to the following:

   a.     the Insured was not a participant in the Address Verification Service at the time of the transaction, or

   b.     the Insured was not a participant in the applicable CVV2 (Visa ®) or CVC2 (MasterCard ®) program at the time of the transaction.

7.     Solely with regard to the Plastic Card Insuring Agreement, the following replaces section *VI. CONDITIONS*, **A. DISCOVERY**:

The Plastic Card Insuring Agreement applies to loss that has a **Discovery Date** within the **Bond Period**. Discovery occurs when an **Employee** of the risk management, compliance, internal audit, or legal departments, or any titled officer, branch manager, risk manager, director, or trustee of the Insured first becomes aware of facts that would cause a reasonable person to assume that a loss of a type covered under the Plastic Card Insuring Agreement has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when an **Employee** of the risk management, compliance, internal audit, or legal departments, or any titled officer, branch manager, risk manager, director, or trustee of the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances that, if true, would constitute a loss under the Plastic Card Insuring Agreement.

8.     Solely with regard to the Plastic Card Insuring Agreement, the following replaces section *VI. CONDITIONS*, **C. SINGLE LOSS**:

© 2017 The Travelers Indemnity Company. All rights reserved.

### C.    PER PLASTIC CARD LOSS

**Per Plastic Card Loss** means all covered loss arising from any one **Plastic Card** account number.

9.    Solely with regard to the Plastic Card Insuring Agreement, the following replaces section *VI. CONDITIONS*, **F. DEDUCTIBLE**:

The Company is liable under the Plastic Card Insuring Agreement only after the Plastic Card Aggregate Deductible Amount set forth in ITEM 5 of the Declarations has been exhausted. The Plastic Card Aggregate Deductible Amount is reduced or exhausted by any **Per Plastic Card Loss** which exceeds the Per Plastic Card Deductible Amount set forth in ITEM 5 of the Declarations.

After exhaustion of the Plastic Card Aggregate Deductible Amount, the Company is liable under the Plastic Card Insuring Agreement only for the amount by which any **Per Plastic Card Loss** exceeds the Per Plastic Card Deductible Amount.

10.    Solely with regard to the Plastic Card Insuring Agreement, the following replaces section *VI. CONDITIONS*, **D. SINGLE LOSS LIMIT OF INSURANCE**:

### D.    PER PLASTIC CARD LIMIT OF INSURANCE

Subject to the Plastic Card Insuring Agreement Aggregate Limit of Insurance and the Per Plastic Card Aggregate Limit of Insurance, the Company's liability for each **Per Plastic Card Loss** will not exceed the Per Plastic Card Limit of Insurance set forth in ITEM 5 of the Declarations.

If a co-insurance percentage is set forth in ITEM 5 of the Declarations, the Company will not be liable for such percentage of any **Per Plastic Card Loss**.

11.    Solely with regard to the Plastic Card Insuring Agreement, the following is added to section *VI. CONDITIONS*, **E. AGGREGATE LIMIT OF INSURANCE**:

### PLASTIC CARD INSURING AGREEMENT AGGREGATE LIMIT OF INSURANCE

Subject to the Aggregate Limit of Insurance of this bond, the Company's total liability for all losses under the Plastic Card Insuring Agreement with a **Discovery Date** during the **Bond Period**, regardless of when paid, will not exceed the Plastic Card Insuring Agreement Aggregate Limit of Insurance set forth in ITEM 6 of the Declarations. The Plastic Card Insuring Agreement Aggregate Limit of Insurance for the **Bond Period** will be reduced by the amount of any payment for any losses covered under the Plastic Card Insuring Agreement with a **Discovery Date** during that **Bond Period**.The reduced Plastic Card Insuring Agreement Aggregate Limit of Insurance then becomes the Plastic Card Insuring Agreement Aggregate Limit of Insurance.Upon exhaustion of the Plastic Card Insuring Agreement Aggregate Limit of Insurance by such payments:

1.    the Company will have no further liability under the Plastic Card Insuring Agreement for losses with a **Discovery Date** during the **Bond Period**, whether or not previously reported to the Company; and

2.    upon notice by the Company to the Insured that the Plastic Card Insuring Agreement Aggregate Limit of Insurance has been exhausted, the Company will have no further obligation for payment or indemnification of court costs and attorney fees as set forth in General Agreement G., whether or not the Company has elected to defend any actions thereunder with respect to the Plastic Card Insuring Agreement.

### PER PLASTIC CARD AGGREGATE LIMIT OF INSURANCE

Subject to the Plastic Card Insuring Agreement Aggregate Limit of Insurance, the Company's liability for all loss under the Plastic Card Insuring Agreement arising from any **Per Plastic Card Loss** is limited to the Per Plastic Card Aggregate Limit of Insurance set forth in ITEM 6 of the Declarations.

12.    Solely with regard to the Plastic Card Insuring Agreement, the following replaces Section *VI. CONDITIONS*, **H. NOTICE - PROOF OF LOSS – LEGAL PROCEEDINGS**:

© 2017 The Travelers Indemnity Company. All rights reserved.

1.    In the event of loss covered under the Plastic Card Insuring Agreement in excess of the Plastic Card Aggregate Deductible Amount or in excess of the Per Plastic Card Deductible Amount, after previously exhausting the Plastic Card Aggregate Deductible Amount, the Insured must furnish to the Company at the earliest practicable moment, not to exceed 60 days after (i) such exhaustion, or (ii) discovery of subsequent loss in excess of the Per Plastic Card Deductible Amount, proof and accounting of loss, duly sworn to, with full particulars including all documentation and information necessary to establish that such loss exceeds the Per Plastic Card Deductible Amount or the Plastic Card Aggregate Deductible Amount. This obligation ceases once the Aggregate Limit of Insurance is exhausted during any **Bond Period**.

2.    Legal proceedings for the recovery of any loss under the Plastic Card Insuring Agreement will not be brought prior to the expiration of 90 days after the original proof of loss is filed with the Company or after the expiration of 24 months from the **Discovery Date** of such loss, except that any action or proceeding to recover under the Plastic Card Insuring Agreement on account of any judgment against the Insured in any suit mentioned in General Agreement G., or to recover attorneys' fees paid in any such suit, must be brought within 24 months from the date upon which the judgment in such suit becomes final.

3.    If any limitation embodied in this section is prohibited by any law controlling the construction hereof, such limitation is deemed to be amended so as to equal the minimum period of limitation provided by such law.

4.    The Plastic Card Insuring Agreement is for the use and benefit only of the Insured named in the Declarations and the Company will not be liable under the Plastic Card Insuring Agreement for loss sustained by anyone other than the Insured.No suit, action or legal proceedings will be brought under the Plastic Card Insuring Agreement by anyone other than the Insured.

5.    The Insured will give the Company written notice as soon as practicable if any of the following events occur during the **Bond Period**:

    a.    An increase of 20% or more in the number of **Plastic Cards** in use from the beginning of the **Bond Period**, or

    b.    **Plastic Card** losses that exceed or have the potential to exceed 100% of the Plastic Card Aggregate Deductible amount in the **Bond Period**.

    If either of the above events occurs during the **Bond Period**, then the Company will be entitled to charge an additional premium and impose additional terms, conditions, and limitations of coverage at the end of the **Bond Period**.If the Insured declines to pay an additional premium or accept any of the additional terms, conditions, and limitations as provided by the Company, then this Plastic Card Insuring Agreement, will be deemed to have been cancelled by the Insured as of the end of the **Bond Period** in which such event has occurred.

13.    Solely with regard to the Plastic Card Insuring Agreement, the following replaces section *VI. CONDITIONS*, **K. SUBROGATION**:

In the event of payment under the Plastic Card Insuring Agreement, the Company will be subrogated to all of the Insured's rights of recovery therefor against any person or entity to the extent of such payment other than any person or entity agreeing to honor the **Plastic Cards** issued by the Insured, provided that such person or entity is not guilty of fraud or negligence.

14.    Solely with regard to the Plastic Card Insuring Agreement, the following replaces section *VI. CONDITIONS*, **L. RECOVERIES**, 1.a. and 1.c.:

    a. first, to the Insured to reimburse the Insured for loss sustained which would have been paid under the Plastic Card Insuring Agreement but for the fact that such loss is in excess of either the Plastic Card Limit of Insurance or Plastic Card Aggregate Limit of Insurance, provided however, such loss does not include claim expense payments made by the Insured in excess of the Single

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00279

Loss Limit of Insurance of Insuring Agreement H. will not be deemed excess for purposes of establishing order of priority;

   c.   third, to the Insured in satisfaction of any Plastic Card Aggregate Deductible Amount and any Plastic Card Single Loss Deductible Amount; and

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned bond, except as expressly stated herein. This endorsement is part of such bond and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00280

> **THIS ENDORSEMENT CHANGES THE BOND. PLEASE READ IT CAREFULLY.**

## AMENDATORY ENDORSEMENT FOR CERTAIN ERISA CONSIDERATIONS

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

**It is agreed that:**

1. The following replaces section **II. INSURING AGREEMENTS**, Coverage A. 3. ERISA:

   Direct loss of, or direct loss from damage to, **Property** that belongs to an **Employee Benefit Plan**, directly caused by acts of **Fraud or Dishonesty** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

2. The following are added to section **IV. DEFINITIONS**:

   *Fiduciary* means any **Employee**, while that person is **Handling Property** that belongs to an **Employee Benefit Plan**.

   **Fiduciary** does not mean any agent, broker, independent contractor, third party administrator, broker-dealer, registered representative, investment advisor, custodian, or other person or entity of the same general character.

   **Fraud or Dishonesty** has the meaning set forth in Title 29, Code of Federal Regulations, Section 2580.412-9.

   *Handled* or *Handling* mean "handle", "handled", "handles" or "handling" as these terms are set forth in Title 29, Code of Federal Regulations, Section 2580.412-6.

3. The following replaces section **IV. DEFINITIONS**, **Employee**, 8.:

   8. any natural person who is a director, trustee, or administrator of any **Employee Benefit Plan** or of its sponsor, while such person is engaged in **Handling Property** of any **Employee Benefit Plan**;

4. Solely with respect to Insuring Agreement A.3. ERISA, wherever "Insured" is used in section **IV. DEFINITIONS**, **Employee**, it is replaced with "**Employee Benefit Plan** or its sponsor".

5. The following replaces section **V. EXCLUSIONS**, **K.**:

   **K.** This bond does not cover loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any **Employee** in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreement A.2., A.3., D.1., E. or P.1.

6. The following replaces the first paragraph of section **VI. CONDITIONS**, **E. AGGREGATE LIMIT OF INSURANCE**:

   Except with respect to Insuring Agreement A.3., the Company's total liability for all loss discovered during any one **Bond Period**, regardless of when paid, will not exceed the applicable Aggregate Limit of Insurance as set forth in ITEM 6 of the Declarations. Such Aggregate Limit of Insurance for a **Bond Period** will be reduced, and may be exhausted, by the amount of any payment under any applicable Insuring Agreement for any loss discovered during that **Bond Period**. Upon exhaustion of such Aggregate Limit of Insurance by any such payment:

   1. the Company will have no further liability under any applicable Insuring Agreement for any loss discovered during that **Bond Period**, whether or not previously reported to the Company; and

   2. upon notice by the Company to the Insured that such Aggregate Limit of Insurance has been exhausted, the Company will have no further obligation for payment or indemnification of court costs and attorney's fees as set forth in General Agreement G., with respect to any loss, claim, or damage under any applicable Insuring Agreement, whether or not the Company has elected to defend any action thereunder.

| | |
|---|---|
| Issuing Company: | **Travelers Casualty and Surety Company of America** |
| Bond Number: | **106420159** |

7. The following replace the second paragraph of section **VI. CONDITIONS**, **T. DISCOVERY PERIOD**:

Upon receipt of such notice from the Insured, the Company will give its written consent thereto; provided that, except with respect to Insuring Agreement A.3., such additional period of time terminates immediately:

1. on the effective date of any other insurance obtained by the Insured, its successor in business or any other party, replacing in whole or in part the insurance afforded by this bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

2. upon any takeover of the Insured's business by any state or federal official or agency, or by any receiver or liquidator acting or appointed for this purpose,

whichever occurs first, without the necessity of the Company giving notice of such termination. In the event that such additional period of time is terminated, as provided above, the Company will refund on a pro-rata basis, unearned premium.

With respect to Insuring Agreement A.3., such additional period of time terminates immediately on the effective date of any other insurance obtained by the Insured, its successor in business or any other party that offers the same coverage afforded by this bond in an amount no less than the minimum amount required under Section 412 of ERISA and that provides coverage for loss sustained prior to its effective date. The Company is not required to give notice of the termination of the Discovery Period. In the event that such additional period of time is terminated, as provided above, the Company will refund on a pro-rata basis, any unearned premium.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned bond, except as expressly stated herein. This endorsement is part of such bond and incorporated therein.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### GLOBAL COVERAGE COMPLIANCE ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

---

**It is agreed that:**

1.    The following is added to section **IV. DEFINITIONS**:

*Financial Interest* means the first named Insured's insurable interest in an Insured that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the first named Insured's:

1.    ownership of the majority of the outstanding securities or voting rights of the Insured representing the present right to elect, appoint, or exercise a majority control over such Insured's board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

2.    indemnification of, or representation that it has an obligation to indemnify, the Insured for loss sustained by such Insured; or

3.    election or obligation to obtain insurance for such Insured.

2.    The following is added to section **VI. CONDITIONS**, **M. COOPERATION**:

In the event the Company indemnifies the first named Insured on account of its **Financial Interest** in an Insured, as a condition precedent to exercising rights under this bond, the first named Insured will cause such Insured to comply with the conditions of this bond.

3.    The following are added to section **VI. CONDITIONS**:

**TERRITORY COVERED**

1.    This bond does not apply to:

a.    loss sustained by an Insured domiciled; or

b.    loss of or damage to property located,

in any country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

2.    In the event an Insured sustains loss referenced in a. above to which this bond would have applied, the Company will reimburse the first named Insured for its loss, on account of its **Financial Interest** in such Insured.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106420159**

BOND-19074 Ed. 03-15                                    Page 1 of 2
© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00283

**SANCTIONS**

This bond will provide coverage, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition or restriction.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

BlueRidge-00284

---

**THIS ENDORSEMENT CHANGES THE BOND. PLEASE READ IT CAREFULLY.**

---

## SOCIAL ENGINEERING FRAUD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

---

**It is agreed that:**

1.  The following is added to ITEM 5. of the DECLARATIONS:

| Insuring Agreement | Single Loss Limit of Insurance | Single Loss Deductible Amount |
|---|---|---|
| **Social Engineering Fraud** | $1,000,000 | $ 10,000 |

2.  The following is added to ITEM 6. of the DECLARATIONS:

    **Aggregate Limit of Insurance –**
    **Social Engineering Fraud Insuring Agreement**                    $1,000,000

3.  The following **INSURING AGREEMENT** is added to section **II. INSURING AGREEMENTS**:

    **SOCIAL ENGINEERING FRAUD**

    Loss resulting directly from the Insured having in good faith transferred funds from its own account as a result of **Social Engineering Fraud**, provided that the Insured performed a **Transfer Verification** prior to transferring such funds. Such **Transfer Verification** must be recorded, logged, or otherwise documented by the **Insured**.

4.  Solely with respect to the Social Engineering Fraud Insuring Agreement, part 3 of section **IV. DEFINITIONS**, **Employee** is deleted.

5.  Solely with respect to the Social Engineering Fraud Insuring Agreement, the following replaces the last paragraph of **IV. DEFINITIONS**, **Employee**:

    **Employee** does not mean any agent, broker, factor, commission merchant, consignee, independent contractor,  attorney retained by the  Insured or any employee of such attorney, or representative or other person of the same general character not specified above.

6.  The following are added to section **IV. DEFINITIONS**:

    **Client** means an entity or natural person for which the Insured performs services as specified in a written agreement, but only while the written agreement is in effect.

    ***Social Engineering Fraud*** means the intentional misleading of an **Employee** through the use of an electronic, telegraphic, cable, teletype, telephone, or written instruction received by such **Employee** that:

    1.    purports to be from:

          a.    a **Vendor**;

          b.    a **Client**; or

---

Issuing Company:    Travelers Casualty and Surety Company of America
Bond Number:    106420159

---

© 2016 The Travelers Indemnity Company. All rights reserved.

      c.       an **Employee**,

      but was in fact transmitted by someone other than such **Vendor**, **Client**, or **Employee**, and without the knowledge or consent of such **Vendor**, **Client**, or **Employee**;

  2.     directs the **Employee** to transfer, pay, or deliver funds, or to change the method, destination or account for payments to such **Vendor**, **Client**, or **Employee**;

  3.     contains a misrepresentation of a material fact; and

  4.     is reasonably relied upon by the **Employee**, believing the material fact to be true.

*Transfer Verification* means a verbal conversation with the purported **Vendor**, **Client**, or **Employee**, using a **Verification Method**, to verify the identity of the **Vendor**, **Client**, or **Employee** and the authenticity of a funds transfer request or a request to change the method, destination or account for future payments.

*Vendor* means an entity or natural person that has provided goods or services to the Insured under a genuine, pre-existing written agreement.

*Verification Method* means:

  1.     with respect to a **Vendor** or **Client**, calling a telephone number that:

      a.       was provided by the **Vendor** or **Client** when the written agreement was first established with the Insured;

      b.       replaced a telephone number previously provided by the **Vendor** or **Client**, provided that confirmation of the legitimacy of the change was achieved through separate verbal contact, initiated by the Insured, with the **Vendor** or **Client** at the previously provided telephone number,

      c.       replaced a telephone number previously provided by the **Vendor** or **Client** and was received by the Insured at least 30 days prior to the occurrence of the **Social Engineering Fraud**, or

      d.       was provided in person by the **Vendor** or **Client** while the **Vendor** or **Client** was physically present on the Insured's premises;

  2.     with respect to an **Employee**, calling a telephone number obtained on a published or electronic company directory maintained by the Insured, or having an in-person conversation with the **Employee**.

7.    The following is added to section **VI. CONDITIONS, E. AGGREGATE LIMIT OF INSURANCE**:

Aggregate Limit of Insurance – Social Engineering Fraud Insuring Agreement

The Company's total liability under the Social Engineering Fraud Insuring Agreement for all loss discovered during any one **Bond Period**, regardless of when paid, will not exceed the Aggregate Limit of Insurance - Social Engineering Fraud Insuring Agreement as set forth in ITEM 6 of the Declarations. Such Aggregate Limit of Insurance for a **Bond Period** will be reduced, and may be exhausted, by the amount of any payment under the Social Engineering Fraud Insuring Agreement for any loss discovered during that **Bond Period**. The reduced Aggregate Limit of Insurance will then become the Aggregate Limit of Insurance – Social Engineering Fraud Insuring Agreement. Upon exhaustion of such Aggregate Limit of Insurance by any such payment:

a.    the Company will have no further liability under the Social Engineering Fraud Insuring Agreement for any loss discovered during that **Bond Period**, whether or not previously reported to the Company; and

b.      upon notice by the Company to the Insured that such Aggregate Limit of Insurance has been exhausted, the Company will have no further obligation for payment or indemnification of court costs and attorney's fees as set forth in General Agreement G., with respect to any loss, claim or damage under the Social Engineering Fraud Insuring Agreement, whether or not the Company has elected to defend any action thereunder.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

## VIRGINIA CHANGES ENDORSEMENT

This endorsement changes the following:
**Financial Institution Bond with Extended Coverages**

**It is agreed that:**

1.     The following replaces the first paragraph of section *VI. CONDITIONS*, **I. VALUATION**, 2. Securities:

The Company will settle in kind its liability under this bond on account of a loss of any securities or, at the option of the Insured, will pay to the Insured the cost of replacing such securities, determined by their highest quoted market value at any time between the business day next preceding the discovery of the loss and the day on which the loss is settled.  In case of a loss of subscription, conversion or redemption privileges through the misplacement or loss of securities, the amount of such loss will be the value of such privileges immediately preceding the expiration thereof.  If such securities cannot be replaced or have no quoted market value, or if such privileges have no quoted market value, their value may be determined by agreement or voluntary arbitration.

2.     The following replaces the final paragraph of section *VI. CONDITIONS*, **I. VALUATION**, 4. Property other than Money, Securities, Books of Account, or Other Records:

Disagreement between the Company and the Insured as to the cash value, replacement value or as to the adequacy of repair or replacement may be resolved by agreement or voluntary arbitration.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned bond, except as expressly stated herein. This endorsement is part of such bond and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Bond Number:  **106420159**

BOND-4011 Ed. 01-12                                                                                                    Page 1 of 1
© 2012 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00288

**THIS ENDORSEMENT CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

## VIRGINIA CANCELLATION OR TERMINATION ENDORSEMENT

This endorsement changes the following:

**Financial Institution Bond with Extended Coverages**

---

**It is agreed that:**

1.	The following replaces section *VI. CONDITIONS*, **S. CANCELLATION OR TERMINATION**, 1. Cancellation, b.:

	b.	This bond is canceled in its entirety:

		(1)	15 days after the receipt by the Insured of a written notice from the Company of its desire to cancel this bond due to non-payment of premium by the Insured; or

		(2)	90 days after the receipt by the Insured of a written notice from the Company of its desire to cancel this bond for any reason other than non-payment of premium.

		Notice provided for in paragraph (1) and (2) above will be sent by certified or registered mail to the Insured's mailing address last known to the Company. A post office certificate of mailing or certified mail receipt will be sufficient proof of mailing such notice. If this bond or an Insuring Agreement is cancelled, the Company will send the Insured any premium refund due, calculated on a pro rata basis. The cancellation will be effective even if the Company has not made or offered a refund, and the Company will have the right to the premium amount for the period of time during which this bond was in effect.

2.	The following replaces section *VI. CONDITIONS*, **S. CANCELLATION OR TERMINATION**, 2. Termination, a.(3):

		(3)	45 days after receipt by the Insured of a written notice from the Company of the Company's desire not to renew this bond, or at the Expiration Date set forth in ITEM 2 of the Declarations, provided 45 days notice has been given to the Insured prior to such date. Such notice will be given at least 45 days before any annual anniversary date of the bond in the event the bond has been issued for a term of longer than one year, and will include the reason for such non-renewal.  Notice of non-renewal will be sent to the Insured by certified or registered mail to the Insured's mailing address last known to the Company. A post office certificate of mailing or certified mail receipt will be sufficient proof of mailing of notice. The Company need not mail notice of non-renewal if the Company has manifested in good faith a willingness to renew.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned bond, except as expressly stated herein.  This endorsement is part of such bond and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Bond Number: **106420159**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## VIRGINIA CANCELLATION AND NONRENEWAL ENDORSEMENT

This endorsement modifies insurance provided under the following when written as part of a package policy containing liability coverage and supersedes the cancellation and nonrenewal provisions contained in any amendatory endorsements of a coverage part (whether a policy or bond) included in the policy to which this endorsement is attached.  The term "policy" as used in this endorsement refers, collectively, to all coverage parts that have been purchased and included with this Policy Number.

**Directors, Officers, and Organization Liability Coverage**
**Private Company Directors and Officers Liability**
**Non-Profit Organization Directors and Officers Liability**
**Private Partnership Liability**
**Employment Practices Liability**
**Fiduciary Liability**
**Miscellaneous Professional Liability**
**Crime**
**Kidnap and Ransom**
**Identity Fraud Expense Reimbursement**
**Health Care Organization Directors, Officers and Trustees Liability**
**Health Care Organization Employment Practices Liability**
**Managed Care Errors & Omissions Liability Plus+ Policy**
**CyberRisk**
**Community Association Management Liability Coverage**
**Credit Union Bond with Extended Coverages**
**Financial Institution Bond with Extended Coverages**
**Insurance Company Professional Liability Coverage**
**Insurance Company Bond with Extended Coverages**

**It is agreed that:**

If the associated coverage part has been purchased as part of this policy, the following replaces, as applicable, section **V. CONDITIONS, P. TERMINATION OF POLICY** of the Directors, Officers, and Organization Liability Coverage; section **III. CONDITIONS, Q. CANCELLATION** of the Private Company Directors and Officers Liability, Non-Profit Organization Directors and Officers Liability, Private Partnership Liability, Employment Practices Liability, Fiduciary Liability, and Miscellaneous Professional Liability, Health Care Organization Directors, Officers and Trustees Liability, Health Care Organization Employment Practices Liability, Managed Care Errors & Omissions Liability Plus+ Policy; section **V. CONDITIONS, D. CANCELLATION OR TERMINATION** , 1. and 2. of Crime; section **V. CONDITIONS, H. CANCELLATION** of Kidnap and Ransom;  **IV. CONDITIONS, J. CANCELLATION**  of Identify Fraud Expense Reimbursement;  **IV. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS, I. CANCELLATION OR TERMINATION, 1. Cancellation** of CyberRisk; section **V. CONDITIONS, S. CANCELLATION AND NONRENEWAL** of Community Association Management Liability Coverage; section **VI. CONDITIONS, S. CANCELLATION OR TERMINATION** , 1. Cancellation of Credit Union Bond with Extended Coverages; section  **VI. CONDITIONS, S. CANCELLATION OR TERMINATION** , 1. Cancellation of Financial Institution Bond with Extended Coverages; section  **N. TERMINATION OF POLICY** of the Insurance Company Professional Liability Coverage; and section **S. CANCELLATION OR TERMINATION** of the Insurance Company Bond With Extended Coverages:

**CANCELLATION**

The Company may cancel this policy by mailing or delivering written notice of cancellation to the  **Named Insured** or **Insurance Representative** stating the reason for cancellation:

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106420159

© 2014 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00290

     a.  at least **twenty 20** days (number of days must equal or exceed 20 days) before the effective date of cancellation when cancellation is for non-payment of premium; or

     b.  at least **forty-five 45** days (number of days must equal or exceed 45 days) before the effective date of cancellation for any reason other than non-payment of premium.

The Company shall have the right to the premium amount for the portion of the **Policy Period** during which this policy was in effect.

Subject to any applicable CHANGE OF CONTROL provisions or the occurrence of any change of control events as described in any applicable CHANGE OF CONTROL provisions, the **Named Insured** or **Insurance Representative** may cancel any coverage by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. Notwithstanding the preceding, with respect to Crime, if applicable, the **Insured** may cancel:

    a. the **Crime Policy** in its entirety;
    b.  an Insuring Agreement; or
    c.  coverage for any **Insured**;

by mailing or delivering to the Company advance written notice of cancellation.

Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**NONRENEWAL**

The Company will not be required to renew this policy upon its expiration.  If the Company elects not to renew, it will provide to the **Named Insured** or **Insurance Representative** written notice to that effect **thirty 30** days (number of days must equal or exceed 30 days) before the Expiration Date set forth in ITEM 2 of the Declarations if we are nonrenewing for nonpayment of premium, or **forty-five 45** days (number of days must equal or exceed 45 days) before such date if we are nonrenewing for any other reason.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

© 2014 The Travelers Indemnity Company.  All rights reserved.

BlueRidge-00291